**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WALTER EDWARD LEMM, JR., Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| NEW YORK COMMUNITY BANCORP, INC., THOMAS R. CANGEMI, and JOHN J. PINTO, | |
| Defendants. | |

Plaintiff Walter Edward Lemm, Jr. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by New York Community Bancorp, Inc., ("NYCB" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by NYCB; and (c) review of other publicly available information concerning NYCB.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired NYCB securities between March 1, 2023 and January 30, 2024, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      NYCB is a large commercial-real estate lender in the New York City market area, where it specializes in rent-regulated, non-luxury apartment buildings. NYCB is engaged in several national businesses, including multi-family lending, mortgage originations and servicing, and warehouse lending. The Company's specialty finance loans and leases are generally made to large corporate obligors that participate in stable industries nationwide, and its warehouse loans are made to mortgage lenders across the country.

3.      On March 20, 2023, the Company's entered into a Purchase and Assumption Agreement to acquire certain assets and assume certain liabilities of Signature Bridge Bank, N.A. ("Signature").

4.    On January 31, 2024, before the market opened, NYCB announced its fiscal fourth quarter 2023 financial results. The Company reported a fourth quarter net loss of $252 million due to "a $552 million provision for loan losses," which was "primarily attributable to higher net charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio. Additionally, the Company disclosed that it would cut its quarterly dividend to $0.05 per common share. The Company further explained that these actions were "necessary enhancements" after NYCB "crossed th[e] important threshold [of becoming a $100 billion bank] sooner than anticipated as a result of the Signature transaction." Crossing this $100 billion threshold subjected NYCB to enhanced banking standards and requirements.

5.    On this news, NYCB's stock price fell $3.90, or 37.57%, to close at $6.47 per share on January 31, 2024, on unusually heavy trading volume.

6.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (2) that, as a result, NYCB was reasonably likely to incur higher loan losses; (3) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (4) that the Company's financial results would be adversely affected; (5) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are in this District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff Walter Edward Lemm, Jr., as set forth in the accompanying certification, incorporated by reference herein, purchased NYCB securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Defendant NYCB is incorporated under the laws of Delaware with its principal executive offices located in Hicksville, New York. NYCB's common stock trades on the New York Stock Exchange under the symbol "NYCB."

14.     Defendant Thomas R. Cangemi ("Cangemi") was the Company's Chief Executive Officer ("CEO") at all relevant times.

15.     Defendant John J. Pinto ("Pinto") was the Company's Chief Financial Officer ("CFO") at all relevant times.

16.     Defendants Cangemi and Pinto (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     NYCB is a large commercial-real estate lender in the New York City market area, where it specializes in rent-regulated, non-luxury apartment buildings. NYCB is engaged in several national businesses, including multi-family lending, mortgage originations and servicing, and warehouse lending. The Company's specialty finance loans and leases are generally made to

large corporate obligors that participate in stable industries nationwide, and its warehouse loans are made to mortgage lenders across the country.

18.    On December 1, 2022, the Company completed the acquisition of Flagstar Bancorp, Inc., which became a wholly owned subsidiary called Flagstar Bank, N.A. ("Flagstar").

**Materially False and Misleading**

**<u>Statements Issued During the Class Period</u>**

19.    The Class Period begins on March 1, 2023. On that day, the Company submitted its Annual Report for the fiscal year ended December 31, 2022 on a Form 10-K (the "2022 10-K") which stated in relevant part:[1]

**Asset Quality**

***Asset quality remained strong during 2022 as increases in NPAs were substantially due to changes in asset mix related to the Flagstar acquisition*** and centered on non-performing one-to-four family residential and home equity loans. Total NPAs at December 31, 2022 were $153 million compared to $41 million at December 31, 2021, primarily driven by NPLs and assets acquired in the Flagstar acquisition. At December 31, 2022, NPAs to total assets equaled 0.17 percent and NPLs to total loans were 0.20 percent, compared to 0.07 percent for both metrics at December 31, 2021.

*      *      *

***At December 31, 2022, total assets were $90.1 billion***, up $30.6 billion or 51 percent compared to December 31, 2021. ***The growth compared the prior period was primarily due to the Flagstar acquisition which added $25.8 billion of assets***, net of PAA, while the remaining growth was driven by growth in our lending portfolios.

*      *      *

**<u>Provision for Credit Losses</u>**

For the twelve months ended December 31, 2022, the provision for credit losses totaled $133 million compared to $3 million for the twelve months ended December 31, 2021. ***The fourth-quarter and full-year provision for credit losses was***

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

*impacted by the provision for credit losses related to the initial ACL measurement of non-PCD Flagstar acquired loans totaling $117 million*.

20.     The 2022 10-K further stated that the Company's "allowance for credit losses ***might***

***not be sufficient*** to cover our actual losses." Specifically, the Company stated, in relevant part:

> ***Our allowance for credit losses might not be sufficient to cover our actual losses, which would adversely impact our financial condition and results of operations.***
>
> In addition to mitigating credit risk through our underwriting processes, we attempt to mitigate such risk through the establishment of an allowance for credit losses. The process of determining whether or not the allowance is sufficient to cover potential credit losses is based on the current expected credit loss model or CECL. This methodology is described in detail under "Critical Accounting Estimates" in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report. ***CECL may result in greater volatility in the level of the ACL, depending on various assumptions and factors used in this model. If the judgments and assumptions we make with regard to the allowance are incorrect, our allowance for losses on such loans might not be sufficient, and an additional provision for credit losses might need to be made.*** Depending on the amount of such loan loss provisions, the adverse impact on our earnings could be material. In addition, growth in our loan portfolio may require us to increase the allowance for credit losses on such loans by making additional provisions, which would reduce our net income. Furthermore, bank regulators have the authority to require us to make provisions for credit losses or otherwise recognize loan charge-offs following their periodic review of our loan portfolio, our underwriting procedures, and our allowance for losses on such loans. Any increase in the loan loss allowance or in loan charge-offs as required by such regulatory authorities could have a material adverse effect on our financial condition and results of operations.
>
> \*       \*       \*
>
> ***Partially reflecting the net recoveries noted above, and the provision of $133 million for the allowance for loan losses, the allowance for credit losses increased $194 million, equaling $393 million at December 31, 2022*** from $199 million at December 31, 2021. ***The majority of the increase is related to the initial provision for credit losses of $117 million and the adjustment for PCD loans acquired in the Flagstar acquisition.*** The allowance for credit losses on loans and leases represented 278.87 percent of non-performing loans at December 31, 2022, as compared to 611.79 percent at the prior year-end.
>
> ***Based upon all relevant and available information at the end of this December, management believes that the allowance for losses on loans was appropriate at that date***.

(First emphasis in original.)

21. On March 20, 2023, the Company announced that its subsidiary, Flagstar Bank, N.A., acquired certain assets and assumed certain liabilities of Signature Bridge Bank in a press release that stated, in relevant part:

> The Bank acquired only certain financially and strategically complementary parts of Signature that are intended to enhance our future growth. Under terms of the Purchase and Assumption Agreement (the "Agreement") with the FDIC, the Bank:
>
> - Purchased assets of approximately $38 billion, including cash totaling approximately $25 billion and approximately $13 billion in loans. Included in the $25 billion of cash is $2.7 billion arising from a discounted bid to net asset value.
>
> - Assumed liabilities approximating $36 billion, including deposits of approximately $34 billion and other liabilities of approximately $2 billion.
>
> - The Company is working on an agreement to sub-service the legacy Signature multi-family, commercial real estate ("CRE"), and other loans it did not acquire.
>
> - Also included in the transaction is Signature's wealth-management and broker-dealer business.
>
> \*      \*      \*
>
> Mr. Cangemi continued, "This transaction continues our transformation from a predominantly multi-family lender to a diversified full-service commercial bank. It builds upon and accelerates the transformation set in motion by the merger of New York Community and Flagstar, and we believe the financial metrics are extremely attractive. The deal is expected to significantly strengthen our deposit base, lower the loan-to-deposit ratio, provide the opportunity to pay down a substantial amount of our wholesale funding, and further diversify our loan portfolio away from CRE loans and more toward commercial loans. ***Financially, the deal is expected to be significantly accretive to both earnings per share and to tangible book value per share.*** The net interest margin expands due to lower funding costs, the additional deposits reduce the loan-to-deposit ratio to less than 90%, improves our profitability ratios, adds liquidity, and we maintain strong pro-forma capital ratios."
>
> Further, he added, "Both the Company and the Bank were well positioned prior to the recent market turmoil, with strong capital, a stable retail deposit franchise, and ample liquidity. ***Moreover, our asset quality metrics remain solid, as they have over multiple business cycles.*** After this transaction, we will be even better positioned to deal with any residual market issues, including by now operating with

a significantly lower loan-to-deposit ratio. Overall, we are happy that our conservative business model and balance sheet put us in a position to quickly consummate this important transaction."

22.     On April 28, 2023, the Company announced its first quarter 2023 financial results

in a press release with stated in relevant part:

At March 31, 2023 **total assets were $123.8 billion** compared to $90.1 billion at December 31, 2022 and $61.0 billion at March 31, 2022.

*        *        *

Asset Quality:

– **Our asset quality metrics and trends remain strong**.

– Non-performing assets ("NPAs") were $161 million at March 31, 2023 or 0.13% of total assets.

– Non-performing loans ("NPLs") were $148 million at March 31, 2023 or 0.18% of total loans.

– **The allowance for credit losses totaled $550 million at March 31, 2023 or 370.38% of non-performing loans and 0.67% of total loans**.

– **Net charge-offs were zero during first quarter 2023 compared to $2 million during first quarter 2022 and $1 million during fourth quarter 2022**.

*        *        *

In addition to the bargain purchase gain, first quarter 2023 GAAP results were impacted by the following items:

• Merger-related and restructuring expenses of $67 million, comprised of $40 million for the Flagstar acquisition and $27 million for the Signature transaction;

• **An initial provision for credit losses totaling $132 million for the loans acquired from Signature**; and

• A 48% increase in average diluted common shares outstanding compared to the year-ago first quarter.

*        *        *

"While we have closed two acquisitions over the past four months, we have remained focused on our fundamentals including asset quality. **Our asset quality metrics remain strong with total non-performing assets increasing only slightly**

> *compared to year-end and net charge-offs remaining at near zero.  We continue to be laser focused on credit quality across all lending verticals. . . .*"

23.     On May 10, 2023, the Company submitted its quarterly report for the period ended March 31, 2023 on a Form 10-Q filed with the SEC, which affirmed the previously reported financial results and stated:

> *Historically, our level of net charge-offs has been relatively low in downward credit cycles, even when the volume of non-performing loans has increased.* For the three months ended March 31, 2023, our net charge-offs were zero as compared to net charge-offs of $2 million over the same period in 2022.
>
> *The allowance for credit losses increased $157 million, equaling $550 million at March 31, 2023 from $393 million at December 31, 2022.* The majority of the increase was related to the initial provision for credit losses of $132 million for the acquired loans in the Signature Transaction and an $18 million provision for loan losses primarily related to higher loan volume. The allowance for credit losses on loans and leases represented 341 percent of non-performing loans at March 31, 2023, as compared to 279 percent at the prior year-end.
>
> *Based upon all relevant and available information at March 31, 2023, management believes that the allowance for losses on loans was appropriate at that date.*

24.     On July 27, 2023, the Company announced its second quarter 2023 financial results in a press release which stated in relevant part:

> At June 30, 2023 *total assets were $118.8 billion* compared to $123.7 billion at March 31, 2023 and $90.1 billion at December 31, 2022.
>
> \*     \*     \*
>
> Asset Quality:
>
> –     Non-performing assets ("NPAs") were $246 million at June 30, 2023 or 0.21% of total assets.
>
> –     Non-performing loans ("NPLs") were $233 million at June 30, 2023 or 0.28% of total loans.
>
> –     The allowance for credit losses totaled $594 million at June 30, 2023 or 255.40% of non-performing loans and 0.71% of total loans.

–      Net recoveries were $1 million during second quarter 2023 compared to $7 million of net recoveries during second quarter 2022 and zero in the previous quarter.

*      *      *

**Our asset quality trends remain among the best in the industry,** despite the slightly higher NPLs.  At June 30, 2023, NPAs to total assets equaled 21 basis points compared to 14 basis points at March 31, 2023, while NPLs to total loans equaled 28 basis points compared to 20 basis points at March 31, 2023.

Allowance for Credit Losses

**At June 30, 2023, the allowance for credit losses was $594 million compared to $550 million at March 31, 2023, up $44 million.**  The allowance for credit losses to total loans held for investment increased to 71 basis points at June 30, 2023 compared to 67 basis points at March 31, 2023.

25.      On August 9, 2023, the Company submitted its quarterly report for the period ended

June 30, 2023, on a Form 10-Q filed with the SEC which affirmed the previously reported financial

results and stated:

At June 30, 2023, **total assets were $118.8 billion**, up $28.7 billion compared to December 31, 2022. Total deposits were $88.5 billion at June 30, 2023, up $29.8 billion from December 31, 2022. **These year-to-date increases were primarily due to our March 20, 2023, assumption of a substantial amount of the deposits and certain identified liabilities and the acquisition of certain assets and lines of business of Signature Bridge Bank, from the FDIC, as receiver for Signature Bridge Bank (the "Signature Transaction").**

*      *      *

**The allowance for credit losses on loans and leases increased $201 million, equaling $594 million at June 30, 2023 from $393 million at December 31, 2022. The increase was primarily related to the initial allowance for credit losses of $132 million for the acquired loans in the Signature Transaction**, an increase of $13 million in specific reserves primarily related to two loans that have moved to nonaccrual and an increase of $56 million primarily related to our worsening forecast of macroeconomic conditions and origination volume since year-end. The allowance for credit losses on loans and leases represented 255 percent of non-performing loans at June 30, 2023, as compared to 279 percent at the prior year-end.

**Based upon all relevant and available information at June 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as that date.**

26.　　　On October 26, 2023, the Company announced its third quarter 2023 financial results in a press release which stated in relevant part:

Balance Sheet:

–　　*Total assets of $111.2 billion at September 30, 2023* declined $7.6 billion compared to June 30, 2023, primarily due to a decline in cash balances, a portion of which was used to paydown wholesale borrowings and brokered deposits. This was partially offset by growth in the loan portfolio.

\*　　　\*　　　\*

Asset Quality:

–　　Non-performing assets ("NPAs") were $404 million at September 30, 2023 or 0.36% of total assets.

–　　Non-performing loans ("NPLs") were $392 million at September 30, 2023 or 0.47% of total loans.

–　　*The allowance for credit losses totaled $619 million at September 30, 2023 or 158% of non-performing loans and 0.74% of total loans.*

–　　Net charge offs were $24 million during third quarter 2023 compared to zero during third quarter 2022 and net recoveries of $1 million in the previous quarter.

\*　　　\*　　　\*

"On the asset quality front, while we experienced a significant decline in early-stage delinquencies compared to the previous quarter, non-performing loans increased on a linked-quarter basis, owing primarily to two commercial real estate loans in the office sector. *Despite this, our asset quality metrics continue to be among the best in the industry* with non-performing loans at 47 basis points of total loans and net charge-offs of only three basis points. This reflects our conservative underwriting practices.

\*　　　\*　　　\*

Allowance for Credit Losses

At September 30, 2023, the allowance for credit losses was $619 million compared to $594 million at June 30, 2023, up $25 million. The allowance for credit losses to total loans held for investment increased to 74 basis points at September 30, 2023 compared to 71 basis points at June 30, 2023.

\*　　　\*　　　\*

*Provision for Credit Losses*

**For the three months ended September 30, 2023, the provision for credit losses totaled $62 million** compared to a $49 million provision for the three months ended June 30, 2023.

For the nine months ended September 30, 2023, the provision for credit losses totaled $281 million compared to $9 million for the nine months ended September 30, 2022.  The year-to-date amount includes a $132 million initial provision for credit losses for the acquired portion of the Signature loan portfolio.

27.     On November 9, 2023, the Company submitted its quarterly report for the period ended September 30, 2023, on a Form 10-Q filed with the SEC which affirmed the previously reported financial results and stated:

**Provision for Credit Losses**

*Comparison to Prior Quarter*

The three months ended September 30, 2023 the provision for credit losses totaled $62 million compared to a $49 million provision for the three months ended June 30, 2023.

**During the third quarter 2023, we incorporated the commercial loans and unfunded commitments acquired in the Signature Transaction in the Company's allowance for credit loss models which resulted in a net provision benefit of $13 million**. The $75 million provision on the remainder of the portfolio was driven by increases to our estimated loan loss and unfunded commitment reserves as a result of changes in the macroeconomic environment, specifically the inflationary pressures leading to sharp increases in interest rates and a slow-down of prepayment activity leading to longer weighted average lives on the balance sheet. In addition, the increase reflects unfavorable market conditions in the CRE portfolio (primarily office). During the quarter we had net charge-offs totaling $24 million.

The second quarter 2023 provision of $49 million included increases of $13 million related to specific reserves for new non-accrual loans and the remainder was driven by changes in the macroeconomic forecast.

*       *       *

**We continue to monitor our loans held for investment portfolio and the related allowance for credit losses,** particularly given the economic pressures facing the commercial real estate and multi-family markets. While our multi-family lending niche has not been immune to downturns in the credit cycle, **the limited number of losses we have recorded, even in adverse credit cycles, suggests that the multi-**

*family loans we produce involve less credit risk than certain other types of loans. In general, buildings that are subject to rent regulation have historically tended to be stable, with occupancy levels remaining more or less constant over time.* Because the rents are typically below market and the buildings securing our loans are generally maintained in good condition, they have been more likely to retain their tenants in adverse economic times. In addition, we generally exclude any short-term property tax exemptions and abatement benefits the property owners receive when we underwrite our multi-family loans.

$$*\qquad*\qquad*$$

The allowance for credit losses increased $157 million, equaling $550 million at March 31, 2023 from $393 million at December 31, 2022. *The majority of the increase was related to the initial provision for credit losses of $132 million for the acquired loans in the Signature Transaction and an $18 million provision for loan losses primarily related to higher loan volume.* The allowance for credit losses on loans and leases represented 341 percent of non-performing loans at March 31, 2023, as compared to 279 percent at the prior year-end.

28.     The above statements identified in ¶¶ 19-27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company was experiencing higher net charge-offs and deterioration in its office portfolio; (2) that, as a result, NYCB was reasonably likely to incur higher loan losses; (3) that, as a result of the foregoing and NYCB's status as Category IV bank, the Company was reasonably likely to increase its allowance for credit losses; (4) that the Company's financial results would be adversely affected; (5) that, to preserve capital, the Company would reduce quarterly common dividend to $0.05 per common share; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

29.     On January 31, 2024, before the market opened, NYCB announced its fiscal fourth quarter 2023 financial results. The Company reported a fourth quarter net loss of $252 million due

to "a $552 million provision for loan losses," which was "primarily attributable to higher net charge-offs" and "a significant increase in the ACL [allowance for credit losses]" coverage ratio. Additionally, the Company disclosed that it would cut its quarterly dividend to $0.05 per common share. The Company further explained that these actions were "necessary enhancements" after NYCB "crossed th[e] important threshold [of becoming a $100 billion bank] sooner than anticipated as a result of the Signature transaction." Crossing this $100 billion threshold subjected NYCB to enhanced banking standards and requirements.

Specifically, the Company's press release stated, in relevant part:

> **For the three months ended December 31, 2023, the Company reported a net loss of $252 million compared to net income of $207 million for the three months ended September 30, 2023.** For the three months ended December 31, 2023, the Company reported a net loss available to common stockholders of $260 million compared to net income available to common stockholders of $199 million for the three months ended September 30, 2023. Diluted EPS totaled $(0.36) for the three months ended December 31, 2023 compared to diluted EPS of $0.27 for the three months ended September 30, 2023.
>
> **Fourth quarter 2023 net income and diluted EPS were impacted by merger-related items and a FDIC special assessment.** As adjusted, the net loss for the three months ended December 31, 2023 totaled $185 million, compared to net income of $274 million for the three months ended September 30, 2023. **The net loss includes the impact from higher provision for credit losses that primarily reflects a significant increase in the ACL which strengthened the credit profile of the Company**.

*     *     *

> "Shortly after closing the acquisition of Flagstar Bank, we were presented with the unique opportunity to accelerate this transformation when we were selected by the FDIC to purchase certain strategically and financially attractive assets and liabilities of Signature Bank. The benefits of this transaction were abundantly clear, as it strengthened our balance sheet by adding a significant amount of low-cost deposits and a middle-market business supported by over 130 private banking teams. **The transaction also put us over $100 billion in total assets, placing us firmly in the Category IV large bank class of banks between $100 billion and $250 billion in assets and subjecting us to enhanced prudential standards, including risk-based and leverage capital requirements, liquidity standards, requirements for overall risk management and stress testing. While we began preparing to be a $100 billion bank almost immediately after closing the Flagstar**

14

*acquisition, we crossed this important threshold sooner than anticipated as a result of the Signature transaction.* Alongside the integration of our three banks and in anticipation of our initial capital plan submission in April of this year, we have *pivoted quickly and accelerated some necessary enhancements that come with being a $100 billion-plus Category IV bank*.

"*With this in mind, during the fourth quarter, we took decisive actions to build capital, reinforce our balance sheet, strengthen our risk management processes, and better align ourselves with the relevant bank peers. We significantly built our reserve levels by recording a $552 million provision for loan losses, bringing our ACL coverage more in line with these peer banks.  In addition, we added on-balance sheet liquidity as we prepare for the enhanced prudential standards that apply to banks with $100 billion or more in total assets*.

"*To this end, we are also building capital by reducing our quarterly common dividend to $0.05 per common share*. We recognize the importance and impact of the dividend reduction on all of our stockholders and it was not made lightly.  We believe this is the prudent decision as it will allow us to accelerate the building of capital to support our balance sheet as a Category IV bank."

30.     The Company disclosed further details concerning its allowance for credit losses,

stating in relevant part:

At December 31, 2023, the allowance for credit losses was $992 million compared to $619 million at September 30, 2023, up $373 million *reflecting our actions to build reserves during the quarter to address weakness in the office sector, potential repricing risk in the multi-family portfolio and an increase in classified assets, which better aligns the Company with its relevant bank peers, including Category IV banks*.

31.     The Company also disclosed details concerning the Company's provision for credit

losses, stating in relevant part:

For the three months ended December 31, 2023, the provision for credit losses totaled $552 million compared to a $62 million provision for the three months ended September 30, 2023.  *The increase is primarily attributable to higher net charge-offs*, as well as, to address weakness in the office sector, potential repricing risk in the multi-family portfolio, and an increase in classified assets.

*      *      *

*Fourth quarter net charge-offs were primarily related to two loans.* First, we had one co-op loan with a unique feature that pre-funded capital expenditures.  Although the borrower was not in default, the loan was transferred to held for sale during the fourth quarter.  We expect the loan to be sold during the

first quarter of 2024.  We also performed a review of other co-op loans and did not find any other loans with similar characteristics.

Second, we had an additional charge-off on an office loan that went non-accrual during the third quarter, based on an updated valuation.  Given the impact of recent credit deterioration within the office portfolio, we determined it prudent to increase the ACL coverage ratio.

***Together, these two loans accounted for the bulk of the $185 million of net charge-offs we took during the fourth quarter***.

32.      On this news, NYCB's stock price fell $3.90, or 37.57%, to close at $6.47 per share on January 31, 2024, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

33.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired NYCB securities between March 1, 2023 and January 30, 2024, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

34.      The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, NYCB's shares actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of NYCB shares were traded publicly during the Class Period on the New York Stock Exchange.  Record owners and other members of the Class may be identified from records maintained by NYCB or its transfer agent

and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NYCB; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

38.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

39.     The market for NYCB's securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, NYCB's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired NYCB's securities relying upon the integrity of the market price of the Company's securities and market information relating to NYCB, and have been damaged thereby.

40.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of NYCB's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about NYCB's business, operations, and prospects as alleged herein.

41.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NYCB's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

42.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

43.     During the Class Period, Plaintiff and the Class purchased NYCB's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

44.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NYCB, their control over, and/or receipt and/or modification of NYCB's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NYCB, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

45.     The market for NYCB's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, NYCB's securities traded at artificially inflated prices during the Class Period.  On July

31, 2023, the Company's share price closed at a Class Period high of $13.87 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of NYCB's securities and market information relating to NYCB, and have been damaged thereby.

46.     During the Class Period, the artificial inflation of NYCB's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NYCB's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of NYCB and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

47.     At all relevant times, the market for NYCB's securities was an efficient market for the following reasons, among others:

(a)     NYCB shares met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, NYCB filed periodic public reports with the SEC and/or the New York Stock Exchange;

(c)     NYCB regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     NYCB was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

48.    As a result of the foregoing, the market for NYCB's securities promptly digested current information regarding NYCB from all publicly available sources and reflected such information in NYCB's share price. Under these circumstances, all purchasers of NYCB's securities during the Class Period suffered similar injury through their purchase of NYCB's securities at artificially inflated prices and a presumption of reliance applies.

49.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

50.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NYCB who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

51.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

52.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase NYCB's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

53.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NYCB's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

54.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about NYCB's financial well-being and prospects, as specified herein.

55.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NYCB's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NYCB and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

56.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management

team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

57.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NYCB's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

58.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of NYCB's securities was artificially inflated during the Class Period.  In ignorance of the fact that market

prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired NYCB's securities during the Class Period at artificially high prices and were damaged thereby.

59.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that NYCB was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NYCB securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

60.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     Individual Defendants acted as controlling persons of NYCB within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65.     As set forth above, NYCB and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 5, 2024

*/s/ Gregory B. Linkh*
**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh (GL-0477)
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com
       rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Counsel for Plaintiff Walter Edward Lemm, Jr.*

**SWORN CERTIFICATION OF PLAINTIFF**

New York Community Bancorp, Inc., SECURITIES LITIGATION

I,          Walter Edward Lemm, Jr.                    , certify:

1. I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2. I did not purchase New York Community Bancorp, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in New York Community Bancorp, Inc., during the class period set forth in the Complaint are as follows:

    See Attached Transactions

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

2/3/2024

Dated: _____

DocuSigned by:

*Walter Edward Lemm, Jr.*

0518542488AC471...

_____

Walter Edward Lemm, Jr.

**Walter Edward Lemm, Jr.'s Transactions in New York Community Bancorp, Inc. (NYCB)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 3/10/2023 | Bought | 500 | $7.4150 |
| 3/14/2023 | Bought | 500 | $6.8000 |