# EXHIBIT A



**Francis P. McConville**
**Partner**
**Labaton Keller Sucharow LLP**
140 Broadway
New York, New York 10005
212.907.0650
fmcconville@labaton.com

**VIA EMAIL**

May 1, 2024

James M. Wilson, Jr.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, NY 10017

Re:    *Lemm, Jr. v. New York Community Bancorp, Inc.*, No. 24-cv-00903 (E.D.N.Y.); *Miskey v. New York Community Bancorp, Inc.*, No. 24-cv-01118 (E.D.N.Y.)

Dear Mr. Wilson:

I am a Partner at the law firm Labaton Keller Sucharow LLP ("Labaton"), counsel for Lead Plaintiff movant Boston Retirement System ("Boston") in the "Related Actions" referenced above. I have attached Exhibits A through G in support of the below.

I am writing in response to representations contained in the reply filed in support of the Lead Plaintiff motion of your client, Sand Hollow Management LLC ("Sand Hollow"). ECF No. 36.[1] Sand Hollow's principal and owner is Jason Stubbs who resides in Spanish Forks, Utah. ECF No. 23-4. In Boston's opposition to Sand Hollow's motion for Lead Plaintiff appointment, it attached a search result from Thomson Reuters indicating Mr. Stubbs was "placed on felony probation for child abuse in 2005." ECF No. 32 at 12; ECF No. 32-3. In response, Sand Hollow filed a reply claiming that Mr. Stubbs was never accused of child abuse, stated that "Mr. Stubbs has never been charged with the crime reflected in the [Boston] submission," and characterized Boston's filing as "an unprofessional 'gotcha' attempt." ECF No. 36 at 3. The reply also indicated that Mr. Stubbs "has no idea how his name came to be associated with such a crime, other than that his name appears to be common." (*Id.* at 8) and filed a declaration from Mr. Stubbs to the same effect. ECF No. 37-1.

On April 30 and May 1, 2024, I called you to try to resolve these issues. You again indicated your client was never involved in or accused of any such criminal activity. During both conversations, I agreed to provide our investigative materials which formed the basis for our belief that your client was involved in the alleged criminal activity. Attached and described below please find those materials.

---

[1]  Unless otherwise noted, ECF references are to the docket in *Lemm, Jr. v. New York Community Bancorp, Inc.*, No. 24-cv-00903 (E.D.N.Y.).

New York | Delaware | Washington, D.C.

 LKS

May 1, 2024
Page 2

By way of background and in addition to evidence of Mr. Stubbs' involvement in a child abuse crime, we have reviewed the docket in *Phillips Law Firm, P.A. v. Jason Stubbs*, a lawsuit currently pending in Florida state court. Evidence obtained from this lawsuit indicates Mr. Stubbs has a history of being a serial liar, including under oath in the course of a lawsuit. In a deposition, attached hereto as Exhibit A, the witness in that deposition (and defendant in the case) indicates that he is an owner of Invert Sports and is located in Spanish Fork, Utah. According to your client's filed declaration (ECF No. ECF No. 23-4), this is the same place of work and place of residence as the Jason Stubbs that owns Sand Hollow, indicating that they are the same person. The defendant in that case has been found liable for posting false and defamatory Google reviews of a law firm called Phillips Law Firm, P.A. Attached as Exhibit B is a final judgment in that case providing further evidence of Mr. Stubbs' history of lying, including in the course of that lawsuit (*see* footnote 5 and pages 11-14). We have communicated with the Phillips Law Firm, plaintiff and counsel in that lawsuit, and are prepared to submit a declaration from the lead trial lawyer from that lawsuit indicating that Mr. Stubbs has, on multiple occasions, lied under oath.

The docket in that case provides information we have used to confirm Mr. Stubbs' identity. In the deposition attached as Exhibit A, Jason Stubbs also gives his date of birth as January 17, 1979. Attached as Exhibit C is an extract from a tax return filed in the docket for the *Phillips Law Firm, P.A. v. Jason Stubbs* case for Jason Stubbs and his spouse, which provides a social security number for the defendant (Jason Stubbs). That same tax return indicates that Jason Stubbs' spouse is named "Stephanie Stubbs" and gives his address as 94 S 2000 E. Spanish Fork, Utah 84660. Thus, based on this deposition and tax return, it appears the Jason Stubbs that owns Sand Hollow is married to Stephanie Stubbs, was born in ██████ 1979, lives at 94 S 2000 E. Spanish Fork, Utah 84660, and has the social security number indicated on the tax return.

Two separate background searches of Jason Stubbs, extracts from which are attached as Exhibits D and E, indicate that Jason Stubbs has been charged with child abuse in Utah. Each of these searches indicate that Jason Stubbs was born in ██████ 1979, that he lives with Stephanie Stubbs, that he lives at 94 S 2000 E. Spanish Fork, Utah 84660, and that he has the social security number appearing in the tax return. Therefore, based on the two distinct searches, the Jason Stubbs who owns Sand Hollow has been charged with child abuse. We are also attaching two arrest records for Jason Stubbs indicating he was arrested for child abuse as Exhibits F and G, both containing police photographs of the defendant, Jason Stubbs. As I communicated to you telephonically on April 30 and May 1, 2024, we have confirmed through third party sources that the photographs accompanying the police records attached as Exhibits F and G are, in fact, Sand Hollow's principal and owner, Jason Stubbs.

Given the facts and circumstances described above, it appears beyond any reasonable doubt that Jason Stubbs, your client, was involved in some criminal accusation related to child abuse as described in Boston's earlier filing. Therefore, the reply memorandum and declaration filed by



May 1, 2024
Page 3


Sand Hollow and Mr. Stubbs contain factual contentions that lack any evidentiary support.  Should you continue to stand by the representations made in these filings notwithstanding your opportunity to perform a reasonable inquiry into the relevant facts and circumstances, we will have no choice but to raise these issues with the Court in advance of the May 3, 2024 hearing on movants' Lead Plaintiff motions.

Respectfully,

*/s/ Francis P. McConville*
Francis P. McConville

Enclosed are Exhibits A-G

**Exhibit A**

PHIPPS REPORTING

*Raising the Bar!*

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL
CIRCUIT IN AND FOR BAY COUNTY, FLORIDA

CASE NO.:  2020 CA 1949


PHILLIPS LAW FIRM, P.A.,

        Plaintiff,

vs.

JASON STUBBS,

        Defendant.

_____/


TELEPHONIC
DEPOSITION OF
JASON STUBBS



Tuesday, May 18, 2021
9:00 a.m. - 9:31 a.m.



via TELEPHONIC CONFERENCE



Stenographically reported telephonically by:
KAIRISA J. MAGEE, RPR, GCCR, FLORIDA NOTARY


Job No. :  186942

APPEARANCES:

(All parties appeared via telephonic conference.)

On behalf of Plaintiff:

PHILLIPS LAW
1115 North Gadsden Street
Tallahassee, FL 32303
(850) 228-3749
BY:  DANNY PHILLIPS, ESQ.
danny@phillipslawpa.com

I N D E X

Proceedings                                          Page

THE TESTIMONY OF MR. JASON STUBBS:

Direct Examination By Mr. Phillips                     5


Certificate of Reporter                              27
Errata Sheet                                         28
Notification Letter                                  29

E X H I B I T S

*** NO EXHIBITS MARKED ***

Proceedings began at 9:00 a.m.:

STENOGRAPHER:  Good morning.  My name is Kairisa Magee.  I am the court stenographer.  I am not physically present in the proceeding room and will be reporting this proceeding remotely.

Due to the Governor's order for social distancing, this deposition is required to take place remotely.  The parties will acknowledge that in lieu of an oath administered in person, the witness will verbally declare his/her testimony in this matter is under penalty of perjury.  The parties and their counsel stipulate to this arrangement and waive any objections to this manner of reporting.  The witness has verified that he is, in fact, Jason Stubbs.

At this time I will ask counsel to identify yourselves and whom you represent and agree on the record that you acknowledge and agree that the witness will verbally declare his testimony in this matter is under penalty of perjury.

MR. PHILLIPS:  Danny Phillips, on behalf of the plaintiff.  I agree.

Page 5

STENOGRAPHER: All right. And, sir, do you agree that your testimony today is under penalty of perjury?

THE WITNESS: Yes.

STENOGRAPHER: Okay. All set.

MR. PHILLIPS: All right. You want to swear the witness in?

STENOGRAPHER: Yes. That was the swearing. I can't swear someone I can't see.

MR. PHILLIPS: I see. All right.

Thereupon:

JASON STUBBS,

a witness named in the notice heretofore filed, being of lawful age testified under penalty of perjury as follows:

DIRECT EXAMINATION

BY MR. PHILLIPS:

**Q    Sir, would you state your full name for the record?**

A    Jason Stubbs.

**Q    And what is your date of birth?**

A    ███████████, '79.

**Q    All right. And what is your address?**

A    94 South 2000 East, Spanish Fork, Utah 84660.

Q    All right.  And who do you live with?

A    Wife and four children.

Q    All right.  And do you own or rent?

A    Own.

Q    Okay.  And what is your email address?

A    Jason@invertsports.com.

Q    That's i-n-v-e-r-t, s-p-o-r-t-s?

A    Correct.

Q    All right.  And where do you work?

A    I work with Invert Sports.

Q    All right.  And what is the -- what is the address of that business?

A    That address is 1112 South 1680 West in Orem, Utah.

Q    Orem?  Can you spell that for me?

A    O-r-e-m.

Q    All right.  And is that the location that you work from?

A    Yes, it is.

Q    And how far is that from your house?

A    Thirty minutes.

Q    Okay.  How long have you worked there?

A    Seventeen years.

Q    And ballpark, about how much do you make?

A    26,000 to 30,000 a year.

Q    Do you have any ownership interest in that business?

A    I have a couple machines that I own in that -- in that business.

Q    All right.  And how does that work in terms of your compensation?

A    The company comps me to help me pay for the payments on the machine.

Q    All right.  And then what is your cut when you rent those machines?

A    I receive 35 percent.

Q    All right.  Do you rent any machines that you don't have an ownership interest in?

A    Yes.

Q    All right.  So other than that 35 percent cut, do you have any ownership interest in Invert Sports?

A    Only a percentage of the company.

Q    And what percentage is that?

A    I don't know.  I'd have to look at the paperwork.  I don't remember.

Q    Ballpark.

A    I think it's 4 to 5 percent of the one location.

Q    So there's other locations of Invert

Sports?

A     Not necessarily of Invert Sports.  Other parts of the companies, sister company.

Q     So you own 4 to 5 percent of the location on South Orem?

A     Correct.

Q     Okay.  And who are the other owners?

A     Do I have to say that?

Q     Yes.

A     Okay.  Do I have to, or are you just saying that?

Q     No, you have to.  You have to answer the questions I'm asking you.

A     Okay.  I plead not to say that.

Q     Okay.  I'm going to tell you now, you don't have an option to answer that question, and you -- and your refusal could result in sanctions from the Court.

A     Okay.  Is that true, or are you just telling me that?

Q     That's the law in Florida.

A     Okay.  So what about people that don't want to answer something?  What do they say when they go into Court and they don't say it?

Q     You don't -- you don't have an option

Page 9

whether or not you want to answer this question.

A    Okay.  My answer is that I'm not aware of all the owners of the company.

Q    All right.  Can you name me the ones that you're aware of?

A    No, I cannot.  I don't know their whole names.

Q    You don't know anybody else's?  You've been with this company for 17 years, and you don't know any of the other owner's names?

A    No.  I'm sorry.  I do not.  I cannot answer it properly.

Q    All right.  And what is your position with Invert Sports?

A    Just supervisor.

Q    Okay.  All right.

Let me ask you this before we go into a bunch of other stuff:  If I agreed to dismiss this lawsuit, would you agree to remove the Google reviews?

A    So I don't have access to the Google reviews that you're speaking to, nor do I know anybody who has access to even get into those Google reviews.

Q    Okay.  All right.

Your pleadings, the stuff that -- when I say "pleadings," I mean the stuff that you filed with the Court.  In some of those pleadings you say you've never traveled to Florida; is that true?

A    Yes, it is.

Q    All right.  Your pleadings also say that you have no association with anyone in Florida; is that true?

A    That's correct.

Q    All right.  So I'm assuming if you've never traveled to Florida, you've never been arrested in Florida; correct?

A    Correct.

Q    All right.  Have you ever filed a lawsuit in Florida?

A    No.

Q    Other than this case, have you ever been sued in Florida?

A    No.

Q    All right.  Have you ever hired an attorney in Florida?

A    No.

Q    Ever needed an attorney in Florida?

A    No.

Q    All right.  So you've never hired me or my

law firm to do any work for you; correct?

A    Correct.

Q    All right.  So you wouldn't have had any -- any legitimate reason to post these Google reviews; correct?

A    Correct.

Q    All right.  Have you ever talked to anyone about me or my law firm?

A    Yes.

Q    All right.  And who have you talked to about me or my law firm?

A    Once I got the lawsuit, I had to do some research to figure out who was suing me and what my correlation was to them.  Or who -- how I'd spoken to them before.

Q    All right.  So you are saying you talked to an attorney about it?

A    I mean, I did, but, I mean, just family members and business co-workers and people that I work with.

Q    All right.  What family members did you talk to about me or my law firm?

A    It would have been my wife, my kids, parents, cousins, and then the rest would have been, like, business, work associates.

Q    And what business, work associates would you have discussed -- do you recall discussing this with?

A    Well, we discussed it when the first occurrence with your law firm had occurred, with the customer that you represent used our services.

Q    Okay.  And who did you discuss it with?

A    There have been several.  I mean, the whole team members knew about it at the St. George location.  So I was the one dealing with the customer on -- on damages that he had done, and then everybody knew about it 'cause we had a big ole' discussion and meeting about it, how to collect the damages that this customer had done.

Q    Is the St. George location different than the -- the South Orem location?

A    It's -- it's different.  It's completely different.  Completely made different and business owner stuff.  So we help manage those locations.

Q    You help manage those locations?

A    Yeah.

Q    Was the -- the particular, whatever it was, UTV or side-by-side, was it rented from the South Orem location or the St. George location?

A    St. George.

Q    Okay.

All right.  And you said this was discussed in a team meeting?

A    It was.

Q    All right.  And when was that?

A    I don't know the date, but it was the date of the rental and then the date immediately after the rental, 'cause it was late at night.  So I don't remember the date of the rental.

Q    All right.  And who was in that meeting when it was discussed?

A    Some of it was a phone call meeting.

Q    All right.

A    So we have -- there was about four or five people within that meeting.

Q    All right.  And who were -- who were those people?

A    We had Justin.  We had Sonny.  We had the delivery guy, which I don't remember his name 'cause he was a transportation guy.  And we had Danny.  There might have been a couple others on there, but I don't know if they still work for that -- that entity down there.

Q    Okay.  And outside of that meeting that you're -- the phone meeting that you're discussing,

had you had any other communications with anyone about me or my law firm?

A    No.  I mean, it's probably discussed, you know, within our business from the Orem location to just round-about.  We have discussions about each customer and the issues that we got to resolve.

So, you know, there's probably some of our team members in Orem what were dropped amongst -- that were mentioned to try to collect and reverse all the charges.  So there's other people that we have to speak with within the company, just to try to resolve it and get payment.

Q    And who else works at that Orem location?

A    We have Tyler, Eric, Brent.

Q    Who else?  Anybody else?

A    No.  That's probably the only ones that would be involved with -- with recovery of money and what job positions they need to take care of to resolve it.

Q    Is there anybody else that works from that location?

A    No.  I think there's -- there's a couple other workers that are seasonal, but they -- they wouldn't really be hired.  I mean, some have been hired since then, so ...

Page 15

Q    Okay.  And so was Tyler, Eric and Brent there back in October of last year?

A    Brent was not, but he came on shortly after, I think in February.  But Tyler was and Eric was.

Q    All right.  What's Tyler's last name?

A    His last name is Brown.

Q    Spell that.

A    B-r-o-w-n.

Q    Oh, Brown.

And what is Eric's last name?

A    Carsen.  C-a-r-s-e-n, I think.

Q    All right.  But going back to that team meeting on the phone that you were talking about earlier, you said there was Justin, Sonny, Danny, and some delivery guy that you don't know his name?

A    Right, correct.  He's the one that delivered it to him, but I didn't really know him.

Q    Okay.  And what is Justin's last name?

A    Let me see.  Justin Kee, K-e-e.

Q    And what about Sonny's last name?

A    Minson, M-i-n-s-o-n.

Q    And what about Danny's last name?

A    I don't know his last name.

Q    All right.  And are all those guys at the

St. George location?

A    Yes.

Q    Do you have any interest in -- business interest in the St. George location?

A    No.

Q    Do you know who owns that location?

A    I do not.

Q    Okay.  Do you know if any of these people that you just mentioned -- do you know if any of them have ever had any contact with me?

A    I don't know if they have or not.

Q    Okay.  And what is your phone number?

A    (801) 735-6425, but it's a company business line.  So please -- it's the phone line our customers call.  So that's the one that's issued to me, but it's also used by other employees, depending upon the workday.

Q    I mean, is that your cell phone number, though?

A    Well, it's a business cell phone.  It's the one that they issued to me, but it's also used by other employees, depending upon the workday and the time and season and what's going on.

Q    But, I mean, is that -- is that your actual cell phone?  I understand what you're saying,

but is that your actual cell phone number, like do you have a -- I mean, do you leave that -- that is a cell phone number; correct?

A    It's a business phone line, and it forwards to my cell phone.  So we can switch that phone number to physically go to any phone number -- cell phone number we need if we're not in the office.

Q    All right.  What is your cell phone number?

A    So mine is (801) 413-9602.

Q    All right.  Give me just a second.

All right.  So this number that ends in 4625, is that through Verizon?

A    Yeah.  I think the company pays through -- all the phone lines it assigns are through Verizon.

Q    And you said the company pays that?

A    They do.

Q    Do you know who opened that phone line with Verizon?

A    I do not.

Q    All right.  And what type of phone does that go to?  If it's like I -- I'm not talking about if it's forwarded to somebody else's phone, but, like, what type of actual phone does that go to?

A    Well, it can go to any phone number, whether it's a landline or a cell phone.  It can be redirected to whoever we need it to go to, depending upon who's working.

Q    Well, I guess what --

A    I don't know if I answered --

(Unreportable simultaneous speaking.)

Q    Is there a cell phone that that 6425 number will ring -- it'll ring to if you don't set up forwarding?

A    I don't know.  It's always been forwarded to one cell phone or another ever since it was, you know, a phone number of the company.  And so it -- it can go to whoever.  So I don't know if ... I guess it could not go to a phone number and then it'd just be a dead line, so ...

Q    I mean, but is there, like, a landline at your office that that rings to?

A    We don't have, like, a landline for -- for our location in Orem.  So it's always been by forwarding to cell phones.

Q    Okay.

All right.  So does anyone else have access to that phone besides you?

A    You mean the phone number?  Well, the

phone number would get forwarded to whoever is working. So mostly I use the phone, but we do forward it to other reps, depending upon who's on call, who needs to take phone calls for other people. So yeah, it could be forwarded to others.

Q    All right. But if it's -- if it's not forwarded to somebody else, it's coming to you; correct?

A    Yeah. I mean, if I don't -- if -- I'm the one that probably has it probably 60 percent of the time.

Q    Okay. So do you carry -- I want to try to understand this. Do you carry two cell phones, one for that 6425 number and then another one for your personal 9602 cell phone?

A    No, 'cause it's an iPhone 12. So both phone lines can come and ring into the same cell phone number, the cell phone and the actual phone itself.

Q    Okay. Got you. Okay.

     So either one of those phone numbers will ring into your iPhone?

A    Uh-huh, yeah.

Q    Okay.

A    We have other phone numbers that ring into

my iPhone, too, based upon other business phone lines that the company has, so ...

Q    Okay.  Give me just a second.

So you mentioned other locations like a St. George location.  Is that also an Invert Sports location?

A    No, it's not.  They -- they named that differently at that location.  It's, like, Utah ATV Rentals.  So it's a different -- different entity, different owners.

Q    Okay.

All right.  Are there any other locations other than the one on South Orem that goes by the name Invert Sports?

A    No.  Just marketing and advertising might show other locations, 'cause we deliver from that location.

Q    Got you.

A    But there's no other physical location.

Q    Okay.

All right.  Have you ever created or used any of the following email addresses?  And I'm just going to spell them out.

F-I-L-L-S-O-M-E-N at gmail.com?

A    No.

Q    F-O-R-I-S-T-K-A-R-E-N 17 at gmail.com?

A    No.

Q    N-C 017790 at gmail.com?

A    No.

Q    B-R-A-N-D-O-N-B-E-R-R-I-T-T-3-7 at gmail.com?

A    No.

Q    Do you -- do you know if anyone else created those email addresses or used those email addresses?

A    Not that I know of.

Q    Okay.

All right.  Have you ever posted a Google review of my law firm?

A    No, I've not.

Q    Do you know if anyone else did?

A    No.

Q    All right.  Have you talked to any of the people that you work with about whether or not they posted Google reviews of my law firm?

A    We did.  When you sent me over that email list, I went and asked others within the company if they knew any of these email addresses and posted reviews, and none of them said that they had or -- or did.

Q   You gave me names earlier from the people at your location and then the people -- some people from the St. George location; Justin, Sonny and Danny at the St. George location, and then Tyler, Eric and Brent at your location.

Did you talk to all of those people and ask them whether or not they knew anything about these postings?

A   No.  I didn't speak to all of them.  There was probably all the ones in the Orem location I did, and then -- I think only Sonny and Justin in the other location.

Q   All right.  So who else would have had access to that phone back when these postings were made?

A   Well, the phone -- the physical phone itself, I mean, would be with me.  So it just is the phone may get forwarded to somebody else probably 40 percent of the time to take phone calls and -- and answer it when I'm off work.  So, you know, it could be any -- any of the ones at the Orem location.

Q   So did -- did anybody else have -- and I understand the process of call forwarding, but did anybody else have access to that phone itself?

A    Family members of mine would have had access to it.

(Simultaneous cross-talk.)

**Q    What family members were those?**

A    We've got Stephanie, Caitlin, Kylie, Hayden, Haylie, Russ, Karen.  Those probably would have been the most -- the most ones that would have access to it, 'cause we use it for a hotspot and internet at our house, because we don't have home internet.

**Q    Any reason any of those people would have posted a review of my law firm?**

A    I don't think so.

**Q    All right.  This -- back in, I think it was October, you had rented a -- we talked a little bit about this earlier, rented a -- like, a side-by-side or a UTV to a Mr. Trusnic.  Do you recall that?**

A    I do.

**Q    Okay.  Do -- did you sign his signature on the rental agreement?**

A    No.

**Q    Do you know if anyone else did?**

A    No.

**Q    Did you see Mr. Trusnic -- go ahead, I'm**

Page 24

sorry.

A    No.  I mean, I'm not -- I wasn't at that location.  The -- the delivery guy who delivered it says that he -- he's the one that signed the paperwork.

Q    And who was that delivery guy?

A    That's the one guy I don't remember because he doesn't work there anymore, but he's not somebody I was familiar with.

Q    Give me just a second.

Does the name Jesse ring a bell?

A    Jesse, maybe.  I don't know if that was the delivery guy, but if -- if that rental customer says it was Jesse who delivered, then that was probably the delivery guy.

Q    All right.  Now, you said earlier that sometimes your -- because you don't have internet at home, sometimes your family will use your phone as a hotspot?

A    Yeah, but we always do that at work, too, because we don't have business internet at the location in Orem.  So we'll use hotspots on the cell phones.

Q    All right.  And who has access to that hotspot?

A    It would be anyone who needs it.  You know, if they need to get on the computer or connect to the internet to do any type of work that we don't have access to.

Q    Does it have a passcode?

A    You have to but everybody has each other's passcodes.  So, you know, we always use the same passcodes.

Q    All right.  So who else at your business would -- would have access to that hotspot?

A    It would be anybody -- any of the three that worked there, plus sometimes we have temp workers that work during the summer months, and they have access to it.

Q    Okay.  So that would be -- when you say any of them that works there, that would be Tyler, Eric, and Brent; correct?

A    Correct.

Q    All right.  But Brent was not back there in October; correct?

A    Correct.

Q    All right.  So it would have just been Tyler and Eric?

A    Correct.

Q    Did you have anybody else there that

worked for you back in October?

A    We had a couple seasonal workers that may have been finishing out the October month.  So I don't know for sure if they were still working at that time or not.

Q    Okay.  And I think you may have already answered this, but did you say that -- that you talked to Tyler and Eric about these posts, and they don't know anything about it?  Is that accurate?

A    Yeah.  Yeah, nobody that I talked to had access to any of the posts or knew anything about it.

Q    Okay.

All right.  Give me just a second.

All right, Mr. Stubbs.  I think that's all the questions I have for you.

A    Okay.  Well, thank you very much.

Q    Okay.  Thank you.

MR. PHILLIPS:  Madame Court Reporter, I am not -- not ordering a copy yet.

STENOGRAPHER:  Off the record.

(Examination was concluded at 9:31 a.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF BAY

I, KAIRISA JOI MAGEE, RPR, GCCR, Florida Notary, do hereby certify that I was authorized to and did telephonically stenographically report the foregoing deposition of JASON STUBBS; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 28th day of June, 2022.


*Kairisa Joi Magee*

_____
KAIRISA JOI MAGEE, GCCR, RPR, FLORIDA NOTARY

Page 28

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS SHEET

PHILLIPS LAW FIRM, P.A. V JASON STUBBS
Deponent:  JASON STUBBS
Date of :  May 18th, 2021
Case No.:  2020 CA 1949

PAGE    LINE          REMARKS

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that
I have read the foregoing document and that
the facts stated in it are true.

Signature of Witness
_____

Dated this _____ day of _____,
_____.

JOB NO.:  186942

June 28th, 2022

JASON STUBBS
Jason@invertsports.com
94 South 2000 East
Spanish Fork, Utah 84660

Re:  PHILLIPS LAW FIRM, P.A. v JASON STUBBS
Case No.:  2020 CA 1949

Please take notice that on May 18th, 2021, you gave your deposition telephonically in the above cause.  At that time, you did not waive your signature.  The transcript is now available for your review.

Please contact Phipps Reporting at production@phippsreporting.com between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, for access to a read-only PDF transcript via computer.

Please execute the PDF-fillable Errata Sheet which will be forwarded to you by Phipps Reporting.  Once completed, please print, sign, and return to us for distribution to all parties.

If you do not read and sign the deposition within a reasonable time, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.

If you wish to waive your signature now, please sign your name in the blank at the bottom of this letter and return to production@phippsreporting.com.

Very truly yours,

*Kairisa Joi Magee*

KAIRISA JOI MAGEE, RPR, GCCR, FLORIDA NOTARY

I do hereby waive my signature.

_____
JASON STUBBS

**Exhibit B**

Case 1:24-cv-00903-NRM-JRC    Document 41-2    Filed 05/02/24    Page 36 of 72 PageID #: 706

Filing # 186267756 E-Filed 11/16/2023 11:12:57 AM

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT
IN AND FOR BAY COUNTY, FLORIDA

CIVIL DIVISION
CASE NO.: 20-1949-CA


PHILLIPS LAW FIRM, P.A.,

      Plaintiff,

v.

JASON STUBBS,

      Defendant.

_____

## FINAL JUDGMENT

**THIS MATTER** is before the Court for final non-jury trial on Plaintiff's Amended Complaint, filed May 18, 2021 (the "Amended Complaint").[1] The non-jury trial was conducted on November 1, 2023 (the "Trial").[2] Having considered the court file and records, the evidence presented at trial, the arguments of counsel, and being otherwise fully advised, this Court finds as follows:

## PROCEDURAL HISTORY

1.      Plaintiff filed its initial complaint on November 25, 2020.[3] Plaintiff, on May 18,

---

[1] The Court would note that Plaintiff filed a "Second Amended Complaint" on March 7, 2022. The Court cannot find, however, where Plaintiff requested leave to amend its complaint and cannot ascertain where the Court entered any subsequent order allowing such amendment. Finally, it appears that Defendant never answered said March 7, 2022, Second Amended Complaint.

[2] The Court has expressed its venue concerns to the parties on numerous occasions. Technically, however, the cause of action may have accrued in any of the sixty-seven Florida counties where any person accessed the simultaneously posted Google Reviews. The parties, however, desired to proceed in this Court, which was Plaintiff's choice of venue.

[3] Plaintiff initially sued "Jane Doe" so that he could procure information regarding who had made certain comments on Google. Upon learning that it appeared to be Jason Stubbs who was posting the information, Plaintiff amended the named Defendant in the lawsuit.

2021, filed a Motion to Amend Complaint. In the Amended Complaint Plaintiff alleges that the actions of Defendant constitute defamation *per se*, and as a result thereof, Defendant is entitled to punitive damages. The Honorable John Fishel entered an Order allowing Plaintiff's Amended Complaint to proceed on May 27, 2021. Defendant filed his Answer to the Amended Complaint on May 24, 2021 (the "Answer").

2.      Until January 5, 2023, Defendant represented himself in a *pro se* capacity. Defendant, however, has been represented by counsel since January 5, 2023. On March 31, 2023, the Court set the matter for a non-jury trial.

3.      Plaintiff set forth at Trial that it is not seeking compensatory damages. Instead, Plaintiff currently only seeks punitive damages.

<u>FINDINGS OF FACT</u>

4.      There were very few facts in dispute at Trial. Indeed, the Court only heard testimony from Danny Phillips and Jason Stubbs.

5.      Plaintiff is a law firm in Tallahassee, Florida, that provides services primarily in marital and family law disputes. Danny Phillips testified that he was the sole attorney in his firm and that during all relevant times, he had not employed a secretary nor had any other staff assisting the firm.

6.      Defendant is a partial owner of Invert Sports, LLC ("Invert Sports"), a business located in Spanish Fork, Utah. Invert Sports rents all-terrain equipment for recreational use as part of its business. Defendant owns Invert Sports with his wife and child.  Defendant performs most of the customer interface for Invert Sports and his wife performs most of the financial functions for the company.  Defendant has been historically designated as the registered agent in Utah for Invert Sports.

7.      In or around November 2020, Plaintiff was retained by an acquaintance to assist in a dispute regarding equipment that had gotten damaged when Plaintiff's client rented the equipment from Invert Sports. Specifically, Plaintiff's client believed that the charges demanded by Invert Sports stemming for the equipment's damage were excessive.

8.      During this period, Plaintiff reached out to Defendant on multiple occasions to mitigate the damages and to hopefully resolve the dispute. Said communications included e-mail and telephone correspondence. Ultimately, communications between Plaintiff and Defendant broke down as each party believed that the other was being unreasonable.

9.      Shortly after the communication breakdown, certain "Google Reviews"[4] were posted about Plaintiff.  Said "reviews" were published over a period of about six weeks and specially set forth as follows:

> A.      <u>Karen Forista (one star)</u>: This is way too expensive and not professional service. Felt like we were going to get gouge for the amount of work we inquired about. Poor lawyer.
> B.      <u>Brandon Berritt (one star)</u>: BEWARE of poor customer service with rude demeaning conversation. Worst attorney ever!
> C.      <u>CAROLINE N (one star)</u>: BEWARE to anyone! This is a very poor and unresponsive attorney that was extremely rude. It's almost like he feels he's better than anyone and to[] smart from what I got from our conversation.
> D.      <u>Natalie Williams (one star)</u>: *no review left*

10.      Defendant admitted that he created the fake names and generated the negative reviews regarding Plaintiff.[5] Defendant's explanation as to his motive in creating the scheme and posting the four separate fictional characters was not credible. Ultimately, the Court finds that Defendant created the fictitious reviewers and wrote the posts for one purpose– to hurt Plaintiff's business by damaging Plaintiff's reputation. Quite simply, this was Defendant's way of getting

---

[4] There was minimal evidence and testimony regarding how "Google Reviews" works. Further, no representative of Google testified and neither party provided any expert witness to explain "Google Reviews" to the Court.
[5] Up until the eve of trial, Defendant denied that he created the negative reviews.

File # 2023071997 BK: 4749 PG: 1457, Pages: 4 of 17

back at Plaintiff for his unpleasant prior experience.

11.     Plaintiff initially believed the reviews were from an upset adversary in a family law case. Thus, when he subpoenaed Google for the necessary information to ascertain the commentator's identity, he was shocked to find out that it was Defendant who left the reviews.

12.     Plaintiff set forth that he does not know how much money the poor reviews cost his business but did testify that a portion of his business is based on people looking for a family law attorney online.   Plaintiff also attempted to impute the gross profits of Invert Sports to Defendant for purposes of a punitive damage analysis.   In such regard, Plaintiff introduced tax returns from Invert Sports, indicating that it had depreciated almost one million dollars in the relevant period.   Conversely, Defendant's personal tax returns showed that he earned around $30,000.00 in taxable income on average.

## THE LAW

### *Defamation Generally*

13.     The law of defamation embraces the idea that individuals should be free to enjoy their reputations unaffected by false and defamatory attacks. Defamation is generally defined as "the unprivileged publication of false statements which naturally and proximately result in an injury to another." *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973); *see also, Hoch v. Loren*, 273 So.3d 56, 57 (Fla. 4th DCA 2019). In Florida, defamation encompasses both libel[6] and slander[7]. *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983). "Publication of defamatory matter is communication of the statement to a third person." *Hoch*, 273 So. 3d at 57.

---

[6] "Libel…is a subcategory of defamation, defined as the unprivileged written publication of a false and defamatory statement." *Lowery v. McBee*, 322 So. 3d 110, 114 (Fla. 4th DCA 2021).
[7] "Slander may be defined as the speaking of base and defamatory words which tend to prejudice another in his reputation, office, trade, business, or means of livelihood" *Spears v. Albertson's, Inc.*, 848 So. 2d 1176, 1179 (Fla. 1st DCA 2003).

14.    Accordingly, while the Florida Constitution provides that every person may speak, write, and publish sentiments on all subjects, when such right is abused, the ones responsible can be held accountable for the damages caused. *See* Art. I, §4, Fla. Const. Such accountability, however, must be balanced with our "profound national commitment to the free exchange of ideas, as enshrined in the First Amendment." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989) (citations omitted). Indeed, "whatever is added to the field of libel is taken from the field of free debate." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964).

15.    Under Florida law, a cause of action for defamation toward a private individual requires five elements: "(1) publication; (2) falsity; (3) [the] actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official or public figure (actual malice), *or at least negligently on a matter concerning a private person*; (4) actual damages; and (5) [the] statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *see also, Lowery*, 322 So. 3d at 114. Stated otherwise, a plaintiff in a defamation action must show that the defendant published a false statement about the plaintiff to a third party and the falsity of the statement caused injury to the plaintiff. *See NITV, L.L.C. v. Baker*, 61 So. 3d 1249, 1252 (Fla. 4th DCA 2011).

## *Defamation Per Se*

16.    Florida has "singled out defamation *per se* for special rules in civil tort litigation." *Lanwood Medical Center, Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. 4th DCA 2010). Generally, if a statement is determined to be defamation *per se*, such a statement is "presumed harmful as a matter of law." *Id.* (citation omitted); *see also, Abraham v. Baldwin*, 42 So. 591, 592 (1906) (holding that with defamation per se, "the law presumes malice in their utterance"). "To qualify

as defamation *per se*, [a plaintiff] must show that the defamatory statement imputes conduct that inures or is incompatible with his profession as an attorney." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, *1249 (S.D. Fla. 2014); *Wallis v. Cueto*, 2017 WL 6388914, *4 (S.D. Fla. 2017) ("To state a claim for defamation per se, a plaintiff must allege that the statement…(3) tends to injure one in his trade or profession.") (citation omitted).

17.    A written publication— like a Google Review or Facebook post— rises to the level of defamation *per se* "if, when considered alone and without innuendo, it . . .  tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953); *see also*, *Taslidzic v. Luther*, 2018 WL 3134419, *7 (S.D. Fla. 2018) ("[A] published statement is libelous per se if, among other things…[it] tends to insure one in his trade or profession."). "The significance of the classification of a communication as actionable *per se* lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occurrence [sic] of damage are both *presumed* from the nature of the defamation."  *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. 4th DCA 1973) (emphasis added). Thus, "in a defamation *per se* action, the plaintiff does not need to show any special damages . . . because 'per se defamatory statements are so obviously defamatory and damaging to reputation that they give rise to an absolute presumption both of malice and damage." *Turner v. Wells*, 198 F. Supp. 1355, 1365 (S.D. Fla. 2016) (citation omitted); *see also, Warrior Trading, Inc. v. Jaffee*, 2019 WL 3248509, *4 (S.D. Fla. 2019) ("Defamation per se creates a presumption of loss or damage"); *Wallis*, 2017 WL 633914 at *4 ("A plaintiff need not, however, allege special damages because defamation per se is so obviously defamatory and damaging to his reputation that it gives rise to an absolute presumption of both malice and damage.") (citation omitted).

*Defamation by Implication*

File # 2023071997 BK: 4749 PG: 1460, Pages: 7 of 17

18.     Finally, Florida has recognized the tort of defamation by implication. "[D]efamation by implication is a well recognized species of defamation that is subsumed within the tort of defamation" *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108 (Fla. 2008). Defamation by implication "applies in circumstances where literally true statements are conveyed in such as a way to create a false impression." *Id.* Another words, defamation by implication "arises not from what is stated, but from what is implied when a defendant [1] juxtaposes a series of facts so as to imply a defamatory connection between them, or [2] creates a defamatory implication by omitting facts." *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1123-24 (S.D. Fla. 2021). Defamation by implication is thus "premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Id.* at 1124.[8]

### True Statement Defense

19.     "A false statement of fact is the sine qua non for recovery in a defamation action." *Turner*, 198 F. Supp. at 1365. Conversely, "[t]rue statements, *i.e.*, statements that are not capable of being proved false, and statements of pure opinion are protected from defamation action by the First Amendment." *Id.* (citation omitted); *see also*, *Wallis*, 2017 WL 6388914 at *4 ("Statements of pure opinion and true factual statements are not actionable."). "Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court." *Turner*, 198 F. Supp. at 1365. (citation omitted).[9]

20.     Falsity exists only if "the publication is substantially and materially false, not just

---

[8] "All of the protections of defamation law that are afforded to the media and private defendants are extended to the tort of defamation by implication." *Jews for Jesus*, 997 So. 2d at 1108.

[9] Defendant failed to bring a motion for summary judgment or a motion for directed verdict on said issues.

File # 2023071997 BK: 4749 PG: 1461, Pages: 8 of 17

if it is technically false." *Smith v. Cuban American National Foundation*, 731 So.2d 702, 707 (Fla. 3d DCA 1999). Further, an "alleged false statement does not have to be 'perfectly accurate' if the 'gist' or the 'sting' of the statement is true." *Turner*, 198 F. Supp. 3d at 1365. Finally, a "statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.*

*Pure Opinion Defense*

21.     "[S]tatements of pure opinion cannot constitute actionable defamation . . . ." *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981). "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public." *Id.*; *see also, Lipsig v. Ramlawi*, 760 So. 2d 170, 184 (Fla. 3d DCA 2000) (indicating that a statement is pure opinion "if the speaker states the facts on which he bases his opinion."). "An important factor in the process of analyzing a comment is determining whether the speaker accurately presented the underlying facts of the situation before making the allegedly defamatory remarks. Where the speaker or writer presents the facts at the same time he or she offers independent commentary, a finding of pure opinion will usually result." *Zambrano v. Devanesan*, 48 So. 2d 603, 606 (Fla. 4th DCA 1986).

22.     Some statements that are ostensibly in the form of an opinion, however, may still be actionable. "Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the publication or assumed to exist by the parties to the communication. *From*, 400 So. 2d at 57. In determining whether an alleged defamatory statement is "pure opinion," the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the

File # 2023071997 BK: 4749 PG: 1462, Pages: 9 of 17

words used in the publication. The court must consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement. All of the circumstances surrounding the publication must be considered, including the medium by which it was disseminated and the audience to which it was published. *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984).

## *Public Concern Defense*

23.    "If allegedly defamatory statements involve a matter of public concern, punitive damages can be recovered only if actual malice is shown." *Rabren v. Straigis*, 498 So. 2d 1362, 1363 (Fla. 2d DCA 1986) (citation omitted). Indeed, "the actual malice requirement applies regardless of whether plaintiffs are deemed to be public figures or private figures, if the statements relate to a matter of public concern." *Id.* (citation omitted). To establish actual malice, "there must be knowledge on the part of the person uttering the allegedly defamatory statement of the statement's falsity or a reckless disregard for its truth of falsity." *Id.* (citation omitted). While there is no bright line test to determine whether a statement involves a matter of public concern, a trial court should generally consider "the statement's content, form and context as revealed by the whole record." *Id.* (citation omitted).

## *Punitive Damages*

24.    "The modern Anglo-American doctrine of punitive damages dates back at least to 1763, when a pair of decisions by the Court of Common Pleas recognized the availability of damages 'for more than the injury received.'" *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2620 (2008) (citation omitted). "Awarding damages beyond compensatory damages was not, however, a wholly novel idea even then, legal codes from ancient times through the Middle Ages have called for multiple damages for certain especially harmful acts." *Id.* Such additional

damages were, however, only "justified as punishment for extraordinary wrong" and were allowed specifically "to deter from any such proceeding for the future . . . ." *Id.*

25.     Today, punitive damages "are aimed not at compensation but principally at retribution and deterring harmful conduct." *Id.* at 2621 (footnote omitted). With respect to the penal nature of punitive damages, they cannot be so excessive that it violates due process. More specifically, "a penalty should be reasonably predictable in its severity, so that even Justice Holmes's 'bad man' can look ahead with some ability to know what the stakes are in choosing one course of action or another." *Id.* at 2627 (citation omitted).

26.     With said framework in mind, a three-part analysis has been established that requires the following be considered when determining punitive damages:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damage awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Engle v. Liggett Group, Inc.*, 945 So. 2d 1246, 1264 (Fla. 2006) (citation omitted).

## ANALYSIS & CONCLUSIONS OF LAW

27.     Justice Stewart succinctly described the value that our society has historically placed on one's good name:

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being- - a concept at the root of any decent system of ordered liberty.

*Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966). Simultaneous with such interest, Article I, Section 4, of the Florida Constitution illustrates the importance we place on broadly permitting freedom of speech. Such "intrinsic tension between the right to sue for

File # 2023071997 BK: 4749 PG: 1464, Pages: 11 of 17

defamatory falsehood and the right to publish one's own views marks one of the most exquisitely sensitive decisions a court can make." *Seropian v. Forman*, 652 So. 2d 490, 493 (Fla. 4th DCA 1995).

28.     The facts of this case are not overly complex but are quite disturbing and represent an evolving moral problem that is exacerbated by modern technology. Defendant, understanding the potential impact of libelous statements on one's trade or profession, let anger override his better judgment. Specifically, the evidence and testimony established that Defendant became frustrated with Plaintiff based on Plaintiff's representation of his client. Said frustration ultimately led Defendant to create four fictional characters for the purpose of posting four Google Reviews in an effort to retaliate against Plaintiff.

29.     Defendant's poor judgment and cringeworthy motives, however, do not alone equal success on Plaintiff's claims. Instead, the Court is tasked with determining whether the posts constitute defamation and whether Defendant has presented any viable defenses thereto.

30.     The post left by "Natalie Williams" does not constitute defamation.  It is simply a one-star review without any explanation. The Court rejects Plaintiff's contention that a third-party reading the review would automatically assume that the review was left by a client of Plaintiff. Instead, the Court expects that a reasonable person would consider the nature of Plaintiff's business and the possibility that the reviewer was an unhappy opposing party. Further, the one-star review indicates that the reviewer had a negative experience with Plaintiff. The evidence and testimony at Trial confirmed this sentiment.

31.     The review propounded by "Caroline N" also does not satisfy the elements

of defamation under Florida law. Again, the evidence and testimony at Trial supported the assertion that Defendant believed that Plaintiff was unresponsive and rude when they discussed the damaged equipment via telephone and email.[10] The Court also rejects Plaintiff's contention that the posting of the review leads a reasonable reader of the review to believe that the post was created by a client of Plaintiff. Nothing in the review indicates as much and could be just as easily construed to be drafted by a frustrated opposing party.

32. Similarly, Plaintiff cannot succeed pursuant to the post left by "Brandon Berritt." Like the analysis of the review left by "Caroline N," the post is ripe with opinion and does not imply that it was left by a former customer of Plaintiff. Indeed, the post reflects Defendant's perception of his interaction with Plaintiff in regard to the damage rental equipment dispute. Like the "Caroline N" post, the "Brandon Berritt" review is protected speech based on Defendant's frustrating experience with Plaintiff.

33. Unlike the aforementioned reviews, however, the post by "Karen Forista" goes a step further. Specifically, this post indicates to a third-party reader that "Karen Farista" reached out to Plaintiff about potentially retaining Plaintiff for legal services. It also implies that "Karen Farista" "inquired" about legal work and that Plaintiff's response was "way too expensive" and Karen felt like "she was going to get gouge[d]." These statements are a complete fabrication of the interactions between Plaintiff and Defendant and set forth a scenario that never occurred. Defendant never contacted Plaintiff to inquire about professional legal services and did not receive any pricing for professional legal services.[11] Unlike the other three posts, this review is a complete fiction and was

---

[10] The evidence and testimony indicated that Plaintiff and Defendant became frustrated with each other and propounded antagonistic correspondence to the other.

[11] Defendant indicated that he reached out to Plaintiff to inquire about legal work. Plaintiff rejected this contention and established that Defendant's assertion was almost impossible via cross examination. The Court, as the trier of

created solely to damage Plaintiff's business.

34.    Defendant's argument that the "Karen Forista" review involves a matter of public concern- -reviewing Plaintiff's legal services— is rejected. Defendant posed as a potential customer of Plaintiff when he posted the negative review. Thus, Defendant was not reviewing Plaintiff's legal services. Instead, Plaintiff was airing his personal dispute with Defendant under the pretext of a fictitious customer review. By viewing the post through this prism, and after contemplating the post in light of the other posts created by Defendant and as revealed by the whole record, the "Karen Forista" review was not made in connection with a matter of public concern.

35.    Further, Defendant's argument that the "Karen Foresta" review is protected because it is "opinion" is misguided. Under Florida law, "pure opinions" are non-actionable "if the speaker states the facts on which she bases her opinion." *Lipsig*, 760 So. 2d at 184. A defendant publishes a "pure opinion" when "the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *100PlusAnimal Rescue, Inc. v. Butkus*, 2020 WL 13517903, *9 (S.D. Fla. 2020). "An important factor in analyzing a comment is determining whether the speaker accurately presented the underlying facts of the situation before making the allegedly defamatory remarks." *Id*. (citation omitted). Unlike "pure opinions," "mixed opinions" are actionable in Florida. *Id*. "Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communication implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *Id*. (citation omitted).

---

fact, did not find Defendant's testimony reliable on this issue.

36.     Here, the post was a complete fabrication of the underlying facts asserted and implied. A defendant cannot state a defamatory opinion of a person that negatively impacts the person's profession based on completely fabricated facts. At best, the post would qualify as a "mixed opinion," which is actionable as a defamatory statement under Florida law, and is not "pure opinion." The post is capable of factual interpretation as it implies the existence of defamatory facts— which are fictional— and not fully disclosed to the audience.

## CONCLUSION

37.     The Court is aware of the foundational importance that freedom of speech plays in protecting our democracy. This freedom, however, has its limits— especially as it relates to defaming a private individual's professional reputation.[12] An individual's reputation derives from the common consent of humankind and has ancient roots. It is highly valued by civilized people. Our State Constitution and common law powerfully support it. This is a value as old as the Pentateuch and the Book of Exodus, and its command is as clear as the Decalogue: "Thou shall not bear false witness against thy neighbor." The personal interest in one's own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one's sense of worth. In short, the wrongdoing underlying the punitive damages in this case has Florida law's most severe condemnation, its highest blameworthiness, its most deserving culpability. "For [defamation] per se, reprehensibility is at its highest." *Lanwood Medical Center, Inc* 43 So. 3d  at 729.

38.     The actions of Defendant constitute defamation per se and are subject to

---

[12] The Court concedes that the threshold for a "public figure" in regard to a matter of "public concern" requires a different analysis.

punitive damages under Florida law. The Court, in this regard, has considered the reprehensibility of Defendant's misconduct as well as the disparity between the harm suffered by Plaintiff and the damage award.

39.     The Court has also considered Defendant's resources as set forth at the Trial. In such regard, Plaintiff failed to establish that it would be proper for the Court to base any award on the amount of money depreciated by Invert Sports on its tax returns. The Court received no expert testimony regarding the nature of Invert Sports' depreciation, nor did it receive adequate testimony regarding the general liquidity of Invert Sports and its overall value. Further, Defendant owns approximately 1/3 of Invert Sports and is not primarily responsible for its accounting. Thus, the Court has used the Defendant's tax returns, which were admitted into evidence, as the primary source of consideration regarding Defendant's financial resources for the purpose of determining the appropriate award.

**IT IS HEREBY ORDERED AND ADJUDGED:**

A.     Based upon the foregoing findings of fact and conclusions of law, Final Judgment is hereby entered in favor of Plaintiff, Phillips Law Firm, P.A., as to Plaintiff's defamation per se claim against Defendant, Jason Stubbs.

B.     Defendant, Jason Stubbs, shall pay punitive damages to Phillips Law Firm, P.A. in the amount of THREE THOUSAND FIVE HUNDRED DOLLARS ($3,500.00) which amount shall bear interest at the applicable legal rate of interest, as adjusted annually, pursuant to Section 55.03, Florida Statutes, from the date of this Final Judgment until satisfied, for which let execution issue.

C.     Defendant, Jason Stubbs, shall pay taxable costs, which amount shall be reserved

for additional hearing, and which amount shall bear interest at the applicable legal rate as adjusted annually, pursuant to Section 55.03, Florida Statutes, from the date of this Final Judgment until satisfied, for which let execution issue. Plaintiff shall consult with Defendant's counsel about the satisfaction of such costs prior to setting the matter for hearing.

D.      All pending Motions, including but not limited to Plaintiff's Motion for Sanctions filed October 3, 2023, are hereby **DENIED**.

E.      The Court hereby reserves jurisdiction to enter further orders in connection with the collection, execution and enforcement of this Final Judgment, to take all appropriate actions, conduct hearings and enter additional Orders in furtherance thereof and to enter further Orders as the Court deems just, necessary, and proper.

**DONE AND ORDERED** this Thursday, November 16, 2023 in Panama City, Bay County, Florida.

03-2020-CA-001949-CA 11/16/2023 10:12:33 AM

_____
James J. Goodman, Judge
03-2020-CA-001949-CA 11/16/2023 10:12:33 AM

Copies to:

KYLE FRED REEDER
kyle@cannonlawgroup.com
kfreeder@gmail.com

DANNY L PHILLIPS
danny@phillipslawpa.com

Adam Benjamin Edgecombe
aedgecombe@cobbgonzalez.com
sdelcogliano@cobbgonzalez.com

File # 2023071997 BK: 4749 PG: 1470, Pages: 17 of 17

*Phillips Law Firm, P.A. v. Stubbs*; Case No.: 20-1949-CA                                   Page **17** of **17**
Final Judgment

file@cobbgonzalez.com

Brittany J. Mills
bmills@lippes.com

Jason Stubbs
jason@invertsports.com

Michael Maida
schedule@maidalawpa.com
mike@maidalawpa.com

**Exhibit C**

IN THE CIRCUIT COURT FOR THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

PHILLIPS LAW FIRM, P.A.,

       Plaintiff,                    CASE NO.: 2020 CA 1949

vs.

JASON STUBBS,

       Defendant.

_____/

## PLAINTIFF'S NOTICE OF CONFIDENTIAL FILING
## AND INTENT TO ADMIT BUSINESS RECORDS

Plaintiff, by and through the undersigned counsel, notifies the Court and opposing

parties of the filing of the attached documents, which contain confidential information, and

which Plaintiff intends to admit into evidence as self-authenticating.

**PHILLIPS LAW**

_____
Danny Phillips
Florida Bar No: 86546
1115 North Gadsden Street
Tallahassee, FL 32303
Ph.: 850-228-3749
danny@phillipslawpa.com
Attorney for Plaintiff

1

PHOTOCOPY

| efile GRAPHIC print - DO NOT PROCESS | ORIGINAL DATA - Production | DLN: 80221460692311 |
|---|---|---|

**Form 1040** Department of the Treasury—Internal Revenue Service (99)
**U.S. Individual Income Tax Return**
**2020**  OMB No. 1545-0074  IRS Use Only—Do not write or staple in this space.

**Filing Status**
Check only one box

☐ Amended Return  ☐ Single  ☑ Married filing jointly  ☐ Married filing separately (MFS)  ☐ Head of Household (HOH)  ☐ Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

Your first name and middle initial: JASON & STEPHANIE<STUBBS
Last name:
Your social security number: ███-██-9262

If joint return, spouse's first name and middle initial:
Last name:
Spouse's social security number:

Home address (number and street). If you have a P.O. box, see instructions.
94 S 2000 E
Apt. no.

City, town, or post office. If you have a foreign address, also complete spaces below.
SPANISH FORK
State: UT
ZIP code: 84660
Foreign country name:
Foreign province/state/county:
Foreign postal code:

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.
☐ You  ☐ Spouse

At any time during 2020, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency? ☐ Yes  ☑ No

**Standard Deduction**

Someone can claim: ☐ You as a dependent  ☐ Your spouse as a dependent

**Age/Blindness**

You: ☐ Were born before January 2, 1956  ☐ Are blind   Spouse: ☐ Was born before January 2, 1956  ☐ Is blind

**Dependents** (see instructions):
If more than four dependents, see instructions and check here ▶ ☐

| (1) First name | Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|---|
| H███ | S███ | ███-██-9283 | DAUGHTER | ☑ | ☐ |
| K███ | S███ | ███-██-4614 | DAUGHTER | ☑ | ☐ |
| K███ | S███ | ███-██-9919 | DAUGHTER | ☑ | ☐ |
| | | | | ☐ | ☐ |

**Attach Sch. B if required.**

**Standard Deduction for—**
- Single or Married filing separately, $12,400
- Married filing jointly or Qualifying widow(er), $24,800
- Head of household, $18,650
- If you checked any box under Standard Deduction, see instructions.

| | | |
|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | **1** 6,613 |
| 2a | Tax-exempt interest . 2a | **2b** |
| | b Taxable interest. Attach Sch. B if required | |
| 3a | Qualified dividends . 3a | **3b** |
| | b Ordinary dividends. Attach Sch. B if required | |
| 4a | IRA distributions . . 4a | **4b** |
| | b Taxable amount | |
| 5a | Pensions and annuities 5a | **5b** |
| | b Taxable amount | |
| 6a | Social security benefits 6a | **6b** |
| | b Taxable amount | |
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | **7** |
| 8 | Other income from Schedule 1, line 9 | **8** 19,831 |
| 9 | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** ▶ | **9** 26,444 |
| 10 | Adjustments to income: | |
| a | From Schedule 1, line 22 . . . . 10a 1,401 | |
| b | Charitable contributions if you take the standard deduction. See instructions 10b | |
| c | Add lines 10a and 10b. These are your **total adjustments to income** ▶ | **10c** 1,401 |
| 11 | Subtract line 10c from line 9. This is your **adjusted gross income** ▶ | **11** 25,043 |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | **12** 36,329 |
| 13 | Qualified business income deduction. Attach Form 8995 or Form 8995-A | **13** |
| 14 | Add lines 12 and 13 | **14** 36,329 |
| 15 | **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- | **15** 0 |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.  Cat. No. 11320B  Form **1040** (2020)

Authentic IRS Reproduction per IRC Section 6103(p)(2)(c), this photocopy has same legal status as if it were original.
Authorized Signature

**Exhibit D**

Accurint® for Legal Professionals

**Important:**  The Public Records and commercially available data sources used on reports have errors.  Data is sometimes entered poorly, processed incorrectly and is generally not free from defect.  This system should not be relied upon as definitively accurate.  Before relying on any data this system supplies, it should be independently verified.  For  ecretary of  tate documents, the following data is for information purposes only and is not an official record.  Certified copies may be obtained from that individual state's Department of  tate.  The criminal record data in this product or service may include records that have been e  punged, sealed, or otherwise have become inaccessible to the public since the date on which the data was last updated or collected.

Accurint does not constitute a "consumer report" as that term is defined in the federal Fair Credit Reporting Act, 15 U  C 1681 et seq. (FCRA).  Accordingly, Accurint may not be used in whole or in part as a factor in determining eligibility for credit, insurance, employment or another permissible purpose under the FCRA.

**Your DPPA Permissible Use:**  Civil, Criminal, Administrative, or Arbitral Proceedings
**Your GLBA Permissible Use:**  Fraud Prevention or Detection
**Your DMF Permissible Use:**  Legitimate Fraud Prevention Interest

# Comprehensive Report

**Date:** 04/30/24
**Reference Code:** 018099.9999

**Report processed by:**
LABATON SUCHAROW LLP
140 BROADWAY FL 34
NEW YORK, NY 10005
212-907-0700 Main Phone

**Report Legend:**

**S** - Shared Address

**D** - Deceased

✔ - Probable Current Address

| Subject Information | AKAs | Indicators |
|---|---|---|
| **(Best Information for Subject)** | **(Names Associated with Subject)** | |
| Name  JASON ORLIN STUBBS | JASON ORLIN STUBBS | Bankruptcy  **No** |
| Date of Birth ██/1979 | Age: **45**  SSN: ██-xxxx | Property  **Yes** |
| Age: **45** | JASON O STUBBS | Corporate Affiliations: **Yes** |
| SSN ██ xxxx       issued in **Utah** | SSN ██ xxxx | |
| between **1/1/1988** and **12/31/1989** | JASON ORLIN STUBBS | |
| View All SSN Sources | SSN ██ xxxx | |
| | JASON STUBBS | |
| | Age: **45**  SSN: ██-xxxx | |
| | JACON O STUBBS | |
| | SSN ██ xxxx | |

**Address Summary:**   View All Address Variation Sources 📌

✔ 94 S 2000 E, SPANISH FORK, UT 84660-5545, UTAH COUNTY ( 2007 - Feb 2024)

✔ 94 E 2000, SPANISH FORK, UT 84660, UTAH COUNTY

94 E SOUTH LN, SPANISH FORK, UT 84660-9471, UTAH COUNTY (Jan 2018)

94 S 2000 E, GOSHEN, UT 84633, UTAH COUNTY (Oct 2012)

94 S 2000 E, SPRINGVILLE, UT 84663, UTAH COUNTY (Oct 2012)

12 S 2000 E, SPANISH FORK, UT 84660-5545, UTAH COUNTY (Sep 2007 - Jan 2011)

12 E 2000, SPANISH FORK, UT 84660, UTAH COUNTY (May 2008)

1425 E 6800 S, SPANISH FORK, UT 84660-9370, UTAH COUNTY (Aug 1997 - May 2020)

1425 S 6800, SPANISH FORK, UT 84660, UTAH COUNTY

72 S 2000 E, SPANISH FORK, UT 84660-5545, UTAH COUNTY ( 2007 - Oct 2008)

1558 S 2000 E, SPANISH FORK, UT 84660-8433, UTAH COUNTY (Aug 1997 - Apr 2005)

**Hide Left Nav**  |  **Back to Top**  |  ← 46, UTAH COUNTY (Feb 2008)

Accurint® for Legal Professionals

**Active Address(es):**    View All Address Variation Sources

Print Report  |  Contact Us  |  Help

✔ 94 S 2000 E, SPANISH FORK, UT 84660-5545, UTAH COUNTY ( 2007 - Feb 2024)
    **Name Associated with Address:**
      JASON O STUBBS
        **Current Residents at Address:**
      STEPHANIE BLAINE STUBBS
      JASON ORLIN STUBBS
      FREDRICK LENNINGS
      MICHAEL BROWN
      BLAKE MANNING
      BROOKE SAMSONS
      BRENT BLAKE
      K███████ S███████
    **Property Ownership Information for this Address**
    **Property:**
        Parcel Number - 51-480-0007
        Owner Name: JASON STUBBS
        Owner Name 2: STEPHANIE STUBBS
        Property Address: - 94 S 2000 E, SPANISH FORK, UT 84660-5545, UTAH COUNTY
        Owner Address:
        Sale Date - 01/23/2008
        Sale Price - $371,250
        Subdivision Name - R J STUBBS A
        Total Market Value - $745,800
        Assessed Value - $410,190
        Land Value - $231,400
        Improvement Value - $514,400
        Land Size - 12,066 Square Feet
        Year Built - 2008
        Seller Name: INVERT SPORTS LLC
        Legal Description - LOT 7, PLAT A, R.J. STUBBS SUBDV. AREA 0.277 AC.
        Loan Amount - $297,000
        Lender Name - UTAH CMNTY FCU
        Data Source - A

✔ 94 E 2000, SPANISH FORK, UT 84660, UTAH COUNTY
    **Name Associated with Address:**
      JASON O STUBBS

**Previous And Non-Verified Address(es):**    View All Address Variation Sources

94 E SOUTH LN, SPANISH FORK, UT 84660-9471, UTAH COUNTY (Jan 2018)
    **Name Associated with Address:**
      JASON STUBBS

94 S 2000 E, GOSHEN, UT 84633, UTAH COUNTY (Oct 2012)
    **Name Associated with Address:**
      JASON O STUBBS

94 S 2000 E, SPRINGVILLE, UT 84663, UTAH COUNTY (Oct 2012)
    **Name Associated with Address:**
      JASON O STUBBS

██ █ ████ █, ██ █████ ████, ██ ███-████5, UTAH COUNTY (Sep 2007 - Jan 2011)

Accurint® for Legal Professionals

Party Status: DISCHARGED 20060123
Race: WHITE
Sex: Male
Eyes: BLUE
Height: 6' 00"
Weight: 175
Case Number: 041404175
Case Type Description: Department Of Correction

Print Report | Contact Us | Help

**Offenses:**
Case Number: 041404175
Offense: CHILD ABUSE    Sentence Date: 07/22/2005

**Parole/Probations:**
[None Found]

**Prison Inmate Records:**
Latest Admission Date: 07/22/2005
Custody Type: TYPE: Z, HISTORY: 2005060    Status: FELONY PROBATION
Latest Admission Date: 06/02/2005
Custody Type: TYPE: Z, HISTORY: 2005060    Status: UNSENTENCED
Custody Type: TYPE: Z, HISTORY: 2005060    Status: DISCHARGED

Unknown
Date

**Utah Arrest Report:**
Name: JASON O STUBBS
SSN: ████-xxxx
Address: SPANISH FORK, UT 84660
Aliases: JASON O STUBBS
State of Origin: Utah
County of Origin: UTAH
Party Status: O
Eyes: BROWN
Height: 6' 00"
Weight: 175

**Arrests**:

**Arrest #1**
Case Type:                              Offense: **CHILD ABUSE**
Arrest Date: **11/17/2004**             Arrest Statute:
Arresting Agency: **UCSO**              Agency Case #:
Arrest Type:                            Arrest Level/Degree:
Arrest Disposition Date:                Arrest Disposition:
Court Fine:

**Utah Arrest Report:**
Name: JASON O STUBBS
SSN: ████-xxxx
Address: SPANISH FORK, UT 84660
Aliases: JASON O STUBBS
State of Origin: Utah
County of Origin: UTAH
Party Status: O
Eyes: BROWN
Height: 6' 00"
Weight: 175

**Hide Left Nav** | **Back to Top** |

Accurint® for Legal Professionals

Case Type:
Arrest Date: **10/26/2005**
Arresting Agency: **UCSO**
Arrest Type:
Arrest Disposition Date:
Court Fine:

Offense: **CHILD ABUSE**
Arrest Statute:
Agency Case #:
Arrest Level/Degree: **C MISDEMEANOR**
Arrest Disposition:

Print Report    |    Contact Us    |    Help

**Sexual Offenses:**
[None Found]

**Professional License(s):**
[None Found]

**Voter Registration:**
Name: JASON ORLIN STUBBS
Address: 94 S 2000 E, SPANISH FORK, UT 84660-5545
Gender: Unknown
Last Vote Date: 11/8/2022
Registration Date: 2/20/2016
Political Party: NONE DECLARED
State of Registration: Utah
Status: ACTIVE

Name: JASON ORLIN STUBBS
Address: 94 S 2000 E, SPANISH FORK, UT 84660-5545
Last Vote Date: 11/3/2020
Registration Date: 9/26/2016
Political Party: NONE DECLARED
State of Registration: Utah
Status: ACTIVE

**Concealed Weapons Permit:**
[None Found]

**Firearms and Explosives:**
[None Found]

**Possible Associates:**

CAROL LEE DENSON  DOB: ██/1947
██-xxxx    issued in California  between  1/1/1963  and  12/31/1963
**Names Associated with Associate:**
CAROL L CASTAGNO  DOB: ██/1947
██-xxxx    issued in California  between  1/1/1963  and  12/31/1963
CAROL DENSON  DOB: ██/1947
██-xxxx    issued in California  between  1/1/1963  and  12/31/1963
CAROL L DENSON  DOB: 1947
██-xxxx    issued in California  between  1/1/1936  and  12/31/1951
SSN belongs to a person reported as deceased.
CAROL CASTAGNO  DOB: 1947
██-xxxx    issued in California  between  1/1/1936  and  12/31/1951
SSN belongs to a person reported as deceased.
**Active Address(es):**
✔ 12816 S RED HORIZON TRL, VAIL, AZ 85641-9529, PIMA COUNTY (Nov 2004 - Feb 2024)
**Previous And Non-Verified Address(es):**
1535 S 1960 E, SPANISH FORK, UT 84660-6201, UTAH COUNTY ( 2014 - Aug 2018)

Hide Left Nav  |  Back to Top  |  ←  ██3-2607, PINAL COUNTY (Sep 2014 - Feb 2015)

**Exhibit E**

## Possible People Information

### Person Overview

**JASON O STUBBS**

94 S 2000 E # 94

SPANISH FORK, UT 84660-5545 | UTAH County

**Phone Number(s):**

801-830-8864

801-735-6425

801-830-8869

**SSN:**

███-XXXX - issued in UT in 1989

**DOB:**

██/XX/1979 (Age: 45)

**Entity ID:**

P11131611

**Spouse/Close Association:**

STEPHANIE



### Date of Birth Summary

| Date of Birth | Source |
|---|---|
| ██/XX/1955 | People Find |
| ██/XX/1979 | Bank Account Header Records    Experian Credit Header    Experian Credit Header Real Time    People Household #1    People Household #2 |
| ██/XX/1997 | Bank Account Header Records    Experian Credit Header |
| ██/1951 | People Household |
| ██/1960 | People Household |

### SSN Summary

| SSN | Source |
|---|---|
| ███-XXXX - issued in UT in 1989 | Bank Account Header Records    Equifax Credit Header    Experian Credit Header    Experian Credit Header Real Time    People Find |

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

04/30/2024 11:09:14

GenID:200060 000J CMR

Case 1:24-cv-00903-NRM-JRC    Document 41-2    Filed 05/02/24    Page 64 of 72 PageID #: 734

| Relative: | Address: |
|---|---|
| JERRY J STUBBS | PO BOX 103, SPANISH FORK, UT |
| | 84660-0103 \| UTAH County |
| | **Address:** |
| | PO BOX 212, CEDAR VALLEY, UT |
| | 84013-0212 \| UTAH County |

## Criminal & Infraction Records

| Offense Charged | Date of Offense or Charges Filed | Source State | Confidence Score | View Full Text |
|---|---|---|---|---|
| CHILD ABUSE | | UT | 96% | Full-Text |
| CHILD ABUSE | | UT | 96% | Full-Text |

## Arrest Records

| Offense Charged | County of Arrest | Date of Arrest | State | Confidence Score | View Full Text |
|---|---|---|---|---|---|
| CHILD ABUSE | UTAH | 11/17/2004 | UT | 96% | Full-Text |

## Lawsuit Records

| Plaintiff | Defendant | Case Type | Confidence Score | View Full Text |
|---|---|---|---|---|
| TAMISHA KING-CASTRO | BOMBARDIER RECREATIONAL PRODUC | OTHER - MISCELLANEOUS | 97% | Full-Text |

## Dockets

| Court | Filing Date | Confidence Score | View Full Text |
|---|---|---|---|
| FIFTH DISTRICT COURT | 05/06/2020 | 97% | Full-Text |

## UCC Records

| Debtor | Creditor | Confidence Score | View Full Text |
|---|---|---|---|
| STUBBS, JASON | BANK OF THE WEST | 97% | Full-Text |
| STUBBS, JASON | BANK OF THE WEST | 97% | Full-Text |
| STUBBS, JASON | BANK OF THE WEST | 97% | Full-Text |
| INVERT SPORTS LLC | CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | 97% | Full-Text |
| STUBBS, JASON | BANK OF THE WEST | 97% | Full-Text |

**WESTLAW** Thomson Reuters. No claim to original U.S. Government Works.

22

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

Case 1:24-cv-00903-NRM-JRC   Document 41-2   Filed 05/02/24   Page 65 of 72 PageID #: 735

| Source: | REAL-TIME MOTOR VEHICLE GATEWAY |

**Vehicle Information**

| VIN: | 5PSC28142N1062375 |
| Model Year: | 2022 |
| Make: | UNK |

**Registration Information**

| License Plate Number: | 218777A |
| License Plate Type: | $MAPKEY |
| Issuing State: | UT |
| Owner/Registrant Information Name: | INVERT SPORTS |
| Address: | 94 S 2000 E<br> SPANISH FORK, UT 84660-5545 |

*Thomson Reuters Legal is not a consumer reporting agency and none of its services or the data contained therein constitute a 'consumer report' as such term is defined in the Federal Fair Credit Reporting Act (FCRA), 15 U.S.C. sec. 1681 et seq. The data provided to you may not be used as a factor in consumer debt collection decisioning, establishing a consumer's eligibility for credit, insurance, employment, government benefits, or housing, or for any other purpose authorized under the FCRA. By accessing one of our services, you agree not to use the service or data for any purpose authorized under the FCRA or in relation to taking an adverse action relating to a consumer application.*

| End of Document | © 2024 Thomson Reuters. No claim to original U.S. Government Works. |

## Criminal & Infraction Records (2)

To Summary

### Department of Corrections Record

**Source Information**

| Current Date: | 04/30/2024 |

**Defendant Information**

| Offender Name: | STUBBS, JASON O |
| FBI Number: | 860945FC8 |
| State ID Number: | 1063057 |
| DOC Number: | 168367 |
| Drivers License Number: | 158532XXX |

**Offense 1**

| Offense Number: | 1 |
| Case Number: | 041404175 |
| Case Status: | DISCHARGED 20060123 |
| Case Information: | INTRA CASE NUMBER: 244834 |
| Statute Violated: | 76-5-109 |
| Offense Charged: | CHILD ABUSE |
| Class of Offense: | THIRD DEGREE FELONY |
| Offense Location: | UTAH |

WESTLAW Thomson Reuters. No claim to original U.S. Government Works. The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

| | | | |
|---|---|---|---|
| **Date of Birth:** | ▮/XX/1979 | **Verdict:** | D |
| **Gender:** | MALE | **Court:** | 4TH DISTRICT COURT, PROVO |
| **Race:** | CAUCASIAN | | |
| **Ethnicity:** | 7 | **Jurisdiction County:** | UTAH |
| **Eye Color:** | BLUE | **Sentence Imposed Date:** | 07/22/2005 |
| **Hair Color:** | BROWN | **Sentence Expiration Date:** | 01/23/2006 |
| **Height:** | 6 FT.0 IN. | **Sentence Status:** | DISCHARGED |
| **Weight:** | 175 LBS. | **Prior Sentence Begin Date:** | 06/02/2005 |
| **Miscellaneous Information:** | 20050722-FELONY PROBATION, 20050602-UNSENTENCED | **Prior Sentence End Date:** | 07/22/2005 |
| | | **Prior Sentence Status:** | UNSENTENCED |

## Offense 1

| | |
|---|---|
| **Offense Number:** | 1 |
| **Case Number:** | 041404175 |
| **Case Status:** | DISCHARGED 20060123 |
| **Case Information:** | INTRA CASE NUMBER: 244834 |
| **Statute Violated:** | 76-5-109 |
| **Offense Charged:** | CHILD ABUSE |
| **Class of Offense:** | THIRD DEGREE FELONY |
| **Offense Location:** | UTAH |
| **Verdict:** | D |
| **Court:** | 4TH DISTRICT COURT, PROVO |
| **Jurisdiction County:** | UTAH |
| **Sentence Imposed Date:** | 07/22/2005 |
| **Sentence Expiration Date:** | 01/23/2006 |
| **Sentence Status:** | DISCHARGED |
| **Prior Sentence Begin Date:** | 07/22/2005 |
| **Prior Sentence End Date:** | 01/23/2006 |
| **Prior Sentence Status:** | FELONY PROBATION |

## Order Documents

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387) for on-site manual retrieval of documents related to this or other matters. Additional charges apply.

WESTLAW   Thomson Reuters. No claim to original U.S. Government Works.

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

---

**End of Document**

To Summary

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

## Department of Corrections Record

### Source Information

| | |
|---|---|
| **Coverage Begin Date:** | 08/29/2013 |
| **Information Current Through:** | 02/15/2024 |
| **Database Last Updated:** | 02/18/2024 |
| **Update Frequency:** | MONTHLY |
| **Current Date:** | 04/30/2024 |
| **Source:** | UT DEPARTMENT OF CORRECTIONS |

### Offense 1

| | |
|---|---|
| **Offense Number:** | 1 |
| **Case Number:** | 041404175 |
| **Statute Violated:** | 76-5-109 |
| **Offense Charged:** | CHILD ABUSE |
| **Case Type or Category:** | CHILD ABUSE |
| **Class of Offense:** | 3RD DEGREE FELONY |

### Order Documents

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387) for on-site manual retrieval of documents related to this or other matters. Additional charges apply.

### Defendant Information

| | |
|---|---|
| **Offender Name:** | STUBBS, JASON O |
| **Inmate Number:** | 168367 |
| **Date of Birth:** | ▮/XX/1979 |
| **Gender:** | MALE |
| **Race:** | WHITE |
| **Eye Color:** | BLUE |
| **Hair Color:** | BROWN |
| **Height:** | 6 FT.0 IN. |
| **Weight:** | 175 LBS. |

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

## Arrest Records (1)

To Summary

## Arrest Record

### Source Information

| | |
|---|---|
| **Current Date:** | 04/30/2024 |
| **Source:** | UT-UTAH |

### Court & Attorney Information

| | |
|---|---|
| **Court:** | DST |

---

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

Case 1:24-cv-00903-NRM-JRC Document 41-2 Filed 05/02/24 Page 68 of 72 PageID #: 738

## Offender Information

| | |
|---|---|
| **Offender Name:** | JASON O STUBBS |
| **Address:** | SPANISH FORK, UT 84660 |
| **Eye Color:** | BLUE |
| **Hair Color:** | BROWN |
| **Height:** | 6 FT. |
| **Weight:** | 175 LBS. |

## Arrest Information

| | |
|---|---|
| **Date of Arrest:** | 11/17/2004 |
| **Offense County:** | UTAH |
| **Arresting Agency:** | UCSO |

## Arrest Information

| | |
|---|---|
| **Date of Arrest:** | 10/26/2005 |
| **Offense County:** | UTAH |
| **Arresting Agency:** | UCSO |

## Current Charge or Offense Information

| | |
|---|---|
| **Offense:** | CHILD ABUSE |
| **Offense:** | CHILD ABUSE |

The preceding record is for informational purposes only and is not the official record. This information is not warranted for accuracy or completeness. For copies of the official record, contact the arresting agency.

This information is not to be used for any purpose regulated by the fair credit reporting act including employment screening or in violation of any local or state law.

## Order Documents

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387) for on-site manual retrieval of documents related to this or other matters. Additional charges apply.

**End of Document** <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

## Lawsuit Records (1)

To Summary

| Lawsuit Records |
|---|

### Case Information

| | |
|---|---|
| **Case Number:** | 200500237 |
| **Filing Date:** | 05/06/2020 |
| **Case Type:** | OTHER - MISCELLANEOUS |
| **Case Category:** | 99999 |
| **Filing Office:** | WASHINGTON COUNTY DISTRICT COURT |
| **Address:** | 220 N 200 E<br> ST GEORGE, UT 84770 |
| **Venue:** | WASHINGTON, UT |

### Party Information

The data provided to you by WESTLAW may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.

**Exhibit F**

**Arrest Record**

## Source Information

| | |
|---|---|
| **Date Acquired:** | 06/13/2008 |
| **Current Date:** | 04/30/2024 |
| **Source:** | UT-UTAH |

## Court & Attorney Information

| | |
|---|---|
| **Court:** | DST |

## Offender Information



| | |
|---|---|
| **Offender Name:** | STUBBS, JASON O |
| **Address:** | SPANISH FORK, UT 84660 |
| **Offender ID:** | 170451STUJAS011979 |
| **Gender:** | BRO |
| **Height:** | 6 FT. |
| **Weight:** | 175 LBS. |

## Current Charge or Offense Information

| | |
|---|---|
| **Offense:** | CHILD ABUSE |
| **Projected Release Date:** | 11/17/2004 |
| **Projected Release Date:** | 11/17/2004 |

The preceding record is for informational purposes only and is not the official record. This information is not warranted for accuracy or completeness. For copies of the official record, contact the arresting agency.

This information is not to be used for any purpose regulated by the fair credit reporting act including employment screening or in violation of any local or state law.

## Order Documents

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387) for on-site manual retrieval of documents related to this or other matters. Additional charges apply.

## Arrest Information

| | |
|---|---|
| **Offense County:** | UTAH |
| **Arresting Agency:** | UCSO |
| **Booking Date:** | 11/17/2004 |

*Thomson Reuters Legal is not a consumer reporting agency and none of its services or the data contained therein constitute a 'consumer report' as such term is defined in the Federal Fair Credit Reporting Act (FCRA), 15 U.S.C. sec. 1681 et seq. The data provided to you may not be used as a factor in consumer debt collection decisioning, establishing a consumer's eligibility for credit, insurance, employment, government benefits, or housing, or for any other purpose authorized under the FCRA. By accessing one of our services, you agree not to use the service or data for any purpose authorized under the FCRA or in relation to taking an adverse action relating to a consumer application.*

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit G**

Case 1:24-cv-00903-NRM-JRC    Document 41-2    Filed 05/02/24    Page 71 of 72 PageID #: 741

**Arrest Record**

## Source Information

| | |
|---|---|
| **Date Acquired:** | 06/13/2008 |
| **Current Date:** | 04/30/2024 |
| **Source:** | UT-UTAH |

## Court & Attorney Information

| | |
|---|---|
| **Court:** | DST |

## Current Charge or Offense Information

| | |
|---|---|
| **Offense:** | CHILD ABUSE |
| **Projected Release Date:** | 01/14/2006 |
| **Projected Release Date:** | 01/14/2006 |

The preceding record is for informational purposes only and is not the official record. This information is not warranted for accuracy or completeness. For copies of the official record, contact the arresting agency.

This information is not to be used for any purpose regulated by the fair credit reporting act including employment screening or in violation of any local or state law.

## Offender Information



| | |
|---|---|
| **Offender Name:** | STUBBS, JASON O |
| **Address:** | SPANISH FORK, UT 84660 |
| **Offender ID:** | 179245STUJAS011979 |
| **Gender:** | BRO |
| **Height:** | 6 FT. |
| **Weight:** | 175 LBS. |

## Order Documents

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387) for on-site manual retrieval of documents related to this or other matters. Additional charges apply.

## Arrest Information

| | |
|---|---|
| **Offense County:** | UTAH |
| **Arresting Agency:** | UCSO |
| **Booking Date:** | 10/26/2005 |

*Thomson Reuters Legal is not a consumer reporting agency and none of its services or the data contained therein constitute a 'consumer report' as such term is defined in the Federal Fair Credit Reporting Act (FCRA), 15 U.S.C. sec. 1681 et seq. The data provided to you may not be used as a factor in consumer debt collection decisioning, establishing a consumer's eligibility for credit, insurance, employment, government benefits, or housing, or for any other purpose authorized under the FCRA. By accessing one of our services, you agree not to use the service or data for any purpose authorized under the FCRA or in relation to taking an adverse action relating to a consumer application.*

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.