UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

```
---------------------------------:
WALTER EDWARD LEMM, JR., et al.,:Case No.:24-cv-0903
                  Plaintiffs,  :
     v.                        :Brooklyn, New York
                               :May 3, 2024
NEW YORK COMMUNITY BANCORP,    :
INC., et al.,                  :
                  Defendants.  :
---------------------------------:
```

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE JAMES R. CHO

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For Movant:<br>Boston Retirement | LABATON KELLER SUCHAROW LLP<br>BY:  Francis P. McConville, Esq.<br>     Michael Canty, Esq.<br>140 Broadway<br>New York, New York 10005 |
| For Movant<br>Sand Hollow | FARUQI & FARUQI, LLP<br>BY:  James M. Wilson, Jr., Esq.<br>     Robert Killorin, Esq.<br>685 Third Avenue<br>New York, New York 10017 |
| For Defendant<br>NY Community<br>Bancorp | SKADDEN, ARPS, SLATE,<br>MEAGHER & FLOM LLP<br>BY:  Shaud G. Tavakoli, Esq.<br>     Christopher P. Malloy, Esq.<br>One Manhattan West<br>New York, New York 10001 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE COURT: Good morning, everyone. It's Judge Cho. We're here for a hearing in Lemm v. New York Community Bancorp; Case Number: 24-cv-903 and Miskey v. New York Community Bancorp; 24-cv-1118.

Again, who do we have on for Boston Retirement System?

MR. McCONVILLE: Good morning, Your Honor.

Frank McConville from Labaton Keller Sucharow. In addition, we have my partner, Michael Canty, also of Labaton. And also on the line is Boston's general counsel, Natacha Thomas.

Thank you.

MR. WILSON: Good morning, Your Honor.

THE COURT: And who's on -- good morning.

Who's on for Sand Hollow Management?

MR. WILSON: James Wilson from Faruqi & Faruqi. And my partner, Robert Killorin, also Faruqi & Faruqi, for Sand Hollow.

THE COURT: All right. Who's on for defendant, New York Community Bancorp?

MR. TAVAKOLI: Your Honor, Shaud Tavakoli from Skadden Arps, for New York Community Bancorp, Thomas Cangemi and John Pinto. And with me, Chris Malloy, also from Skadden Arps.

THE COURT: All right. Good morning,

everyone. Because we're doing this by telephone, until I start recognizing voices, please identify yourself if you're speaking.

All right. There are four motions I want to address this morning, or at least hear argument on. The first one is Boston Retirement's motion to consolidate, appoint lead plaintiff and counsel, Docket Number 13 from the Lemm docket. Sand Hollow's motion also to consolidate, appoint lead plaintiff and counsel, Docket Number 30, also from the Lemm docket as well. And more recently, Docket Number 39, Sand Hollow's request to supplement, and Docket Number 42, Boston's request to file a surreply.

All right. So why don't I hear from Boston Retirement first on your motion. Do you want to be heard?

MR. McCONVILLE: Yes. Thank you very much, Your Honor. Again, Frank McConville from Labaton Keller Sucharow.

Your Honor, there are two active motions currently pending before the Court, Boston Retirement System and Sand Hollow Management. Boston Retirement System lost approximately $890,000 in the New York Community Bank stock, while Sand Hollow purports to lose around 1 million. So the losses are, you know,

give or take about $100,000 difference.

We do not dispute Sand Hollow's calculated loss.  They appear to have a bigger number than Boston; however, in order to trigger the presumption, as lead plaintiff and ultimately be appointed, Sand Hollow would need to also satisfy adequacy and typicality under Rule 23.  It is our position, based on the arguments we made in our papers, that Sand Hollow fails to satisfy both adequacy or typicality.

And I want to start with the standard for review which a court undertakes when taking a look at the analysis for the presumptive lead plaintiff.  And this is from Judge Furman's opinion in the *Schaffer v. Horizon Pharma* case.

Judge Furman says, "The dispositive issue is whether there 'exists a nonspeculative risk that the movant with the greatest financial loss will not be adequate.'"

And as many courts in the Second Circuit have noted -- and this is from Judge Preska's opinion in the *Karp v. Diebold* case -- "The review is predictive and probabilistic, and it's a process that requires evaluation of potential risk that a movant's unique defense could threaten to become the focus of the litigation."

And we think that's precisely what is occurring here.  We think Sand Hollow has several issues which render them atypical and inadequate, and simply incapable of serving as a trusted fiduciary for this class.

I'll start with the typicality analysis because we think this issue is dispositive.  It was raised first in our papers, and we think it is grounds to deny Sand Hollow's motion.

So Sand Hollow made the entirety, 100 percent, of their purchases after the largest and most complete and impactful partial disclosure in this case on January 31, 2024.

Now, as a bit of background, New York Community Bank acquired many billion dollars worth of additional assets through the course of 2022 and 2023 through their acquisition of Flagstar and Signature Bank assets.  And the allegations center on the false statements regarding the quality of those assets, the bank's ability to manage the credit risk of those assets, the loan loss provisions they have on those assets, their ability to meet the regulatory standards that they were incumbent to meet once they hit the $100 billion asset level under the prudential standards, and their ability to maintain adequate

capital levels.

So those are the false statements that are alleged in the complaint. There's no dispute about that. Both in the Lemm case and the Miskey case, the false statements center on those issues.

On January 31st, before the opening of trading, New York Community Bank disclosed that they lost $552 million on loans and that they need to put a provision aside to cover those losses. In addition to that, they disclosed that they had a $252 million loss in the quarter.

So these disclosures, it is our position, correct, clearly, the statements previously made about the quality of the assets and the loan loss provisions they had on their books. The disclosure also shows that the Community Bank failed to meet the regulatory requirements after they acquired the Signature Bank's assets. And so that disclosure corrects prior statements about regulatory risk and the ability to meet the standards.

Finally, they revealed that they would need to cut their dividends because they needed to preserve sufficient capital, again, to meet these capital requirements, which, again, goes to false statements about their level of capital on the books.

So this disclosure resulted in a 39 percent stock drop; nearly $6.50 per share. It also resulted in multiple law firms announcing investigations into securities fraud, which we attached to our opposition, ECF Number 32-2. And it was also the end of the class period in the first filed case, in the Lemm class action. The class period ended on January 30th because the disclosure occurred on January 31st.

After that disclosure occurred, Sand Hollow purchased the entirety of its position, so they didn't have any purchases prior to that January 31st disclosure. And, again, this was the most qualitative and quantitative, most impactful disclosure that occurred throughout the course of the litigation.

Now, there was two other disclosures that are alleged in the complaints. The first is January 31st after market, so the same day, but now after market. There was an announcement from Moody's that they were reviewing the corporate debt ratings from New York Community Bank, which dropped the stock about 11 percent. And then on February 5th, after trading, Bloomberg released an article showing that there are pressures from a U.S. agency for New York Community Bank to cut their dividend and maintain a

AMM TRANSCRIPTION SERVICE - 631.334.1445

higher stockpile of cash to cover the loan losses in their real estate portfolio.

Again, this led to a 22 percent drop, but these disclosures are merely follow-on and provide further context for the revelations that initially occurred on January 31st.  I don't think there's any dispute that the January 31st disclosure will drive the theory of this case and determine whether or not the statements made during the class period were either false or not.  And, again, Sand Hollow purchased an entirety of his position after this disclosure.

And what's the risk here?  The risk is that the purchases were done notwithstanding the knowledge that the prior statements that New York Community Bank made were false, and so that would break the link in the presumption of reliance under *Basic v. Levinson*, and it would render Sand Hollow incapable of triggering the fraud on the market presumption of reliance, which would be a very big problem at class certification.  This would create a sideshow of epic proportions which defendants will, no doubt, raise at the class-certification stage.

And the reason why this standard of review exists at the lead plaintiff stage is to suss out

these types of issues now so that the class can have appointed as a lead plaintiff an investor that is typical of the class and does not have these unique trading issues.

So the arguments that Sand Hollow makes to address this issue is they say, well, this January 31st disclosure may not actually be a corrective disclosure, you know.  There's no mea culpa.  There's no admission of fraud by New York Community Bank.

Our position and our response to that is, well, that's just simply not what the standard is for determining what a corrective disclosure is.  A corrective disclosure merely refers to an event or series of events that cure prior misrepresentations. And here, the announcement of a nearly half-billion-dollars worth of loan loss provisions, we think, cure prior statements about the quality of their assets and their capital reserves.  You know, just because they don't admit to fraud doesn't make that any less of a corrective disclosure.  And, in fact, if that were the standard, neither of the other two disclosures would be technically corrective disclosures either.  There's no admission to fraud. That just simply isn't required under the federal

AMM TRANSCRIPTION SERVICE - 631.334.1445

securities laws.

The next thing they say -- and this is bizarre.  They say that this is an omissions case.  And that's at their page -- document 36, page 4, they say this is an omissions case.

Well, first, it's not.  The case is premised on false and misleading statements, affirmative statements by the defendant.  And second, two weeks ago, the Supreme Court released an opinion titled *Macquarie v. Moab Partners*, in which Justice Sotomayor stated for the majority opinion on page 1, "Pure omissions are not actionable under Rule 10b-5."

So we certainly hope that -- should Sand Hollow assume the position of lead plaintiff -- and for all the reasons that we've articulated in our papers, we don't think it should, but we surely hope that that's not their theory of this case because the class would be in trouble.

And lastly, what I'll say is, you know, the position that the January 31st corrective disclosure is not or may not be a corrective disclosure really puts Sand Hollow at a position antagonistic to the class.  And, as I said, this is the most impactful corrective disclosure in the case.  And for them to take the position that they will not, you know,

AMM TRANSCRIPTION SERVICE - 631.334.1445

advocate on behalf of that corrective disclosure, you know, really puts the class at risk because that is the one that is going to drive the theory of this case.

And so the cases that they cite say, oh, you know, well, it's okay, you can buy some stuff after a partial disclosure. But those cases are distinguishable. They cite the *Facebook* case. Well, that's distinguishable because only 43 percent of the purchases were done before corrective disclosure. So there were purchases made before anything was released.

And then they cite the *AIG* case, but I'll quote that case at pincite 265 F.R.D. 157, pincite 169: "Lead Plaintiffs purchased thousands of AIG shares on multiple occasions prior to any disclosures by AIG." So, again, distinguishable.

Sand Hollow, here, had they made purchases prior to January 31st, it would be a different story, but they made the entirety of their purchase after the most impactful corrective disclosure.

So the cases that Boston cites in their papers, ECF Number 32, pages 5 through 10, we believe, are on all fours of the facts here. And I'll run through a couple of them.

AMM TRANSCRIPTION SERVICE - 631.334.1445

And the first I'll point out is the *Erickson v. Snap* case, where Judge Wilson rejected -- out in the Central District, California -- rejected a movant who purchased 60 percent of his shares after disclosure.

The disclosure there was not admission of fraud, not a mea culpa. It was an announcement of first-quarter earnings that missed the estimates. They just resulted -- they disclosed a declining daily-active user growth, which was the theory of the case: their ability to continue to grow their daily-active users on the Snap platform. The disclosure was just simply a first-quarter miss on those daily-active users.

So, again, no admission of fraud. And Judge Wilson knocked out that movant because they purchased 60 percent of the shares.

Next one I'll point to is Judge Engelmayer's opinion in *Hebron Technology*, which we also cite. The disclosure there was a short report by an anonymous third party maintaining that certain parts of this company's business did not line up with the financial statements, and, therefore, the financial statements were false. Not an admission of fraud; just an allegation from a short report that there

AMM TRANSCRIPTION SERVICE - 631.334.1445

were false statements that the companies made in their financial statements.

And finally, I'll point to the *Hawaiian Electric* case, again, that we cite in our papers. There, this is the case that relates to the tragic fires out in Hawaii last fall. And there were news reports over a weekend during the class period that Hawaiian Electric lacked proper policies to mitigate the fires.

And after that, the disclosure, the stock dropped and the movant purchased all of their positions after that disclosure. And then the case finally concluded with an S&P downgrade of Hawaiian Electric because of the wildfire vulnerability. And, again, the court held that the movant there, because they purchased after the news reports relating to the issue that corrected the prior false statements, was subject to these unique trading defenses.

So in sum, on this point, the market in this case fundamentally understood what was happening with New York Community Bank and their assets premarket January 31st. That's the core of this fraud case.

The next two disclosures only provide additional context into what that theory of the case ultimately will be. And there's nothing new that

happened during those disclosures, other than providing additional details.

So to say that the January 31st disclosure may not actually be pled is just simply not a credible position.

Next, as we argue --

THE COURT:  All right.

MR. McCONVILLE:  I'm sorry, Your Honor.

THE COURT:  Let me stop you for a minute there.

Well, anything else on your motion that you want to address at this time?

MR. McCONVILLE:  We just have two quick points on the adequacy of Sand Hollow and its owner, Jason Stubbs.  Now, we're happy to, you know, rely on the papers.  We think the motion is very clear, and we think our position is very clear.  But if you want, I'm happy to address any questions you may have on those.

THE COURT:  Let's hold off on that for now.  Let me hear from Sand Hollow.

MR. McCONVILLE:  Very good.

THE COURT:  Mr. Wilson, do you want to be heard?

MR. WILSON:  Yes, Your Honor.  Thank you.

Sand Hollow's purchases -- well, let me just start -- there's a lot to digest.

We believe Sand Hollow should be appointed lead plaintiff because it has met all of the requirements under the PSLRA. It has the largest financial interest of actually 1.4 million, not 1 million, as counsel for BRS stated. That's significantly higher than the $889,000 in losses that Boston had reported.

The 1.4 million is not disputed. That puts my client clearly as having the largest financial interest. And we have demonstrated in our filings that Sand Hollow and its owner, Mr. Stubbs, meet all of the requirements of the Rule 23. The purchases were made during the class period. There are no conflicts of interest.

Mr. Stubbs is a long-time business owner. Been in business for 20 years, and has been investing in the stock market on his own account for 12 years -- approximately 12 years. So it's up to Boston, under the PSLRA, to come up with proof, not speculation and conjecture, of potential unique defenses.

So going to the typicality issues, first of all, this notion that counsel for Boston brought

up -- I think it's the *Macquarie* case, the Supreme Court case that talks about pure omissions. It's a completely different situation, Your Honor.

That case involved an attempt to bring in omissions that were required under SEC regulations into the 10b realm, regardless of whether it rendered previous statements false or misleading.

We're talking about statements that omitted material information that were rendered false and misleading because of the omissions. That's what we're talking about. So *Macquarie*, the pure omissions issue is a red herring. It doesn't apply to this case.

Now, the disclosures that were made on January 31st, what we've said is that that is a disclosure of a quarterly report that had bad financial information in it. It talked about some of the metrics that may be at issue here, but it didn't contain and it didn't disclose any of the actual fraud that was going on.

And all of the cases that Boston cites in its papers -- the *Loncop* (phonetic) case, the *Snap* case, the *Hebron* case, *Ideanomics* -- they all involve partial disclosures where actual fraud was disclosed to the market. The market had some knowledge of the

wrongdoing, of the underlying wrongdoing that was going on.  That did not happen in this case, okay.  It was basic, bad news going to some of the metrics.

And if you look at the *Ideanomics* case, it actually talks about this very situation and distinguishes a case called *Tronox*, which was a chemical manufacturing company that made partial disclosures, bad news about environmental costs that it was having and that it was incurring.  And there were purchases by lead plaintiff movants who bought after those partial disclosures.

And the argument, same arguments being made here was made, that it contained information to the market, it was disqualifying because it was a unique defense.  And the court rejected that because it said you have to -- and this is uniform in all cases -- you have to look at the strength and the extent of the fraud in the partial disclosure.  That is applied across the board by all the courts.

And in the *Tronox* case, discussed by the Southern District of New York in the *Ideanomics* decision, specifically said that it didn't have the kind of disclosure of fraudulent conduct that would qualify as a unique defense.

It has to be -- it looked for disclosures

that mentions the fraud, that mentions governmental investigations, or that sufficiently corrected the prior false and misleading statements, okay.

And in that case, where we have partial disclosures, just like in this case, the lead plaintiff who bought after those partial disclosures was not disqualified.

So that's what we have here, Your Honor. The information that came out later, in February, had new information about what was really going on behind the scenes during the class period. It talks about private negotiations between federal banking authorities with the banks' executives regarding their compliance or their failure to comply with the new banking regulations. It disclosed that two senior executives had been let go months ago. All brand-new information that goes to the actual fraud in this case, Your Honor. And so that is new information that the market did not have.

So at this early point -- and that's all we're talking about, is this early stage of this case, going on the thin allegations in the original complaints that started this process, to say and commit at this point that the January 31st partial disclosure is going to drive this case just -- I

don't understand that.

It might make it in the case, Your Honor. But as lead counsel, my client and my firm would do a thorough investigation, due diligence, to make a determination, what actionability that statement has in this case.

So that's our view on the typicality. It's speculative. There's no evidence. It's conjecture, whether this is going to be a unique defense. And we don't think it will at all. The market didn't have this information regarding the fraud. And there is going to be plenty of shareholders out there that tried to take advantage of a decrease in the stock price, just like our client did, but not based on the fraud. There's no knowledge of the fraud based on the current allegations.

THE COURT: Mr. Wilson, let me ask you a question.

Other than what you've just mentioned, what more, in your view, was revealed in the February 5th *Bloomberg* article that wasn't already contained in the January 31st corrective disclosure?

Was there anything else?

MR. WILSON: Yes. Yes, Your Honor. I just -- I touched on it.

There was disclosures of the firing of two senior executives who were in charge of compliance issues with these particular issues. That's considered to be important, relevant information that the market would have wanted to know about, especially regarding the compliance with the new regulatory matters. And the information -- this was in a *Bloomberg* article that did a -- I think they said, behind-the-scenes communications between the comptroller and New York Community Bancorp's executives regarding these issues that we're talking about, compliance with the new regulations, their loan-loss reserves, and that kind of thing.

That's the new information that came out in February, that was not disclosed in January. And that's why that also caused a significant drop -- 22 percent -- very significant drop, new information that the market did not know and should have known earlier, during the class period, when this was all happening.

THE COURT: All right. Understood. Let me take a pause for a minute there.

Mr. McConville, for Boston, let me ask you a question.

Based on what you just heard Mr. Wilson say

AMM TRANSCRIPTION SERVICE - 631.334.1445

about the additional disclosures in the *Bloomberg* article, how would you respond to that?

Is it your view that there was nothing in the January 31, 2024 disclosure -- there was nothing new in the *Bloomberg* article that wasn't already contained in the prior disclosure on January 31st?

Mr. McConville, how would you address that?

MR. McCONVILLE:  Sure.  Thank you very much. Frank McConville.

The response to that is twofold.  One, the discussions between the bank and the U.S. regulatory agencies merely provide the context for what the disclosure on January 31st already provided; that they weren't in compliance of the regulations and that they did not have sufficient capital despite what they were saying during the class period.

So the new information is that the reason why those disclosures on January 1st happened was because there was mounting pressure from a U.S. watchdog.

And my response to the executive resignation, that doesn't provide any sort of curing of a prior misrepresentation.  Executive resignations go squarely to the issue of scienter.  In other words, whether or not the defendant knowingly

AMM TRANSCRIPTION SERVICE - 631.334.1445

committed these, these fraudulent statements.

And so, you know, the disclosure on February 5th about the departures, while it's dropped its stock, in our opinion, provides more context for scienter than it does anything else. And I'd like to just address, real quickly, Mr. Wilson's discussion of the *Ideanomics* case.

There, the court actually did find the movant who purchased 100 percent of his shares after a short report to be inadequate based on these unique defenses. And sure, we don't dispute that there are other cases out there -- namely, the *Tronox* case, which relied on facts of partial disclosures that mention fraud, but that's not the universe of the cases, and that's not what the balance of the case law holds, as we cited in our papers.

And I'll cite real quickly to the *Hebron* case. This is Footnote 7 in which Judge Engelmayer says, "In any event, that there is conflicting authority on this point does not show that the movant is not subject to an arguable or potential unique defense. If anything, the conflicting authority on this point may enhance the risk that the movants, should they lead the class, this issue would divert the attention from the merits of the core claims in

this case or saddle the class with a representative whose claims carried a unique defense."

So that's really what's going on here.  It's not that any purchases after January 31st are disallowed.  There are plenty of class members, as Mr. Wilson pointed out, that will have viable claims.

But to serve as the lead plaintiff, as the fiduciary for the class, you need to have claims that are typical and adequate of all class members.  And this trading pattern is just simply too extreme.  It's premised on big, block purchases after a major corrective disclosure that simply puts the class at an unnecessary risk, you know, whereas you have Boston, who, by the way, is an experienced fiduciary and has recovered over $500 million worth of securities class action recoveries.  And that number, as we note in our papers, will go up shortly, as Boston is currently negotiating a settlement, which will be public shortly, in the Uber litigation, which they were appointed as lead plaintiff and subsequent class representative.

So our position is there's just no reason to subject the class to this risk for Sand Hollow being lead plaintiff because there's a viable alternative in Boston, and the unique defenses that Sand Hollow

has really do provide a threat that -- look, down the road, will they potentially not be meritorious?  Who knows?  But that's not the point.

The point is, will they provide a sideshow?  Will they be a distraction for the class?  And I think the answer to that is indisputably yes.

Thank you.

THE COURT:  Mr. McConville, let me ask you a question now, turning to the Rule 23 adequacy requirement.

Now, isn't it true that, typically, courts focus primarily on the competency and experience of counsel when looking at that factor?

I know there's been some discussion about your views as to Mr. Stubbs and any other activity he's been involved in, but at the end of the day, is the analysis really focused on counsel and not Mr. Stubbs?

MR. McCONVILLE:  I think the analysis is focused on whether the proposed lead plaintiff has done their due diligence in selecting counsel.  Counsel themselves I don't think would go towards the adequacy analysis absent some sort of extreme issue, which, you know, we don't see here.  The Faruqi firm is a well-respected firm.  We have no doubt they

would do a great job here.

But the issue that we have with Mr. Stubbs as the owner of Sand Hollow just simply relates to his credibility. And, you know, we've cited cases in the Second Circuit from Judge Rakoff and from Judge Buchwald and Judge Preska, sort of, describing what the bar is in order for an individual investor like Mr. Stubbs to meet, in order to serve as lead plaintiff.

I mean, this is a privilege to serve as lead plaintiff. It's not anyone's right. And so the courts in those cases -- *TG Therapeutics*, *WorldWide Wrestling*, *HEXO Corp.*, *Diebold* -- we cite all these in our opposition brief, pages 10 through 12 -- really look to the sophistication and experience of the individual. Does this individual have experience overseeing lawyers? Does this individual have experience serving in a fiduciary capacity, managing complex litigation?

And in all of those situations, the individual, however well intentioned they may be and motivated they may be, just simply doesn't have the resources and experience and wherewithal to adequately drive this case and sit across the table at a mediation, going toe to toe with Skadden Arps,

AMM TRANSCRIPTION SERVICE - 631.334.1445

one of the largest law firms in the world.  And that's why, in each of those cases, those judges appointed an institution that has experience doing these cases and has successfully recovered money on behalf of investors instead of the individual.

So that's our point one on Mr. Stubbs' adequacy.  And I'm happy to get into point two about his credibility.  We think the record speaks for itself.  We stand by our third-party searches, which uncovered his criminal history.  We've contacted each of them, and they stand by the results as well.  We simply cannot fathom why he would deny this, but we do believe that denial now goes straight to his credibility.

And, Your Honor, I would -- as we noted in our papers last night, I would say that if this issue about his credibility and his denial of these crimes becomes something the Court would like to resolve, the Court has the authority to do that under the Utah Criminal Code, which allows these records, which we believe to have been expunged, which is why they're not -- the actual records themselves are not available, notwithstanding the third-party results. Those records would be released upon court order.

So, like I said, we don't think it's

necessary.  We think the typicality issues with his trading and the general adequacy issues themselves resolve the issue, so we don't even need to get there.  But there is an avenue, there is a mechanism for the Court to get to the bottom of this should it determine that it's germane to the analysis.

THE COURT:  All right.  Mr. Wilson, let me turn back to you.

Has Sand Hollow ever served as lead plaintiff in any securities case?

MR. WILSON:  No, Your Honor.  The answer is no.

THE COURT:  Okay.  All right.

Mr. Wilson, anything else you want to add on your end for purposes today?

MR. WILSON:  Yes, Your Honor.  Thank you.

None of the issues that counsel for Boston have raised rebut the presumption that my client is more than adequate to serve as lead plaintiff. Mr. McConville mentioned risk to the class.  Well, there's a history of risk with respect to Boston serving as a lead plaintiff.  We mentioned the *Allergan* (phonetic) case, where Boston was appointed lead plaintiff, represented the class for approximately a year, I believe, and then Judge

McMahon denied class certification because of Boston's performance.

Failure to supervise its lawyers in that case, violation of a direct order from Judge McMahon, severely delayed that case. My firm actually was appointed lead counsel to step in at that point. And so that's the manifestation of a risk that Mr. McConville is talking about that actually happened in that case.

There is no risk of that happening here, Your Honor. It is all speculative, what they're talking about. Mr. Stubbs has invested an enormous amount of time at this point addressing these baseless, unsupported accusations that counsel for Boston continues to press. We've exchanged information on this. We've discussed this. We've put in, you know, two responses from my client. He has taken the time to review these records. He has described the pictures that were shown to us.

And so in terms of, you know, his commitment to this case and willingness to serve in this case, he has demonstrated leaps and bounds at this point, Your Honor, to try to put this to rest, this issue with these charges. And so we just think that, you know, in terms of the adequacy issue, Boston has not

come up with any proof, any evidence that's required under the PSLRA to rebut the presumption in favor of our client.

Regardless of whether Sand Hollow has served as lead plaintiff, as Your Honor mentioned, counsel is going to be litigating this case in consultation with the client. Our client is an experienced -- very experienced -- businessman, and so he is going to be actively involved in this case. And just one -- you know, we talked about Boston's history.

I noted on their PSLRA certification that it appears, right now, that Boston is already heavily involved in three or four current, large securities class actions, and they were at the time of the *Allergan* case, I believe, too.

So, in terms of time commitment and commitment to serving the class, I think that's something the Court should take into account as well. The burden of these cases on the lead plaintiff and their ability to devote the time to supervise counsel, perhaps, is an issue as well with Boston.

THE COURT: Okay. Last but not least, New York Community Bancorp. Anyone from Skadden want to be heard on any of these issues?

MR. MALLOY: Yes. This is Chris Malloy.

I think we would just stand by the point we made in our papers, that this is a preliminary assessment of the Rule 23 requirements, and that we would reserve our rights on all issues related to class certification, if the case gets to that stage, including totality, which would normally be addressed on a full record at that stage.

THE COURT:  Okay.  Understood.

All right.  I will take the motions under advisement.  You'll be receiving a decision from the Court shortly.

0o0

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Lemm, Jr. v.New York Bancorp, Inc., et al., Docket #24CV0903 was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature    *Adrienne M. Mignano*
             _____
                 ADRIENNE M. MIGNANO, RPR


Date:        May 7, 2024