## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALTER EDWARD LEMM, JR., Individually and on Behalf of All Others Similarly Situated, | Case No. 1:24-cv-00903-NRM-JRC |
| Plaintiff, | Served on May 20, 2024 |
| v. | |
| NEW YORK COMMINUTY BANCORP, INC., THOMAS R. CANGEMI and JOHN J. PINTO, | |
| Defendants. | |
| DALE MISKEY, Individually and on behalf of all others similarly situated, | Case No. 1:24-cv-01118-NRM-JRC |
| Plaintiff, | Served on May 20, 2024 |
| v. | |
| NEW YORK COMMINUTY BANCORP, INC., THOMAS ROBERT CANGEMI and JOHN J. PINTO, | |
| Defendants. | |

## SAND HOLLOW MANAGEMENT, LLC'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
## FOR RECONSIDERATION OF THE COURT'S MAY 7, 2024, MEMORANDUM AND
## ORDER APPOINTING LEAD PLAINTIFF

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.   STANDARDS FOR RECONSIDERATION MOTIONS ................................... 3

III.  THERE IS NO PROOF OF A UNIQUE DEFENSE ........................................ 4

IV.  NYCB DISCLOSED THAT IT HAD EXCEEDED THE $100 BILLION
THRESHOLD TO BE A CATEGORY IV BANK EARLY IN THE CLASS
PERIOD ............................................................................................................ 9

V.   THERE IS NO COUNTERVAILING PREFERENCE FOR AN INSTITUTIONAL
INVESTOR WITH OVER HALF A MILLION DOLLARS LESS THAN THE
PRESUMPTIVE LEAD PLANITIFF ............................................................. 11

CONCLUSION .......................................................................................................... 12

## TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page(s)**

*Atanasio v. Tenaris S.A.*,
  331 F.R.D. 21 (E.D.N.Y. 2019) ..................................................................................12

*Ciccarello v. Alibaba Grp. Holding Ltd.*,
  No. 20 Civ. 9568 (GBD), 2022 WL 409087 (S.D.N.Y. Feb. 10, 2022) ...................................6

*In re Comverse Tech., Inc. Sec. Litig.*,
  No. 06-CV-1825 (NGG)(RER), 2008 WL 820015 (E.D.N.Y. Mar. 25, 2008) .......................7

*Dietrich v. Bauer*,
  192 F.R.D. 119 (S.D.N.Y. 2000) ...............................................................................8

*In re Gentiva Sec. Litig.*,
  281 F.R.D. 108 (E.D.N.Y. 2012) ...............................................................................12

*Grassia v. Scully*,
  892 F.2d 16 (2d Cir. 1989).........................................................................................3

*In re Hebron Technology Co., Ltd. Securities Litigation*,
  No. 20 Civ. 4420 (PAE), 2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020)................................9

*Lawrence v. Phillip Morris Co.*,
  No. 94-CV-1494 JG, 1999 WL 51845 (E.D.N.Y. Jan. 9, 1997)........................................8

*LM Ins. Corp. v. Safety Nat'l Cas. Corp.*,
  No. 1:21-cv-1802(KAM)((RML), 2023 WL 8440864 (E.D.N.Y. Dec. 6, 2023) .....................3

*Lundy v. Ideanomics, Inc.*,
  No. 20 Civ. 4944 (GBD), 2020 WL 7389027 (S.D.N.Y. Dec. 16, 2020).........................5, 8, 9

*Menaldi v. Och-Ziff Cap. Mgt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) .................................................................................7

*Murphy v. JBS S.A.*,
  No. 17-3084, 2017 WL 4480751 (E.D.N.Y. Oct. 6, 2017).........................................4

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ...............................................................................8

*In re Sequans Commc's S.A. Sec. Litig.*,
  289 F. Supp. 3d 416 (E.D.N.Y. 2018) .........................................................................12

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995).........................................................................................4

*In re Tronox, Inc. Sec. Litig.*,
    262 F.R.D. 338 (S.D.N.Y. 2009) ............................................................................2, 3, 5, 6

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    No. 20-CV-8585 (LJL), 2021 WL 148752 (S.D.N.Y. Jan. 15, 2021) .......................................4

*In re VEON Ltd Sec. Litig.*,
    No. 15 Civ. 8672 (ALC) (OTW), 2022 WL 1284547 (S.D.N.Y. Apr. 29,
    2022) ...................................................................................................................................6

*Yong M. Cho v. Blackberry Ltd.*,
    991 F.3d 155 (2d Cir. 2021)...................................................................................................4

**Statutes**

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)...................................................................................................4

28 U.S.C. § 636(b)(1) .......................................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 72(b)(3)....................................................................................................................3

LR 6.3 ...............................................................................................................................................3

Sand Hollow Management, LLC ("Sand Hollow") respectfully submits this memorandum of law under Local Civil Rule ("LR") 6.3 for entry of an Order granting partial reconsideration of the Court's May 7, 2024 Memorandum and Order appointing Boston Retirement System ("BRS")  Lead Plaintiff and approving BRS's selection of Labaton Keller Sucharow LLP as Lead Counsel ("May 7 Order") (ECF No. 44).[1] For the reasons set forth below, on reconsideration, this Court should reverse its May 7 Order appointing BRS as Lead Plaintiff and its counsel as Lead Counsel, and instead appoint Sand Hollow as Lead Plaintiff and its counsel as Lead Counsel.

## I.      PRELIMINARY STATEMENT

In its May 7 Order, this Court recognized that Sand Hollow – with losses of $1,446,642.62 ($557,465.62 more than BRS, or over 38% higher) - was the presumptive Lead Plaintiff under the PSLRA, but nevertheless disqualified Sand Hollow based on BRS's argument that there was a risk that Sand Hollow's purchases of New York Community Bancorp, Inc. ("NYCB" or the "Company") stock after Defendants' alleged partial disclosure on January 31, 2024, may subject it to a unique defense against the presumption of reliance. May 7 Order 8, 11 – 14. This Court also adopted a "Congressional preference for institutional investors" like BRS. *Id.* at 14. Neither of these grounds relied on by the Court to rebut the presumption in favor of Sand Hollow is supported by the statute, the case law, or the complaints' allegations.

The Court accepted BRS's argument of a possible unique defense without weighing the strength of the January 31, 2024, disclosure – as courts uniformly do in situations like this. If the allegation that the market had been made aware of Defendants' fraud does not appear to have merit, then the cases that hold that the presumptive lead plaintiff should be appointed control.

---

[1]      Sand Hollow does not contest that part of the May 7 Order consolidating the actions.

Holding only that the January 31, 2024, disclosure was "highly germane" to the case (May 7 Order 12), the Court held that BRS had shown proof of a *risk* of a unique defense. *Id.* at 14. That holding conflicts with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which requires **proof** of unique defenses not a risk of a possible defense. That holding also conflicts with the approach taken by courts which weigh the strength of the partial disclosure to determine if there is a unique defense that could threaten class certification, since defendants are sure to raise numerous defenses against class certification. Courts uniformly hold that disclosures like the one made by NYCB on January 31, 2024, ***that do not actually reveal fraud*** are not proof of a unique defense that rebuts the PSLRA presumption. *See e.g., In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 346 (S.D.N.Y. 2009).

In this case the supposed risk of a unique defense dissipates entirely upon a review of the complaints' allegations and NYCB's Securities and Exchange Commission ("SEC") filings. The Court held that the current complaints' allegations center largely on NYCB's failure to disclose that the Signature Bridge Bank, N.A. ("Signature Bank") acquisition required it to comply with heightened regulatory standards causing NYCB to overstate financials and that on January 31, 2024, this new regulatory status was disclosed. May 7 Order 12. However, NYCB disclosed in April 2023, shortly after the beginning of the Class Period, that its total assets had exceeded the $100 billion threshold due to the Signature Bank acquisition (*see Miskey v. New York Community Bancorp, Inc., et al.*, No. 1:24-cv-01118-NRM-JRC, Complaint for Violation of the Federal Securities Laws ("*Miskey* Compl.") ¶¶ 32, 49), which is the regulatory threshold mandating it to meet the Category IV Dodd-Frank Act stress testing requirements.[2] Indeed,

---

[2]     Dodd-Frank Act refers to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 as amended.

NYCB had been disclosing the Category IV regulatory requirements in its SEC filings since 2022 as its total assets approached the $100 billion threshold due to the Flagstar Bancorp, Inc. ("Flagstar") acquisition. As currently alleged in the complaints, the January 31, 2024, disclosure was in the nature of generic poor financial results with no fraudulent explanation and did not sufficiently make class members actually aware of the actual fraud to the extent that purchases after that disclosure would disqualify a class representative. *See e.g., Tronox*, 262 F.R.D. at 346.

Finally, courts uniformly recognize that a preference for institutional investors is not contained in the PSLRA and that a movant's status as an institutional investor may matter only when an institutional investor has a slightly lower loss than another potential lead plaintiff. That is plainly not the case here, where Sand Hollow has losses that are over 38% higher than BRS.

This Court should reconsider and reverse its decision to appoint BRS Lead Plaintiff and instead appoint Sand Hollow as Lead Plaintiff.[3]

## II.    STANDARDS FOR RECONSIDERATION MOTIONS

Motions for reconsideration are governed by Federal Rule of Civil Procedure 59(e) and LR 6.3. *LM Ins. Corp. v. Safety Nat'l Cas. Corp.*, No. 1:21-cv-1802(KAM)((RML), 2023 WL 8440864, at *1 (E.D.N.Y. Dec. 6, 2023). A party must "set[ ] forth concisely the matters or controlling decisions which [the party] believes the Court has overlooked." L.R. 6.3. Reconsideration is justified where: (i) the moving party points to an intervening change in

---

[3]      Although there does not appear to be a referral in the docket by District Judge Nina R. Morrison for Magistrate Judge James R. Cho to rule on the lead plaintiff motions - rather than issuing a report and recommendation ("R&R") - the May 7 Order appears to be a final decision. Sand Hollow respectfully submits that reversal is warranted whether there is a reconsideration of the May 7 Order under LR 6.3 or on a *de novo* review under Fed. R. Civ. P. 72(b)(2) if the May 7 Order is treated as an R&R (*see* 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b)(3), *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir. 1989)), and Sand Hollow and not BRS should be appointed Lead Plaintiff.

controlling law; (ii) newly available evidence is identified; (iii) clear error is established; or (iv) reconsideration is necessary to avoid a manifest injustice. *See Yong M. Cho v. Blackberry Ltd*., 991 F.3d 155, 170 (2d Cir. 2021).  Reconsideration is proper where "the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Id.* (quoting *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 54, 56 (2d Cir. 2019), granting reconsideration); *see also Shrader v. CSX Transp., Inc*., 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted).

Here, Sand Hollow respectfully submits that the Court overlooked the statute, the case law, and the complaints' allegations that would have altered the Court's decision on the competing lead plaintiff motions.

## III.   THERE IS NO PROOF OF A UNIQUE DEFENSE

To rebut the presumption that Sand Hollow is the most adequate Lead Plaintiff the PSLRA requires ***proof*** that Sand Hollow "is subject to unique defenses" - not conjecture that there is a risk that it may possibly be subject to a unique defense. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see In re Turquoise Hill Res. Ltd. Sec. Litig.,* No. 20-CV-8585 (LJL), 2021 WL 148752, at *8 (S.D.N.Y. Jan. 15, 2021)(risk of unique defense must be supported by proof and rise above mere speculation); *Murphy v. JBS S.A.*, No. 17-3084, 2017 WL 4480751, at *5 (E.D.N.Y. Oct. 6, 2017)("Courts indeed have denied lead plaintiff applications in situations where an applicant's hedging strategy might leave it vulnerable to unique defenses. (citation omitted), But Mac Phail Trust and Kreuser have hardly provided adequate proof that GWI Enterprise was engaged in such a hedging strategy. Their allegations concerning the potential use of tax havens and the supposed economic illogic of investing in ADRs are mere speculation and innuendo (note omitted), which are insufficient to rebut the presumption that GWI Enterprise is the most adequate plaintiff").

4

In adopting BRS's argument, the Court relied on the risk of a possible unique defense, holding that "the importance of the various disclosures will not be adjudicated at this stage of the litigation" and "…the argument that Sand Hollow relied on NYCB's misstatements *may be questionable* and, therefore, subject the class to unnecessary additional litigation and threaten class certification." May 7 Order 13 – 14 (emphasis added) (footnote omitted). That is not the standard of proof in the PSLRA or that which is applied by courts.

This Court should have considered the strength of the January 31, 2024, disclosure to determine if BRS presented proof to rebut the presumption in favor of Sand Hollow, as courts uniformly do when addressing an argument like the one raised by BRS. In contested lead plaintiff motions such as this one, courts weigh the strength of partial disclosures and uniformly hold that where the partial disclosure fails to mention the fraud or sufficiently corrects prior false and misleading statements, then purchases by a lead plaintiff movant after that partial disclosure do not raise a unique defense sufficient to rebut the PSLRA presumption. For example, the court in *Lundy v. Ideanomics, Inc.*, No. 20 Civ. 4944 (GBD), 2020 WL 7389027, at *2–3 (S.D.N.Y. Dec. 16, 2020) (cited in the court's May 7 Order at 11) examined the strength of the partial disclosure at issue in that case and distinguished it from the *Tronox* case in which the partial disclosure was similar to the January 31, 2024 disclosure in this case:

> Sons' reliance on *Tronox* is similarly misplaced. The initial disclosure in *Tronox* did not mention "fraud or government investigation." *In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 346 (S.D.N.Y. 2009). In the present case, the June 25, 2020 disclosures mention the alleged fraudulent conduct. Accordingly, Aghajanian has successfully rebutted the presumption that Sons is an appropriate lead plaintiff.

*Id.* at *3. This Court did not consider the distinction found in the *Tronox* case that the *Ideanomics* court clearly viewed as important and potentially dispositive to the lead plaintiff motions. Had the Court properly weighed the January 31, 2024, disclosure, Sand

Hollow respectfully submits that it would have concluded that it was in line with partial disclosures considered by other cases that held that there was no proof of a unique defense. In *Tronox,* the court rejected a competing movant's argument similar to the argument made by BRS in this case that purchases made after a partial disclosure were disqualifying:

> The cases cited by Alaska in support of its argument are unavailing due to the **strength and extent** of correction in the partial disclosures in those cases. By comparison, the Tronox partial disclosures that Alaska emphasizes prior to LaGrange's purchases were merely *partial* corrective disclosures. They neither make mention of fraud or government investigations; nor do they sufficiently correct Tronox's prior false and misleading statements or make LaGrange, or any other class member, actually aware of the fraud. As even Alaska's own Complaint recognizes, it was only once Tronox filed for bankruptcy in January 2009 that "[t]he true extent of Tronox's environmental liabilities finally came to light." Without more, LaGrange's purchase of these shares after the partial disclosures does not render LaGrange atypical or subject it to unique defenses.

262 F.R.D. at 345-46 (emphasis added) (footnote omitted); *see also e.g., Ciccarello v. Alibaba Grp. Holding Ltd.*, No. 20 Civ. 9568 (GBD), 2022 WL 409087, at *3 (S.D.N.Y. Feb. 10, 2022) ("Here, the November 2 and 3 publications did not reveal any alleged misstatements or omissions—they disclosed that Ant Group met with Chinese regulators and that Ant Group 'may not meet listing qualifications or disclosure requirements due to material matters....' [Hess Compl. at ¶¶ 5-6.] The fact that Ant Group met with regulators does not necessarily amount to a corrective disclosure, even if the meeting was allegedly described as a 'dressing down'. Similarly inconclusive is that Ant Group *may* not meet listing qualifications or disclosure requirements—this was simply a possibility not a previously undisclosed fact"); *In re VEON Ltd Sec. Litig.*, No. 15 Civ. 8672 (ALC) (OTW), 2022 WL 1284547, at *6 (S.D.N.Y. Apr. 29, 2022) (court cited cases holding that purchases made by class members before and after partial disclosures during the

class period were "by definition" typical and held "Here, Lvov made his purchases after some partial disclosures but before others, all within the class period. As Lvov notes, there is nothing unique about his situation . . . . The class is defined to include investors who purchased shares during the Class Period, of which Lvov is one. Presumably, other putative class members bought shares at various points during the Class Period, including before and after some disclosures."); *see also In re Converse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG)(RER), 2008 WL 820015, at *3 (E.D.N.Y. Mar. 25, 2008) (district court affirmed its order to vacate magistrate judge's report and recommendation to disqualify the movant with the largest losses because it had purchased all of its shares after a partial disclosure made in March 2006, and compared the March 2006 disclosure to an April 2006 disclosure holding "Comverse's April 17, 2006 corrective disclosure, which was significantly stronger than the March 14, 2006 disclosure relied upon here by P & P, was not as a matter of law necessarily sufficient to 'counter-balance effectively' its previous misleading statements. [citation omitted] The weaker disclosure in Comverse's March 14, 2006 press release therefore will not likely be a significant barrier to Menorah Group's recovery." The court further noted that the defense was not "unique" because there were undoubtedly many members of the class who purchased after the March 2006 partial disclosure and the argument was not being made to exclude those purchasers from the class based on these post-March 2006 purchases. *Id.*).

Indeed, the very argument being made by BRS has been rejected at the class certification stage in other cases. *See e.g., Menaldi v. Och-Ziff Cap. Mgt. Grp. LLC*, 328 F.R.D. 86, 92-93 (S.D.N.Y. 2018) (in granting motion for class certification, court's key concern that lead plaintiff might be subject to unique defenses because they bought stock

after a Wall Street Journal ("WSJ") article was alleviated because the WSJ article was a partial disclosure that revealed only that a defendant faced an investigation but did nothing to correct prior misstatements); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) ("[T]he fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not the representative relied on the integrity of the market during the class period [for purposes of Rule 23(a) typicality.]" (internal quotation marks omitted); *Dietrich v. Bauer*, 192 F.R.D. 119, 125 n.1 (S.D.N.Y. 2000) (finding proposed class representative satisfied typicality despite purchasing stock after disclosures of certain information where the disclosures did not concede the existence of the fraudulent schemes at issue in the litigation)*; Lawrence v. Phillip Morris Co.*, No. 94-CV-1494 JG, 1999 WL 51845, at *5–6 (E.D.N.Y. Jan. 9, 1997) (court granted class member's motion to intervene in certified class even though his purchases were made after a partial disclosure – his purchases after *partial disclosure* did not render his claims, which were the same as the certified class claims, atypical and even if there was a unique defense, denial of certification could occur only if that unique defense would become a "major focus" of the litigation, which it would not in that case).

The *Ideanomics* case and other cases relied on by BRS and this Court stand in stark contrast to the January 31, 2024 disclosure in this case. For example, in *Ideanomics,* some of the defendants' fraud had clearly been disclosed to the market in the partial disclosure at issue in that case, *i.e.*, Hindenburg Research and J Capital Research issued reports to the market alleging various misrepresentations by Ideanomics directly rebuking prior false and misleading statements issued about the company's Mobile Energy Global

Division. *Ideanomics*, 2020 WL 7389027, at *2 n.5.  In *In re Hebron Technology Co.,*

*Ltd. Securities Litigation*, No. 20 Civ. 4420 (PAE), 2020 WL 5548856, at *7 (S.D.N.Y.

Sept. 16, 2020), Grizzly Research issued a report to the market at a virtual investor

conference accusing Hebron of being an "insider enrichment scheme without economic

basis. [citations omitted]. According to a later article describing the report, Eggert stated

during the [Grizzly] presentation that Hebron's controlling shareholder, Bodang Liu,

owned both Beijing Hengpu and Nami, along with other acquired companies, making

their acquisitions undisclosed related-party transactions."  *Id.* at *2 (internal quotation

marks omitted). These detailed allegations of fraud caused the stock price to drop to such

an extent that the SEC's short sale rule went into effect. *Id.* The January 31, 2024

earnings report by NYCB does not come close to the disclosures made in these cases on

which BRS relied to speculate about a unique defense to disqualify Sand Hollow.

Under the controlling case law, the January 31, 2024 disclosure, as alleged, does

not mention fraud or sufficiently correct prior false and misleading statements such that

purchasers who bought NYCB stock after that disclosure, like Sand Hollow, would be

subject to a unique defense.

## IV.   NYCB DISCLOSED THAT IT HAD EXCEEDED THE $100 BILLION THRESHOLD TO BE A CATEGORY IV BANK EARLY IN THE CLASS PERIOD

Further, the supposed risk of a unique defense dissipates entirely upon a review of the

complaints' allegations and of NYCB SEC filings. The supposedly critical new information that

may have partially revealed the fraud on January 31, 2024 - that NYCB was subject to a "new

regulatory status" (May 7 Order 12) for being a Category IV bank under the Dodd-Frank Act due

to the acquisition of Signature Bank's assets – was not new information that revealed the fraud.

NYCB had disclosed in SEC filings since 2022 leading up to the Flagstar acquisition that

the Company's total assets were approaching the $100 billion threshold that would make it a

Category IV bank under the Dodd-Frank (12 C.F.R. Part 252) and subject it to the heightened

stress testing requirements. For example, in a March 4, 2022, supplement to the joint proxy

statement/prospectus regarding the Flagstar acquisition, NYCB disclosed that the new company

would have total assets of $85 billion (NYCB Prospectus Supplement 24 (Form 424B3) (Mar. 4,

2022) ("Joint Proxy Suppl.")) and the following:

> ### Stress Testing
>
> #### Stress Testing for Category IV U.S. Banking Organizations
>
> In 2019, the Board of Governors of the Federal Reserve System (the "Board") finalized a framework that sorts large banking organizations into one of four categories of prudential standards based on their risk profiles (the "tailoring rule"). The most stringent prudential standards apply under Category I (defined as U.S. Global Systemically Important Banks and their depository institution subsidiaries), and the least stringent prudential standards apply under **Category IV (defined as U.S. banking organizations with $100 billion or more** but less than $250 billion in total assets and have less than $75 billion in cross-jurisdictional activity, weighted short-term wholesale funding, nonbank assets, or off-balance sheet exposure).
>
> In January 2021, the Board finalized a rule to update capital planning requirements for large banks to be consistent with the tailoring rule. The Board's capital planning requirements for large banks help ensure they plan for and determine their capital needs under a range of different scenarios. The rule removes the company-run stress test requirement for banking organizations subject to Category IV standards. Therefore, banking organizations subject to Category IV standards are not required to calculate forward-looking projections of capital under scenarios provided by the Board.
>
> The rule also aligns the frequency of the calculation of the stress capital buffer requirement with the frequency of the supervisory stress test (that is, both would occur every other year for banking organizations subject to Category IV standards). The rule allows a banking organization subject to Category IV standards to elect to participate in the supervisory stress test in a year in which the banking organization would not otherwise be subject to the supervisory stress test, and to receive an updated stress capital buffer requirement in that year.

Joint Proxy Suppl. 16 (emphasis added).[4]

---

[4]     The Joint Proxy Supplement may be accessed at
www.sec.gov/Archives/edgar/data/910073/000119312522066161/d282465d424b3.htm.

Additionally, since April 2023 – long before the January 31, 2024 disclosure- the Company disclosed that its total assets had exceeded the $100 billion threshold that qualified it as a Category IV bank. The *Miskey* complaint expressly acknowledges this in one of its allegations:

> In an April 28, 2023 press release (the "4/28/23 Press Release"), NYCB announced its first quarter 2023 ("1Q23") financial results for the interim period ended March 31, 2023.  The byline of the 4/28/23 Press Release emphasized in all caps that the "SIGNATURE BANK TRANSACTION SIGNIFICANTLY ACCELERATES TRANSITION TO COMMERCIAL BANK TRANSFORMING OUR FUNDING PROFILE AS NON-INTEREST-BEARING DEPOSITS SURGE TO 27% OF TOTAL DEPOSITS."  In addition to reporting approximately $2 billion in net income on $2.653 billion revenues for 1Q23, the release stated, "**Total assets of $123.8 billion** compared to $90.1 billion at December 31, 2022, due to the addition of $35.2 billion in assets, net of purchase accounting adjustments ("PAA"), arising from the Signature transaction and organic growth.

*Miskey* Compl. ¶ 49.

An examination of the complaints' allegations and SEC filings shows that NYCB had already disclosed earlier in the Class Period, well before the January 31, 2024, earnings release, that its total assets had crossed the $100 billion threshold subjecting it to heightened regulatory requirements, and therefor this also does not constitute ***proof*** that Sand Hollow's purchases after the January 31, 2024, might give rise to a unique defense.

## V.    THERE IS NO COUNTERVAILING PREFERENCE FOR AN INSTITUTIONAL INVESTOR WITH OVER HALF A MILLION DOLLARS LESS THAN THE PRESUMPTIVE LEAD PLANITIFF

Finally, there is no countervailing preference for institutional investors over individual investors in the PSLRA as the Court held. May 7 Order 14. Although the legislative history may reflect Congressional desire to "increase[e] the role of institutional investors" (*id.* (internal quotation marks omitted)), a preference for institutional investors not only is "not embodied in the statutory text in any respect" but "that preference has only been 'determinative' when an

11

'institutional investor has a slightly lower loss than another potential lead plaintiff.'" *In re Sequans Commc's S.A. Sec. Litig.*, 289 F. Supp. 3d 416, 421-22 (E.D.N.Y. 2018); *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 113 (E.D.N.Y. 2012).

Here, Sand Hollow has over a half a million dollars more in losses (38% more) than BRS's.  BRS's losses clearly do not qualify as "slightly lower" as that term is used in the rare cases that have appointed an institutional investor over an individual investor with larger losses. *See Atanasio v. Tenaris S.A.*, 331 F.R.D. 21, 29 (E.D.N.Y. 2019) ("the 33% difference in this case is not minor but significant, and thus City of Warren's status as an institutional investor does not affect the Court's determination that Sanders has the largest financial interest in relief sought by the class."); *see Sequans*, 289 F. Supp. 3d at 422  ("It is true that several courts have found that the PSLRA's legislative history embodies a preference for institutional investors serving as lead plaintiffs. *E.g.*, *In re Gentiva Sec. Litig.*, 281 F.R.D. at 113 (collecting cases). Whatever the merits of that position may be—the preference is not embodied in the statutory text in any respect—that preference has been 'determinative' when an 'institutional investor has a slightly lower loss than another potential lead plaintiff.' *Id.* But as discussed above, Retirement System does not have a 'slightly lower' loss than Johal and McGee, and the Court rejects the contention (based on an analysis of all four *Olsten* factors) that the financial interests are comparable.)").

In this case, it is undisputed that Sand Hollow's losses are significantly higher that BRS's losses and therefore BRS's status as an institutional investor should not have affected the Court's determination to appoint BRS over Sand Hollow.

## CONCLUSION

For the foregoing reasons, Sand Hollow respectfully requests that the Court: (1)

reconsider and reverse the part of the May 7 Order appointing BRS Lead Plaintiff and its counsel Labaton Keller Sucharow LLP as Lead Counsel; and (2) appoint Sand Hollow as Lead Plaintiff and Faruqi & Faruqi, LLP as Lead Counsel for the Class.

Dated: May 20, 2024

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By:  */s/ James M. Wilson, Jr.*
     James M. Wilson, Jr.

James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email:  jwilson@faruqilaw.com

Robert W. Killorin (*pro hac vice* forthcoming)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email:  rkillorin@faruqilaw.com

*Attorneys for [Proposed] Lead Plaintiff Sand Hollow Management, LLC and [Proposed] Lead Counsel for the putative Class*