**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| WALTER EDWARD LEMM, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   vs.<br><br>NEW YORK COMMUNITY BANCORP, INC., THOMAS R. CANGEMI, and JOHN J. PINTO,<br><br>               Defendants. | No. 24-cv-00903-NRM-JRC<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u> |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

GLOSSARY OF CERTAIN DEFINED TERMS ............................................................ v

I.      INTRODUCTION ................................................................................................. 2

II.     JURISDICTION AND VENUE ........................................................................... 9

III.    EXCHANGE ACT PARTIES ............................................................................ 10

        A.      Plaintiffs ................................................................................................. 10

        B.      Exchange Act Defendants ...................................................................... 10

IV.     SUMMARY OF DEFENDANTS' FRAUD ...................................................... 14

        A.      The Credit Quality of NYCB's Primary Asset—Its CRE Loan Portfolio—
                Was a Critical Marker of the Bank's Financial Health ......................... 14

        B.      Pre-Class Period Changes in Rent Regulation Laws, Post-Pandemic
                Vacancies, and Interest Rate Hikes Put Significant Stress on the CRE
                Loan Market That Lacked Historical Precedent .................................... 17

        C.      NYCB Ensured Enhanced Regulatory Scrutiny of Its Risk Management
                and Loan Review Practices After Doubling Its Assets in Four Months ..... 22

                1.      NYCB Acquired Flagstar Through "Regulatory Arbitrage" To
                        Avoid FDIC Rejection of the Merger ......................................... 22

                2.      A Series of Bank Failures Roils the Markets and Spotlights the
                        Need for a Strong Risk Management Framework to Protect
                        Against Credit Risk .................................................................... 27

                3.      NYCB Acquires Signature's Assets, Ensuring Enhanced Scrutiny
                        of Its Risk Management Capabilities And CRE Asset Quality ............... 29

        D.      The Exchange Act Defendants Assured Investors That NYCB Complied
                with Heightened Regulatory Requirements and Standards and Touted the
                Bank's "Sound Risk Management Practices" and "Stellar" Asset Quality ......... 31

        E.      The Exchange Act Defendants' Statements Were Material to Investors ............. 37

        F.      In Reality, NYCB Did Not Maintain "Sound Risk Management Practices"
                and Misled Investors About the Credit Risks in Its CRE Portfolio ..................... 40

                1.      NYCB Failed to Adequately Assess the Deteriorating Asset
                        Quality of Its CRE Loan Portfolio and Lacked a Risk Management
                        Framework Required of a Category IV Bank ............................ 40

i

2.      Former Employees Confirm That NYCB Lacked a Risk
Framework, Had "Zero Controls" in Place, and Failed To
Effectively Identify Problem Loans as Part of Its Loan Review
Process ................................................................................................ 41

G.      As the Truth Is Revealed, NYCB Faces Collapse ................................................. 55

1.      NYCB Reveals Over Half a Billion Dollars in Expected Loan
Losses, a Net Quarterly Loss of $193 Million, and a Slashed
Dividend .............................................................................................. 55

2.      Media Reports Reveal New Concerns Over the Bank's Credit Risk
And Outlook ......................................................................................... 61

3.      The Truth Is Fully Revealed When NYCB Admits to Material
Weaknesses in Its Loan Review and Writes Off $2.4 Billion in
Goodwill .............................................................................................. 67

H.      Subsequent Events Further Confirm the Exchange Act Defendants' Fraud.......... 71

1.      NYCB Narrowly Avoids Failure with a $1 Billion Capital Infusion ....... 71

2.      NYCB Cleaned House, Ousting the Senior Leadership Responsible
for Risk Management and Credit Review .................................................... 74

3.      Media Reports Detail How NYCB Engaged in "Regulatory
Arbitrage" To Secure Approval of the Flagstar Merger .......................... 76

4.      NYCB Details How Its Material Weaknesses Impacted the
Company's Internal Loan Review And Recognition of Its ACL ............. 78

5.      NYCB's 2024 Financial Results to Date and Additional
Admissions ........................................................................................... 81

I.      NYCB's Material Weaknesses in Its Loan Review Process Prevented
Accurate Recognition of the Allowance for Credit Losses, in Violation of
GAAP ....................................................................................................................... 87

1.      GAAP and Other Governing Accounting Standards Established
Clear Rules Concerning How NYCB Should Have Recorded Its
Provision for Credit Losses ................................................................. 87

2.      NYCB's Admitted Material Weaknesses in Its Loan Review
Processes Impacted the Company's ACL and Inflated Income and
Earnings Throughout the Class Period ..................................................... 94

V.      THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING
STATEMENTS AND OMISSIONS .................................................................. 99

A.    The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About FDIC Opposition to the Flagstar Merger ........ 99

B.    The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About NYCB's Risk Management Practices and Controls ................................................................................................ 104

   1.    March 1, 2023—2022 Form 10-K ................................................ 104

   2.    March 20, 2023—Signature Transaction Conference Call .................... 106

   3.    April 21, 2023—2023 Proxy Statement and Annual Report to Shareholders .............................................................................. 108

   4.    April 28, 2023—First Quarter 2023 Earnings Call ............................... 110

   5.    October 26, 2023—Third Quarter 2023 Earnings Call .......................... 111

C.    The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About NYCB's Loan Review Process and Asset Quality ................................................................................. 112

   1.    July 27, 2022—Second Quarter 2022 Earnings Release ...................... 112

   2.    August 8, 2022—Second Quarter 2022 Form 10-Q ............................ 116

   3.    October 26, 2022—Third Quarter 2022 Earnings Release .................... 117

   4.    November 4, 2022—Third Quarter Form 10-Q ................................. 121

   5.    January 31, 2023—Fourth Quarter 2023 Earnings Release ................... 121

   6.    March 1, 2023—2022 Form 10-K ................................................ 125

   7.    March 20, 2023—Signature Transaction Press Release ........................ 127

   8.    April 21, 2023—2023 Proxy Statement and 2022 Annual Report ........ 128

   9.    April 28, 2023—First Quarter 2023 Earnings Release .......................... 128

   10.   May 10, 2023—First Quarter 2023 Form 10-Q ................................. 132

   11.   July 27, 2023—Second Quarter 2023 Earnings Release ...................... 133

   12.   August 9, 2023—Second Quarter Form 10-Q ................................. 138

   13.   October 26, 2023—Third Quarter 2023 Earnings Release .................... 138

   14.   November 9, 2023—Third Quarter Form 10-Q ................................. 144

D. The Exchange Act Defendants' Materially False and Misleading
Statements and Omissions About NYCB's Internal Controls Over
Financial Reporting and Their Effectiveness .................................................. 144

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ........................................... 148

VII. LOSS CAUSATION ....................................................................................... 160

VIII. PRESUMPTION OF RELIANCE .................................................................. 162

IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
BESPEAKS CAUTION DOCTRINE ............................................................ 164

X. CONTROL PERSON ALLEGATIONS .......................................................... 165

XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................ 167

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against
the Exchange Act Defendants .......................................................................... 167

COUNT II For Violation of Section 20(a) of the Exchange Act Against the Officer
Defendants ....................................................................................................... 169

XII. CLAIMS UNDER THE SECURITIES ACT OF 1933 .................................. 171

A. The Securities Act Parties .................................................................. 173

B. The Flagstar Merger Offering Documents ......................................... 178

C. Materially False and Misleading Statements and Omissions in the Offering
Documents ........................................................................................... 181

D. Defendants' Misstatements and Omissions Were Material ................ 195

E. Claims For Relief Under the Securities Act ....................................... 201

COUNT III For Violation of Section 11 of the Securities Act Against the  Securities Act
Defendants ....................................................................................................... 201

COUNT IV For Violation of Section 12(a)(2) of the Securities Act Against  NYCB .............. 204

COUNT V For Violation of Section 15 of the Securities Act Against the Signer
Defendants ....................................................................................................... 206

XIII. CLASS ACTION ALLEGATIONS ............................................................... 208

XIV. PRAYER FOR RELIEF ................................................................................ 209

XV. JURY DEMAND ........................................................................................... 210

iv

## GLOSSARY OF CERTAIN DEFINED TERMS

| | |
|---|---|
| ACL | Allowance for credit losses on loans and leases, a valuation allowance reported on a company's balance sheet, the calculation of which is governed by Accounting Standards Codification ("ASC") 326. |
| Category IV Banks | Risk-based category of U.S. banking organizations and holding companies of banks with $100 billion to $250 billion in total assets. |
| Charge-off | Refers to the amount of a loan balance that has been written off against the ACL. |
| Class Period | July 27, 2022 through February 29, 2024, inclusive |
| CRE | Commercial Real Estate Loans, as defined in the CRE Guidance, includes loans secured by real estate for multifamily residential properties, non-residential properties, and construction, land, development and other land loans. |
| CRE Concentration Ratio | Refers to the sum of multi-family, non-owner occupied CRE, and acquisition, development, and construction ("ADC") loans divided by total risk-based capital. |
| CRE Guidance | Guidance issued by the Federal Banking Agencies (defined herein) in 2006: *Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580 (Dec. 12, 2006). |
| CW | Confidential Witness who was a former employee of NYCB. CWs are referred to in the masculine to preserve their anonymity. |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act, enacted in July 2010.  Pub. L. No. 111-203, 124 Stat. 1376. |
| DSCR | Debt Service Coverage Ratio is an indication of a borrower's ability to repay a loan. DSCR generally measures the cash flows available to a borrower over the course of a year as a percentage of the annual interest and principal payments owed during that time. |
| Defendants | Collectively, the Exchange Act Defendants and the Securities Act Defendants. |
| EGRRCPA | Economic Growth, Regulatory Relief, and Consumer Protection Act, enacted in 2018 (Pub. L. 115-174 § 104(a)(2), 132 Stat. 1296, 1300–01). |
| Exchange Act Defendants | Collectively, Defendants NYCB and the Officer Defendants. |

| | |
|---|---|
| Federal Banking Agencies | Collectively, the FDIC, Federal Reserve, and OCC. |
| Federal Reserve | The Federal Reserve System, the central bank of the United States that, *inter alia*, promotes the stability of the financial system. |
| FDIC | Federal Deposit Insurance Corporation, the regulator responsible for oversight of NYCB up and until the Flagstar Merger on December 1, 2022. |
| Flagstar | Flagstar Bancorp, Inc. |
| Flagstar Merger | NYCB's acquisition of and merger with Flagstar, which closed on December 1, 2022, also referred to as the "Offering." |
| HSTPA | Housing Stability and Tenant Protection Act of 2019, passed by New York State on June 14, 2019. |
| LTV | Loan-to-Value Ratio, which measures the balance of a loan as a percentage of the appraised value of the underlying property. |
| Multifamily | Multifamily real estate, including mortgage loans secured by a rental or cooperative apartment building with more than four units. |
| NPA | Non-Performing Assets consist of non-performing loans, OREO and other repossessed assets. |
| NPL | Non-Performing Loans consist of non-accrual loans and loans that are 90 days or more past due and still accruing interest. |
| NYCB | Defendant New York Community Bancorp, Inc. (referred to herein as "NYCB," the "Bank," or the "Company"). |
| NYDFS | New York Department of Financial Services |
| NYCB | Defendant New York Community Bancorp, Inc. (referred to herein as "NYCB," the "Bank," or the "Company"). NYCB is also the Company's stock symbol on the New York Stock Exchange. |
| OCC | Office of the Comptroller of the Currency, the regulator responsible for oversight of NYCB following the Flagstar Merger on December 1, 2022. |
| Officer Defendants | Collectively, Defendants Thomas R. Cangemi, John J. Pinto, Alessandro P. DiNello, and John T. Adams |

| | |
|---|---|
| PCL | Provision for credit losses, a reserve that reflects the increase in the ACL and is reported as an expense on a company's income statement, which is governed by ASC 326. |
| Plaintiffs | Collectively, Lead Plaintiff Boston Retirement System and additional plaintiff Indiana Public Retirement System |
| Sarbanes-Oxley | Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241, or "SOX" |
| Securities Act Plaintiff | Plaintiff Indiana Public Retirement System |
| Securities Act Defendants | Collectively, Defendants NYCB and the Signer Defendants |
| Signature | Signature Bridge Bank (formerly Signature Bank, N.A prior to the bank's failure) |
| Signer Defendants | Collectively, Defendants Thomas R. Cangemi, John J. Pinto, Alessandro P. DiNello, Robert Wann, David Treadwell, Dominick Ciampa, Hanif W. Dahya, Leslie D. Dunn, Marshall J. Lux, James J. O'Donovan, Lawrence Rosano, Jr., Ronald A. Rosenfeld, and Lawrence J. Savarese. |

Court-appointed Lead Plaintiff Boston Retirement System ("BRS" or "Lead Plaintiff") and additional plaintiff Indiana Public Retirement System ("Indiana" and, collectively with BRS, "Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action on behalf of themselves and a class consisting of all persons and entities that purchased or otherwise acquired New York Community Bancorp, Inc. (referred to herein as "NYCB," the "Bank," or the "Company") common stock during the period from July 27, 2022 through February 29, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Plaintiffs assert claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act") against NYCB, the Company's former Chief Executive Officer ("CEO"), Thomas R. Cangemi ("Cangemi"), NYCB's former Chief Financial Officer ("CFO"), John J. Pinto ("Pinto"), NYCB's former Head of Commercial Real Estate Finance, John T. Adams ("Adams"), and NYCB's non-Executive Chairman of the Company's Board of Directors ("Board"), Alessandro P. DiNello ("DiNello") (collectively defined as the "Exchange Act Defendants"). Plaintiff Indiana also brings claims for violation of the Securities Act of 1933 (the "Securities Act") against the Securities Act Defendants (defined below) on behalf of all persons and entities that owned Flagstar Bancorp, Inc. ("Flagstar") common stock and acquired NYCB common stock in exchange for their shares of Flagstar through NYCB's acquisition of and merger with Flagstar, which closed on or about December 1, 2022 (the "Flagstar Merger"), and were damaged thereby.

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the ongoing investigation of their undersigned counsel ("Lead Counsel"). This investigation includes review and analysis of, among other things: (i) public filings made by NYCB with the SEC; (ii) transcripts of the Company's conference calls with analysts and

investors; (iii) NYCB presentations, press releases, and other public statements issued by Defendants; (iv) research reports issued by securities and financial analysts; (v) news and media reports and other publicly available information concerning NYCB and Defendants; (vi) publications from the government and regulators, including the Federal Deposit Insurance Corporation ("FDIC") and the Office of the Comptroller of the Currency ("OCC") (the "Federal Banking Agencies"); (vii) economic analyses of the movement and pricing of the Company's publicly traded securities; and (viii) statements from former employees of NYCB. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.       INTRODUCTION

1.       This federal securities class action arises from Defendants' materially false and misleading statements and omissions concerning the risks posed to NYCB by the deteriorating credit quality of the Bank's primary asset—its commercial real estate loan ("CRE") portfolio, valued as high as $80 billion during the Class Period—as well by the heightened regulatory scrutiny and standards imposed on the Bank as it doubled its size in a matter of months.

2.       NYCB, a 150-year-old financial institution known as a CRE lender to multi-family landlords and other non-residential commercial property owners in the New York metro area, recklessly embarked on a dramatic four-month growth spurt when it acquired Flagstar and billions of dollars of the assets of recently collapsed competitor Signature Bridge Bank ("Signature"). Those acquisitions catapulted NYCBt into the heavily regulated $100 billion plus "Category IV" banking class, immediately subjecting it to heightened regulatory scrutiny. Regulators focused on NYCB's ability to withstand losses from its outsized portfolio of CRE loans at a time when

NYCB's CRE portfolio was under incredible stress from an unprecedented trifecta of market events—changes in New York City's rent regulation laws, skyrocketing post-pandemic office vacancies, and a string of federal interest rate increases that created repricing and repayment risks. In addition, the collapse of three Category IV banks in early 2023, raised serious concerns about risk management safeguards at NYCB.

3.       Led by NYCB's recently-appointed CEO, Defendant Cangemi, the Exchange Act Defendants emphatically assured the market in the lead-up to and in the wake of these acquisitions that NYCB—now one of the largest banks in the United States—maintained a "***stellar***" CRE portfolio largely immune from market pressures.  Moreover, Cangemi and the other Exchange Act Defendants were adamant that NYCB was more than ready for heightened scrutiny by regulators after having spent years prioritizing development of a Category IV-level risk management framework.

4.       Specifically, the Exchange Act Defendants expressly and repeatedly assured investors that risk management was the Bank's "***#1 focus***"; such that its "***comprehensive risk management framework***" and "***very strong risk management team***" supported Defendants' statements that NYCB was "***laser focused on credit quality***," and NYCB's CRE loan portfolio was "***sound***," "***unbelievably strong***," "***superb***," "***stellar,***" and "***among the best in the industry***." As late as October 2023, Defendant Cangemi, stated unequivocally that "***our asset quality metrics continue to be among the best in the industry . . .***" and "[d]espite aggressive Fed tightening and an inverted yield curve, still, we produced . . . ***continued strong levels of asset quality, which remains our hallmark***."  NYCB's former President of Commercial Real Estate Finance, Defendant Adams, responded to analyst concerns in the third quarter of 2023 over the multi-family market, and represented that the Bank was "***monitoring the rent-regulated properties closely, but***

***there's not really a lot of cracks in that particular portfolio that is really raising anything for us to have any real concern right at this time***."  NYCB's former CFO, Defendant Pinto, similarly shrugged off analyst concerns about high interest rates increasing repricing risk in the CRE market, stating, "***despite the negativity you're reading about, our portfolio is performing extremely well relevant to the marketplace***."  Based on the Bank's purportedly careful monitoring of both its portfolio and the market, NYCB recorded a comparatively low allowance for credit losses ("ACL") and related provision for credit losses ("PCL"), resulting in positive net income and earnings that consistently met or beat analyst expectations during the Class Period.  As peer bank stock prices fell in 2023, NYCB's stock price steadily increased, reaching a peak price of $41.61 per share on July 31, 2023.[1]

5.      Only a few months later, the Exchange Act Defendants' representations about the Bank's Category IV-level risk management framework, its "strong" and "stellar" CRE asset quality, and its internal controls over financial reporting were revealed to be untrue in a series of disclosures beginning with the Bank's release of its fourth quarter 2023 earnings.

6.      On January 31, 2024, NYCB shocked the market with news of a fourth quarter net loss of $252 million due to a $552 million provision for loan losses—an 800% increase from the prior quarter.  In connection with these devastating results, NYCB was forced to preserve capital by slashing its consistently reliable dividend by 71%, from $0.17 to $0.05.  News of the Bank's decision to slash dividends and set aside over half a billion dollars for potential loan losses—ten times greater than analyst expectations—rattled the market, with one analyst noting: "Something has clearly changed in their tone . . .  What changed?  When did it change?"  Following this news,

---

[1] The Company issued a one-for-three reverse stock split, effective July 11, 2024, such that every three shares of common stock were combined into one share of common stock. All NYCB stock price references herein use adjusted post-reverse stock split pricing unless otherwise stated.

shares of NYCB plunged by as much as **46%** in intraday trading, ultimately closing **38%** lower on January 31, 2024 at $19.41 per share—the stock's worst one-day drop on record.

7.      Defendants attempted to quiet the market's reaction by explaining that the increased loss reserves and charge offs were "proactive" and "necessary enhancements that come with being a $100 billion plus Category IV bank," rather than indicative of any true deterioration in the asset quality of the CRE loan portfolio.  News reports over the following days cast serious doubt on Defendants' explanations.   On February 5, 2024, *Bloomberg* reported that, rather than being "proactive," NYCB was forced to take "drastic financial moves" in response to "behind-the-scenes conversations with" and in the face of "mounting pressure from a top US watchdog."  *Bloomberg* further revealed that amidst this "mounting pressure," two executives responsible for managing risk at the Bank—its Chief Risk Officer, Nicholas Munson, as well as its Chief Audit Executive— had secretly been removed in prior months, leaving NYCB without anyone in this critical position. This news rang alarm bells because, as media reports noted, the dramatic and simultaneous collapses in 2023 of two other similarly-sized banks were linked to the sudden departures of their chief risk officers.  On this news, NYCB's stock dropped an additional **22%** by the close of trading on February 6, 2024.

8.      Within days, credit rating agency Moody's slashed the Company's corporate debt rating to "junk," and NYCB announced a shakeup in its leadership wherein Defendant Cangemi would now report to the newly elevated Executive Chairman, Defendant Alessandro DiNello.  *The Wall Street Journal* reported that "[DiNello] said he was coming in to right the ship."   More information came to light when, on February 22, 2024, a prominent independent watchdog published a report revealing that the Bank's meteoric sprint to Category IV status was made possible by NYCB's "regulatory arbitrage" through which NYCB avoided the imminent rejection

5

of the Flagstar Merger by its longtime regulators at the FDIC by changing the banks' charters in order to replace the FDIC with the OCC.  This arbitrage paved the way for a new regulator, with no historical exposure to NYCB, to approve the Flagstar Merger.  However, inviting the fresh eyes of the OCC opened the Company up to new and heightened scrutiny as NYCB approached and then quickly surpassed the $100 billion Category IV threshold.

9.      On February 29, 2024, NYCB delayed the filing of its Form 10-K, wrote off $2.4 billion in goodwill (reducing income by the same amount), and made a startling admission: the Bank's "***laser focus[] on credit quality***" and "***comprehensive risk framework***" were a fabrication. The Bank admitted to "material weaknesses in the Company's internal controls related to internal loan review, resulting from ***ineffective oversight, [ineffective] risk assessment and [ineffective] monitoring activities***."  As further explained in the Company's delayed Form 10-K, these material weaknesses meant that NYCB's (a) "internal loan review processes ***lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged***," (b) "ineffective controls ***impact[ed] the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately [recognize] the allowance for credit losses on loans and leases***," and (c) with respect to its "periodic risk assessment," the Company ***lacked processes*** "***to identify and timely respond to emerging risks in . . . internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates***."

10.     With these further admissions and disclosures, the price of NYCB common stock fell yet again, dropping ***26%*** on March 1, 2024 and then another ***23%*** on March 4, 2024, closing at $8.19 per share.  On March 6, 2024, trading halted on the NYSE as NYCB shares plunged further and traded as low as $5.10.

11.     NYCB's risk management and loan review failures were no secret within the Company.  A former employee in NYCB's Regulatory Lending and Compliance Team, CW-1,[2] described how NYCB lacked ***any*** formal risk management framework, explaining that he was asked to help put together a "risk framework" ***following*** the March 2023 Signature Transaction, in direct response to OCC requests.  CW-1 noted that it was "mindboggling" that NYCB had "nothing in place" in terms of controls, adding that NYCB did not even satisfy the first requirement of a risk framework—identifying and analyzing risks.  Another former employee, CW-2, who worked directly with NYCB's secretly removed Chief Risk Officer, stated that the senior executive was set up for failure because he had too much responsibility and was "in over his head," overseeing nine departments with only a background in auditing, and not in credit risk.

12.     Other former employees explained how NYCB's CRE credit risks were systemic and ran deeper than—and predated—the more recent market headwinds, creating additional undisclosed risks to the portfolio.  These former employees had firsthand knowledge of NYCB's lending practices and described how the Bank approved loans from repeat borrowers "no matter what;" relied on a single broker with lax underwriting standards for the majority of its multi-family loans; and allowed borrowers to withhold updated financials prior to receiving a loan.  Further, former NYCB employees detailed how, after loans were approved, the Bank failed to conduct proper and timely credit and appraisal reviews of at-risk loans, leaving deteriorating loans without accurate risk analysis.

13.     The full scope of Defendants' misrepresentations and omissions has continued to materialize.  On March 6, 2024, as trading was halted and fears over the Bank's imminent collapse

---

[2] Confidential Witnesses ("CWs") are former NYCB employees that are referred to in the masculine to protect their identity.

spread, NYCB was rescued by a $1 billion capital infusion from an investor group led by former Treasury Secretary Steven Mnuchin.  This $1 billion lifeline was conditioned on a sweeping overhaul of NYCB's management.  Joseph Otting, a former leader of the OCC, was appointed CEO, ending the brief term of Defendant DiNello, and Otting announced that the current NYCB Board would be purged of its legacy NYCB directors, including Defendant Cangemi.  Within weeks, new management had cleaned house, and the Officer Defendants were replaced.  New CEO Otting left no question that the removed officers were "***accountable***" for the Bank's material weaknesses, and the newly composed Board denied Defendants Cangemi, Pinto, and Adams any incentive bonuses for 2023, attributing this decision to NYCB's "***significant risk management failures***" under their watch.

14.    NYCB is still struggling to right the ship.   In the two quarters immediately following the Class Period, NYCB recorded an additional $705 million in loss reserves to account for expected credit losses, bringing the post-disclosure increase to over $1.2 billion, resulting in a reported non-GAAP net loss of nearly $500 million.  Indicative of the true, deteriorated asset quality of the CRE loan portfolio, NYCB's number of non-performing loans and past due loans also increased astronomically, indicating additional losses to come.  NYCB's faltering financials following the Class Period led the Company to further slash its historically high dividend to the bare minimum—$0.01.

15.    As a direct result of Defendants' fraudulent misrepresentations, investors have lost billions of dollars and NYCB's stock price has not recovered, closing at $10.93 per share on September 24, 2024, down from its Class Period high of $41.61 per share.

16.    By this Complaint, Plaintiffs bring two different sets of claims on behalf of investors that purchased and/or acquired NYCB's securities during the Class Period.  Counts I and

II assert securities-fraud and related control-person claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 against NYCB and the Officer Defendants (defined below). Counts III, IV, and V, assert strict liability, negligence, and control-person causes of action against those Securities Act Defendants (defined below) who are statutorily responsible under Sections 11, 12(a)(2), and 15 of the Securities Act for materially untrue statements and misleading omissions in the prospectus and registration statement (and documents incorporated by reference therein) for the Flagstar Merger.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a); Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and Section 22 of the Securities Act, 15 U.S.C. § 77v.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b); Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a); and Section 22 of the Securities Act, 15 U.S.C. § 77v.

20.    NYCB maintains its corporate headquarters in Hicksville, New York, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.     EXCHANGE ACT PARTIES

#### A.     Plaintiffs

21.     Lead Plaintiff Boston Retirement System ("BRS" or "Lead Plaintiff") is a government defined benefit pension plan that administers retirement benefits to all employees of the City of Boston, Massachusetts, as well as its autonomous agencies, including: the City of Boston, the Boston Planning & Development Agency, the Boston Housing Authority, the Boston Public Health Commission, and the Boston Water and Sewer Commission.  Boston Retirement System oversees the pensions of more than 34,000 retired and active members.  The value of Boston Retirement System's assets under management is approximately $7 billion.  As shown in Lead Plaintiff's certification (ECF No. 13-4), BRS purchased or otherwise acquired over 370,000 shares of NYCB common stock during the Class Period.  BRS suffered damages as a result of the violations of the federal securities laws alleged in the Complaint.

22.     Additional Plaintiff Indiana Public Retirement System ("Indiana" or the "Securities Act Plaintiff") provides retirement, disability, survivor, and other benefits and is headquartered in the state of Indiana.  As of fiscal year-end 2023, Indiana manages approximately $46.7 billion in assets on behalf of more than 500,000 members and their beneficiaries, representing 1,318 employers including public universities, school corporations, municipalities, and state agencies.  As shown in the certification attached as Exhibit A hereto, Indiana purchased or otherwise acquired over 145,000 shares of NYCB common stock during the Class Period, including 44,435 shares of NYCB traceable to the Offering when Indiana's shares of Flagstar common stock were converted into NYCB shares pursuant to and traceable to the Offering Documents.

#### B.     Exchange Act Defendants

23.     NYCB became a public company on July 20, 1993 under the name Queens County Bancorp, Inc., to serve as the holding company for Queens County Savings Bank, a bank that was

established on April 14, 1859 as the first savings bank chartered by the State of New York in Queens. Queens County Savings Bank and Queens County Bancorp, Inc. were renamed as New York Community Bank and NYCB, respectively, in 2000. In December 2022, following the Merger between NYCB and Flagstar Bancorp, Inc., New York Community Bank was renamed Flagstar Bank, N.A., with NYCB remaining as the holding company for Flagstar Bank, N.A. The Company is headquartered in Hicksville, New York, and operates approximately 420 branches around the nation, including numerous branches in the Northeast and Midwest.

24.     NYCB common stock is listed and traded on the New York Stock Exchange ("NYSE"), an efficient market, throughout the Class Period under the ticker symbol NYCB. As of May 6, 2024, there were more than 820 million shares of NYCB common stock issued and outstanding. On June 27, 2024, the Company announced a 1 for 3 reverse stock split, effective July 11, 2024. On the effective date, every three shares of common stock issued and outstanding or held by the Company in treasury were combined into one issued share of common stock. After the reverse stock split, as of August 7, 2024, there were more than 351 million shares of NYCB common stock issued and outstanding. Historical (pre-July 12, 2024) pre-split share prices reflected herein have been adjusted to reflect the split, unless otherwise noted.

25.     Defendant Thomas R. Cangemi served as President and CEO of NYCB from December 31, 2020 until February 23, 2024, when he resigned effective immediately. When he was appointed CEO in December 2020, Cangemi was also appointed as member of NYCB's Board of Directors ("Board") and served as Chairman of the Board from March 26, 2021 to November 30, 2022. Cangemi resigned as a member of NYCB's Board on March 11, 2024. Cangemi first joined NYCB on July 31, 2001, and from April 5, 2005 through December 30, 2020, served as the Company's Senior Executive Vice President and CFO. Cangemi signed NYCB's materially

misstated public filings including quarterly and annual reports, as well as the Registration Statement for the Offering, all of which were filed with the SEC during the Class Period, and made other materially false and misleading statements to investors as set forth below.

26.     Defendant John J. Pinto served as the Company's Chief Financial Officer ("CFO") from December 31, 2020, and Senior Executive Vice President from February 5, 2021, until he ceased serving in those roles on or about April 12, 2024.  After joining NYCB on July 31, 2001, Pinto served as Executive Vice President and Chief Accounting Officer of the Company from April 5, 2005 until he was promoted to CFO.  Pinto signed NYCB's materially misstated public filings including quarterly and annual reports, as well as the Registration Statement for the Offering, all of which were filed with the SEC during the Class Period, and made other materially false and misleading statements to investors as set forth below.

27.     Defendant Alessandro P. DiNello ("DiNello") was President and CEO of Flagstar prior to the Merger and made statements directly to NYCB shareholders in that capacity.  DiNello joined NYCB's Board of Directors as a Non-Executive Chairman on December 1, 2022 and in that capacity, signed NYCB's March 1, 2023 Form 10-K.  DiNello served as Executive Chairman of the Board from February 6, 2024 through April 1, 2024. DiNello replaced Defendant Cangemi as CEO on February 29, 2024, following the Company's admission regarding material weaknesses in its internal controls, and served in that role for 32 days.  DiNello signed a "Consent of Prospective Director" pursuant to Rule 438 of the Securities Act in which he consented to being named in the Registration Statement as a prospective director.  He reviewed, contributed to, and signed the Offering Documents, and he was named in the Registration Statement as an incoming Non-Executive Chairman of NYCB's Board of Directors.

28.     Defendant John T. Adams served as the Company's Senior Executive Vice President and President of Commercial Real Estate Finance during the Class Period until he ceased serving in that role on April 12, 2024.  At the start of the Class Period, Adams also served as Senior Executive Vice President and Director of Indirect Multi-Family Lending beginning on December 1, 2022, and was previously appointed Chief Lending Officer in January 2020.  Prior to those roles, Adams served as Executive Vice President and Chief Credit Officer from 2017 to 2020, managing NYCB's credit risk and credit risk administration responsible for ensuring the adequacy of NYCB's asset quality.  Adams joined NYCB in 2000.  Adams made false and misleading statements to investors as set forth below.

29.     Defendants Cangemi, Pinto, DiNello, and Adams are collectively referred to hereinafter as the "Officer Defendants."  The Officer Defendants, because of their positions within NYCB, possessed the power and authority to control the contents of NYCB's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations were materially false and/or misleading when made.

30.     NYCB and the Officer Defendants are collectively referred to as the "Exchange Act Defendants."

IV.    **SUMMARY OF DEFENDANTS' FRAUD**

A.    **The Credit Quality of NYCB's Primary Asset—Its CRE Loan Portfolio—Was a Critical Marker of the Bank's Financial Health**

31.    NYCB is a leading producer of CRE loans collateralized by multi-family apartment buildings (its self-described "bread and butter" product) and other non-residential commercial office and retail spaces.  When faced with market volatility, NYCB's CRE loans are a significant liability, if not an existential threat, to a bank with a heavy concentration in this product.  As noted by the OCC, while "many banks rely on revenue from [CRE lending] to grow and prosper. . . . [i]mprudent risk-taking and inadequate risk management, particularly during periods of rapid economic growth, can lead to significant levels of problem assets and loan losses and can contribute to bank failures."[3]  This risk is most pronounced in banks "with large concentrations of CRE loans" because given "the cyclical nature of real estate markets[,] . . . [a]s markets peak and decline, banks with large concentrations of CRE loans can suffer considerable distress."

32.    NYCB held an extremely high concentration of CRE loans.  A bank's CRE Concentration Ratio is calculated against its total risk capital (its Tier 1 and Tier 2 equity), which serves as a cushion for the bank to absorb any unexpected losses.[4]  A high CRE Concentration Ratio, defined as total CRE loans that represent 300% or more of the institution's total capital, is a measure of a bank's potential risk of stress and indicates that a bank will be subject to increased scrutiny from regulators over its credit risk functions.  NYCB far surpassed, and at times more than doubled, the 300% risk threshold, with a CRE concentration of ***between 501% and 788%*** throughout the Class Period, indicating a material and key weakness related to CRE volatility.

---

[3] Comptroller's Handbook on Safety and Soundness, Commercial Real Estate Lending, OFF. OF COMPTROLLER OF THE CURRENCY (Version 2.0, Mar. 2022), at 1 ("OCC 2022 CRE Lending Handbook").

[4] NYCB classified its CRE loans, for purposes of its "CRE Concentration Ratio," as the sum of multi-family, non-owner occupied CRE, and ADC loans. *See, e.g.*, 2022 Form 10-K, at 5.

Indeed, as the table below shows, NYCB's CRE concentration dwarfed that of its 2023 self-identified peer banks:

**NYCB and Peer Bank CRE Concentration Ratios:**

| Bank | 2Q22 | 3Q22 | 4Q22 | 1Q23 | 2Q23 | 3Q23 | 4Q23 |
|------|------|------|------|------|------|------|------|
| **NYCB** | 788% | 779% | 614% | 523% | 509% | 504% | 501% |
| M&T | 290% | 278% | 269% | 258% | 258% | 251% | 241% |
| First Citizens | 226% | 245% | 253% | 150% | 150% | 151% | 152% |
| Citizens | 164% | 160% | 158% | 161% | 163% | 160% | 164% |
| Key | 138% | 136% | 130% | 131% | 126% | 121% | 118% |
| Regions | 152% | 159% | 156% | 153% | 152% | 150% | 145% |
| Fifth Third | 89% | 84% | 83% | 82% | 85% | 80% | 81% |
| Huntington | 124% | 124% | 122% | 118% | 115% | 113% | 111% |

33.     In response to increased concern over the "substantial risks" posed to regulated banks by heavy and unbalanced CRE concentrations, the Federal Banking Agencies issued guidance in 2006 specifically addressing the risk management concerns inherent in highly concentrated CRE loan portfolios, noting that a high concentration "could create safety and soundness concerns in the event of a significant economic downturn" (the "CRE Guidance").[5]

34.     The CRE Guidance emphasized that one of the Bank's "critical" functions was to monitor the credit risk of its concentrated CRE loan portfolio over the life of the loan because only a robust credit review system ensures that banks have an "effective, accurate, and timely risk-rating system . . . to assess credit quality and, ultimately, to identify problem loans."  The Bank's credit risk review function was expected to assign risk ratings to loans that are "risk sensitive, objective, and appropriate for the types of CRE loans underwritten by the institution" and "should be reviewed regularly for appropriateness."  Banks like NYCB, with CRE concentrations greater

---

[5] *Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580 (Dec. 12, 2006).

15

than 300%, were subject to even greater scrutiny because they needed to demonstrate an "ability to withstand difficult market conditions," and that ability "will depend heavily on the adequacy of their risk management practices and capital levels."

35.    NYCB acknowledged in its filings with the SEC that, pursuant to the CRE Guidance, NYCB's "management must employ heightened risk management practices that address key elements, including board and management oversight and strategic planning, portfolio management, development of underwriting standards, risk assessment and monitoring through market analysis and stress testing, and maintenance of increased capital levels as needed to support the level of CRE lending."[6]

36.    Throughout the Class Period, NYCB's CRE loans dominated the Bank's total assets, comprising 90% of the Bank's total loans held for investment prior to the Flagstar Merger, and nearly 70% afterwards.  Given their weight, the quality and performance of NYCB's CRE portfolio was, according to the Company's SEC filings, "instrumental to [NYCB's] production of solid earnings and [its] consistent record of exceptional asset quality."  NYCB measured and reported its "exceptional asset quality" through several metrics detailed in its SEC filings.  A primary metric cited by the Company and analysts was the amount of nonperforming, or nonaccrual, loans ("NPL"), which reflected loans that were either 90 days or more past due or otherwise impaired because the Bank no longer expected to collect all contractually due amounts.

37.    NYCB also represented that its loan review process assigned a "credit quality indicator" risk rating to its CRE loans to further help identify problem loans.  According to the Bank's SEC filings, the Bank's internal risk rating system classified the CRE portfolio into four categories of risk: "pass," "special mention," "substandard," or "doubtful."  According to NYCB:

---

[6] *See, e.g.*, 2022 Form 10-K at 17-18.

pass loans are of satisfactory quality; special mention loans have potential weaknesses that deserve management's close attention; substandard loans are inadequately protected by the current net worth and paying capacity of the borrower or of the collateral pledged (these loans have a well-defined weakness and there is a possibility that the Company will sustain some loss); and doubtful loans, based on existing circumstances, have weaknesses that make collection or liquidation in full highly questionable and improbable.[7]

The purpose of the risk ratings was purportedly to assign a rating to each loan that correlated to the amount of loan loss reserves set aside for potential losses on the loan, as well as the likelihood that some portion of the loan amount would be "charged off" because the Bank could not expect to receive the full amount of the loan's principal.[8]

**B.      Pre-Class Period Changes in Rent Regulation Laws, Post-Pandemic Vacancies, and Interest Rate Hikes Put Significant Stress on the CRE Loan Market That Lacked Historical Precedent**

38.      Leading up to and continuing throughout the Class Period, a series of events, including some with no historical precedent—stark new rent regulation laws and the lasting impacts of the COVID-19 pandemic—placed significant stress on NYCB's CRE loan portfolio, increasing the need for NYCB to implement and sustain the required "heightened risk management practices" to ensure that NYCB's loan portfolio review adequately assessed asset quality risks to the Bank and its investors.

39.      *First*, on June 14, 2019, New York passed the Housing Stability and Tenant Protection Act of 2019 ("HSTPA"), a series of sweeping changes to New York's real estate laws governing rent-controlled and rent-stabilized properties.   Roughly one-third of New York's housing rental stock—roughly one million tenancies—qualifies for a decades-old regulatory regime known as rent stabilization, which comes with more modest limits on rent increases and a

---

[7] *See, e.g.*, 2022 Form 10-K at 103-04.
[8] The inadequacy of the Bank's allowance for credit losses ("ACL") and related provision for credit losses ("PCL") is discussed in more detail in Section IV.I, *infra*.

host of other tenant protections.  The HSTPA materially increased those tenant protections, eliminating the way rent-stabilized property landlords could increase rent or otherwise secure capital from a property.

40.    Prior to the HSTPA, rent increases and conversion to market-rate rents were the two main avenues used by multi-family landlords to increase revenues and net operating expenses. The legislation both limited a landlord's ability to increase rents on rent-regulated apartments and made it more difficult to convert rent-regulated apartments to market-rate apartments.  Without those revenue avenues, industry experts opined that the HSTPA "was 'a horror show' that 'gutted and neutered' routes to deregulation."[9]  NYU's Furman Center reviewed HSTPA's impact on rent stabilized properties in New York City through the first quarter of 2020 and issued a report finding that even within just the first year of HSTPA's passage, "stabilized buildings were already declining in value and owners were increasingly offloading these depreciating assets."  The report's authors concluded "that HSTPA had a statistically significant differential impact on the change in sales prices."

41.    During the Class Period, NYCB was the largest lender to New York's rent-stabilized property landlords, with approximately half of NYCB's $38 billion multi-family loan portfolio subject to HSTPA limitations.  As a result, HSTPA was poised to negatively impact the value, and loan to value ratios, of nearly one-quarter of NYCB's total loan portfolio.  As noted by the CEO of a multi-family investment firm in late 2021, "If you really look at rent-stabilized, the

_____

[9] Suzannah Cavanaugh, *Who is still buying NYC's rent-stabilized buildings?*, THE REAL DEAL (Oct. 5, 2021), https://therealdeal.com/magazine/national-october-2021/who-is-still-buying-rent-stabilized-buildings/ (last accessed on Sept. 6, 2024).

units are worth almost zero," continuing to question, "Why would you have an apartment where your taxes and maintenance are higher than your rent roll?"[10]

42.     **Second**, shortly after passage of the HSTPA, the COVID-19 pandemic disrupted the non-owner occupied CRE loan market, NYCB's second largest asset at the start of the Class Period, as employees were forced to work from home and employers began to realize the benefits of remote working.  The result was a stark increase in office vacancy rates, which placed pressure on landlords' ability to collect rent and impacted the value of these properties.  New York City, the locus of NYCB's CRE loans, was one of the hardest hit office markets due to the pandemic and the impact of remote working.  According to a June 2, 2022 industry news report published in *The Real Deal*, vacancy rates reached record highs in several major markets, including New York, which experienced a 20.4% vacancy rate for the fourth quarter of 2021.[11]  Similarly, the New York City Comptroller reported that city office vacancy rates nearly doubled at the start of the pandemic and remained at 14.6% by the end of 2023.[12]  A May 2022 analysis reviewed New York's commercial office stock by "taking into account pandemic-induced cash flow and discount rate effects," and concluded that by 2029, New York City's office stock would fall in value by 28 percent, or $49 billion, as lease revenue and the number of new leases would drop. [13]  Given that

---

[10] *Id.*

[11] Hiten Samtani, *Tough decade at the office: Analysis predicts $500B value destruction*, THE REAL DEAL (June 2, 2022), https://therealdeal.com/new-york/2022/06/02/tough-decade-at-the-office-analysis-predicts-500b-value-destruction/ (last accessed on Sept. 6, 2024).

[12] Office vacancy rates doubled across New York City by the end of 2023, from 7.8% at the start of 2020 to 14.6% as of Q4 2023. *Spotlight: New York City's Office Market*, N.Y.C. COMPTROLLER (May 14, 2024), https://comptroller.nyc.gov/reports/spotlight-new-york-citys-office-market/ (last accessed on Sept. 6, 2024).

[13] Arpit Gupta, et al., *Work From Home and the Office Real Estate Apocalypse*, NAT'L BUREAU OF ECON. RSCH. (Sept. 2022), https://www.nber.org/system/files/working_papers/w30526/w30526.pdf (last accessed on Sept. 6, 2024).

NYCB's non-owner occupied CRE loans totaled nearly 20% of its loan portfolio by the end of the Class Period, the Bank was highly exposed to the declining CRE office and retail markets.

43.     **Third**, in addition to rent regulation and office vacancy pressures, a series of interest rate hikes placed critical additional pressures on the value of NYCB's CRE loan portfolio. Between March 17, 2022 and July 26, 2023, the Federal Reserve Bank conducted eleven separate rate hikes in the space of twenty months, which raised the Federal Fund Rate from a low of 0.25% to 5.50%. By mid-2022, increases in treasury rates and issuance spreads resulted in CRE mortgage rates of between 5.5% and 6.25% that Moody's reported "were unacceptable to most borrowers."[14] These rates only increased through the Class Period. Higher mortgage interest rates have a direct impact on the asset quality of a bank's CRE loan portfolio because higher interest rates are likely to decrease a property's debt service coverage ratio ("DSCR") level, which reflects the capacity of CRE borrowers to meet their debt obligations.[15] An April 2023 research study concluded that the recent interest rate hikes, combined with the widespread adoption of hybrid working patterns, meant that approximately 14% of all loans and 44% of office loans appear to be in a "negative equity" where their current property values are less than the outstanding loan balances. The same analysis concluded that a 10% default on CRE loans, which was a range close to what was seen in the Great Recession, would result in about $80 billion of additional bank losses, a number that

---

[14] Darrell Wheeler, et al., *Fed Rate Hikes Likely to Translate into Further CRE Lending Slowdown and More Loan Extensions*, MOODY'S (June 22, 2022). https://cre.moodysanalytics.com/insights/cre-trends/fed-rate-hikes-likely-to-translate-into-further-cre-lending-slowdown-and-more-loan-extensions/ (last accessed on Sept. 6, 2024).

[15] NYCB defined its DSCR as an indication of a borrower's ability to repay a loan. The DSCR generally measures the cash flows available to a borrower over the course of a year as a percentage of the annual interest and principal payments owed during that time. A property's DSCR is calculated as the annual property net cash flow divided by its annual debt service. A DSCR less than one signifies a "negative income" situation, where the net proceeds from the property are inadequate to cover debt obligations. This scenario significantly raises the risk of borrower default.

could go up to $160 billion of losses if default rates rose to 20%.[16]  Skyrocketing interest rates could have a deleterious impact on NYCB's CRE portfolio.  Indeed, according to the Company's 2022 Form 10-K, $7.6 billion of its CRE loans (including multifamily, non-residential CRE, and ADC loans) (11% of total loans) were set to mature or reprice within 2023, and an additional $28 billion of its CRE loans (42% of total loans) were set to mature or reprice in one to five years.

44.     The credit stress on the CRE lending market propounded by the HSTPA, post-COVID-19 vacancies, and rising interest rates peaked leading into the Class Period, creating a "perfect storm."  On January 3, 2023, *The Real Deal*, in an article titled "Signs of distress hit rent-stabilized buildings; Rising rates, loans coming due and revenue drops are taking toll," reported that "[w]ith their revenue starved by the 2019 rent law, the pandemic and a problematic rent-relief program, [multi-family property] owners have been caught in a perfect storm."  By March 2023, rent-stabilized property values reportedly sank between 20% to 65% since the passage of the HSTPA.[17]  This devaluation was attributed by industry insiders to HSTPA, COVID-19 pandemic arrears, and interest rates, which had already risen four percentage points (and would continue to rise), noting that, by early 2023, "[w]ith revenue streams capped, owners faced with inflated operating costs and billions in pandemic arrears have struggled to keep buildings above water."[18]

45.     As described below, however, the Exchange Act Defendants assured investors throughout the Class Period that these serious market stressors would not materially impact the

---

[16] Erica Xuewei Jiang, et al., *"Monetary Tightening, Commercial Real Estate Distress, and US Bank Fragility,"* NAT'L BUREAU OF ECON. RSCH. (Apr. 4, 2023), https://www.nber.org/system/files/working_papers/w31970/w31970.pdf (last accessed on Sept. 6, 2024).

[17] Suzannah Cavanaugh, *"Really concerning": NYCB snubs Signature's CRE loans New York Community Bank's decision could signal problems with multifamily debt*, THE REAL DEAL (Mar. 20, 2023), https://therealdeal.com/new-york/2023/03/20/really-concerning-nycb-snubs-signatures-cre-loans/ (last accessed on Sept. 6, 2024).

[18] *Id.*

Bank's own portfolio.  For example, on July 27, 2022, the first day of the Class Period, Defendant

Cangemi told investors that "[b]y almost any measure, results exceeded expectations, *despite*

*market volatility and higher interest rates*."  Similarly, on October 26, 2023, just weeks prior to

the end of the Class Period, Defendant Cangemi emphasized how NYCB "monitored" the market

"very carefully" and denied existence of "any delinquency trends with any material at all in the

multifamily space."  Cangemi then emphasized how "despite the negativity you're reading about,

*our [CRE] portfolio is performing extremely well relevant to the marketplace*."

> ### C.   NYCB Ensured Enhanced Regulatory Scrutiny of Its Risk Management and Loan Review Practices After Doubling Its Assets in Four Months
>
> #### 1.   NYCB Acquired Flagstar Through "Regulatory Arbitrage" To Avoid FDIC Rejection of the Merger

46.      Beginning in the 1990s, NYCB funded the Bank's real estate loans by buying up

rival banks, preserving the rivals' branding to appeal to loyal depositors, and then using those

deposits to issue billions of dollars of multi-family and other CRE loans to borrowers based largely

in metro New York.  NYCB's acquisition strategy continued for nearly twenty years and, by 2010,

NYCB acquired or merged with numerous banks, bringing its asset size close to $50 billion.

47.      NYCB's growth-by-acquisition strategy was stopped in its tracks when the 2008

financial crisis ushered in the Dodd-Frank Wall Street Reform and Consumer Protection Act

("Dodd-Frank").  Dodd-Frank imposed a slate of mandatory and preferred risk management and

compliance obligations on historically mid-sized banks with more than $50 billion in assets.

Among other things, Dodd-Frank required those banks to implement strict compliance and risk

management processes, perform annual publicly reported stress tests to assess how a

macroeconomic recession would impact the bank's capital levels, and undergo a qualitative

assessment of capital adequacy by the Federal Reserve to ensure that a bank had robust forward-looking capital planning processes that account for its unique risks.[19]

48.      The implementation of Dodd-Frank created a bright dividing line between banks with less than, and banks with more than, $50 billion in assets.  NYCB was right on the line.

49.      Regulators prevented NYCB's first attempt to pass the $50 billion Dodd-Frank threshold.  In October 2015, NYCB and rival bank, Astoria Financial, announced a $2 billion cash and stock deal that would elevate NYCB to above the $50 billion Dodd-Frank asset threshold.  The combination required the approval of NYCB's regulators at the Federal Reserve and the FDIC.  However, after the Federal Reserve sat on the merger application and seemed poised to reject it, NYCB pulled the application and ended the deal.  Media reports noted that NYCB is "boxed into a $50 billion corner, courtesy of Dodd-Frank," reporting that Defendant Cangemi referred to the $50 billion designation as the "lion's den" in a NYCB conference call.

50.      The tides turned for NYCB in 2018 when the banking industry, with the support of a new U.S. administration, passed the Economic Growth, Regulatory Relief, and Consumer Protection Act (the "EGRRCPA").  The EGRRCPA increased the threshold for Dodd-Frank's enhanced standards from $50 billion to $250 billion in assets, and the Federal Banking Agencies, following its passage, rolled back some of Dodd-Frank's more restrictive provisions for banks with less than $250 billion in assets.  Following EGRRCPA, four large bank "categories" were created, with the "Category IV" designation reserved for the smallest banks of the group—those with $100 billion to $250 billion in assets.  While Category IV banks were released from many

---

[19] *See, e.g.*, *Dodd-Frank Act Stress Test (Company Run), Off. of Comptroller of the Currency*, https://www.occ.treas.gov/publications-and-resources/forms/dodd-frank-act-stress-test/index-dodd-frank-act-stress-test.html (last accessed on Sept. 6, 2024); *see also Stress Test*, BD. OF GOVERNORS OF FED. RESERVE SYS. (June 22, 2022), https://www.federalreserve.gov/supervision reg/stress-tests-capital-planning.htm (last accessed on Sept. 6, 2024).

Dodd-Frank regulations and restrictions, including annual public stress tests and certain capital planning requirements, one materially consistent requirement is that a Category IV designation requires greater onsite regulator presence and increased regulatory scrutiny of Category IV bank assets and ability to withstand expected losses.

51.     NYCB was quick to capitalize on the loosened regulations, as reported in a September 2019 article in *The Real Deal* titled "Freed by Dodd-Frank, NYCB is on the hunt for M&A deals."  In the article, NYCB's then-CEO confirmed that the Federal Reserve had prevented the Astoria merger because it would have put the bank over the Dodd-Frank $50 billion threshold. Now, with Dodd-Frank's cap lifted, NYCB was "preparing for a growth spurt despite major headwinds."

52.     On December 28, 2020, NYCB issued a press release announcing that after 55 years with NYCB, the Bank's CEO was resigning, and current CFO, Defendant Cangemi, would become the Company's CEO.  NYCB's Chief Accounting Officer, Defendant Pinto, was elevated to CFO. Defendant Cangemi was quick to communicate during his first earnings call as CEO that his top priority would be to grow NYCB through acquisitions, noting: "we are very much looking at deposit opportunities as well as whole bank M&A. I mean, there's no question that we're in an environment that mergers and acquisitions makes a lot of sense."

53.     A few months later, on April 26, 2021, NYCB announced that it had entered into a stock for stock merger agreement with its competitor Flagstar whereby, once completed, pre-Merger NYCB shareholders would hold 68% of the merged NYCB, and pre-Merger Flagstar shareholders would own 32% of the merged NYCB.  The merged entity would hold $88 billion in total assets, nearly double NYCB's current asset holdings. Because NYCB was the acquiring entity, and would be the surviving entity, approval was required from NYCB's, and not Flagstar's,

regulators: the Federal Reserve, the FDIC, and the New York Department of Financial Services ("NYDFS").  The initial Merger applications were submitted to these agencies on May 19, 2021.  As noted in the initial Proxy filed with the SEC on June 24, 2021, the approval of Flagstar's regulator, the OCC, was "not required with respect to the merger or the bank merger."

54.     Despite NYCB's statement that the Merger was "expected to close by the end of 2021," the application process did not go smoothly, echoing NYCB's prior failed efforts to merge with Astoria. One year after the Merger announcement, NYCB, lacking approval from either the FDIC or the Federal Reserve, had been forced to extend the Merger closing deadline several times.

55.     On April 27, 2022, NYCB and Flagstar announced that they had decided to change their corporate banking charters, and now intended to operate under a national bank charter rather than the state charter that NYCB had operated under since its inception.  This switch would conveniently remove the FDIC from the equation.  It would now be up to the OCC to approve the national banking charter, and the OCC—an agency that had no prior experience with NYCB— would be responsible for regulating and overseeing the combined NYCB.  The FDIC would have no more role with NYCB or the Merger.  A press release issued that day described the restructuring into a national bank-chartered entity as "an appropriate charter for the combined company's banking operations."

56.     On the same day this change was announced, during NYCB's first quarter 2022 analyst earnings call, analysts asked Defendant Cangemi if "the FDIC [being] a roadblock in getting th[e] deal approved" necessitated the switch, to which Cangemi refused to comment. Instead, he stated that "we truly believe that with the National Banking platform and where we're heading in the bank in the future that the OCC charter is the way to go."  A few months later, during the Company's July 27, 2022 second quarter earnings call (the first day of the Class Period),

then-Flagstar CEO, Defendant DiNello, responded to a question asking for "a temperature check on obtaining regulatory approval for the deal," with a warning that investors should not "read anything into the National Bank piece of it," and stated that "[t]here's no complication with the application because of the National Bank piece if it."

57.     The OCC ultimately conditionally approved the transaction on or about October 27, 2022.  In exchange for the OCC's conditional approval, NYCB relinquished to the OCC the authority to veto the issuance of any dividend to investors for the period of two years.  The OCC imposed this condition "[t]o ensure [NYCB bank subsidiary] has sufficiently allocated resources to address any supervisory issues that arise post-merger."  Generally, while the OCC has the freedom to ask pointed questions or signal disapproval about a bank's capital management and dividend plans, NYCB's commitment to secure final, written OCC approval for the issuance of any dividend was a notable change to the general rule.

58.     On December 1, 2022, NYCB completed the Flagstar Merger, which created a regional banking franchise that ranked among the top 25 banks in the country based on total assets. The Merger represented NYCB's largest acquisition at the time with a value of about $2.6 billion.

59.     As discussed further below in Section IV.H.3, unknown to investors until February 2024, NYCB's sudden decision to remove the FDIC from having any role in approval of the Merger or further oversight of the Company was not simply an organic decision about "more appropriate" banking charters, but was at least in significant part due to the fact that the FDIC had privately vetoed the May 19, 2021 Merger application based on concerns over NYCB's and Flagstar's "lending practices" and CRE concentration.

### 2. A Series of Bank Failures Roils the Markets and Spotlights the Need for a Strong Risk Management Framework to Protect Against Credit Risk

60. Shortly after the Flagstar Merger closed, new concerns over mid-sized banks' abilities to control for risks in a challenging market environment accelerated rapidly. On January 13, 2023, First Republic Bank ("First Republic"), a bank with a little over $225 million in assets, delivered seemingly strong financial results from the last quarter of 2022, topping analysts' earnings estimates, but also revealed that its interest expenses surged some 2,040% year-over-year and 153% from the prior quarter. This news indicated that First Republic, which focused on offering banking services to high-net-worth individuals, including residential real estate lending, private banking, business banking, wealth management, trust, and brokerage services, had failed to navigate the Federal Reserve's 2022-23 interest rate hike campaign. First Republic did not fail right away, after being bailed out in March 2023 by the private sector with the receipt of $30 billion in deposits from eleven of the country's largest banks, including J.P. Morgan, Morgan Stanley, and Wells Fargo.

61. Then, over the course of five days in March 2023, three other similarly-sized U.S. banks failed—Silvergate Capital Bank ("Silvergate") on March 8, 2023, Silicon Valley Bank ("SVB") on March 10, 2023, and Signature on March 12, 2023. SVB and Signature both had between $100 billion to $250 billion in assets and Signature was a direct peer of NYCB with a similar CRE loan portfolio. This waterfall of bank failures triggered a sharp decline in global bank stock prices and swift responses by regulators hoping to prevent a potential global banking collapse. In the weeks following the banks' collapses, regulators at the Federal Reserve and FDIC put out "postmortem" reports highlighting some of the risk management failures that precipitated the banks' demises.

62.     For example, the fall of Silvergate and SVB were both precipitated by the removal of the banks' chief risk officers, indicating a lack of adequate oversight over the banks' regulatory compliance and risk management practices.  In its report on SVB's collapse, the Federal Reserve revealed how SVB's deficient risk management framework created severe weaknesses that were "linked directly" to its collapse.  Notably, the Federal Reserve had observed that the bank's risk management controls suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting."[20]

63.     On March 12, 2023, New York-based Signature, a $110 billion commercial bank that issued billions of dollars of loans, including multi-family and CRE loans similar to NYCB's portfolio, was shut down and the FDIC was named its receiver.  To protect depositors, the FDIC transferred all the deposits and substantially all the assets of Signature Bank to Signature Bridge Bank, N.A., a full-service bank operated by the FDIC.[21]  On April 28, 2023, an FDIC Report issued sweeping conclusions regarding Signature's failed risk management practices that led to its collapse.  According to the FDIC, the Bank's senior management and Board did not timely respond to the FDIC's supervisory concerns and "did not prioritize appropriate risk management practices and internal controls."  The FDIC Report further described Signature's Board and senior management "as reactive, rather than proactive, in addressing bank risks and supervisory

---

[20] *Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank*, BD. OF GOVERNORS OF THE FED. RESERVE SYS. (Apr. 2023), https://www.federalreserve.gov/publications/files/svb-review-20230428.pdf (last accessed on Sept. 7, 2024).

[21] A bridge bank is a chartered national bank that operates under a board appointed by the FDIC.  It assumes the deposits and certain other liabilities and purchases certain assets of a failed bank.  The bridge bank structure is designed to "bridge" the gap between the failure of a bank and the time when the FDIC can stabilize the institution and implement an orderly resolution.

concerns" and that their "primary focus on growth, deposits, and profits took priority over the responsibility to ensure sound risk management."[22]

64.     This string of alarming bank collapses sent a strong message to the market that effective risk management practices and internal controls were essential to a bank's survival.

### 3.     NYCB Acquires Signature's Assets, Ensuring Enhanced Scrutiny of Its Risk Management Capabilities And CRE Asset Quality

65.     While Signature's collapse was publicly linked to its cryptocurrency-reliant business segment, Signature owned $74 billion in CRE and multi-family loan portfolio assets and non-crypto deposits, which the FDIC immediately auctioned out for sale.  Just eight days later, the FDIC announced that NYCB won the rights to buy billions of dollars of Signature loan assets and regional bank branches (the "Signature Transaction").

66.     Through the Signature Transaction, the Company acquired $38.8 billion in assets, including $12.9 billion worth of Signature's $74 billion loan portfolio.  In consideration, the FDIC received over 39 million shares of NYCB stock.  The FDIC had little choice but to accept NYCB's bid, regardless of how the regulator viewed the risks posed by NYCB taking on Signature's assets just months after acquiring Flagstar.  This is because while four other banks submitted competitive bids for the Signature assets, the FDIC was statutorily compelled to accept NYCB's lower bid that resulted in the least cost resolution to the Deposit Insurance Fund.[23]

67.     NYCB assured investors that "the purchased loans consist exclusively of commercial and industrial loans ('C&I')" and that it "did not acquire digital asset banking, crypto-related assets or deposits, or loans or deposits related to the fund banking business."  Raising some concern in the market was the fact that NYCB also passed on acquiring any of Signature's nearly

---

[22] *FDIC's Supervision of Signature Bank*, FED. DEPOSIT INS. CORP. (Apr. 28, 2023), at 9, https://www.fdic.gov/sites/default/files/2024-03/pr23033a.pdf (last accessed on Sept. 7, 2024).
[23] *See* 12 U.S.C. § 1823(c)(4).

$55 billion of CRE and multi-family loans, the "bread and butter" of NYCB's loan portfolio.  As reported in *The Real Deal* in a March 20, 2023 article titled "'Really concerning:' NYCB snubs Signature's CRE loans," NYCB's "deal included none of Signature's commercial real estate portfolio, which totaled $35 billion at the end of 2022, or its $19.5 billion multi-family loan book." NYCB spokesperson Salvatore DiMartino confirmed this "snub" and was quoted as stating: "We did not acquire any multi-family or commercial real estate loans. . . . Zero."  Market insiders quoted in a March 20, 2023 *The Real Deal* article questioned whether NYCB's "snub could signal problems with those loans."  *The Real Deal* also reported that commercial brokers "expect the fallout from resets and maturities [in multi-family loans] to crop up later this year, when loans issued before the 2019 rent law [HSTPA] start to come up," noting that the coming trend was "like a train wreck in slow motion" because "[o]nce someone starts with the default, I don't see how they're getting out of trouble."

68.   NYCB's total assets surged beyond the $100 billion Category IV bank threshold following the Signature Transaction, transforming the Bank overnight into a Category IV bank. While the most onerous of Dodd-Frank's requirements for banks with less than $250 billion in assets had been pared back in 2019, crossing the $100 billion threshold subjected NYCB to stricter Federal Reserve standards, including risk-based and leverage capital requirements, liquidity standards, and requirements for overall risk management and stress testing.  Most saliently, NYCB's Category IV status meant that it was now part of the Federal Reserve Board's Large and Foreign Banking Organization ("LFBO") supervisory program as opposed to the smaller Regional Banking Organization ("RBO") supervisory portfolio of firms.  Unlike RBO supervision, LFBO supervision entailed greater use of horizontal exams that allow examiners to compare risk management practices at different firms, identify gaps in practices at specific firms, and promote

30

sound practices across the industry.[24]  NYCB's ascendancy to Category IV large bank standing ensured a greater, constant presence by OCC and Federal Reserve examiners.  Now under the OCC's "Large Bank Supervision" program, NYCB was assigned a designated Bank Examiner, and the OCC "maintain[ed] a continuous on-site presence" at NYCB headquarters.[25]

69.     Given the public string of bank collapses due to risk management failures at the management and Board levels, the Exchange Act Defendants knew that NYCB's risk management framework, especially the Company's ability to adequately assess the credit risk of its CRE loan portfolio, would be of key importance to its regulators at the Federal Reserve and OCC.

D.      **The Exchange Act Defendants Assured Investors That NYCB Complied with Heightened Regulatory Requirements and Standards and Touted the Bank's "Sound Risk Management Practices" and "Stellar" Asset Quality**

70.     In its Class Period SEC filings, press releases, and quarterly conference calls, the Bank reported a relatively modest amount of past due and nonperforming CRE loans, key credit metrics relied on by investors and analysts because they directly communicated whether loans were being repaid on a timely basis.  Based on these relatively modest metrics, the Bank took minimal allowances for credit losses (ACLs) and provisions for credit losses (PCLs) each quarter, communicating to investors that the Bank's capital was secure and its net income and earnings per share were consistently above analyst consensus expectations.  The chart below reflects the Bank's reported asset quality metrics from the start of the Class Period through the third quarter of 2023 (*all dollar values are in millions, except for per earnings per share data*):

---

[24] *See Supervision and Regulation Report*, BD. OF GOVERNORS OF FED. RESERVE SYS. (Nov. 2023), https://www.federalreserve.gov/publications/files/202311-supervision-and-regulation-report.pdf (last accessed on Sept. 7, 2024).

[25] *See* OCC Website, https://www.occ.treas.gov/about/who-we-are/locations/large-bank-supervision/index-large-bank-supervision.html (last accessed on Sept. 18, 2024).

| Reporting Metric | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 | Q2 2023 | Q3 2023 |
|---|---|---|---|---|---|---|
| **Total Loans & Leases Held for Investment** | $48,537 | $48,984 | $69,001 | $82,547 | $83,278 | $83,995 |
| **30-89 Days Past Due** | $30 | $39 | $64 | $175 | $335 | $169 |
| **NPL** | $50 | $45 | $141 | $148 | $233 | $392 |
| **Net Charge-offs (recoveries)** | ($7) | $0 | $1 | $0 | ($1) | $24 |
| **ACL** | $216 | $218 | $393 | $550 | $594 | $619 |
| **PCL** | $9 | $2 | $124 | $170 | $49 | $62 |
| **Net Income (Non-GAAP)** | $166 | $147 | $139 | $159 | $345 | $266 |
| **Diluted Non-GAAP EPS** | $0.35 | $0.31 | $0.25 | $0.23 | $0.47 | $0.36 |

71.    In reflection of these positive metrics, the Exchange Act Defendants repeatedly touted NYCB's "***strong***," "***superb***," and "***stellar***" loan portfolio asset quality, even as the market faced significant headwinds through increased rent regulation, raised interest rates, and post-pandemic office vacancies.  Further, the Exchange Act Defendants assured investors that their statements about asset quality were well founded and credible due to NYCB's "***comprehensive risk framework***," which they touted as the Bank's "***#1 focus***" and "***priority***."  The Exchange Act Defendants certified such assurances in NYCB's financial statements, each of which represented that NYCB had effective internal controls over the Bank's processes.

72.    Statements touting NYCB's "***strong***" and "***stellar***" asset quality were repeated throughout each quarter during the Class Period, including on the first day of the Class Period, when the Exchange Act Defendants stated: "***Our asset quality in <u>any</u> credit cycle has consistently been better than our industry peers*** . . ." (additional emphasis in original).  In fact, Defendant Cangemi described NYCB's credit quality as the Bank's "hallmark," reiterating that "***[o]ur asset quality and credit trends remain superb and continue to rank the company as among the best in the industry***."  This "strong" and "stellar" asset quality was conveyed through NYCB's asset

quality metrics themselves, including the Bank's nonperforming loans and assets, ACL, PCL, and net charge-offs for each quarter during the Class Period, all of which directly impacted reported net income and earnings per share.  Defendant Cangemi praised these metrics, stating that "***[t]hese strong asset quality metrics reflect our conservative underwriting and our historical track record of little to no losses in our core portfolios***."  This sentiment persisted throughout the Class Period—even as NYCB's peer banks suffered from market risk and ultimately failed—with Defendant Cangemi stating: "***these metrics are proof positive that our conservative underwriting standards have served us well over numerous credit cycles***."

73.     During the Class Period, NYCB also assured investors that the Bank had "***a strong risk culture***" and "***sound risk management practices***."  The Federal Reserve has stressed that "[m]anaging risks is fundamental to the business of banking" and "[a]n institution's failure to establish a management structure that adequately identifies, measures, monitors, and controls the risks of its activities has long been considered unsafe-and-unsound conduct."[26] The Federal Reserve has further emphasized that "properly managing risks has always been critical to the conduct of safe and sound banking activities and has become even more important as new technologies, product innovation, and the size and speed of financial transactions have changed the nature of banking markets."[27]

---

[26] *Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets for Less than $100 Billion*, BD. OF GOVERNORS OF THE FED. RESERVE SYS. (Feb. 17, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR1611a1.pdf (last accessed on Sept. 7, 2024).

[27] *Rating the Adequacy of Risk Management Processes and Internal Controls at State Member Bank and Bank Holding Companies*, BD. OF GOVERNORS OF THE FED. RESERVE SYS. (Feb. 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm (last accessed on Sept. 7, 2024).

74.     In banking, a standard risk management framework includes the following basic "three lines of defense," which NYCB affirmed adherence to in its public filings with the SEC:

- *First Line of Defense*. A bank's "first line of defense" is responsible for designing and implementing the Bank's risk controls. According to the Company's public filings, NYCB's "departmental managers are the first line of defense for managing risk in the areas for which they are responsible."[28]

- *Second Line of Defense*. A bank's "second line of defense" is responsible for independently evaluating NYCB's risk controls. A bank's chief risk officer is responsible for the bank's second line of defense. According to the Company's public filings, NYCB's Chief Risk Officer led the second line of defense, and "provide[d] overall leadership for several important independent risk management functions, including: information security and cyber security, Company-wide enterprise risk, operational risk, compliance risk and model risk management frameworks, that are focused on risk identification, risk measurement, risk monitoring, risk mitigation, risk reporting and escalation."[29]

- *Third Line of Defense*. A bank's "third line of defense" is responsible for providing objective and independent assessment of the first and second lines of defenses, as well as reporting its findings to the bank's board of directors. NYCB's internal audit department is responsible for the bank's third line of defense.

- *Board Oversight*. A bank's board of directors is engaged in the risk management framework by providing oversight of all three lines of defense. According to the Company's public filings, the NYCB Board's Risk Assessment Committee was tasked with assisting the Board of Directors "with respect to oversight of the Company's risk management program, including as it relates to the risk appetite of the Company and the policies and procedures used to manage various risks, including credit, market, interest rate, liquidity, legal/compliance, regulatory, strategic, operational, reputational, and certain other risks."[30]

---

[28] Definitive Proxy Statement on Form DEF14A filed April 21, 2023 ("2023 Proxy Statement") at 21.
[29] *Id.*
[30] *Id.*

75.     From the first day of the Class Period, and in almost every Investor Presentation thereafter, the Bank touted its "*[l]ow risk credit culture*" as contributing in part to its "*superior asset quality*."  Indeed, the Bank's 2023 Proxy Statement touted NYCB's "*high level of enterprise risk management incorporating best practices from NYCB and Flagstar procedures*," resulting in the development of a "*comprehensive risk framework*" for the Bank.

76.     The need for an effective risk management framework to account for asset quality became critical once NYCB closed the Signature Transaction and accelerated its transition into a Category IV LFBO overnight.  Upon announcing the Signature Transaction, Defendant Cangemi acknowledged the increased regulatory scrutiny the Signature Transaction incurred, and emphatically assured investors that risk management was his "*priority as CEO*," and that *NYCB's "job"* was *"to be risk managers"* such that NYCB had already "*built a very strong risk management team, and we strengthen it every day*, and *we're up for the challenge and we're open to the regulatory landscape changing*."  Cangemi added that NYCB had made "sizable investments" to its risk management framework and that *NYCB "know[s] what our obligations are as a large institution, and we convey it with confidence and professionalism with our regulatory constituents*."   One month later, Cangemi reinforced these statements in the Company's first quarter earnings press release:

> While we have closed two acquisitions over the past four months, *we have remained focused on our fundamentals including asset quality*.  *Our asset quality metrics remain strong* with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero.  *We continue to be laser focused on credit quality across all lending verticals*.

77.     The Exchange Act Defendants reinforced their representations regarding NYCB's strong asset quality, the processes to ascertain that asset quality, and robust risk management practices through specific sworn assurances about the accuracy of the Company's quarterly and annual reports and the effectiveness of NYCB's internal controls over financial reporting.

78.     As required by Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("Sarbanes-Oxley"), Defendant Cangemi (as CEO) and Defendant Pinto (as CFO) certified NYCB's quarterly and annual reports filed with the SEC.  This included certifying that Cangemi and Pinto had each, *inter alia*, reviewed the Bank's financial report and determined based on their knowledge that the report does not contain any untrue statement of material fact, or omit to state a material fact necessary to make any statements made not misleading.  Cangemi and Pinto's certifications similarly attested that they maintained appropriate disclosure controls and internal controls to ensure the reliability of the financial information contained in the reports.

79.     Similarly, Section 404 of Sarbanes-Oxley, 15 U.S.C. § 7262, requires management of public companies such as NYCB to establish and maintain a system of internal controls relating to, among other things, financial reporting.  Section 404 was "intended to bring information about material weaknesses in [internal controls] into public view"[31] and requires that management of a public company annually evaluate the effectiveness of the company's internal controls over financial reporting and disclose any material weaknesses to investors.  In each of NYCB's Class Period quarterly and annual financial reports, Defendants Cangemi and Pinto certified that they had: (a) evaluated the effectiveness of NYCB's disclosure controls and procedures; and (b) designed disclosure controls and procedures to ensure that material information about NYCB was made known to them.  Cangemi and Pinto repeated in each of NYCB's quarterly and annual filings with the SEC during the Class Period that they "***have concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective***."  Moreover, NYCB's SEC filings throughout the Class Period did not contain any risk warnings that

---

[31] *Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934*, Exchange Act Release No. 55929 (June 20, 2007).

explicitly warned investors that the Company's internal controls could be ineffective. Thus, investors were repeatedly assured as to the effectiveness of NYCB's financial reporting throughout the Class Period as attested to by Defendants Cangemi and Pinto.

### E. The Exchange Act Defendants' Statements Were Material to Investors

80.     The Exchange Act Defendants' statements during the Class Period regarding, *inter alia*, NYCB's assessment of the risks to its CRE loan portfolio, its "strong" CRE asset quality, and its readiness to operate as a Category IV bank under increased regulatory requirements and prudential standards were important to investors, as evidenced by reactions from analysts, comments from the media, and movements in the price of NYCB common stock.

81.     For example, on July 27, 2022, the first day of the Class Period, analysts from J.P. Morgan issued a positive report following the release of NYCB's second quarter 2022 results, noting that NYCB's "***credit quality remained pristine***." In response to the Company's second quarter 2022 earnings release, NYCB stock closed nearly 8% higher on July 27, 2022. The Exchange Act Defendants again reported positive performance and strong credit quality in NYCB's third quarter 2022 earnings release, and analysts once again echoed the Bank's positive news, with analysts at RBC Capital writing on October 26, 2022 that the Bank's "***[c]redit metrics continued to be very clean and a hallmark of the company***," while American Capital Partners remarked on the same day that "the company has consistently maintained ***superior credit quality*** throughout the economic cycle."

82.     After the consummation of the Flagstar Merger on December 1, 2022, on January 4, 2023, Piper Sandler voted NYCB as one of its top 20 financial services stock picks for 2023, crediting the Bank's asset quality as its top value driver: "***We do not worry about asset quality with this name***. We consider New York Community to have ***one of the lowest risk loan books among all the banks we follow***." Analysts valued NYCB's asset quality as a shield against a

slowing economy, with Piper Sandler opining in the same report that, "if we are indeed entering a slower economic period ahead, we think NYCB will experience substantially fewer problems than peer banks."  Compass Point Research echoed this sentiment in a February 2, 2023 report stating that "***NYCB's strong credit track record should make it a name to own were a more notable economic slowdown materialize [sic] in FY23/24 due to rising interest rates***."

83.     Positive analyst feedback continued to pour in after NYCB announced the completion of the Signature Transaction and the Exchange Act Defendants provided explicit assurances about the Bank's risk management framework and superior credit quality.  Following announcement of the Signature Transaction, NYCB's common stock surged $6.21 per share, or 31.54%, to close at $25.83 on March 20, 2023, from a previous closing price on March 17, 2023 of $19.62 per share.  NYCB stock rose again on March 21, 2023, closing at $27.57 per share. Analysts adopted and echoed the Exchange Act Defendants' rosy statements about credit quality and preparedness for Category IV LFBO regulatory scrutiny.  For example, on March 21, 2023, J.P. Morgan analysts stated that, "on the credit front, ***NYCB standalone has pristine credit quality***," and "***overall the bank stands in a better-than-peer credit risk profile***."  Other market insiders echoed Defendant Cangemi's assurances that NYCB was prepared to be a Category IV bank and withstand enhanced scrutiny from regulators.  On March 28, 2023, S&P Global issued an article stating that while "New York Community may be crossing the $100 billion asset threshold at time when there is momentum to amp up regulatory pressure," "Cangemi touted the company's preparedness level on the deal call, saying it has '***all of the appropriate risk management tools to be a $100 billion bank***.'"

84.     Analysts took comfort in the Exchange Act Defendants' repeated defense of the Bank's asset quality in the face of market pressures, including increasing interest rates, after

NYCB announced its first quarter 2023 earnings results.  For example, on April 28, 2023, American Capital Partners issued an analyst report stating that NYCB "*has consistently maintained superior credit quality throughout the economic cycle*."  Following the Exchange Act Defendants' statements on April 28, 2023, NYCB's stock price increased 17.6%, closing at $32.07 per share from the prior trading day's close of $27.57 per share.  While other peer banks' stock plummeted in the wake of the March 2023 collapses of Silvergate, SVB, and Signature, and the May 1, 2023 collapse of First Republic, NYCB's stock price improved.  On May 10, 2023, *Barron's* reported that NYCB stock had gained 19% since the days just prior to the series of bank collapses, while a comparable regional banking index had lost 35%, making NYCB the only stock in the index to see any improvement in that period.

85.    Despite an increase in nonperforming assets in NYCB's July 2023 second quarter earnings release, analysts accepted that the uptick was confined to one-time charges related to the Flagstar Merger and Signature Transaction, with analysts at American Capital Partners noting that "*[c]redit quality ratios remained very strong despite an increase in NPAs largely related to the [Flagstar and Signature] transactions*."  Following the earnings release on July 27, 2023, NYCB's stock price increased over 5%, closing at $39.03 per share on July 27, 2023 from a previous trading day close of $37.14 per share, and reaching a Class Period high of $41.61 per share on July 31, 2023.

86.    Even after NYCB increased NPA to $404 million, and NPL to $392 million in its third quarter earnings release, which the Exchange Act Defendants confined to losses related to two office properties, NYCB still exceeded Wall Street expectations and largely retained analyst confidence in its CRE portfolio strength.  On October 27, 2023, J.P. Morgan analysts commented on NYCB's earnings, and noted that they "*continue to see NYCB's loan portfolio as being very*

*high quality*" and that the Bank's recent charge-offs and "***buildup in multi-family NPA is***

***primarily driven by one or two families (more like idiosyncratic events) and doesn't represent a***

***systemic issue***." Similarly, analysts from D.A. Davidson adopted NYCB's defense of the multi-

family portfolio, echoing Defendant Adams' earnings call statement that "despite the rent

regulation law changes in 2019, ***they are still not seeing cracks on the credit front***."

<blockquote>

**F.** **In Reality, NYCB Did Not Maintain "Sound Risk Management Practices" and Misled Investors About the Credit Risks in Its CRE Portfolio**

**1.** **NYCB Failed to Adequately Assess the Deteriorating Asset Quality of Its CRE Loan Portfolio and Lacked a Risk Management Framework Required of a Category IV Bank**

</blockquote>

87. The Exchange Act Defendants misrepresented the Bank's CRE loan portfolio asset

quality and failed to adequately reserve against expected credit losses, which artificially inflated

NYCB's stock price. Contrary to Defendants' bold statements that risk management was

management's "#1 priority" and that NYCB was ready for the enhanced regulatory scrutiny

necessitated by the Flagstar Merger and Signature Transaction, NYCB lacked effective internal

controls over the credit and risk review of its loan portfolio such that the Bank could not accurately

"disclose loan rating classifications" or "identify problem loans," failures that "ultimately

[impacted] the recognition of the allowance for credit losses on loans and leases."

88. In truth and as described below in Sections IV.G.3 and IV.H.4, NYCB has now

admitted that throughout the Class Period, the Bank lacked effective internal controls over

financial reporting and already suffered material weaknesses in its internal controls for, *inter alia*,

tracking loan risks, and through the ineffective oversight of NYCB's Board and management,

failed to assess risk and adequately monitor its nearly $70 billion loan portfolio. In sum, NYCB's

Board failed to exercise oversight responsibilities; NYCB lacked an effective control environment

due to a lack of resources and qualified employees to assess and monitor risks; NYCB had

ineffective processes for timely identifying and responding to financial reporting risks, including risks arising from changes in the business, regulatory, and economic environments impacting its internal loan reviews; and NYCB had ineffective monitoring activities, including for internal loan reviews.

      **2.**      **Former Employees Confirm That NYCB Lacked a Risk Framework, Had "Zero Controls" in Place, and Failed To Effectively Identify Problem Loans as Part of Its Loan Review Process**

           **a.**      **NYCB Lacked a Credible Risk Management Framework and Was Unprepared for Increased Scrutiny Following the Flagstar Merger and Signature Transaction**

89.    In the immediate wake of the Flagstar Merger and Signature Transaction, Defendant Cangemi made specific representations to investors that NYCB prioritized its "***sound risk management practices***" and that the Exchange Act Defendants were "***laser focused***" on risk management and regulatory oversight. However, statements from former NYCB employees confirm that in reality, the Company's risk management was both insufficient and ineffective. As discussed herein, accounts from former employees show that NYCB effectively had "no controls" in place and scrambled unsuccessfully to put together a formal risk management framework after the Company pivoted from FDIC to OCC regulatory oversight.

90.    For example, CW-1, a member of NYCB's Regulatory Lending & Compliance Team throughout the Class Period,[32] recalled that once the Company pivoted from the FDIC's regulatory oversight to the OCC's regulatory oversight in late 2022, it was like transitioning from

---

[32] CW-1 was a member of NYCB's Regulatory Lending & Compliance Team from July 2020 until March 2024. CW-1 was initially responsible for Quality Assurance and Quality Control, ensuring that all information entered into NYCB's systems matched the information on the loan documents produced. Beginning in March 2021, CW-1 was responsible for producing a "Board Report" for then-President of Commercial Real Estate John T. Adams. The Board Report contained high-level information about all of the Company's loans and was presented to the Board at their monthly meetings on every third Thursday of each month. Prior to working at NYCB, CW-1 had worked at other large banks for 24 years.

being a big fish in a small pond to being "a betta fish in the ocean."  CW-1 explained that there were "no controls" in place and that the Company took no additional steps in preparation for the regulator switch.  CW-1 explained that there was "no sense of urgency" with respect to this change and the Company just acted as if their relationship with the OCC was going to be the same as their relationship with the FDIC.

91.    CW-1 emphasized that the Company had "zero controls" and "nothing prepared" for the transition to OCC regulation and soon after, into a Category IV bank.  For example, CW-1 described how NYCB was not prepared for the types of questions and requests that the OCC asked when the agency came on board.  CW-1 explained that managers at the Company were surprised and overwhelmed by the types of questions asked and requests made by the OCC, and no one was prepared to answer those questions.  For example, one of CW-1's supervisors seemed surprised by the OCC scrutiny because in contrast, the relationship between the FDIC and NYCB had been "easy breezy."  However, CW-1 noted that based on his experience working with regulators at other banks, the OCC's requests and questions were normal.

92.    Following the Signature Transaction, toward the end of 2023, CW-1 was asked by Anna Mak, a First Senior Vice President in NYCB's Lending and Regulatory Compliance Department, to assist in putting together a "risk framework" that had been requested by the OCC. CW-1 informed Mak that a risk framework could not be put together "overnight" and should have already been in place.  CW-1 explained that risk frameworks require researching the risks that face the Company, including speaking with various departments to understand what types of risk they face individually.  After that is complete, it is necessary to assess these risks and then mitigate and/or minimize them through the implementation of internal controls.  CW-1 stated that it was

"mindboggling" that NYCB had "nothing in place" in terms of controls.  CW-1 added that NYCB did not even satisfy the first requirement of a risk framework—identifying and analyzing risks.

93.     Former employees further confirm that NYCB was only in the beginning stages of establishing even the semblance of a credible risk management framework when it consummated the Flagstar Merger and Signature Transaction.  CW-3 was employed by NYCB in Enterprise Risk Management Governance, and for most of his tenure, he worked on an "Issue Management Report," which summarized risk management issues at the Company.[33]  CW-3 described how former NYCB Deputy Chief Risk Officer Gregory Gaare specifically "pushed" for this report, but CW-3 was surprised that this type of thorough report did not previously exist at NYCB.  CW-3 explained that NYCB maintained an issue management tracking system called Archer where various internal sources, including internal audit employees, entered issues that they identified with NYCB's risk management and CW-3 was responsible for taking information from the issue management tracking system and putting it into slides for the Issue Management Report.  CW-3 described how the Issue Management Report contained numerous slides and covered all "risk stripes" across the Bank, including credit risk, noting that some of the risk management issues included in the report were labeled "past due" and "critical."  CW-3 stated that the final version of the Issue Management Report was sent to Defendant Cangemi and other senior officials at NYCB shortly before CW-3 departed NYCB.

94.     CW-1 opined that the change to OCC oversight in 2022 was the "straw that broke the camel's back," adding that the transition to a Category IV bank was overwhelming for the

---

[33] CW-3 was employed by NYCB in Enterprise Risk Management (ERM) Governance from Fall 2021 to Fall 2022.  CW-3 supported former NYCB Deputy Chief Risk Officer Gregory Gaare. In his role, CW-3 worked on an Issue Management Report, the final version of which was sent to Defendant Cangemi and other senior officials shortly before CW-3 departed NYCB.

Company and its managers. Regarding the issues NYCB faced with its loan portfolio, CW-1 explained that "they [senior leadership] freaking knew" and that they "just didn't care."

95.     Moreover, CW-4, an Analyst in the Company's Internal Loan Review department, explained that NYCB merged with Flagstar Bank because the Company had no choice but to grow, but that NYCB was not prepared to expand to a national bank, nor was it prepared for the increased costs associated with these larger banks.[34]  CW-4 added that NYCB's risk management was insufficient to oversee the national bank that NYCB had become.

96.     Further, CW-1 recalled that Chief Risk Officer Nicholas Munson was elevated from Chief Audit Officer to Chief Risk Officer "out of nowhere" despite not having any risk-related experience that made him suited for the position.  CW-2, who supported Chief Risk Officer Munson in this role, confirmed that Munson was set up for failure because he had too much responsibility and was "in over his head."[35]  According to CW-2, Munson oversaw nine departments, including the entire Risk Management department at NYCB.  Moreover, CW-2 added that Munson was an auditor and had to hire credit risk employees to assist him.

> **b.      NYCB's Reliance on Brokered Loans Created Additional Risk Management Weaknesses**

97.     In filings with the SEC, NYCB discussed how some portion of its CRE portfolio was originated through "a select group of mortgage brokers who are familiar with our credit

---

[34] CW-4 joined NYCB in 2010 as a Vice President – Financial Loan Analyst, worked prior to the Class Period in NYCB's Loan Recovery department (where troubled loans were sent to mitigate loss and avoid foreclosure), and later transitioned to Vice President – Senior Internal Loan Review ("ILR") Analyst many years before the Class Period.  CW-4 was employed with NYCB until Q1 2023.  The ILR department, which had approximately twelve employees at the time of CW-4's departure, reviewed between 20% and 45% of NYCB's loan portfolio, both those that were newly originated and those already part of NYCB's loan portfolio.  The ILR department was tasked with checking NYCB's Asset Management group's work to make sure their scorecards and recommendations were correct.

[35] CW-2 was employed by NYCB in a senior role that supported the Chief Risk Officer from before the Class Period until the end of 2022.

standards and whose track record with our lending officers is typically greater than ten years." However, NYCB did not disclose that the Bank worked primarily with one broker, whose lending practices did raise alarms within the Bank.  Multiple former employees described that the commercial mortgage broker responsible for originating the vast majority of NYCB's loans was Meridian Capital Group ("Meridian").  In November 2023, Meridian was effectively "blacklisted" by powerful multifamily lending agency Freddie Mac pending an investigation into allegations that some of its brokers falsified figures to help their clients get bigger mortgages.  NYCB's relationship with Meridian was revealed after the Class Period when, on March 24, 2024, the *Wall Street Journal* described how "the companies rode the New York property boom fueled by low interest rates, going from local upstarts to major players in the real estate world."  Rivals told *The Wall Street Journal* how "Meridian was so close to NYCB that other brokers found it hard to get their clients loans from the bank," and "other banks, meanwhile, would often lose out on loans Meridian had because NYCB would offer better terms."

98.    NYCB's dependence on indirectly underwritten and brokered loans created a distance between NYCB and its borrowers, creating a greater need for stringent risk management practices and making the honesty and practices of those brokers critical.  However, NYCB's so-called "conservative" underwriting standards were instead deprioritized to avoid severing the Company's relationship with Meridian.

99.    Several former employees describe how NYCB's outsized relationship with Meridian posed serious asset quality risks to NYCB's loan portfolio.  CW-1 and CW-5[36] describe

---

[36] CW-5 was a member of the Appraisal team for NYCB from before the Class Period through the latter part of 2022.  As part of his responsibilities, CW-5 produced a "Review Report" for appraisal reports provided to NYCB from third-party appraisers.  CW-5 explained that the head of his group was Executive Vice President & Chief Appraiser Tom Zammit and then Sean Gustafson,

Footnote continued on next page

how Meridian was the broker on the majority of NYCB's multifamily and, to a lesser extent non-residential CRE, loans.  CW-1 ran a monthly report on NYCB's brokers and confirmed that Meridian Capital was "one of the bigger" brokers used by the Bank, and that "Meridian was bringing in a lot of business for the Company," including a mix of multifamily and commercial real estate loans.  CW-5, a member of NYCB's Appraisal team, described NYCB's relationship with Meridian as holding NYCB "hostage," and confirmed that NYCB "relied very heavily" on Meridian, explaining that there was a 1:5 ratio regarding non-Meridian loans, meaning that for every 5 loans originated by Meridian, there was a loan originated by some other originator.  CW-5 recalled that multi-family properties were Meridian's "bread and butter" and explained that the majority of NYCB's commercial real estate portfolio was originated by Meridian.  CW-5 added that it is his understanding that NYCB was almost exclusively working with Meridian at the time of his departure in late 2022, as he saw no other originators on documents.

100.   CW-5 explained that while at NYCB, he saw things in Meridian origination documents that he knew was "bulls***."  For example, CW-5 described how Meridian brokers inflated the amount of rent collected on a property by including the superintendent's apartment in the rent calculation, or by including miscellaneous charges, such as one-off key replacement charges, in ordinary income when they knew these charges were not going to be routine.  CW-5 recalled that when there was pushback on issues, such as listing the superintendent's apartment as one paying rent, Meridian would send a certified letter attesting to the questioned that is notarized and signed by Meridian.  CW-5 added "do they think we're idiots?" as he and others were aware that regardless of the existence of a letter that a superintendent is not a rent generating resident.

---

but that Senior Vice President Ines Kurtov served as the "de facto" liaison between NYCB and Meridian Capital Group.

CW-5 explained that these types of issues were experienced and observed by himself and others on his team on numerous occasions during his tenure.

101.    Further, CW-6, a CRE underwriter of NYCB, explained that any time Meridian wanted a deal pushed through there were direct conversations between current Executive Vice President at Meridian Capital Group Avi Weinstock and Head of Commercial Real Estate, Defendant Adams.[37]  CW-6 stated that the Company conducted due diligence and "knew what they were doing" when issuing poor quality loans.  CW-6 recalled that "most of the deals" brought to NYCB by Meridian were below the cash-flow break-even point and only deals that appeared glaringly wrong were denied.  CW-6 added that Meridian was the main broker on all the deals that he saw.

102.    CW-6 stated it was known throughout the underwriting team at NYCB that Meridian "skewed" numbers to make deals look better and "just slapped" a number on a piece of paper without comments from the owner.  CW-6 explained that the department had no idea whether or not the numbers were accurate.

103.    Former employee accounts also establish that the members of NYCB's "C-Suite" cultivated the relationship with Meridian and that Adams would speak directly with Meridian management whenever NYCB gave any pushback to Meridian brokers.  For example, CW-5 explained that the C-Suite had to have been aware of the relationship between Meridian and the

---

[37] CW-6 was employed by NYCB from Spring 2019 until Fall 2021, initially as a Junior Underwriter before being elevated to a Commercial Real Estate Underwriter in 2020.  According to CW-6, NYCB had a single underwriting team that included approximately 20 to 25 underwriters, which was broken up into teams consisting of approximately six Underwriter Is and four Underwriter IIs, led by a Lead or Senior Underwriter.  CW-6 explained that current 1st VP, Commercial Credit Officer Matt Fink oversaw the deals completed by the department.  CW-6 was responsible for cash flow analysis typically on loans worth $1 million to $15 or $20 million.  CW-6 explained that deals involving larger dollar values were handled by upper management.

Company because they "cultivated" the relationship.  According to CW-5, Senior Vice President Ines Kurtov served as the point person between NYCB and Meridian.  CW-5 explained that Kurtov was the "de facto" leader of the department and she reported to Executive Vice President & Chief Appraiser Tom Zammit, who initially reported to former CEO Thomas Cangemi and then former Chief Risk Officer Nicholas Munson (who reported to CEO Thomas Cangemi).

104.   According to CW-6, if NYCB gave any pushback to Meridian brokers that they went directly to Weinstock, who then spoke directly with Adams.  According to CW-6, Adams was leading the relationship with Weinstock from the NYCB side.

105.   With respect to NYCB's credit issues, accounts from former employees show that the Exchange Act Defendants and/or their direct reports received, *inter alia*, information from Board Reports, Issue Management Reports, and the Company's Critical Classified Review Loan List.

106.   For instance, from March 2021 through March 2024, CW-1 produced a "Board Report" for Defendant Adams.  CW-1's Board Report contained high-level information about all of the Company's loans and was presented by Adams to NYCB's Board of Directors (of which Defendants Cangemi and DiNello were members) at the Board's monthly meetings on every third Thursday of each month.  CW-1 also created the slide deck that Adams presented at those monthly Board meetings.  According to CW-1, the Board Report detailed the "delta" (*i.e.*, changes) for the loan report.

107.   CW-1 then explained that the Board Reports were "very high level," but the "data dumps" that he used to compile these reports included the "nitty gritty" details of the entire loan portfolio.  Regarding issues with NYCB's loan portfolio, CW-1 stated that "he [Adams] knew, he had to" based on the specific questions that he asked about the loan portfolios.

108.    According to CW-1, at these same monthly meetings, Michael Grochocki, NYCB's Chief Credit Officer through the end of 2022 and Deputy Chief Credit Officer thereafter, presented to the Board on NYCB's loan portfolio credit risk, and discussed loan portfolio ratings scorecards. CW-1 added that detailed information pertaining to "risky" and "non-performing" loans were always presented at these meetings, and his reporting had "no sugar coating" and included the "good, bad, and in between."   According to CW-1, Grochocki reported directly to Defendant Cangemi.

109.    Further, CW-7 explained that NYCB's Asset Management group, led by Kevin Dellegar, reviewed approximately 5,000 CRE loans each year and worked "in conjunction" with Grochocki's team, which included Senior Vice President, Director of Credit Risk Administration, Michael Della Penna.   According to CW-7, factors such as property operations, ability to cover debt service (debt service coverage ratio), increases in operating expenses, and decreases in occupancy were the type of inputs weighted more heavily in determining a loan's rating.   CW-7 recalled that there were approximately 5,000 loans that were rated one to eight, with one being best and a rating of seven and eight designated that loan as a "critical classified loan."   According to CW-7, the loans that were designated as "critical" were copied from the "Master Loan List" into a separate Excel spreadsheet, which were referred to internally as the "Critical Classified Review Loan List" or "CCR."

110.    CW-7 estimated that in total there were approximately 300 loans on the CCR list. CW-7 added that the total value of the critical classified loans was totaled at the bottom and the sheet was reviewed by Dellegar's "second in command," First Vice President, Asset Management Team Lead Michael Bank.   CW-7 explained that Della Penna reviewed the critical classified loan reviews produced by the Asset Managers for each of the loans before Dellegar and Grochocki

discussed them in further details with the "committee" and returned with recommendations for how to approach the loans the following quarters for the Asset Managers.

<strong>c.     Former Employees Describe Critical Weaknesses in the Bank's Ability to Timely Identify Problem Loans</strong>

111.    Former employees also confirm that NYCB's processes for risk rating, monitoring, and identifying problem loans was riddled with problems, including (a) improper delays of "high priority" loan reviews; (b) errors in loan recordkeeping that went uncorrected; and (c) understaffing in departments responsible for the review of billions of dollars of CRE loans.  The deficiencies in NYCB's loan review process undermine the Company's ability to adequately assess risk in its loan portfolio—a necessary factor in ensuring proper ACL and PCL.

112.    Certain former employees described how formal practices, such as stress testing and regular credit reviews of at-risk loans, were modified.  For example, CW-2 recalled that NYCB did not always comply with regulatory requirements during his tenure.  CW-2 explained that other, much larger banks could not have done some of the things that NYCB did because they were large banks while NYCB was a smaller bank.  CW-2 detailed that between 2016 and 2018, he worked on stress testing analysis.  CW-2 explained that NYCB conducted stress tests on loan portfolios and focused specifically on leveraged loans and non-performing loans to determine what loan losses might occur.  According to CW-2, the U.S. Federal Government required NYCB to conduct these stress tests to make sure that the Company had enough reserves in its portfolio.  CW-2 recalled that if the stress testing models did not "spit out" the information that would appease the regulators, then NYCB would "trick" the models to show the regulators what they wanted to see.

113.    Other former employees described how regular loan reviews were delayed by borrowers' unwillingness to provide current information, a red flag in and of itself.  For example, CW-8 was a CRE Financial Analyst II who worked on a team with 13-14 analysts responsible for

50

performing annual and semi-annual assessments of the Company's CRE loans to ascertain the loans' "viability." CW-8 and the other analysts in his CRE Analysis Department worked with NYCB's Asset Management, Credit Risk and Loan Review Departments in order to perform these assessments.[38] CW-8 explained that his duties included receiving financial reports from landlords or management companies to whom NYCB had issued loans, and conducting a financial analysis using that information. According to CW-8, he asked clarifying or follow-up questions, which were included in his analysis. Once his reports were approved by CW-8's supervisor, they were sent to the Asset Management Department.

114.     CW-8 explained that ideally, he completed his analysis within a few days, but more difficult or less responsive clients could take several months to complete. CW-8 explained that "high priority" clients—clients that either passed a particular dollar threshold for the value of their loan ($50 million) or had been upgraded to "high priority" as a result of an increase in their credit risk—required a semi-annual review of their financials. CW-8 recalled instances where "high priority" clients failed to provide their financials in a timely manner or failed to address questions quickly enough. In response, CW-8 was instructed to skip their semi-annual review and only conduct an annual assessment for them despite work having already been completed on their semi-annual assessment.

115.     CW-8 added that non-responsive clients always appeared to be a red flag to him, and he suspected that they may be hiding something. According to CW-8, red flags were elevated to his manager (who was above himself and his supervisor in the chain of command) and handled

---

[38] CW-8 was employed by NYCB in a variety of roles between May 2015 and October 2022. Between September 2020 until July 2021, CW-8 was a Financial Coordinator. From July 2021 until his departure, CW-8 was a member of the Income and Expense ("I&E") Department (renamed to the CRE Analysis Department shortly before his departure) and had the role of CRE Financial Analyst II.

by individuals in managerial positions and above.  CW-8 added that the unresponsive clients were marked as such in his report, including the duration in which they were unresponsive and any attempts to obtain information from them including copies of e-mails and other forms of correspondence.  However, clients whose information was untimely faced little consequences. This is because, according to information provided by CW-8, NYCB delayed the reviews of borrowers who withheld updated financial information necessary to perform the analysis.

116.    CW-8 recalled how NYCB loans often had issues, including clients potentially attempting to manipulate their financials, or the continued lending to large customers who had previously failed to repay loans or had been unresponsive to questions posed about their loans. CW-8 recalled instances where "higher ups" said they would consider not loaning to a client again, but ultimately did if they were large enough.

117.    Other witnesses described deficiencies in NYCB's recordkeeping, that could create additional risks as the loans aged. For example, CW-7 explained that NYCB received information from borrowers such as financials, occupancy figures, and other details and that information was compiled and put into a report, which was then provided to the Asset Managers and once approved was input into the "Master Loan Inventory."[39]  CW-7 added that the "Master Loan Inventory" was an Excel spreadsheet that based on the information input, produced an automated credit rating for each loan. CW-7 explained that he noticed a trend in the critical classified loans that he reviewed— they were missing some common underwriting documents.  CW-7 recalled that the loans often did not have a third-party "environmental report" or a third-party "property condition reports," which

---

[39] CW-7 was employed by NYCB as a Senior Asset Manager from Spring 2022 until Fall 2022.  CW-7 reported to Senior Vice President, Director of Asset Management, Kevin Dellegar and worked on a team of 10-12 Asset Managers.  CW-7 explained the next level up was led by Michael Grochocki, who was at the time of CW-7's employment, NYCB's Chief Credit Officer, Managing Director.

were common inclusions in his experience at other banks.  According to CW-7, a property condition report included information such as what expenditures are required or "obvious" capital needs that can assist in "firm[ing] up asset value."  CW-7 added that NYCB relied almost "exclusively" on the original appraisal rather than current financials and that there were "not a lot of reevaluations."

118.    Similarly, CW-1 recalled that there were errors made in the transition of information from the loan documents to NYCB's system. CW-1 recalled that these issues ranged from improperly inputting "Drive" instead of "Street" on address information, transposing digits in social security numbers, or putting down incorrect percentage of ownership information as examples.  According to CW-1, when these issues were raised to current Senior VP, Credit and Pre-Close Manager Jennifer McTigue, she responded by saying that they were not going to be fixed because the loan had already closed.

119.    CW-1 stated that "we found a lot of errors, and they [NYCB] didn't want to fix them." CW-1 attributed the regular errors to a "lack of training" and lack of people to go to for guidance on problems.  CW-1 recalled there were a significant number of errors that he observed while working at NYCB, and these mistakes paired with an unwillingness to change were "mindboggling" given his experiences at other banks.

120.    CW-1 relayed additional details related to NYCB's weak loan review processes. CW-1 described how another Asset Manager who worked at NYCB throughout the Class Period, and who had significant prior experience at other large lending banks, explained to him that the loans the Asset Manager reviewed for NYCB had "bad structure," and that even a "quick and dirty analysis" showed that the DSCR was "off" and that the borrower would "never be able to cover the debt."  CW-1 explained that this Asset Manager opined that NYCB's loans had "no strategy"

and "no thought" put into them and it seemed like all that mattered was the commission associated with them. According to CW-1, the Asset Manager informed him that "we're [NYCB] taking a huge loss" and his manager "just didn't care."

121.    Former employees also confirm that NYCB commonly approved loans that lacked the requisite information and should have otherwise been disqualified.  CW-9 recalled that Meridian Capital Group would bring loans with issues or questionable repetitive borrowers only to NYCB because they knew that NYCB was the only lender to approve them because of "certain connections" between the Company and Meridian.[40]  CW-9 recalled that during his tenure, NYCB approved loans from certain "big shot" borrowers "no matter what" because the Company did not want to lose their business.

122.    Not only was NYCB's loan documentation system riddled with errors, but NYCB also lacked the amount of personnel to properly carry out their responsibilities.  For example, CW-1 recalled that initially his Regulatory Lending & Compliance Team consisted of eight people, and this was initially enough to share the workload.  However, according to CW-1, by the end of his first year, half of his team had left NYCB, which led to each team member having the responsibility of reviewing "hundreds" of loans per month.  Similarly, CW-4 stated that the Internal Loan Review department, which reviewed loans that were both newly originated and already part of NYCB's loan portfolio, had approximately 12 employees at the time of his departure, which he noted was insufficient.  CW-4, who had previously worked in the Loan Recovery department, which was responsible for working out bad loans with the borrowers to

---

[40] CW-9 was employed with NYCB as a Commercial Loan Processor I from Fall 2020 to Spring 2021 and as a Commercial Loan Processor II from Spring 2021 to Fall 2021.  In his role, CW-9 worked directly with individual borrowers on loans and submitted credit and appraisal reviews.

mitigate losses and avoid foreclosures, stated that the Loan Recovery department, which was originally comprised of approximately 15 employees, had only one or two employees by the time CW-4 departed in Q1 2023.

### G.     As the Truth Is Revealed, NYCB Faces Collapse

123.     The relevant truth concealed by the Exchange Act Defendants' false and misleading statements and omissions emerged through a series of disclosures and/or materializations of risk, culminating in both the admission of multiple material weaknesses in the Bank's internal controls over its loan portfolio review, rating and reserves reporting, resulting in the near collapse of NYCB at the end of the Class Period.  Only a $1 billion cash infusion from a group of private investors saved NYCB from collapse.  With that capital injection in hand, the Bank, in Q4 2023 and the first two quarters of 2024, announced well over $1 billion in provisions for credit loss related to the deteriorating loan portfolio, resulting in a net income loss of $683 million, the near-complete eradication of the Bank's historically high dividend, and the complete erasure of $2.4 billion in goodwill.  In the wake of these devastating disclosures, Defendants Cangemi, Pinto, and Adams, along with other senior executives and the majority of the Board of Directors, were also shown the door as a consequence for the major losses and risk management failures admitted to by the Bank.

124.     Each of the disclosures between January 31, 2024 and February 29, 2024, described below, disclosed new information related to, and materialized risks concealed by, the Exchange Act Defendants' misrepresentations and omissions.

### 1.     NYCB Reveals Over Half a Billion Dollars in Expected Loan Losses, a Net Quarterly Loss of $193 Million, and a Slashed Dividend

#### a.     January 31, 2024: Q423 Earnings Release Partial Corrective Disclosures

125.     Given the Exchange Act Defendants' prior representations, the market was rocked when NYCB made a series of surprise negative announcements concerning its CRE loan portfolio.

On January 31, 2024, before the market opened, NYCB released its Q4 2023 results and hosted an earnings call with Defendants Cangemi and Pinto.  In the press release and accompanying investor presentation ("Q4 2023 Press Release," "Q4 2023 Investor Presentation," and "Q4 2023 Conference Call," respectively), NYCB reported that the Company would record a PCL of $552 million, a quarterly increase of roughly 800%, up $490 million from the prior quarter.  The Company also disclosed fourth quarter net charge-offs totaling $185 million, compared to approximately $19 million in total charge-offs for the prior seven quarters combined.  NYCB also disclosed that it increased its ACL to $992 million, up $373 million compared to $619 million (or 60%) from the previous quarter, in order to "build reserves during the quarter to address weaknesses in the office sector, potential repricing risk in the multi-family portfolio and an increase in classified assets."

126.   Defendants downplayed these drastic financial steps, claiming that this action "better aligns the Company with its relevant bank peers, including Category IV banks."  However, as explained herein, the Exchange Act Defendants repeatedly told investors during the Class Period that NYCB was already "prepared to be a $100 billion bank," even under the new rules, "before the Flagstar transaction[.]"  Defendants indication that the Bank increased reserves simply to reach parity with peers—as opposed to actual deterioration in its credit outlook—made little sense, especially in light of the Exchange Act Defendants' representations that it was prepared to join the ranks of Category IV banks just months earlier, signaling no need to increase reserves 800% or report a non-GAAP net loss of $193 million, which was $459 million less than the prior quarter's net income of $266 million.  Given the Bank's highest-of-its peers CRE Concentration Ratio, NYCB was obligated to have created a risk management framework that accurately assessed credit risk and credit loss provisions long before the OCC entered the picture.  Indeed, throughout

the Class Period, the Exchange Act Defendants continuously touted, *inter alia*, NYCB's "conservative underwriting," "strong asset quality metrics" that ranked "among the best in the industry[,]" and "superior credit quality[.]"  Further, in anticipation of NYCB's fourth quarter 2023 financial results, CFRA equity analyst Alexander Yokum issued a report on January 27, 2024, noting that CFRA's "Buy" Recommendation "reflect[ed] NYCB's *sustainable profitability supported by strong operational efficiency*," with the "[a]dditional benefits com[ing] from *NYCB's conservative underwriting standards and well-established relationships with property owners*."

127.   Because of this overnight asset deterioration, NYCB slashed its historic, above-peer dividend by 71%, from $0.17 to $0.05 per quarter.  Altogether, these results led to a reported, non-GAAP net loss of $193 million, which equated to a quarterly diluted EPS loss of ($0.27) per share, which was in stark contrast to the previous quarter's profit of $0.36 per share. NYCB's earnings results for Q4 2023, including diluted EPS, were well below analysts' EPS consensus of $0.29 per share.

128.   In the wake of this news, NYCB's stock sank by as much as *46%* on January 31, 2024, eventually closing *38%* lower on unusually high trading volume, falling $11.73 per share from a $31.14 per share closing price on January 30, 2024 to a $19.41 per share closing price on January 31, 2024.[41]  The following day, the Company's stock price dropped an additional *11%* on unusually heavy trading volume, falling an additional $2.16 per share, from $19.41 per share at close on January 31, 2024 to $17.25 per share at close on February 1, 2024.

---

[41] Unless otherwise stated, all references to the price of NYCB common stock herein refer to post-reverse stock split adjusted (discussed further *infra*).

129.    In his "CEO Commentary" included in the Q4 2023 Press Release, Defendant Cangemi described the surprise losses and increased reserves as "necessary enhancements that come with being a $100 billion plus Category IV bank."  Cangemi's claim—that the Bank's elevation to Category IV membership was the reason behind the negative results—was inconsistent with his statements in March 2023 that NYCB had already made "***sizable investments***" in "***risk management***" and "***regulatory oversight***" to ensure that the Company had "***all of the appropriate risk management tools to be a $100 billion bank***."  Moreover, as stated above, while elevation to Category IV status certainly increased regulatory oversight of the Bank, it did not actually change the risk management practices and processes that the Bank was expected to utilize when assessing the credit quality of its loan portfolio, given its longstanding and extremely elevated CRE concentration.  *See* Sections IV.A and IV.C *supra*.

130.    During the Q4 2023 Conference Call, analysts expressed surprise and questioned Defendants Cangemi and Pinto about whether there would be significant additional loss reserves and charge offs.  For example, the first question posed by an analyst questioned whether the market should anticipate additional losses in NYCB's CRE and multi-family portfolios, asking "what[] the reserve build at the end of the fourth quarter cover[s] and what that implies for future reserve build through the course of 2024?"  The analyst also pressed on the $185 million net charge off, asking "[w]here do you see credit losses migrating next year?  And if you expect any losses to come from the multi-family book?"  Defendant Cangemi responded that NYCB had "***looked at the marketplace, looked at the office perspective and the general office weaknesses throughout the country***" and "***did a deep dive in the office portfolio as well as thinking through payment shock and interest rate shock given the rise of interest rates that we've experienced over the past few quarters, in particular, the impact to our customers in respect to repricing***."  Given that

"deep dive," Cangemi noted that while they "clearly had significant addition to our reserve build," with respect to "***the actual performance of the portfolio, there hasn't been a whole lot of change in respect to the NPAs and delinquencies***." Defendant Pinto then spoke about the multi-family portfolio, assuring the market that the reserves announced for the fourth quarter ***reflected*** "***repricing risk in that portfolio***" and adding that "***we're not seeing any significant trends in the multi-family portfolio besides the repricing risk that we spoke about***."

131.    Defendant Pinto again echoed Defendant Cangemi's responses, emphasizing that the negative news reflected a "deep dive" indicating that management was "very comfortable" with the remainder of the portfolio:

> ***So we did a really, as Tom mentioned earlier, really deep dive on the office portfolio and really took into account some of the more recent appraisals we're seeing and what we're seeing in that sector and really tried to capture that risk in that portfolio***. So the 800% coverage – the 800 basis points of coverage that we have there, we're comfortable with right now. We still have two loans that are the same loans we talked about in the third quarter that are sitting in non-accrual. ***We haven't seen any other significant trends from a delinquency perspective yet in that portfolio. So we're comfortable with where we are now***. We'll continue to revisit it, of course, as we get additional appraisals in for properties that have been rated, that have been criticized.

132.    Later during the call, Defendant Pinto confidently assured investors that NYCB is "***very comfortable with the early delinquencies that we're seeing***."

133.    Analysts continued to question Cangemi and Pinto as to the reliability of their assurances that the current reserves were adequate and that there was low risk of additional losses. An analyst from Jefferies noted that to meet the reported "10% CET1 target," NYCB's provision for credit loss in 2024 "is going to have to de minimis" and, as a result, questioned "***what are you guys baking in for provision to get to that 10% level? And is that aggressive?***" Defendant Pinto responded that NYCB expected that the fourth quarter provision of $552 million "***covers the emerging risks and the portfolio that we have currently***," and that NYCB was "***very comfortable***

with the early delinquencies that we're seeing and those trends have not dramatically jumped up" and "***there's not a -- anywhere near a significant provision as we saw in the third and the fourth quarter combined in 2024 that we're expecting right now given what we're seeing in the portfolio and in the portfolio dynamics***."

134.    When pressed by an RBC Capital Markets analyst about whether the unexpected slashing of NYCB's historically stable dividend "***ha[d] anything to do with your outlook for credit***? Or was it more about looking peer-like and adjusting for the new earnings run rate?" Cangemi responded that the negative results did not indicate additional undisclosed negative credit risk:

> ***Let me be crystal clear on this. This is razor focused on looking at the company's long term plan and being part of the new Category IV banking institutions and having a capital position as we grow it into a level that we are in our peer group***. And clearly, the dividend significantly increases that capital efficient in 2024 and beyond.
>
> When you take all of the factors that we talked about between the forward guidance and the dividend adjustment, we get our CET1 to double digits. That is primarily focused on the rationale there as well as thinking about the future growth in this company as a Category IV bank. And there's no question that this was a difficult decision as a firm, but clearly necessary as we reestablish our capital allocation story.

The analyst then confirmed that "it's more about the latter. ***It's not about your outlook for credit is what you're saying***? Cangemi responded: "***Yes***."

135.    In the wake of the January 31, 2024 news, analysts including Compass Point Research and RBC Capital Markets, downgraded their recommendations on NYCB to hold-equivalent ratings in addition to cuts made by Raymond James, Jefferies and CFRA.  "The growing pains from being a larger bank will weigh on earnings in the near-to-medium term, and we believe management will need to outperform on credit to regain investor confidence[,]" RBC wrote in a note to clients.  RBC further stated that "larger than expected provision for credit losses" and the

dividend reduction were both a "**major negative surprise**" and reported that these "**trends and decisions were not expected at all**," noting that "**[i]n the prior quarterly call, management's prepared comments mentioned that asset quality remained strong. Something has clearly changed in their tone, . . . What changed? When did it change? What is the outlook for the provision and credit losses?**" Jefferies also cut its recommendation before the market opened on February 1, lowering to sector perform from outperform, noting that NYCB's higher-than-expected provision, a meaningfully lower margin and a dividend cut weighed on its quarterly results, and that "**credit quality concerns weigh on valuation framework**."

136. Some analysts, however, were assured by the Exchange Act Defendants' representations that the actions taken adequately captured remaining credit risks, expressed confidence that the worst was over. For example, on February 1, 2024, J.P. Morgan issued an optimistic report, stating that "with NYCB having built a war chest of reserves to pay for potential loan losses, **the bottom line is that the looming CRE risk factor has been mitigated in our view with minimal provision expense likely for 2024**."

### 2. Media Reports Reveal New Concerns Over the Bank's Credit Risk And Outlook

137. On February 5, 2024, after the close of trading, *Bloomberg*, in an article titled "NYCB's Talks with Watchdog Led to Moves that Rocked the Market," revealed that "[m]ounting pressure" from the Bank's new regulators at the OCC forced NYCB's "surprise decision to slash its dividend and stockpile cash in case commercial real estate loans go bad, according to people with direct knowledge of the matter." The Bank's "drastic financial moves—which triggered a record plunge in the company's stock and dragged down shares across the industry last week—followed behind-the-scenes conversations with officials from the Office of the Comptroller of the Currency, the people said, asking not to be identified describing the confidential discussions."

This news revealed that the January 31, 2024 reserves were not just an attempt to increase reserves to reach parity with peers, but reflected a previously unreported deterioration in the Bank's loan quality.

138.    *Bloomberg* also revealed that in the months leading up to the January 31, 2024 announcement, NYCB had been operating without a Chief Risk Officer or Chief Audit Executive, two vital leadership executives in the heightened regulatory landscape.  Specifically, *Bloomberg* reported that according to one of the people with direct knowledge of the matter, NYCB's Chief Risk Officer, Nicholas Munson, and Chief Audit Executive, Meagan Belfinger, "left their posts in the months before the bank unveiled its measures."  News of Munson's hasty and secret departure was also reported in *The Financial Times* on February 5, 2024, in an article titled, "New York Community Bancorp's chief risk officer left weeks before big loss."  The article compared NYCB to failed bank SVB, noting that SVB "was without a chief risk officer for much of 2022" and that "NYCB's share price tumble has reawakened investor scrutiny of regional banks after turmoil swept across the industry early last year."

139.    This news raised critical concerns about the Company's credibility. Analysts made note of NYCB's secret executive departures.  For example, Piper Sandler issued an analyst report on February 6, 2024 stating, "[y]esterday, Bloomberg News reported that NYCB's Chief Risk Officer and Chief Audit Executive had left the bank early this year.  ***Unfortunately, this represented yet another unlooked-for surprise – for us and for investors.  We do not know if management pushed them out, if regulators prompted it, or if they simply chose to leave***."  J.P. Morgan, in a February 7, 2024 analyst report, commented that the fact that news of key executive departures did not come from NYCB directly "***will heighten investor concerns***," and discussed the importance of having a Chief Risk Officer while "crossing from one regulatory threshold to

the next" in the wake of the Flagstar and Signature acquisitions.  J.P. Morgan emphasized that going forward, "*investors will be looking for risk management execution and we think it will take time to rebuild confidence*."  Moreover, J.P. Morgan noted that investors were surprised, not by NYCB's need to be Category IV compliant, "but rather, the dramatic actions that this new level of compliance would almost immediately require[.]"  In addition, J.P. Morgan spoke with "many bank managements" and determined that "*NYCB is an outlier*."

140.   A February 7, 2024 post on the *Motley Fool* reflected investors' rising concerns with the lack of transparency from NYCB's management:

> New York Community Bancorp did not publicly announce the departure of either executive at the time they left, which raises concerns about its transparency with investors. The alleged meetings with an important federal agency that *Bloomberg* reported are also cause for concern. ***It seems there's much more to the story of the bank's sudden decline in fortunes, so investors would be wise to avoid it for now***.

141.   On these media reports, the Company's stock price dropped $3.60 per share, or approximately *22%*—from $16.20 per share at close on February 5, 2024 to $12.60 per share at close on February 6, 2024—on unusually high trading volume.  NYCB shares had not closed that low since 1997.

142.   More bad news followed the *Bloomberg* article.  On February 6, 2024, after the market closed, Moody's slashed the Company's corporate debt ratings to junk citing "*high governance risks*."  In relevant part, Moody's reported that this "*rating action reflects multi-faceted financial, risk-management and governance challenges facing NYCB*."  Specifically, Moody's explained that "control functions with strong knowledge of a bank's risks are key to a bank's credit strength," and because of concerns over these key control functions, "*NYCB faces high governance risks from its transition with regards to the leadership of its second and third lines of defense, the risk and audit functions of the bank, at a pivotal time*."  Moody's made sure

to note that "*NYCB is highly concentrated in rent regulated multi-family properties*" and "*NYCB's loan-to-deposit ratio was 104% as of 31 December 2023, also higher than most peers*."

143.    In the hours between the stock market close on February 6, 2024 and its opening the next morning, NYCB quickly issued press releases to blunt the impact of the Moody's downgrade.  In these rapid-fire press releases, NYCB announced that the Board had appointed Board member and former Flagstar CEO Alessandro DiNello as its executive chairman with immediate effect, assuring investors that DiNello would work alongside Cangemi and the rest of the senior leadership team to "improve all aspects of the Bank's operations."  Moreover, NYCB acknowledged *Bloomberg's* reporting on the mysterious loss of its Chief Risk Officer and Chief Audit Officer, claiming that "as part of the bank's enhancements to its risk management processes we have been engaged in an orderly process of bringing in a new chief risk officer and chief audit executive with large bank experience," and claimed that "we currently have qualified personnel filling those positions on an interim basis."

144.    While Defendant Cangemi still held on to the title of CEO, DiNello ran and dominated a hastily convened special analyst call on February 7, 2024 (the "February 7, 2024 Special Call").  During the call, DiNello sought to allay investor concerns by explaining that "Tom [Cangemi] and I will be working together to strengthen every aspect of the bank's operations."  In doing so, he acknowledged that NYCB was "dealing with a very serious situation since [the Company's] fourth quarter earnings release," but sought to instill confidence by confirming that the "bank remains strong and will get itself back on the right track."

145.    During the call, DiNello seemed to hint for the first time that the Bank lacked the ability to quantify and report credit risk and likely losses in the loan portfolio.  DiNello told analysts that moving forward, NYCB would "*build[] a solid capital base*" and "*enhance the*

processes that are needed to properly identify the inherent losses in the book going forward[,]" while being "laser-focused on reducing [the Company's] CRE concentration" as quickly as possible.

146.    Analysts sought additional information about whether the Bank's actions had been the result of pressure from regulators.   A Bank of America analyst queried whether "**management's hand was forced by regulators to take actions that in normal course you may not have taken**."   DiNello denied this was the case, stating: "Let me put that to bed right here, okay? **What we did was what we needed to do, all right? We did the proper review of our loan portfolio. We made some changes in the way we risk weighted our loan portfolio and came to the conclusion that we needed to take action, and we did**. . . . So this speculation of why and when and who, look, we did the right thing, and we're going to go forward now."

147.    When asked whether NYCB would need to increase loan loss ACL provisions and reserves in 2024, DiNello stated: "**I don't have any idea of what that need might be** because the only thing I can tell you is that at 12/31, we were in the right place."

148.    An investor from J.P. Morgan asking DiNello for his "assessment of the risk management infrastructure at the company today and relative to where you need to be as a Category IV bank."   In response, DiNello indicated that NYCB's risk management infrastructure was likely inadequate and that the Bank still lacked a chief risk officer who could even assess the Bank's risk management framework:

> Well, of course, **as you grow as an organization, you have to continue to strengthen your risk and compliance framework**. It's a hallmark of mine. You may not know this, but I started my career as a bank examiner. So I have a high respect for not only the regulatory process, but the way the world thinks about the importance of risk compliance and having the right infrastructure. Because **if you don't have that, if you're not in a position to properly identify the risk that you're exposed to, then you're not going to be ready for them if they come to pass**.

And so we're probably never going to be totally satisfied with it. But -- and look, we're in a position here where we've got -- *I think we can announce a very strong new CRO in the very near future*. We're getting that wrapped up. And *that person will come in and assess it better than probably I can right now and make sure that we are -- if we need to improve it or how we need to improve it, that we do it*. And we are absolutely committed to that.

149.    An analyst from Stephens Inc. then pointed to NYCB's abnormally high CRE concentration levels in comparison to its peers and asked whether the Company could operate a $100 billion institution with such heavy concentration.  In response, DiNello acknowledged that "*we're an outlier there*" but noted that they planned to reduce concentration moving forward.

150.    Newly elevated Executive Chairman DiNello dominated the February 7 call, sidelining the Company's ostensible CEO Cangemi.  Indeed, the normally talkative Cangemi spoke only once during the entire call.  This was not lost on the market.  On February 7, 2024, *Axios* reported that DiNello "took the reins" on the February 7 Special Call, remarking that: "DiNello did his best on the call to not sound panicked. But in banking, trust is everything — and the markets tend not to trust any bank whose share price has fallen more than 50% in the space of a week."  *The Wall Street Journal* reported on February 7, 2024 that DiNello said he was brought on to "right the ship."  A few days later, on February 13, 2024, NYCB filed a Form 8-K with the SEC making clear that DiNello was in charge and noting that Cangemi, who still held the title of CEO, reported to DiNello and not the other way around.

151.    Additional concerning news over how NYCB was allowed to double its size in four months was revealed during the afternoon on February 22, 2024, in a report released on Twitter and on the website of respected industry watchdog *Better Markets*, titled "New York Community Bancorp: A Frankenstein Monster Federal Regulators Created."  *Better Markets* acknowledged that the Flagstar Merger and rapid acquisition of Signature's assets, doubling the Bank's size in less than four months, "quickly created a much larger bank that continues to *present financial*

*stability concerns for the American people and the broader banking and financial industry*." *Better Markets* revealed that this growth would not have occurred absent the Bank's decision to strip itself of FDIC oversight just before the regulator was set to publicly announce that it was not going to approve the Flagstar Merger.  The article further reported that "NYC Bancorp decided to change its approach in 2022 and engage in what looks like ***blatant regulatory arbitrage***: *moving from an unfriendly federal banking regulator to a much more friendly one*."

152.    *Better Markets* also reported that NYCB's participation in the March 2023 bid for Signature Bank assets roughly 100 days after closing on the Flagstar Merger "raises serious red flags" because the regulators' private  "concerns about the two banks' integrating management, operations, risk, compliance and other systems and processes, including those related to capital and asset quality evaluations, suggest that [NYCB] should not have been viewed as a viable bidder for Signature." *Better Markets*  noted that rapid asset growth like that seen at NYCB was "a key factor and catalyst for [the] bank failure" of SVB, Signature, and First Republic, warning that NYCB's "***growth exceeded what was reported by all three of the 2023 regional banks in the years leading up to their failures***" and the Bank's CRE Concentration level was still roughly 500%, "ranking in the 96th percentile for its peer group [of] banks with more than $100 billion in total assets." *Better Markets* noted that "this level of concentration indicates ***extreme exposure to the volatile and currently vulnerable CRE sector***."  The price of NYCB stock dropped on the first full trading day following the *Better Markets* report, closing at $13.56 per share on February 23, 2024, down 2.2%.

### 3.    The Truth Is Fully Revealed When NYCB Admits to Material Weaknesses in Its Loan Review and Writes Off $2.4 Billion in Goodwill

153.    After the market closed on February 29, 2024, NYCB filed a Form 8-K/A with the SEC, revealing that: (a) management had "identified material weaknesses in the Bank's internal

controls related to internal loan review, resulting from ineffective oversight, risk assessment and monitoring activities;" (b) NYCB would write off 100% of its $2.4 billion in goodwill; and (c) the Company would delay filing its Form 10-K in order to further assess the impact of its material weaknesses.  As a result of the $2.4 billion goodwill impairment, ***the Company's fourth-quarter 2023 GAAP net loss was now $2.71 billion, up from $252 million***.

154.    On the same day, NYCB filed another Form 8-K with the SEC that revealed Defendant Cangemi had resigned as CEO one week earlier and had been replaced by Defendant DiNello.  NYCB also disclosed that DiNello's appointment as CEO was not unanimous, noting that Board Member Hanif Dahya had resigned after voicing opposition to the Company's decision to appoint DiNello as CEO.  Market watchdog *Better Markets* argued that the rapidly changed leadership team signals "red flags of deep, deep deficiencies."

155.    The market strongly reacted to the Company's disclosures on February 29, 2024. Rating agency Fitch downgraded the Long- and Short-Term Issuer Default Ratings for NYCB and its bank subsidiary, Flagstar Bank, N.A. to 'BB+'/'B' from 'BBB-'/'F3', respectively. Fitch explained that its rating action resulted from "NYCB's various disclosures related to updated Q4 2023 financials to recognize goodwill impairment, changes in senior and executive management and board of directors, and finding of material weakness with respect to internal loan review." Fitch analysts stated that the material weaknesses prompted a "re-assessment of NYCB's risk profile" and warned that the bank may see its profitability hampered if it further ramps up its reserves, which guard against losses in its real estate-heavy loan portfolio. Moody's also cut the bank's rating to B3, deeper into junk territory.[42]  This followed Moody's two-notch downgrade in

---

[42] According to Moody's rating scale, a "Ba" rating signifies that the "[o]bligations rated . . . are judged to have speculative elements and are subject to substantial credit risk."

February 2023.  In a note published on March 1, 2024, Moody's said that NYCB's overhaul is coming during a "particularly challenging" environment and flagged "ongoing risks to [NYCB's] creditworthiness" as the bank's changes take full effect.

156.    On March 1, 2024, *American Banker*, in an article titled "NYCB's new risk team fails to calm investors, ratings firms," reported that "New York Community Bancorp's latest leadership revamp did little to quell investors' worries about the Long Island-based bank, as its stock price fell nearly 26% after a flurry of announcements that started late Thursday." Analysts and news agencies reported that the problems disclosed by NYCB were unique to the Company and not the byproduct of any sort of contagion in the banking sector.  A Citi analyst wrote in a March 1, 2024 client note that "The disclosure of a material weakness in its loan review process is important, and significant changes will need to be made with respect to ***how they monitor credit risk going forward which we expect may lead to them being more proactive on recognizing issues going forward***."  Citi noted that the material weakness "add[ed] more fuel to [the] fire."

157.    On February 29, 2024, Piper Sandler analyst Mark Fitzgibbon downgraded NYCB from "Overweight to Neutral," and stated that "[t]he whack-a-mole at New York Community continues[]."  Fitzgibbon was interviewed in the March 1 *American Banker* article, where he noted that NYCB's problems are "very opaque," making it hard for investors to predict whether there's more pain to come, and noting that: "Everybody thought they had ripped the Band-Aid off three or four weeks ago, . . . . "Now it appears that's not the case, and that there's more to come."  In his report, Fitzgibbon explained that he had "been wrong" in not downgrading NYCB earlier, noting that he had incorrectly relied on the Exchange Act Defendants' January 31, 2024 statements that they were "taking several meaningful strategic actions, including building liquidity, cutting the dividend and boosting reserves," under the false assumption that the company had "ripped the

band-aid off." "Most worrisome" to Fitzgibbons was the fact that "***the company announced that it identified a material weakness in its internal controls related to internal loan review***."

158.   Similarly, Deutsche Bank concluded that NYCB "likely will have a long road to recovery as it builds capital, liquidity and its risk mgmt/internal controls infrastructure[,]" due to news of "the resignation of the current CEO, the announcement of a large goodwill impairment, other items related to the Signature acquisition, another resignation of a board member (this will be the second post earnings) and the identification of material internal control weaknesses. . . ." On the same day, Raymond James analysts acknowledged that the Company's disclosure regarding material weaknesses in internal controls presented long-term problems for NYCB and "adds concerns that credit costs could be elevated for an extended period."

159.   The February 29, 2024 disclosures and continuing March 1, 2024 rating and analyst reactions caused a significant stock price decline in NYCB shares, with the stock falling $3.72 per share (or ***26%***), from a close of $14.37 per share on February 29, 2024, to a close of $10.65 per share on March 1, 2024.[43]  These disclosures and continuing coverage of NYCB caused a dramatic decline in the Company's already struggling stock price, with the price of NYCB common stock falling an additional $2.46 per share (or ***23%***), to close of $8.19 per share on March 4, 2024, the next trading day.

160.   Media and analysts raised serious concerns about NYCB's future and the impact of the Moody's downgrade and deteriorating CRE portfolio on the Bank's ability to retain the

---

[43] On March 1, 2024, trading for NYCB common stock on the NYSE was halted for five minutes between 9:43 AM (ET) through 9:48 AM (ET).  According to the NYSE, this halt constituted a "LULD Pause."  Limit Up-Limit Down ("LULD") bands are a protection designed to address volatility in stocks.  LULD gets triggered when a stock hits its lower or upper price bands, resulting in a limit state for 15 seconds, where further momentum is paused.

critically needed deposits acquired through Flagstar and Signature.  For example, *Inc. Magazine* wrote on March 5, 2024:

> ***Yesterday's slide brought the total decline of NYCB stock values to 73 percent since the year started, though that's only a reflection of its underlying problems***. The selloff was sparked by Moody's Investors Service downgrading the bank's deposit rating for the second time in a month, the cumulative junk status placing it three levels below investment grade. ***That came on the heels of news Friday that two executives at NYCB had departed following discoveries of "material weaknesses in internal controls" related to vetting of loans to commercial real estate (CRE) clients***.
>
> ***Why are those weaknesses a problem for markets? Because the likelihood of defaults on those loans had already led NYCB to write off $2.4 billion beyond the $252 million in losses they cost its fourth quarter 2023 activity. The Moody's rating downgrade factored this announcement into its outlook, having the effect of both seeming to anticipate and raise the probability of clients defensively moving their deposits to other banks***.

**H.  Subsequent Events Further Confirm the Exchange Act Defendants' Fraud**

**1.  NYCB Narrowly Avoids Failure with a $1 Billion Capital Infusion**

161.    On March 6, 2024, in an article titled "New York Community Bancorp Seeks Cash Infusion," the *Wall Street Journal* reported NYCB was seeking capital to "shore up confidence in the troubled regional lender."  The *WSJ* credited people familiar with the matter as stating that: "NYCB, buffeted by fears over potential real-estate loan losses, weaknesses in its internal controls and a sharp drop in its stock price, has dispatched bankers to gauge investors' interest in buying stock in the company."  The authors cautioned that "[t]here's no guarantee there will be a deal, or that one would succeed in addressing the bank's challenges, which as of Wednesday morning (March 6, 2024) had led to a roughly 70% decline in its stock price since January."

162.    The *WSJ* article caused NYCB shares to crater 42%, forcing trading on the NYSE to be halted several times as NYCB shares traded as low as $5.10 per share (or $1.70 per share pre-reverse stock split) in intraday trading.  Media reports and industry insiders questioned whether NYCB could survive.  As reported in the *Commercial Observer* on March 6, 2024, just after

trading on NYCB stock was halted: "[NYCB] is facing the possibility of collapse after the bank's stock cratered Wednesday to less than $2 per share, a decline of 83 percent on the year, and trading was halted." *Commercial Observer* interviewed a commercial real estate banking insider who doubted NYCB could survive: "What's happening now, no, I'm not convinced New York Community Bank will survive," said the professional.  "I don't think they will, and, if and when that happens, it will be like Signature [Bank] going under - a vacuum will open, a daisy chain."

163.    As fears of NYCB's possible collapse enveloped the market, on the afternoon of March 6, 2024, NYCB announced it had raised more than $1 billion from a consortium of investors led by former Treasury Secretary Steven Mnuchin, changed its CEO for the second time in less than a week, and added four new directors to its board, including Mnuchin.  Joseph M. Otting, who previously served as the 31st Comptroller of the Currency from November 2017 to 2020, and former CEO of OneWest Bank, would take over as CEO and join the Board, while DiNello, who had served as CEO for just one week, would return back to non-executive Chairman of the Board.

164.    In a statement from NYCB, Mnuchin made clear that the $1 billion capital infusion was necessary in light of "the bank's credit risk profile," and "should reserves need to be increased in the future to be consistent with or above the coverage ratio of NYCB's large bank peers."  The *Wall Street Journal* confirmed the capital infusion was in direct response to the newly disclosed CRE losses and weaknesses in internal controls, reporting that: "the infusion is meant to steady a bank that has been buffeted over the past several weeks by fears over potential real-estate loan losses, weaknesses in its internal controls and a sharp drop in its stock price."  Once trading resumed following the announcement of the capital infusion and appointment of Otting, NYCB shares rebounded slightly, closing at $10.38 per share on March 6, 2024.

165.    A Deutsche Bank analyst report issued on March 6, 2024 explained how NYCB's disclosures regarding higher credit provisions, concerns over CRE, reduced dividend, material weaknesses in internal controls, various resignations, and credit downgrades put an enormous amount of pressure on NYCB's stock, stating that "[t]he stock was down 45-50% at one point while trading was halted due to price volatility. . . ."  Deutsche Bank viewed the $1 billion capital raise positively because it could "shore up" the Company's balance sheet.

166.    While the $1 billion cash infusion likely saved NYCB from entering the ranks of failed regional banks like Signature, SVB, and First Republic, the deal, as Deutsche Bank acknowledged, "does add considerable dilution" for shareholders.  RBC also noted that the capital raise was "significantly dilutive" but also "a necessary step to restore confident *[sic]* in the stock and the near-term direction of the company."

167.    A Raymond James analyst report issued on March 6, 2024 explained that the "[s]izeable capital raise allows NYCB to be in-line with Category IV banks[,]" but raised concerns regarding NYCB's "aggressively underwritten" loans in light of the interest rate environment. Specifically, this analyst report stated:

> Based on our discussions with industry participants, NYCB's non-conforming disclosures with regard to DSCRs, and our calculations in this report, we believe many borrowers will *[sic]* not satisfactorily cash flow when a loan resets due to higher interest rates. Further, **the math suggests that borrowers were likely aggressively underwritten**, will be stressed should the interest rate environment remain elevated for an extended period, and that LTV's for the I/O portfolio likely range from 80-100%+. **NYCB's disclosures about a material weakness around credit and risk management only add to the concerns we see in our calculations**, and we believe it would take several hundred basis points in rate cuts to avoid structural issues with the $18B I/O portfolio.

168.    Further, this cash injection helped extinguish a deposit exodus that stemmed from a lack of trust in NYCB.  Between February 5, 2024 and March 5, 2024, the Company experienced

deposit outflow of $6 billion, resulting in a 7% decline in its deposit base to $77 billion.[44]  This deposit exodus was later confirmed by NYCB and DiNello during an investor conference call held on March 7, 2024, where DiNello explained that "there certainly were some people that lined up to withdraw," but "[o]nce the press release was out, it was back to normal."

169.    NYCB's new management under CEO Otting later confirmed that this cash injection saved the Bank from failing when, during a question and answer period at NYCB's June 5, 2024 Annual General Meeting, Otting revealed just how close NYCB had come to collapsing, stating "if you go back to the March 5th or 6th timeline, the company was in pretty difficult shape. There was obviously a run on the bank stock. . . . But if the capital raise was not ready to go specifically that afternoon, the chances of the company surviving would have been at in peril."

### 2.    NYCB Cleaned House, Ousting the Senior Leadership Responsible for Risk Management and Credit Review

170.    As noted above, by the end of the Class Period, NYCB had quietly removed its Chief Risk Officer and Chief Audit Executive prior to the Bank's dramatic revelation of hundreds of millions of dollars of losses and serious material weaknesses in internal controls over its loan review processes.    Defendant Cangemi's February 23, 2024 resignation as CEO was communicated to investors on February 29, 2024, with the message that he would remain as a Board member to quell investor concern.  However, just one week later, on March 7, 2024, NYCB announced Defendant Cangemi would resign from the NYCB Board, effective March 11, 2024, severing his relationship with the Company.

171.    Seven other Board members, six of whom had served on the Risk Assessment Committee during the Class Period resigned in February and March 2024, including the Risk

---

[44] Editorial Team, New York Community Bank Faces $6 Billion Deposit Exodus Amid Financial Struggles, TECHGOLLY (Mar. 7, 2024), https://techgolly.com/new-york-community-bank-faces-6-billion-deposit-exodus-amid-financial-struggles.

Assessment Committee's Chairman, David Treadwell.  Similarly, five of the seven members of the Bank's Credit Committee, including its Chairman James Carpenter and member Defendant Cangemi, resigned.

172.   Finally, on April 12, 2024, NYCB issued a press release announcing the appointment of three new executives who replaced, effective immediately, Defendant Pinto, Defendant Adams and the Bank's General Counsel, Patrick Quinn.  That same day, *The Real Deal* wrote that "Pinto, Adams and Quinn are the latest NYCB executives to head for the door as a maelstrom of bad news engulfs the key lender to New York real estate owners, which is trying to restore the confidence of investors and customers."  *The Real Deal* highlighted Defendant Pinto's January 31 description of NYCB's problem multi-family loans as "manageable," noting that "now someone else will be managing it."

173.   Altogether, NYCB's top officers and directors responsible for risk management and credit risk assessment "resigned" or were otherwise removed from their positions in the space of four months:

| Removed Officer/Director | Departure Date |
|---|---|
| Defendant John Pinto<br>***CFO*** | April 12, 2024 |
| Defendant John T. Adams<br>***Head of Commercial Real Estate Financing*** | April 12, 2024 |
| Patrick Quinn<br>***General Counsel*** | April 12, 2024 |
| Defendant Thomas R. Cangemi<br>***CEO***<br>***Member of Credit Committee*** | February 23, 2024 (CEO)<br>March 11, 2024 (Board) |
| David L. Treadwell,<br>***Chairman, Risk Assessment Committee*** | March 11, 2024 |
| Lawrence J. Savarese,<br>***Chairman, Audit Committee*** | March 11, 2024 |
| James Carpenter,<br>***Chairman, Credit Committee*** | March 11, 2024 |
| Leslie Dunn | March 11, 2024 |

| Chairwomen, Compensation Committee and Member of Audit Committee | |
|---|---|
| Lawrence Rosano Jr. Member, Risk Assessment and Credit Committees | March 11, 2024 |
| Ronald Rosenfeld Member, Risk Assessment and Credit Committees | March 11, 2024 |
| Robert Wann Member, Risk Assessment Committee | March 11, 2024 |
| Toan C. Huynh Member, Risk Assessment Committee | February 2024 |
| Hanif (Wally) Dahya Member, Credit Committee | February 2024 |
| Nicholas Munson Chief Risk Officer | Late 2023 |
| Meaghan Belfinger Chief Audit Executive | Late 2023 |

174.    On June 5, 2024, during a call with shareholders at NYCB's Annual General Meeting (the "2024 Annual General Meeting"), Joseph Otting, the current CEO of NYCB, admitted that the departures of "most of the executive management" (including Cangemi, Pinto, Adams, Quinn) and the "majority of the board" were part of an effort "of holding people accountable" "for material weaknesses and other items associated with the company."  Otting's statement confirmed that each of these officers and directors were either terminated or asked to resign as a direct result of the Company's disclosures and admitted material weaknesses.

### 3.    Media Reports Detail How NYCB Engaged in "Regulatory Arbitrage" To Secure Approval of the Flagstar Merger

175.    On March 4, 2024, *Bloomberg* expanded on the earlier March 1, 2024 revelation that NYCB engaged in "regulatory arbitrage" in order to push through the Flagstar Merger, which added additional credit risk to the Bank, whose risk management practices were already deficient and unable to control for credit risk to its loan portfolio.  In an article titled, "NYCB Ballooned Despite Real Estate Warnings in Years Before Fall," *Bloomberg* reported that a nonprofit called the Association for Neighborhood & Housing Development was "suspicious" about NYCB's and

Flagstar's sudden decision to convert into a nationally chartered bank in April 2022.  According to *Bloomberg*, the nonprofit raised concerns with the OCC over how the banks "were unable to secure the necessary approvals from their regulator at the FDIC, and are now going through another regulator in the hopes that they will be more favorable," asking "How is NYCB able to do this?"

176.    *Reuters* published an article on March 7, 2024 titled, "Insight: US regulators greenlit NYCB's rapid growth, even with red flags."  *Reuters* reported that the OCC approved the $2.6 billion merger "even though other regulators feared the deal could create problems at the New York bank."  The article noted that, according to people with knowledge of the matter and public records, "The [NYCB-Flagstar] deal had issues from the start," and described how "[r]egulators' deliberations reported here for the first time are surfacing a year after Silicon Valley Bank's implosion exposed areas of weak oversight. . . ."  The article explains that interviews with "a dozen industry officials, merger experts and regulatory sources, as well as public documents," show how NYCB for years wanted to grow by pulling off a major deal, but when the FDIC "stood in its way the bank turned to the OCC."  According to two of the sources, "[t]he OCC greenlit the deal even though the FDIC had already privately vetoed the transaction over concerns about the banks' lending practices."

177.    On April 15, 2024, Senators Elizabeth Warren and Richard Blumenthal issued a scathing letter addressed to Michael Hsu, the Acting Comptroller for the OCC, that requested answers to various questions as to why the OCC approved the Flagstar Acquisition and the Signature Acquisition when the FDIC, NYCB's long-term regulator, "raised concerns about Flagstar's fair lending practices and NYCB's exposure to multifamily loans."  The letter cited an anonymous source at the FDIC as stating that "[n]o one at the FDIC was comfortable recommending a merger approval for [NYCB and Flagstar]."

### 4. NYCB Details How Its Material Weaknesses Impacted the Company's Internal Loan Review And Recognition of Its ACL

178.    On March 15, 2024, NYCB filed a Form 10-K/A for the Company's full year 2023 financial results (the "2023 Form 10-K/A").  In the 2023 Form 10-K/A, NYCB restated the fact that the Company had identified material weaknesses in its internal controls: "*[w]e have identified certain material weaknesses described in Item 9A of this Annual Report on Form 10-K and may discover additional future material weaknesses or significant deficiencies, which could divert management attention and increase our expenses, in order to correct the weaknesses or deficiencies in our controls*."  Further, NYCB's 2023 Form 10-K/A added a risk warning that was not previously present in the Company's quarterly or annual reports, stating "[w]e may fail to maintain effective internal controls, which could impact the accuracy timeliness of financial reporting."

179.    NYCB described the nature of its four material weaknesses in the Form 10-K, admitting, *inter alia*, that its material weaknesses in its internal controls over financial reporting prevented the Bank from (a) accurately, independently. and timely risk rating NYCB's CRE loans; (b) identifying problem loans in its portfolio; and (c) timely responding to emerging risks in in the business operations and regulatory and economic environments in which the Company operates. While it is uncommon for public companies in the United States to disclose any material weakness in their internal controls over financial reporting, it is very rare for any company to report more than three material weaknesses.[45]  Only one of NYCB's self-identified peer financial institutions reported a material weakness in their Forms 10-K for 2020-2024, and that institution, Webster

---

[45] *See* KPMG, 2023 Trends in material weaknesses, pp. 3, 9, available at kpmg.com/kpmg-us/content/dam/kpmg/pdf/2024/trends-in-material-weaknesses.pdf.

Financial Corporation, reported only a single material weakness related to IT systems access, and not to critical accounting estimates such as the ACL.[46]

180.    A material weakness is "a deficiency, or a combination of deficiencies, in internal controls over financial reporting such that **there is a reasonable possibility that a material misstatement of our annual or interim financial statements would not be prevented or detected on a timely basis**." NYCB explained that management had identified four out of five possible material weaknesses in internal controls relating to the Company's (1) control environment, (2) risk assessment, (3) monitoring, (4) control activities.  In other words, the only component of internal controls that NYCB did not report a material weakness for was information and communication.[47]

181.    In the 2023 Form 10-K, NYCB described the specific material weaknesses that management identified, that were first disclosed on February 29, 2024, and which led the Company to conclude that NYCB "**did not maintain effective internal control over financial reporting as of December 31, 2023**:"

> Control environment – **Our Board of Directors did not exercise sufficient oversight responsibilities, which led to us lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities**.
>
> Risk assessment – **We lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were**

---

[46] *See* Webster Financial Corporation's 2022 Form 10-K identified a material weakness related to "general information technology controls" including the design and implementation of "logical access controls including deprovisioning, privileged access, and user access reviews."

[47] COSO identifies five interrelated components of internal control: (i) control environment, (ii) risk assessment, (iii) control activities, (iv) information and communication, and (v) monitoring activities. 2013 COSO Framework, Ch. 2.  COSO requires that: "[e]ach of the five components of internal control and relevant principles is present and functioning [and that] [t]he five components are operating together in an integrated manner." *Id.*  COSO also identifies that these components are relevant to an entire entity and to the entity level, its subsidiaries, divisions, or any of its individual operating units or functions. *Id.*

*responsive to changes in the business operations and regulatory and economic environments in which the Company operates*.

Monitoring – ***Our recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively***.

Control activities – ***We did not sufficiently maintain effective control activities related to internal loan review***. Specifically, ***our internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged***. These ineffective controls ***impact the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases***.

These control deficiencies create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis, and therefore we concluded that the deficiencies represent material weaknesses in our internal control over financial reporting and our internal control over financial reporting was not effective as of December 31, 2023.

The Company's independent registered public accounting firm, ***KPMG*** LLP, which audited the 2023 consolidated financial statements included in this Form 10-K***, has expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting***.

182.    Altogether, these admitted material deficiencies stood in stark contrast to the Exchange Act Defendants' Class Period statements attesting to the Company's strong risk management practices that enabled the Exchange Act Defendants to adequately assess the loan portfolio credit quality.

183.    The Company described how it had already taken steps to remediate the material weakness through removing certain executives and Board members from the Company: "***We have enhanced our control environment, risk assessment and monitoring activities by addressing our Board composition and key members of executive management, including the Chief Risk Officer and Chief Audit Executive***."   The Company also described how it planned to "remediate the material weaknesses in its internal controls."   These remediation efforts provided additional insight into the root cause of the Bank's loan review failures.   In order to correct its material weaknesses,

NYCB would need to, among other things: (1) "[i]ncreas[e] the frequency and nature of reporting from [NYCB's] internal loan review team and first line business units to the Board Risk Committee to support the Board's risk oversight role[;]" (2) "[i]mprov[e] the internal loan review team's ability to independently challenge risk rating scorecard model methodologies[;]" (3) "[a]ssess[] the adequacy of staffing levels and expertise within the internal loan review program, taking into account, among other things, the size, complexity, and risk profile of the Company's loan portfolio[;]" and (4) "[p]rovid[e] additional risk rating process training for all internal loan review employees."  NYCB also listed a remediation step that would require the Company to rely less on internal tools and analysis, by "[e]xpanding the use of independent credit analysis."  Lastly, NYCB's remediation plan included hiring and appointing new members of management and the Company's Board of Directors "with extensive experience as financial experts and backgrounds in risk management."[48]  Similarly, the new Credit Risk Officer and Chief Audit Executive were required to have "large bank experience."

### 5. NYCB's 2024 Financial Results to Date and Additional Admissions

184.    Over the next three months, NYCB released financial results for the first two quarters of 2024, providing further evidence of how the Company's previously undisclosed aggressive underwriting, poor asset and credit quality, and deficient risk management framework harmed the Bank and its investors.

185.    In recognition of the true deterioration in NYCB's loan portfolio, NYCB's ACL and PCL spiked dramatically, and substantial net losses continued through the end of the second

---

[48] In listing appointing several new members to the Board as a remediation, NYCB hinted that it was necessary for some Board members to leave the Company.  Specifically, the 2023 Form 10-K/A stated that "several members of the Board of Directors resigned."

quarter of 2024, as new management assessed the true asset quality of the struggling portfolio, demonstrating that the Class Period figures were woefully underreported:



186.    In addition, NYCB reported that the Bank's number of NPL and loans 30 to 89 days past due rose astronomically from Q4 2023 through Q2 2024, again indicating that the Class Period figures were woefully underreported:



187.    As a result of increased loan losses and the need for capital to cover losses, NYCB continued to slash the Bank's historically highly coveted dividend between Q1 2024 and Q2 2024:



188.    Over the course of issuing financial results for Q1 2024 and Q2 2024, NYCB hosted an earnings call for each respective quarter.  During those calls, NYCB's new CEO Otting and CFO Gifford acknowledged and expounded on the deficiencies that permeated NYCB's controls and risk management practices during the Class Period.

189.    For example, on May 1, 2024, NYCB hosted its first quarter 2024 earnings call. On that call, Otting disclosed that NYCB had belatedly "completed an in-depth due diligence process of our multi-family and commercial real estate portfolios, including the office portfolio performed both by the bank and separately by an independent third-party[,]" and as a result, the Company needed to further "increase[]" its "credit loss reserves."  Newly appointed CFO Craig Gifford subsequently clarified that this review did not entail a review of all their loans, stating "we started with the largest [loans and] . . . [w]e will continue through our standard and improving credit processes to take a closer look at the smaller loan portfolio."  Otting described how NYCB's "credit" and "risk management infrastructure" were deficient, noting that given his background

with the OCC he knew what a "first line of defense and second line of defense [and] third line [of] defense should be."   Otting explained that before NYCB could consider any future growth opportunities, the Bank needed to "*clean up our house and get it in order. . . . We have a lot of work to do in this organization to put the risk structure in place*.  And we're committed to doing that."

190.    Later, during the same call, an analyst asked for "any color" to help "understand the situation that you inherited" from NYCB's prior management.  CFO Gifford responded that "the biggest indicator of the situation *was just that there wasn't as much visibility to the developing situation in the office market and to a small degree, in the multi-family market and the impacts that, that would have on provisioning*. So that ultimately passed through in the 10-K and the fourth quarter in a big reserve."  Gifford added that NYCB's "*internal infrastructure still has a lot of improvement to go, and we continue to work on those action plans. . .  So we have a ways to go. We're not done*."

191.    Before ending the earnings call, Otting admitted that during the Class Period, and even at present, NYCB "as an organization . . . [*was*] *not ready to be regulated by the OCC*" and attributed that in large part to the fact that the Bank under prior management "*didn't have people that could visualize the end game or work in a work environment that ha[d] proper regulatory infrastructure*."

192.    On June 5, 2024, during NYCB's 2024 Annual General Meeting, Otting and Gifford provided further color regarding the false and misleading nature of the Exchange Act Defendants' Class Period statements.  For example, a shareholder question to NYCB management asked "*why were problem loans not identified earlier*."  In response, Gifford acknowledged that the "principal drivers of portfolio stress" in the loan portfolio that led to the fourth quarter 2023

and first quarter 2024 catastrophic financial results were present and increasing throughout the Class Period.  With respect to non-residential CRE loans, Gifford explained that COVID-related office vacancies "continued to *build throughout several years, including through 2023* ultimately leading to challenges of some borrowers in meeting their loan commitment obligations, and therefore ultimately loan loss reserve requirements."  These vacancies and borrower challenges were present during the Class Period and, had the Exchange Act Defendants operated an effective risk management framework over NYCB's loan review process, those "principal drivers" of portfolio stress would have been recognized and mitigated in a timely manner.  Gifford similarly acknowledged that stresses on NYCB's multi-family portfolio were also all present during the Class Period: "*the combined effects of regulation changes [] just in high inflation following the reactions to COVID and continued high interest rates that have been in place*."

193.    On July 25, 2024, NYCB hosted its Q2 2024 earnings call led by Otting and Gifford (the "Q2 2024 Earnings Call").  At the conclusion of the call, Otting once again admitted that during the Class Period, NYCB's "*talent and infrastructure of [NYCB's] risk organization was not in place*."

194.    Otting and Gifford also provided additional details on the Company's belated credit risk review of the CRE and multi-family loan portfolio and the increasing ACL and charge-offs. Otting explained that NYCB was "really focused" on the Company's office portfolio because of its large balance and because it "*was experiencing pretty significant market stress in terms of occupancy levels*."  Specifically, Otting stated that the Bank was "focus[ed] on the credit risk management" and had, during the past quarter, reviewed an additional 40% of the CRE and multi-family portfolio, meaning that new management was "now through 75% of the CRE portfolio, 80% of the office and 80% of the multi-family."  As part of this review—which should have been

performed during the Class Period—the Bank "did an 18 month look forward on the portfolio," meaning that the Bank focused on loans that had maturities coming up in the next 18 months. Of those loans, the Bank re-underwrote loans "that had a debt service coverage [ratio] of 1:1." NYCB then "ordered appraisals and the end result of that is if the debt service coverage and the loan to values were . . . above 90%, we moved those loans into the classified section." Otting explained that this "pulls a lot of that risk into our current numbers. And we feel that that's one of the reasons why we've seen an increase both in our criticized and our classified and our non-accruals."

195.     The belated review of NYCB's loan portfolio resulted in astonishing losses in the second quarter of 2024. The Bank reported a non-GAAP net loss of $308 million, fueled by a PCL of $390 million, bring the Bank's total PCL for the prior three quarters of over $1.2 billion. In addition, the Bank recorded net charge-offs of $349 million, its NPL grew to roughly $2 billion (up from roughly $800 million in the first quarter), and delinquent loans 30-89 days past due spiked up to $1.2 billion. During the Q2 2024 earnings call, Gifford predicted that as the Bank reviewed the remaining $11 billion of the loan portfolio, NYCB would report increased charge-offs over the next two quarters and would take total provisions for loan losses in 2024 of $900 million to $1 billion, roughly an additional $300 million.

196.     In response to a question from an analyst regarding whether the Company's "credit outlook has changed dramatically[,]" Gifford responded by stating that "inflation was pretty impactful to particularly the rent-regulated portfolio. And while it's fairly stabilized at this point, it's certainly at a much lower level of return for those borrowers." Gifford then added "there will be some that will fail . . . and that's why we're focused really hard at identifying that, measuring that and classifying that. . . ."

197.    Towards the end of the call, Otting briefly discussed three steps that NYCB had taken in "the last 90 days" to build a risk structure to correct for the fact that "both the talent and infrastructure of the risk organization was not in place."  Otting laid out the three steps: (a) get the Company's "earnings accurate in forecasting and communicating those and understanding the consequences of activities[;]" (b) make sure the Company "understood the loan book[,] underst[ood] the risk[,] and . . . communicate[d] that risk and with a degree of confidence[;]" and (c) build out the Company's "risk infrastructure within the company[.]"

I.    **NYCB's Material Weaknesses in Its Loan Review Process Prevented Accurate Recognition of the Allowance for Credit Losses, in Violation of GAAP**

1.    **GAAP and Other Governing Accounting Standards Established Clear Rules Concerning How NYCB Should Have Recorded Its Provision for Credit Losses**

198.    Each quarter, NYCB reported its ACL and PCL, estimates calculated using a "current expected credit loss" (CECL) methodology in purported compliance with GAAP.  CECL requires financial institutions to recognize lifetime expected credit losses for financial assets— such as loans—based not only on past events and current conditions but also on reasonable and supportable forecasts.  In the case of NYCB, the ACL is a financial buffer maintained to cover potential loan defaults.  This reserve is not arbitrarily set; it should be meticulously calculated based on several components that reflect the risk profile of the loan portfolio.  One of the elements used to calculate the ACL is the historical loss experience, which provides a baseline by examining past loan performance.  Another significant component is the current economic market condition. As discussed above, current market conditions—including specifically increased interest rates, office vacancies, and changes in rent regulations—posed risks that impacted borrowers' ability to repay loans presently and in the future, necessitating a higher allowance. This dynamic CECL approach ensures that the ACL and PCL remain relevant and responsive to changing economic

landscapes, and align a company's financial reporting with management's estimates of expected credit losses.

199.    NYCB's ACL and its directly related provision for credit losses, or PCL (*i.e.*, loss reserves), were critical metrics for investors, for which Defendants Cangemi and Pinto were directly responsible.  As described in a December 2006 "Interagency Policy Statement on the Allowance for Loan and Lease Losses," issued jointly by the Federal Banking Agencies, and which was in effect throughout the Class Period:

> The [Loan Loss Reserve] represents *one of the most significant estimates in an institution's financial statements and regulatory reports*. Because of its significance, each institution has a responsibility for developing, maintaining, and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the [Loan Loss Reserve] and the provision for loan and lease losses (PLLL). To fulfill this responsibility, *each institution should ensure controls are in place to consistently determine the [Loan Loss Reserve] in accordance with GAAP, the institution's stated policies and procedures, management's best judgment and relevant supervisory guidance*.

200.    During the Class Period, NYCB's financial reports were subject to GAAP, as promulgated by the Financial Accounting Standards Board ("FASB") through its Accounting Standards Codification ("ASC").  NYCB's ACL and PCL were subject to the specific GAAP requirements in FASB's ASC 326 Financial Instruments—Credit Losses, which NYCB adopted on January 1, 2020, when this guidance was first effective.[49]  NYCB adopted subsequent amendments to ASC 326, including with respect to troubled debt restructuring which it adopted effective January 1, 2022.[50]

201.    ASC 326 was issued in FASB's Accounting Standards Update ("ASU") 2016-13. This issuance replaced the previous "incurred loss model" in GAAP with an "expected credit

---

[49] 2022 Form 10-K, p. 75.
[50] 2022 Form 10-K, p. 70.

losses model."[51]   In ASU 2016-13, FASB explained that one reason for the change was that financial institutions and the users of those institutions' financial statements had "expressed concern that current GAAP restrict[ed] the ability to record credit losses that [were] expected, but [did] not yet meet the 'probable' threshold."  Consistent with this objective, NYCB disclosed that the adoption of ASU 2016-13 resulted in its "balance sheet reflect[ing] the net amount the Company expects to collect."[52]  ASU 2016-13 was issued in the wake of the global financial crisis which had further highlighted the validity of those concerns.

202.    Among other things, FASB expected the implementation of ASC 326 to result in the following improvements as compared to then-current GAAP:

a. *Earlier measurement of credit losses*;

b. *Greater transparency about the extent of expected credit losses* on financial assets held at the reporting date;

c. *Improve a user's ability to understand the realizability of assets* held at each reporting period;

d. *Improve a user's ability to understand changes in expected credit losses* that have taken place during the period;

e. Improve a user's ability to understand purchased financial assets with credit deterioration by *enhancing the comparability of the reporting with that of originated assets*, while also reducing the cost and complexity of accounting for those assets; and

f. Provide *greater transparency to the user in assessing the credit quality indicators* of a financial asset portfolio and *changes in composition of the financial asset portfolio* over time.[53] (emphasis added.)

203.    The amount of the ACL as reported in NYCB's balance sheet and the impact of changes to the ACL reported in NYCB's income statement were prominent features in each of

---

[51] FASB ASU 2019-11, ¶ BC.3.
[52] 2022 Form 10-K, p.75.
[53] FASB ASU 2016-13, ¶ BC.7.

NYCB's earnings releases and financial statement filings during the Class Period.  The following table shows NYCB's loan values and related ACL reported in its balance sheets:

**NYCB Publicly Reported Value of Loans and Allowance for Credit Losses**

| Balance sheet date (in millions) | 10-Q 6/30/2022 | 10-Q 9/30/2022 | 10-K 12/31/2022 | 10-Q 3/31/2023 | 10-Q 6/30/2023 | 10-Q 9/30/2023 | 10-K 12/31/2023 | 10-Q 3/31/2024 | 10-Q 6/30/2024 |
|---|---|---|---|---|---|---|---|---|---|
| Loans and leases held for investment, net of deferred loan fees and costs | $48,537 | $48,984 | $69,001 | $82,547 | $83,278 | $83,995 | $84,619 | $82,327 | $74,552 |
| Less: Allowance for credit losses on loans and leases | (216) | (218) | (393) | (550) | (594) | (619) | (992) | (1,215) | (1,268) |
| Total loans and leases held for investment, net | $48,321 | $48,766 | $68,608 | $81,997 | $82,684 | $83,376 | $83,627 | $81,112 | $73,284 |
| *Allowance for credit losses as % of Loans and leases held for investment, net* | *-0.45%* | *-0.45%* | *-0.57%* | *-0.67%* | *-0.71%* | *-0.74%* | *-1.17%* | *-1.48%* | *-1.70%* |
| Change in allowance for credit losses from prior quarter | | ($2) | ($175) | ($157) | ($44) | ($25) | ($373) | ($223) | ($53) |
| *Percent change in allowance for credit losses from prior quarter* | | *0.93%* | *80.28%* | *39.95%* | *8.00%* | *4.21%* | *60.26%* | *22.48%* | *4.36%* |

Notes and sources:
[1] Q2 2022 Form 10-Q, p. 7; Q3 2022 Form 10-Q, p. 7; 2022 Form 10-K, p. 78; Q1 2023 Form 10-Q, p. 39; Q2 2023 Form 10-Q, p. 41; Q3 2023 Form 10-Q, p. 40; 2023 Form 10-K/A, p. 80; Q1 2024 Form 10-Q, p. 33; Q2 2024 Form 10-Q, p. 31.

204.    When a company's ACL increases, it reports the related changes in management's current expected credit losses as a negative amount in its income statement as a PCL ("provision for credit losses"), reducing its income.  NYCB's publicly filed income statements include the following PCLs, which directly impacted the Bank's net income and were an important component of its quarterly increases in its ACL:

**In re New York Community Bancorp, Inc., et al.**
**NYCB Publicly Reported Quarterly Provision for Credit Losses**

| Income statement date (in millions) | 10-Q 6/30/2022 | 10-Q 9/30/2022 | 10-K 12/31/2022 | 10-Q 3/31/2023 | 10-Q 6/30/2023 | 10-Q 9/30/2023 | 10-K 12/31/2023 | 10-Q 3/31/2024 | 10-Q 6/30/2024 |
|---|---|---|---|---|---|---|---|---|---|
| [1] Provision for credit losses | $9 | $2 | $124 | $170 | $49 | $62 | $552 | $315 | $390 |
| [2] Net income (non-GAAP) | | | | | | | | | |
| Analysts' consensus estimate | $150 | $149 | $141 | $153 | $223 | $253 | $206 | ($112) | ($152) |
| Actual NYCB result | $166 | $147 | $139 | $159 | $345 | $266 | ($193) | ($182) | ($308) |
| Actual minus analysts' consensus estimate | $16 | ($2) | ($2) | $6 | $122 | $13 | ($399) | ($70) | ($156) |
| Difference as % of analysts' consensus estimate | 11% | -1% | -1% | 4% | 55% | 5% | -194% | -62% | -103% |

Notes and sources:
[1] Q4 2022 Earnings Release, p. 5; Q1 2023 Form 10-Q, p. 40; Q2 2023 Form 10-Q, p. 42; Q3 2023 Form 10-Q, p. 41; 2023 Form 10-K/A, p. 38; Q1 2024 Form 10-Q, p. 34; Q2 2024 Form 10-Q, p. 32. Figure for Year End ("YE") amounts reflect the YE total minus the quarterly amounts for Q1, Q2, and Q3.
[2] S&P Capital IQ Report "Capital IQ Estimates > Surprise," for New York Community Bancorp, Inc.

205.    ASC 326 required NYCB to estimate expected credit losses on financial assets and disclose the methodology used to do so.  While ASC 326 does not prescribe a specific methodology to be utilized, it makes clear that the estimate of expected credit losses is to be made as part of a deliberate and thoughtful process.  Under GAAP, estimates are not guesses.  Rather, they are based on a combination of known information, supportable assumptions, and reliable methodologies.[54]

206.    Under GAAP, the ACL should reflect the amount the entity expects to collect on its loan portfolio, net of losses.  ASC 326 addresses the initial development of an estimate of expected credit losses as follows:

> **326-20-30-1** The allowance for credit losses is a valuation account that is deducted from, or added to, the amortized cost basis of the financial asset(s) to present the net amount expected to be collected on the financial asset…At the reporting date, an entity shall record an allowance for credit losses on financial assets within the scope of this Subtopic. *An entity shall report in net income (as a credit loss expense) the amount necessary to adjust the allowance for credit losses for management's current estimate of expected credit losses on financial asset(s)*.

207.    As seen in the excerpt above, entities report their ACL at each reporting date based on management's current estimate of expected credit losses.  In subsequent periods, changes to expected credit losses are also reported as income or expense in NYCB's publicly filed financial statements, this reported as a PCL.[55]

208.    ASC 326 also addresses required disclosures related to an entity's ACL, including the following:

> **326-20-50-10** An entity shall provide information that enables a financial statement user to do the following:
>
> a. Understand management's method for developing its allowance for credit losses

---

[54] *See, e.g.*, ASC 326-20-30-3; ASC-235-10-50; SEC Release No. 33-8350, Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, effective December 29, 2003.

[55] ASC 326-20-25-1.

b. Understand the information that management used in developing its current estimate of expected credit losses

c. ***Understand the circumstances that caused changes to the allowance for credit losses***, thereby affecting the related credit loss expense (or reversal) reported for the period.

**326-20-50-11** To meet the objectives in paragraph 326-20-50-10, an entity shall disclose all of the following by portfolio segment and major security type:

a. A description of how expected loss estimates are developed

b. A description of the entity's accounting policies and methodology to estimate the allowance for credit losses, as well as a discussion of the factors that influenced management's current estimate of expected credit losses, including:

1. Past events

2. ***Current conditions***

3. ***Reasonable and supportable forecasts about the future***.

c. A discussion of risk characteristics relevant to each portfolio segment

d. A discussion of the changes in the factors that influenced management's current estimate of expected credit losses and the reasons for those changes (***for example, changes in portfolio composition, underwriting practices, and significant events or conditions that affect the current estimate but were not contemplated or relevant during a previous period***).

209.   NYCB disclosed its process for determining and reporting its ACL in the notes to its publicly reported financial statements.  Based upon its disclosures, NYCB purported to engage in an ongoing and robust process to estimate its ACL, using "economic parameters" based on "available information relating to past events, current conditions, and economic forecasts."  *See, e.g.*, 2022 Form 10-K.  Also disclosed in the Form 10-K, Note 2, Summary of Significant Accounting Policies, NYCB stated that "Management estimates the allowance by projecting and multiplying together the probability-of-default, loss-given-default and exposure-at-default depending on economic parameters for each month of the remaining contractual term."  While "[h]istorical credit experience provides the basis for the estimation of expected credit losses,"

NYCB made "qualitative adjustments . . . for differences in current loan-specific risk characteristics such as *differences in underwriting standards, portfolio mix, delinquency levels and terms, as well as for changes in environmental conditions, such as changes in legislation, regulation, policies, administrative practices or other relevant factors*."

210.   The same section of NYCB's 2022 Form 10-K also disclosed how the Company estimates expected credit losses "to be dynamic and responsive to changes in portfolio credit quality and forecasted economic conditions:"

> Expected credit losses are estimated over the contractual term of the loans, adjusted for forecasted prepayments when appropriate. The contractual term excludes potential extensions or renewals. ***The methodology used in the estimation of the allowance for loan and lease losses, which is performed at least quarterly, is designed to be dynamic and responsive to changes in portfolio credit quality and forecasted economic conditions***. Each quarter the Company reassesses the appropriateness of the economic forecasting period, the reversion period and historical mean at the portfolio segment level, considering any required adjustments for differences in underwriting standards, portfolio mix, and other relevant data shifts over time.[56]

211.   NYCB segmented loans for purposes of performing its ACL analysis into those loans that exhibited similar risk characteristics, which it analyzed together.  For those loans that did not share risk characteristics, such as loans in nonaccrual status, NYCB performed the ACL analysis on an individual basis as follows:

> Loans that do not share risk characteristics are evaluated on an individual basis. These include loans that are in nonaccrual status with balances above management determined materiality thresholds depending on loan class and also loans that are designated as TDR or "reasonably expected TDR" (criticized, classified, or maturing loans that will have a modification processed within the next three months). If a loan is determined to be collateral dependent, or meets the criteria to apply the collateral dependent practical expedient, expected credit losses are determined based on the fair value of the collateral at the reporting date, less costs to sell as appropriate.

*        *        *

---

[56] 2022 Form 10-K, pp. 86-87.

When applying this critical accounting estimate, we incorporate several inputs and judgments that may be influenced by changes period to period. ***These include, but are not limited to changes in the economic environment and forecasts, changes in the credit profile and characteristics of the loan portfolio, and changes in prepayment assumptions which will result in provisions to or recoveries from the balance of the allowance for credit losses***.[57]

### 2. NYCB's Admitted Material Weaknesses in Its Loan Review Processes Impacted the Company's ACL and Inflated Income and Earnings Throughout the Class Period

212.    As discussed above, on January 31, 2024, NYCB issued its fourth quarter 2023 earnings results, where the Company reported a 60% increase in its ACL from the prior quarter and a PCL of $552 million, an 800% increase over the prior quarter.  Incredibly, the PCL NYCB recorded in the fourth quarter of 2023 alone significantly exceeded the cumulative increase to the PCL over the prior eleven quarters (*i.e.*, since December 31, 2020) of approximately $417 million. In a filing on February 29, 2024, NYCB reiterated these results and further disclosed "material weaknesses in the Bank's internal controls related to internal loan review, resulting from ineffective oversight, risk assessment and monitoring activities."  As the Company admitted in its 2023 Form 10-K, these material weaknesses impacted its identification and "timely respon[se] to emerging risks . . . [and] changes in the business operations and regulatory and economic environments in which the Company operates," and also resulted in the conclusion that NYCB's "internal loan review processes lacked an appropriate framework to ensure that [loan risk] ratings were consistently accurate, timely and appropriately challenged."  These weaknesses in risk assessment and control activities, among others, "impact[ed] . . . the recognition of the allowance for credit losses on loans and leases."

213.    In NYCB's January 31, 2024 earnings call related to its December 31, 2023, results, the Exchange Act Defendants characterized the increase in its ACL as related to its recent status

---

[57] 2022 Form 10-K, pp. 86-87.

as a Category IV bank and its desire to align reserves with relevant peer banks.  However, these reasons are inconsistent with the requirements imposed by GAAP, which requires the estimate of a company's expected credit losses and related ACL to be driven by the company's specific portfolio of financial assets, and the specific credit risks related to those assets.

214.    NYCB's accounting for credit losses violated GAAP because the change in the ACL, and directly related PCL, did not result from new information in Q4 2023 but was instead the result of the misuse of facts existing in earlier quarters related to changes in rent regulation, increasing vacancies, and rising interest rates leading to repricing risks.  Consequently, NYCB should have restated prior period financial statements, but it failed to do so.[58]

215.    Primarily as a result of the substantial increases to the ACL in Q4 2023, as reflected in its PCL, NYCB drastically missed consensus earnings targets in that quarter.  Specifically, NYCB reported "Net (loss) income available to common stockholders, as adjusted non GAAP" of -$193 million in Q4 2023, which fell vastly short of the positive $206 million target for that quarter.

216.    Despite its year-end attempt to satisfy regulators and improve its estimate of its expected credit losses and resulting ACL, NYCB's ACL continued to increase in the next two consecutive quarters as the Company, now under new management did the credit loss review it had represented was performed throughout the Class Period.  According to the Company's Q1 2024 and Q2 2024 earnings results.  The resulting increases to NYCB's PCLs in the two most recent quarters have been remarkable: $315 million in Q1 2024 and $390 million in Q2 2024.  The ACL increases in these two quarters have averaged 0.5% of NYCB's loans held for investment. This rate compares to NYCB's average ACL provision from Q2 2022 to Q4 2023 of 0.1%.  Put

---

[58] ASC 250-10-20, Accounting Changes and Error Corrections.

differently, NYCB's most recent ACL increases have occurred at a rate ***five times*** the ACL increases prior to Q4 2023.

217.    Consequently, the provision recorded by NYCB in each of the three most recent quarters to increase its ACL constitutes a vast departure from its Class Period provisions as seen in the chart below:



218.    The substantial abnormal PCLs, and resulting increases to the ACL, in each of the three most recent quarters occurred because of the long-standing but undisclosed breakdowns in NYCB's internal controls over financial reporting surrounding the ACL process.  If NYCB had maintained effective internal controls over financial reporting, as the Exchange Act Defendants represented that it did, the recent PCLs and related, necessary increases in the ACL that are now evident, would have been recorded beginning no later than Q2 2022 and continued thereafter. These control deficiencies undermining NYCB's loan review process did not appear out of thin air on December 31, 2023.  Instead, NYCB concealed the existence of the material weaknesses and the implications of understatement of the ACL during the Class Period.

219.    To be clear, the charges recorded by NYCB in Q4 2023, Q1 2024, and Q2 2024 did not relate to new loans originated in those periods but rather to loans originated before the Class Period that resided under-reserved on NYCB's financial statements throughout the Class Period. For context, NYCB had at least $2.1 billion multi-family loans and $1 billion in CRE loans that were subject to repricing risk throughout the Class Period.  According to the Company's Q1 2024 Earnings Presentation, approximately $1.5 billion of its multi-family loans repriced higher to a 7.82% rate from a 3.76% rate.  Further, NYCB reported that at least 56% of the Company's ACLs were attributable to multi-family and CRE loans for Q4 2023, Q1 2024, and Q2 2024.

220.    If NYCB had designed effective controls over its internal loan review processes, and implemented such controls during the Class Period, then the ACL and PCL would have appropriately increased on a timely basis consistent with credit ratings that sufficiently incorporated emerging negative conditions.

221.    As seen in the table below, from the quarter ended June 30, 2022 through the quarter ended September 30, 2023, NYCB originally reported earnings (Non-GAAP net income) that consistently either met or beat analysts' consensus estimates:

| $s in millions | 6/30/22 | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 | 9/30/23 |
|---|---|---|---|---|---|---|
| Net Income (As Reported) | $166 | $147 | $139 | $159 | $345 | $266 |
| Analysts' consensus estimate | $150 | $149 | $141 | $153 | $223 | $253 |
| Difference | $16 | ($2) | ($2) | $6 | $122 | $13 |
| **Outcome** | **Beat** | **Meet** | **Meet** | **Beat** | **Beat** | **Beat** |

222.    But NYCB's earnings in each of those periods were inflated by a failure to record appropriate PCLs and relatedly failing to sufficiently increase the ACL to reflect the emerging risk of losses.  It is reasonable to make a conservative assumption that at least 25% of the $1.257 billion in PCLs, taken in the fourth quarter of 2023 and the first two quarters of 2024 was attributable to

earlier quarters in the Class Period (*i.e.*, approximately $314 million of that increase, which equates to an additional reserve of $52 million per quarter).   An allocation of only that portion of the increase to the six preceding quarters is illustrated in the chart immediately below:



223.   In this corrected scenario, NYCB would have missed earnings targets (non-GAAP net income) in at least five of the quarters as seen in the table and chart below:

| Net Income,<br>$ in millions | 6/30/22 | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 | 9/30/23 |
|---|---|---|---|---|---|---|
| As Reported | $166 | $147 | $139 | $159 | $345 | $266 |
| As Corrected | $127 | $108 | $90 | $107 | $301 | $226 |
| Difference Between Reported and Corrected | ($39)<br>-23% | ($39)<br>-26& | ($49)<br>-35% | ($52)<br>-33% | ($44)<br>-13% | ($40)<br>-15% |
| Analysts' consensus estimate | $150 | $149 | $141 | $153 | $223 | $253 |
| Difference Between Corrected and Consensus Net Income | ($23) | ($41) | ($51) | ($47) | $78 | ($27) |
| **Outcome** | **Miss** | **Miss** | **Miss** | **Miss** | **Beat**[59] | **Miss** |

<hr>

[59] NYCB's reported earnings for Q2 2023 outperformed expectations due to the inclusion of a full quarter's results from Signature, which had closed on March 20, 2023. *See, e.g.*, Q2 2023 Earnings Release ("Net interest income during second quarter 2023 totaled $900 million, up 62%

Footnote continued on next page

## V.     THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

224.    Throughout the Class Period, Defendants NYCB, Cangemi, Pinto, Adams and DiNello made materially false and misleading statements and omissions concerning: (a) NYCB's decision to amend the terms of the Flagstar Merger Agreement and switch regulators from the FDIC to the OCC; (b) NYCB's readiness for heightened regulatory scrutiny as a Category IV Bank through its risk management framework and practices; (c) the "strong" and "stellar" asset quality of NYCB's highly concentrated CRE loan portfolio; and (d) NYCB, Cangemi, and Pinto's creation and maintenance of effective internal controls over financial reporting.  The following identifies each of Defendants' materially false and misleading statements and the reasons for their falsity. Plaintiffs allege generally that the statements that are ***bolded and italicized*** are materially false and misleading.

### A.     The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About FDIC Opposition to the Flagstar Merger

225.    The FDIC, alongside the NYDFS and Federal Reserve, had served as NYCB's primary federal regulator for decades.  As required, NYCB filed an application for approval of the Flagstar Merger with these regulators on May 19, 2021.  However, after nearly one year without FDIC approval, on or about April 25, 2022, NYCB and Flagstar amended the initial Merger Agreement to make one change.  Rather than NYCB acquire Flagstar, after which the banks would be regulated under NYCB's New York banking charter, the terms of the Merger now provided that Flagstar's banking subsidiary change its charter, converting to a national bank, after which

---

as compared to $555 million during the previous quarter of 2023, primarily due to a full quarter's benefit from the Signature transaction and higher average cash balances.").  Additionally, NYCB recorded a reduced PCL in Q2 2023 as compared to the prior period (*i.e.*, recording a PCL that increased the ACL only $49 million in Q2 2023 versus $170 million in Q1 2023), which propelled higher earnings.  Regardless, an adjustment of $52 million in Q2 2023 would have been notable as the provision would have more than doubled.

NYCB's banking subsidiary would merge into Flagstar.  The result of this unexpected structural change was that the Flagstar Merger no longer involved any approvals by the FDIC and the NYDFS.  Instead, the OCC, an entity that had no prior exposure to or experience with NYCB, along with the Federal Reserve, would need to approve the Merger and continue supervision of the combined company.

226.    NYCB and Flagstar submitted their application for the necessary approvals to the OCC on May 10, 2022.  During NYCB's second quarter 2022 earnings call (the "Q2 2022 Earnings Call"), led by Defendants Cangemi, Pinto, and then-Flagstar CEO DiNello, analysts raised concerns over the lack of approval from the regulators and the reason for the switch from the FDIC to the OCC.  One analyst raised questions about the status of the Flagstar Merger, and specifically, about the Company's decision to switch regulators, asking for "a temperature check on obtaining regulatory approval for the [Flagstar] deal," and whether "any critical milestones at this point have been reached and approved and if you can speak to any of them, including that national bank charter switch?"  In response, Defendant Cangemi opaquely stated that "*we feel very confident where we are*."

227.    Flagstar CEO, Defendant DiNello elaborated, claiming that "*the National Bank target just makes a lot more sense for our organization and for the combined organization as well*."  DiNello denied that the regulatory switch had anything to do with the FDIC's underlying concerns about the deal, stating: "*don't read anything into the National Bank piece of it. It's just an easy way to get there. . . . So again stop, don't read anything into that. There's no complication associated with the application because of the National Bank piece of it*."

228.    The Exchange Act Defendants' statements identified in ¶¶226-227 were materially false, misleading, and omitted material facts.  The Flagstar Merger was not without "complication

associated with the application" such that it "just makes a lot more sense for … the combined organization."  In fact, as was first revealed on February 22, 2024, with more news developing after the Class Period, NYCB's decision to amend the Merger Agreement, which eliminated the need for FDIC approval and pivoted to the OCC's approval, was due to the FDIC's opposition to the Flagstar Merger over concerns based in part on "NYCB's exposure to multi-family loans" and the banks' lending practices.  As media later reported, "[n]o one at the FDIC was comfortable recommending a merger approval for [NYCB and Flagstar]."  The OCC, which was unfamiliar with NYCB's banking practices and portfolio, was a less challenging avenue for approval.  News reports at the end of the Class Period labeled FDIC's regulator shopping as a type of "regulatory arbitrage" used to avoid the FDIC's imminent decision to deny approval of the Flagstar Merger.

229.    In NYCB's Offering Documents for the Flagstar Merger—specifically the October 12, 2022 Prospectus on Form 424(b)(3) that was signed by Defendants Cangemi and DiNello—NYCB discussed the need for "Regulatory Approvals" in order to effectuate the Flagstar Merger. In that discussion, NYCB stated:

> Subject to the terms of the merger agreement, NYCB and Flagstar have agreed to cooperate with each other and use reasonable best efforts to . . . obtain as promptly as practicable all permits, consents, approvals and authorizations of all third parties and governmental entities which are necessary or advisable to consummate the transactions contemplated by the merger agreement, and to comply with the terms and conditions of all such permits, consents, approvals and authorizations of all such governmental entities. Pursuant to the original merger agreement, these approvals included, among others, the approval of . . . the Federal Deposit Insurance Corporation (the "FDIC") . . . . The initial submission of regulatory applications to the Federal Reserve Board, FDIC and NYDFS occurred on May 19, 2021. . . .

> Pursuant to the amendments to the merger agreement effected by the merger agreement amendment, ***the approvals of the FDIC and the NYDFS are no longer required to consummate the transactions contemplated by the merger agreement. The requirement to obtain these approvals has been replaced, pursuant to the merger agreement amendment, with the approval of the Office of the Comptroller of the Currency (the "OCC"), which is required to consummate the transactions contemplated by the merger agreement***. The merger agreement amendment made

no other changes to the approvals required to consummate the transactions contemplated by the merger agreement, including those described in the previous paragraph.  The initial submission of regulatory applications to the OCC occurred on May 10, 2022.

Although *neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals required to consummate the transactions contemplated by the merger agreement in a timely manner*, NYCB and Flagstar cannot be certain when or if they will be obtained, or that the granting of these regulatory approvals will not involve the imposition of conditions on the completion of the merger, the holdco merger, the conversion or the bank merger.

230.   In the "Background of the Merger" section of the October 12, 2022 Prospectus, the Company provided further information on the switch from FDIC to OCC regulation, stating that "On April 25, 2022, NYCB and Flagstar agreed to amend the merger agreement pursuant to the merger agreement amendment . . . [that], among other things . . . amend[ed] the regulatory approvals necessary to consummate the transactions contemplated by the merger agreement such that the approvals of the FDIC and NYDFS are no longer required, replacing such approvals with the approval of the OCC."  The Prospectus further stated that "*NYCB and Flagstar each believe that a national bank charter is an appropriate charter for the combined company's banking operations*, especially taking into account Flagstar's national mortgage banking business, which Flagstar has operated successfully for many years under the supervision of the OCC."

231.   While the Company cautioned that regulatory "approvals could be delayed or not obtained at all, including due to: an adverse development in either party's regulatory standing or in any other factors considered by regulators when granting such approvals," in the same paragraph, NYCB dispelled any notion of regulatory concerns with respect to the Merger, explicitly stating: "*NYCB and Flagstar believe that the merger does not raise significant regulatory concerns and that they will be able to obtain all requisite regulatory approvals*."

232.    The Exchange Act Defendants' statements in the October 12, 2022 Prospectus identified in ¶¶229-231 were materially false, misleading, and omitted material facts for the reasons stated in ¶228.

233.    NYCB's October 26, 2022 conference call announcing NYCB's third quarter financial results (the "Q3 2022 Earnings Call"), was led by Defendants Cangemi, Pinto, and DiNello.  At the start of the call, Defendant Cangemi stated that the individuals were not going to speak specifically about the pending Flagstar merger, which was still not approved by regulators. Nevertheless, curious analysts inquired about the lack of regulatory approval, now eighteen months after the proposed merger was first announced.  A Bank of America analyst sought clarity on whether the Defendants "expect to close the deal" and whether "anything [had] changed . . . that would make you think differently about the strategic merits of the deal today or November 1 versus when the deal was announced?"   Defendant Cangemi responded that: "*we're very comfortable that the business combination is [a] powerful opportunity for two companies to come together and build a NewCo that has good diversity, a tremendous unique opportunity on deposit side and funding and give us an opportunity to transition a thrift commercial to a commercial banking enterprise*."

234.    Later in the call, another analyst from KBW asked whether it was correct to understand that regulators were "slow-playing the approvals."  Defendant DiNello responded that "*[t]he regulatory process is what it is*" and "*I don't think you should read anything into any of our comments today, other than we're still hopeful because we see that the -- as we always have, we've seen that the opportunity and power of the combined organization is really something special*."

235.     The Exchange Act Defendants' statements identified in ¶¶233-234 were materially false, misleading, and omitted material facts for the reasons described in ¶228.

**B.     The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About NYCB's Risk Management Practices and Controls**

**1.     March 1, 2023—2022 Form 10-K**

236.     On March 1, 2023, the Company filed with the SEC its full-year and fourth quarter 2022 financial results on Form 10-K, signed by Defendants Cangemi, Pinto, and DiNello ("2022 Form 10-K").   In the Company's 2022 Form 10-K, the first periodic report filed following the Flagstar Merger, the Exchange Act Defendants described NYCB's "risk culture" and "sound risk management practices," stating:

**Enterprise Risk Management**

***The Company's and the Bank's Boards of Directors are actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department to identify, measure, monitor, mitigate, and report risk. The Company has established an ERM program that reinforces a strong risk culture to support sound risk management practices***. The Board is responsible for the approval and oversight of the ERM program and framework.

ERM is responsible for setting and aligning the Company's Risk Appetite Policy with the goals and objectives set forth in the budget, and the strategic and capital plans. ***Internal controls and ongoing monitoring processes capture and address heightened risks that threaten the Company's ability to achieve our goals and objectives, including the recognition of safety and soundness concerns*** and consumer protection. Additionally, ***ERM monitors key risk indicators against the established risk warning levels and limits, as well as elevated risks identified by the Chief Risk Officer***.

237.     The Exchange Act Defendants' statements identified in ¶236 were materially false, misleading, and omitted material facts.  NYCB's Board of Directors was not "actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department to identify, measure, monitor, mitigate, and report risk;" the ERM program did not "reinforce[] a strong risk culture to support sound risk management practices;" "[i]nternal controls and ongoing

monitoring processes" did not "capture and address heightened risks that threaten the Company's ability to achieve our goals and objectives;" and the Company's ERM department did not "monitor key risk indicators against the established risk warning levels and limits."

238.    In fact, as the Company has now admitted: (a) NYCB's "Board of Directors did not exercise sufficient oversight responsibilities, which led to [NYCB] lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities;" (b) NYCB "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" (c) NYCB's "recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively;" and (d) NYCB "did not sufficiently maintain effective control activities related to internal loan review" such that the Bank's "internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged," and which "impact[ed] the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases."

239.    Former employees confirm that the Company's risk management practices were ineffective, if not nonexistent.  Indeed, NYCB did not have in place at the start of the Class Period a risk management framework to identify, rank and mitigate risks, and moreover, was only beginning to even create an issue management report that collected and identified major risks to the Company in one central location.  As CW-1, a member of NYCB's Regulatory Lending & Compliance Team throughout the Class Period, recounted, he was asked to put together a "risk

framework" in late 2023, and that through the end of the Class Period, the Company had "no controls." CW-1 found it "mindboggling" that the Company had "nothing in place" in terms of controls. *See* Section IV.F.2. Further, CW-1 recalled that Nicholas Munson was elevated from Chief Audit Officer to Chief Risk Officer "out of nowhere," despite not having any risk-related experience that made him suited for the position. CW-2, a former employee who worked directly with the Chief Risk Officer, confirmed that Munson was an auditor and had to hire credit risk employees to assist him in the role. CW-2 stated that Chief Risk Officer Munson was set up for failure and was "in over his head," and noted that Munson oversaw nine departments, including the entire Risk Management department at NYCB.

240.    NYCB's new management has also admitted how, contrary to Class Period representations, NYCB lacked a working risk management structure and needed to build it out from the start. On May 1, 2024, new CEO Otting explained that NYCB lacked "good risk management infrastructure" and that he and new management needed to "clean up our house and get it in order" as "we build infrastructure here." On that same call, new CFO Gifford agreed that NYCB's "internal infrastructure still"—after two months of work—"has a lot of improvement to go and we continue to work on those action plans." Otting also clearly admitted that NYCB "was not ready to be regulated by the OCC." During the next quarterly earnings call on July 25, 2024, Otting again described how, since March, the Bank had built a risk management infrastructure because during the Class Period, "both the talent and infrastructure in the risk organization was not in place." In order to build that out, Otting explained how NYCB first had to make sure it even "understood the loan book" and then "build out the Company's infrastructure."

**2.    March 20, 2023—Signature Transaction Conference Call**

241.    On March 20, 2023, Defendants Cangemi and Pinto hosted a conference call to discuss NYCB's deal to acquire certain assets and liabilities from Signature. During the call,

Defendant Cangemi was asked by a UBS analyst, "what are the things that . . . you think enables you to execute on this transaction?"   In response, Cangemi explicitly acknowledged that the Signature Transaction catapulted NYCB into a Category IV bank designation that carried with it enhanced risk management expectations, and affirmatively represented that NYCB was ready to meet the challenge:

> I would just say . . . *there's no question that['s] my priority as CEO, I'm very confident that we've built a very strong risk management team and we strengthened it every day, and we're up for the challenge and we're open to the regulatory landscape changing. That's our job[,] to be risk managers*.
>
> *****
>
> *So, we're pleased and proud about the investment made on the risk management [and] regulatory oversight. But that's my priority.* This is important. *We're now a $100 billion bank. We're going to ensure that we have all of the appropriate risk management tools to be a $100 billion bank. We've made sizable investments. . . . We know what our obligations are as a large institution, and we convey it with confidence and professionalism with our regulatory constituents.*

242.     In response to an analyst question about whether the "outside noise" and "almost panic on deposit trends" brought on by the Signature, SVB and Silvergate collapses was "overblown" for NYCB.  Cangemi responded that:

> So look, I can't address the stock market though I want to address the stock market. And I think we've done a really good job on managing client calls, dealing with the liquidity funding position and putting out the risk management tools to ensure that if a—we'll call it the lack of content continues that our risk managers are in place to have excess liquidity. But at the end of the day, we have a very stable source of funding being a legacy thrift model of a lot of retail stability in the system. . . .  so in the event if we had to pull a liquidity situation, we would literally take down the securities without any real consequence of the capital and be in a very unique position with significant lines available because *our portfolio is pledgeable [sic] on the multifamily side. So we have a very good risk management plan in place*.

243.     The Exchange Act Defendants' statements in ¶¶241-242 were materially false, misleading, and omitted material facts for the reasons stated above in ¶¶237-240.

3.      **April 21, 2023—2023 Proxy Statement and Annual Report to Shareholders**

244.    On April 21, 2023, NYCB filed its 2023 Proxy Statement with the SEC.  The 2023 Proxy Statement discussed the Signature Transaction, which the Company stated would "enhance and quicken [NYCB's] growth."

245.    With respect to risk management, the 2023 Proxy Statement touted NYCB's "*[h]igh standards of regulatory compliance*" and "*effective enterprise risk management practices*," stating:

> In coordination with the acquisition, *management has formed a highly capable and effective program to maintain and enhance our regulatory compliance culture, ensuring that our teammates understand and adhere to our compliance management program that meets regulatory standards*.
>
> *The Company has maintained a high level of enterprise risk management incorporating best practices from NYCB and Flagstar procedures.  The Company has developed a comprehensive risk framework that aligns strategy with risk appetite, reflects the entity's risk management philosophy, and is reflected in our culture and operating style.*  The risk framework guides the Company's resource allocation and aligns people, process and infrastructure.

246.    The 2023 Proxy Statement also highlighted NYCB's "*robust and exacting enterprise risk management program*," stating in pertinent part, as follows:

> Our Board Risk Assessment Committee, which meets the requirements for U.S. Bank Holding Companies under the Dodd-Frank Act's Enhanced Prudential Standards, meets at least on a quarterly basis and oversees *a robust and exacting enterprise risk management program*.
>
> * * *
>
> *Risk Governance* – Management of risk is important to the success of our operations and business strategies and *our Board devotes significant attention to the oversight of risks inherent in our banking business, including, but not limited to, credit, interest rate, liquidity, price, operational, strategic, compliance and reputational risks*.
>
> The Board reviews the key risks associated with the Company's strategic plan annually and regularly throughout the year as part of its consideration of the strategic direction of the Company as well as regularly reviewing various

Company's risk management processes reporting and reviewing risks associated with specific business units and corporate functions.

***While the Board of Directors as a whole is responsible for risk management oversight, management is responsible for the day-to-day management of the risks faced by the Company.*** As part of our risk oversight processes, ***our Chief Risk Officer reports to the Risk Assessment Committee; the Chairman of the Board's Risk Assessment Committee meets regularly with management to discuss the risks facing the Company and strategies to address these risks***; and senior members of management attend Board meetings and are available to address questions or concerns raised by the Board on risk management and other matters.

247.   On April 21, 2023, NYCB filed an Annual Report to Shareholders on Form ARS with the SEC ("2022 ARS") for the fiscal year ending December 31, 2022.  The 2022 ARS stated that as of December 31, 2022, NYCB had "$90.1 billion of assets, $69 billion of loans, deposits of $58.7 billion, and total stockholders' equity of $8.8 billion."  The 2022 ARS included a letter to stockholders from Defendant Cangemi.  Therein, Cangemi stated "I don't expect a large number of banks to fail this time" and that "[r]ecent failures appear to be more idiosyncratic in nature." Cangemi then contrasted how while the recent bank failures "stemmed from each of these banks' specific business models along with substantially high levels of uninsured deposits and the lack of an appropriate risk management framework," the regulators' approval of the Signature Transaction revealed regulator confidence in NYCB:

Not only is the transaction expected to immediately and significantly boost our earnings per share and tangible book value per share, but ***to execute such a transaction during the depths of a crisis, speaks volumes of the faith and confidence our regulators have in our management team and business model***.

248.   The Exchange Act Defendants' statements in ¶¶245-247 were materially false, misleading, and omitted material facts for the reasons stated above in ¶¶237-240.  Moreover, Defendant Cangemi's statement in the Annual Report that the approval of the Signature Transaction "speaks volumes of the faith and confidence our regulators have in our management team and business model" was materially false and misleading and omitted material facts because

the FDIC, the regulator who just months prior was poised to terminate the Flagstar Merger over concerns with the banks' lending practices and NYCB's concentrated exposure to multi-family loans, was statutorily compelled to accept NYCB's lower bid that resulted in the least cost resolution to the Deposit Insurance Fund.  *See* ¶66.

### 4.    April 28, 2023—First Quarter 2023 Earnings Call

249.    On April 28, 2023, during a conference call hosted by Defendants Cangemi and Pinto to discuss NYCB's earnings release for the first quarter of 2023 ("Q1 2023 Earnings Call"), the officers were asked about NYCB's "risk management infrastructure" and "[h]ow much do you have to invest in it . . .?"  In response, Defendant Cangemi expanded on NYCB's risk team and its readiness to operate as a Category IV bank, stating:

> We went to a journey at 49.9.  If I recall, when I was CFO, it was about five years at the time, holding the line at 49.9 and not crossing over an average.  So that until we really built a position to understand what was expected as our regulatory framework was uniquely different than some others, which gave us a lot of oversight at the time to be with.  ***And obviously those rules and pronouncements have changed but we've held through that our position that we were going to have a bank that could be ready to be $100 billion.  That goes back to when we started that journey back in 2012 or 2011, and it's been a constant reinvestment over time***.

> So we're really excited about where we are. There's always going to be updates, it's always going to be evolving, especially given the regulatory landscape that we're in currently, because who knows what's going to come out of this, I will call a mini crisis of confidence. But I don't think it's going to get easier but, you know, ***we're prepared to do what we have to do to manage a safe and sound organization. And risk management is our number one focus***, right?

> So we have a tremendous team and I'm proud of my risk team and I do a great job. And we're going to add a lot of new people from all three organizations together, as well as from the outside, and be ready for what's required for us as a highly regulated institution. ***But this is nothing new to us. It's just something we've been working on for quite some time, and we're prepared to make sure we have the highest standard***.

250.    Defendant Pinto also reassured investors that NYCB was ready to operate as a Category IV bank given the structure the Company already had in place, stating: "***there will always***

*be some incremental add, but we don't think it will be a material add given the structure and the backbone that we already have in place*."  Cangemi also added that: "*we were ready to be at that $100 [b]illion mark* and getting ready, but we were there, as far as operationally, moving from that direction.  And at the same time, we get the offering leverage, we're making very substantial investments going back to early days, and we just continue to evolve from that.  So, obviously, *it's the most important aspect of this company going forward, is handling risk, given the nature of the bank and our new products*."

251.    The Exchange Act Defendants' statements in ¶¶249-250 were materially false, misleading, and omitted material facts for the reasons stated above in ¶¶237-240.

### 5.    October 26, 2023—Third Quarter 2023 Earnings Call

252.    On October 26, 2023, Defendants Cangemi and Pinto hosted an analyst call in connection with the release of NYCB's third quarter 2023 financial results ("Q3 2023 Earnings Call").  During the call, an analyst asked Defendants Cangemi and Pinto about the expenses NYCB was incurring as a result of becoming a Category IV bank.  In response, Defendant Pinto explained that NYCB informed investors that the Company had an already-existing "significant stress testing group" and that they added two new people to that group in order to "be ready for the plan to be ready to be over $100 billion[,]" stating:

> *I mean, we'll continue to do what we have been doing.* And since we started building to get ready for the old $50 billion threshold back in 2012 with preparing a capital plan, submitting a capital plan, going through the process, *we have a significant stress testing group that we've put in place a long time ago and have added 2 to be ready for the plan to be ready to be over $100 billion.*

253.    When asked a similar question about guidance for expenses moving forward, Defendant Cangemi assured investors that NYCB was making sure that the Company had "all of the requisite infrastructure" to operate as a Category IV bank, stating:

We haven't given our 2024 guidance. And clearly, we are investing, as you indicated into the infrastructure, the build out past the $100 billion now. ***We understand our obligations there. So we clearly are focusing on making this company at the point of a $100 billion process, making sure that we have all of the requisite infrastructure, and we spent a lot of money over the years to get there. So we would understand the path there. . . . The reality is that we have a very strong focus here to make sure that we have a history, and this is just a history of managing a very strong efficiency ratio, but we're also being cognizant of our obligations as a $100 billion plus institution***.

254.    The Exchange Act Defendants' statements in ¶¶252-253 were materially false, misleading, and omitted material facts for the reasons stated above in ¶¶237-240.

### C.    The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About NYCB's Loan Review Process and Asset Quality

255.    Throughout the Class Period, the Exchange Act Defendants made a series of false and misleading statements about the robustness of NYCB's loan review process, strong asset quality, and superior performance of its highly concentrated CRE loan portfolio.

### 1.    July 27, 2022—Second Quarter 2022 Earnings Release

256.    On July 27, 2022, the first day of the Class Period, NYCB released its second quarter results for 2022, along with "CEO Commentary" by Defendant Cangemi, in a press release attached to a Form 8-K ("Q2 2022 Earnings Release").   Also on July 27, 2022, Defendants Cangemi, Pinto, and DiNello participated in an earnings call to discuss NYCB's second quarter results for 2022 ("Q2 2022 Earnings Call"), which was accompanied by an Investor Presentation, also filed on Form 8-K ("Q2 2022 Investor Presentation").

257.    In the Q2 2022 Press Release, NYCB reported the following "asset quality" metrics for the quarter ended June 30, 2022:

- ***Nonperforming assets of $56 million***, equal to nine basis points (0.09%) of total assets ($63.1 billion);

- ***Non-performing loans of $50 million***, equal to ten basis points (0.10%) of total loans ($48.5 million);

- ***Total loans past due 30 to 89 days of $30 million***;

- ***ACL of $216 million***, representing 434% of total non-performing loans and 0.45% of total loans ($48.5 billion);
- ***Provision for credit losses of $9 million***;
- ***Net charge-offs (recoveries) of ($7 million)***.

258.     The Company also reported ***non-GAAP net income for the three months ended June 30, 2022, of $166 million***, up 6% from the previous quarter, and diluted non-GAAP ***earnings per share of $0.35***, also up 6% from the previous quarter.  Moreover, the Company's Board of Directors declared a quarterly cash dividend of $0.17 per share on the Company's common stock.

259.     Commenting on the above listed second quarter asset quality metrics, NYCB stated in the Q2 2022 Press Release that the Bank's "***asset quality remained strong during the second quarter . . .***"  Defendant Cangemi elaborated, stating in his "CEO Commentary" quoted in the press release:

> We are extremely pleased with the Company's operating performance during the current second quarter.  ***By almost any measure, results exceeded expectations, despite market volatility and higher interest rates.  We reported record net income available to common stockholders***, another quarter of record deposit growth, near-record loan growth, record originations, a higher net interest margin, and stable operating expenses, ***while asset quality remained stellar.***  This resulted in strong year-over-year diluted earnings per share growth.

260.     In the Q2 2022 Investor Presentation, the Company assured investors that the 2019 NYC rent regulation legislation, HSTPA, did not threaten the Bank's $36.8 billion multi-family loan portfolio, stating: "***Our Multi-Family Portfolio is Well Insulated Against Recent Changes in the Rent Regulation Laws***."  In the same presentation, the Company also declared that: "***Our asset quality in <u>any</u> credit cycle has consistently been better than our industry peers . . .***" (additional emphasis in original).  In another slide, the Company emphasized that NYCB "rank[s] among the largest U.S. bank holding companies . . . ***but without the risk other large banks have***," explaining: "***Our asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers***."  This statement was followed by the below chart, which

demonstrated, for example, that NYCB's percentage of nonperforming loans to total loans was nearly ***ten times lower than banks in the S&P U.S. BMI Banks Index, and twelve times lower than NYCB's peer banks***:

| RATIO | NYCB<br>AT 6/30/2022 | S&P U.S. BMI BANKS INDEX (b)<br>AT 3/31/2022 | PEERS (b)<br>AT 3/31/2022 |
|---|---|---|---|
| NCOs/Average Loans | (0.01)% | 0.13% | 0.08% |
| Cumulative losses (a) | 107 bp | 2,425 bp | 1,360 bp |
| NPAs/Total Assets | 0.09% | 0.41% | 0.49% |
| NPLs/Total Loans | 0.10% | 0.95% | 1.20% |
| ALLL/NPLs | 434.11% | 124.34% | 123.64% |

261.    The Exchange Act Defendants' statements on July 27, 2022 identified in ¶¶257-260 were materially false, misleading, and omitted material facts.  The Exchange Act Defendants' statements about the Bank's assessment and characterization of its loan portfolio asset quality and allowance and provision for credit losses were false and misleading and lacked any reliable foundation because, as the Company has since admitted: (a) NYCB's "internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged" and "these ineffective controls impact the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately [impact] the recognition of the allowance for credit losses on loans and leases;" (b) NYCB's "recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively;" (c) NYCB "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations

and regulatory and economic environments in which the Company operates;" and (d) NYCB "lack[ed] a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities."   The statements in ¶¶257-260 were also false and misleading because former employees describe how: (a) NYCB's loan underwriting practices created undisclosed risks to the Bank's asset quality; (b) NYCB's loan review processes failed to properly update financial information for, reappraise, and adequately risk rate these already high-risk loans; and (c) NYCB's loan review teams in the Asset Review, Internal Loan Review, and Regulatory & Compliance Departments, were understaffed during the Class Period. *See, e.g.*, ¶¶97-122.   The statements in ¶¶257-260 were also false and misleading because NYCB's new management has since begun remediating the Company's failed internal controls over financial reporting through an assessment of the CRE loan portfolio asset quality—exactly what the Exchange Act Defendants represented had been done throughout the Class Period.   The results of new management's review, which covers approximately 80% of NYCB's loan portfolio, demonstrated **that nearly $2 billion** of the portfolio are NPLs, and the Company has taken a PCL of $1.257 billion, with additional expected losses and reserves still to come.   On June 5, 2024, new CFO Gifford acknowledged in an investor day conference call that "the principal drivers" of the NPLs, losses and loss reserves were the same pre-Class Period market events that the Exchange Act Defendants claimed to have been well-insulated from: New York's rent regulation laws, COVID-related office vacancies, and federal interest rate hikes.

262.   The materiality of Defendants' false and misleading statements and omissions of material facts is also clear.   For example, when NYCB began implementing the remediation steps required to correct the material weaknesses in the Company's loan review processes, the Company reported $683 million in non-GAAP net losses for the fourth quarter of 2023 through the second

quarter of 2024, attributable to a dramatic spike in NYCB's provision for credit losses of $1.257 billion over those three quarters. *See, e.g.*, ¶204.  The reported ACL and PCL violated GAAP and net income was inflated because of the Bank's admitted "[in]ability to accurately disclose loan rating classifications [and] identify problem loans," which impacted NYCB's "recognition of the allowance for credit losses on loans and leases."  As discussed in ¶¶220-222, *supra*, the application of only 25% of the $1.257 billion increase to the PCL to earlier periods would have resulted in a $39 million reduction in NYCB's net income in the second quarter of 2022, which would have missed analysts' consensus estimates, as illustrated in the table immediately below and in ¶223:

| Net Income, $ in millions | 6/30/22 |
|---|---|
| As Reported | $166 |
| As Corrected | $127 |
| Difference Between Reported and Corrected | **($39)** **-23%** |
| Analysts' consensus estimate | $150 |
| Difference Between Corrected Net Income and Consensus | ($23) |
| Outcome | **Miss Consensus** |

### 2.      August 8, 2022—Second Quarter 2022 Form 10-Q

263.    On August 8, 2022, after the market closed, NYCB filed its Form 10-Q for the second quarter of 2022, which was signed by Defendants Cangemi and Pinto ("Q2 2022 Form 10-Q").  In the Q2 2022 Form 10-Q, the Company repeated the same asset quality metrics described above in ¶¶257-258.  With respect to allowance for credit losses, the Company's Q2 2022 Form 10-Q stated: "***Based upon all relevant and available information as of the end of the current second quarter [sic], management believes that the allowance for losses on loans was appropriate at that date***."  For the reasons stated above in ¶¶261-262, those statements were false and misleading when made.

### 3.    October 26, 2022—Third Quarter 2022 Earnings Release

264.    On October 26, 2022, NYCB released its third quarter results for 2022, along with "CEO Commentary" by Defendant Cangemi, in a press release attached to a Form 8-K ("Q3 2022 Earnings Release").  Also on October 26, 2022, Defendants Cangemi and Pinto participated in an earnings call to discuss NYCB's third quarter results for 2022 ("Q3 2022 Earnings Call"), which was accompanied by an Investor Presentation, also filed on Form 8-K ("Q3 2022 Investor Presentation").

265.    In the Q3 2022 Press Release, NYCB reported the following "asset quality" results for the quarter ended September 30, 2022:

- ***Nonperforming assets of $50 million***, equal to eight basis points (0.08%) of total assets ($63 billion);
- Non-performing loans of $45 million, equal to nine basis points (0.09%) of total loans ($49 billion);
- ***Total loans past due 30 to 89 days of $39 million***;
- ***ACL of $218 million***, representing 480% of total non-performing loans ($45 million) and 0.45% of total loans ($49 billion);
- ***PCL of $2 million***;
- ***Net charge-offs (recoveries) of zero***.

266.    The Company also reported non-GAAP net income for the three months ended September 30, 2022, stating in the Q3 2022 Press Release ***net income of $147 million and non-GAAP diluted earnings per share of $0.31***.  Moreover, the Company's Board of Directors declared a quarterly cash dividend of $0.17 per share on the Company's common stock.

267.    The Q3 2022 Press Release stated that "***Our asset quality metrics remained superb***" and "***[t]he Company's asset quality during the third quarter continues to be strong***."  In the "CEO Commentary" section of the release, Defendant Cangemi stated that "***[w]e recorded*** very good loan and deposit growth, ***stellar asset quality***, and stable operating expenses."  He then

emphasized this point, stating that "*[o]ur credit quality remains superb as non-performing assets declined $6 million on a linked-quarter basis and represent a mere 0.08% of total assets*." In doing so, Cangemi touted the Company's "*zero net charge-offs during the quarter*" and added that "*[t]hese strong asset quality metrics reflect our conservative underwriting and our historical track record of little to no losses in our core portfolios*."

268.     In the Q3 2022 Investor Presentation, the Company assured investors that the 2019 NYC rent regulation legislation, HSTPA, posed no threat to the Bank's $37.2 billion multi-family loan portfolio, stating: "*Our Multi-Family Portfolio is Well Insulated Against Recent Changes in the Rent Regulation Laws*."

269.     In the Q3 2022 Investor Presentation, the Company once again declared that: "*Our asset quality in <u>any</u> credit cycle has consistently been better than our industry peers* . . ." (additional emphasis in original). In another slide, the Company repeated its second quarter statement, writing: "We rank among the largest U.S. bank holding companies . . . *but without the risk other large banks have*," explaining that "*Our asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers*," following that statement with this chart, which demonstrated, for example, that NYCB's percentage of nonperforming loans to total loans was nearly ten times lower than NYCB's peer banks and six times lower than banks in the S&P U.S. BMI Banks Index:

| Ratio | NYCB<br>At 9/30/2022 | S&P U.S. BMI Banks Index [(b)]<br>At 6/30/2022 | Peers [(b)]<br>At 6/30/2022 |
|---|---|---|---|
| NCOs/Average Loans | 0.00% | 0.06% | 0.10% |
| Cumulative losses [(a)] | 107 bp | 2,431 bp | 1,362 bp |
| NPAs/Total Assets | 0.08% | 0.37% | 0.43% |
| NPLs/Total Loans | 0.09% | 0.57% | 0.87% |
| ALLL/NPLs | 480.22% | 302.11% | 204.96% |

270.    NYCB also boasted of the Company's underwriting and asset quality in the Q3 Investor Presentation, stating that *"[w]e are a conservative lender across all of our loan portfolios[;]"* and the Company's *"[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles*."

271.    During the Q3 2022 Earnings Call, the Exchange Act Defendants touted NYCB's earnings results and "strong" asset quality.  For example, Defendant Cangemi praised NYCB's "hallmark" strong asset quality, stating in pertinent part: "*we produced solid loan and deposit growth, lower operating expenses and continued strong levels of asset quality, which remains our hallmark*."

272.    Defendant Cangemi expanded on this characterization of asset quality as NYCB's "hallmark," stating:

> Moving on to *one of the company's hallmarks: credit*.  *Our asset quality and credit trends remain superb and continue to rank the company as among the best in the industry*. Nonperforming assets totaled $50 million, down $6 million compared to $56 million in the prior quarter and were 8 basis points of total assets. Additionally, we recorded 0 net charge-offs during the current third quarter compared to $7 million of net recoveries last quarter.  *The strong asset quality metrics reflect our conservative underwriting practices and historically low level of losses in our core portfolios.*

273.     The Exchange Act Defendants' statements on October 26, 2022 identified in ¶¶265-272 about the Bank's assessment and characterization of its loan portfolio asset quality and allowance and provision for credit losses were materially false, misleading, and omitted material facts for the same reasons as stated above in ¶261.

274.     The materiality of Defendants' false and misleading statements and omissions of material facts is clear.  For example, when NYCB began implementing the remediation steps required to correct the material weaknesses in the Company's loan review processes, the Company reported $683 million in non-GAAP net losses for the fourth quarter of 2023 through the second quarter of 2024, attributable to a dramatic spike in NYCB's provision for credit losses of $1.257 billion over those three quarters.  *See, e.g.*, ¶204.  Given the Bank's "[in]ability to accurately disclose loan rating classifications, identify problem loans, and . . . [recognize] the allowance for credit losses on loans and leases," the Bank's results were inflated and in violation of GAAP by a failure to sufficiently increase the Company's ACL and related PCL to reflect the emerging risk of losses.  As discussed in ¶¶220-222, *supra*, application of only 25% of the $1.257 billion increase to the PCL to earlier periods would have resulted in a $39 million reduction in NYCB's net income in the third quarter of 2022, which would have significantly missed analysts' consensus estimates, as illustrated in the table immediately below and in ¶223:

| Net Income, $ in millions | 9/30/22 |
|---|---|
| As Reported | $147 |
| As Corrected | $108 |
| Difference Between Reported and Corrected | ($39) -26% |
| Analysts' consensus estimate | $149 |
| Difference Between Corrected Net Income and Consensus | ($41) |
| Outcome | **Miss Consensus** |

### 4.     November 4, 2022—Third Quarter Form 10-Q

275.     A few weeks later, on November 4, 2022, after the market closed, NYCB filed its Form 10-Q for the third quarter of 2022, which was signed by Defendants Cangemi and Pinto ("Q3 2022 Form 10-Q").  In the Q3 2022 Form 10-Q, the Company repeated the same asset quality metrics described above in ¶¶265-266.  With respect to allowance for credit losses, the Company's Q3 2022 Form 10-Q stated: "***Based upon all relevant and available information as of the end of the current second quarter [sic], management believes that the allowance for losses on loans was appropriate at that date***."  For the reasons stated above in ¶¶273-274, those statements were false and misleading when made.

### 5.     January 31, 2023—Fourth Quarter 2023 Earnings Release

276.     On January 31, 2023, NYCB released its fourth quarter results for 2022, along with "CEO Commentary" by Defendant Cangemi, in a press release attached to a Form 8-K ("Q4 2022 Earnings Release").  Also on January 31, 2023, Defendants Cangemi and Pinto participated in an earnings call to discuss NYCB's fourth quarter results for 2022 ("Q4 2022 Earnings Call"), which was accompanied by an Investor Presentation, also filed on Form 8-K ("Q4 2022 Investor Presentation").

277.     The Flagstar Merger closed on December 1, 2022, making NYCB the holding company for one of the largest regional banks in the United States.  NYCB announced in the Q4 2022 Press Release that "the transition to commercial bank model" was "underway."  Total assets and total loans increased over the quarter from $63 billion in total assets and $49 billion in total loans, to $90.1 billion in total assets, and $69 billion in total loans resulting from the Flagstar Merger.

278.     In the Q4 2022 Press Release, NYCB reported the following "asset quality" results for the quarter ended December 31, 2022:

- ***Nonperforming assets of $153 million***, or 0.17% of total assets ($90 billion);

- ***Nonperforming loans of $141 million***, or 0.20% of total loans ($69 billion)[60];

- ***Total loans past due 30 to 89 days of $64 million***;

- ***ACL of $393 million***, representing 279% of total non-performing loans ($141 million) and 0.57% of total loans ($69 billion);

- ***PCL of $124 million***, as "impacted by the initial provision for credit losses totaling $117 million due to the Flagstar acquisition." Excluding this item, the fourth-quarter and full-year 2022 provision for credit losses was $7 million; and

- ***Net charge-offs (recoveries) of $1 million***.

279.    The Company ***reported non-GAAP net income for the three months ended December 31, 2022, of $139 million and non-GAAP diluted earnings per share of $0.30***. Moreover, the Company's Board of Directors declared a quarterly cash dividend of $0.17 per share on the Company's common stock.

280.    The Q4 2022 Press Release reported that the Company's "***[a]sset quality remained strong during the fourth quarter of 2022***."   In the "CEO Commentary" portion of the press release, Defendant Cangemi touted NYCB's transformation "to a commercial banking model" as a result of the Flagstar Merger.  Cangemi also explained that NYCB was restructuring its mortgage business due to the Federal Reserve's decision to increase interest rates, which caused mortgage activity to decline dramatically.  However, Cangemi again brushed off macroeconomic pressures and their ability to affect NYCB's business, stating that "***our sensitivity to interest rate changes has improved materially to a more balanced position***."

---

[60] The Company explained that the quarterly increases to nonperforming assets and nonperforming loans "were entirely due to the Flagstar acquisition and composed of mostly one-to-four family and home equity loans."

281.    In the Q4 2022 Investor Presentation, NYCB continued to tout the Company's underwriting and asset quality, stating: "[*o]ur asset quality over various credit cycles has consistently been better than our industry peers[;]*" and "*[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles*[.]"  The Company presented a chart that was prefaced with the statement: "*[o]ur asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers*."  In the chart, shown below, NYCB's nonperforming loans as a percentage of total loans, was still five times less than that of its peers, even with the uptick in nonperforming loans "due to the Flagstar acquisition and composed of mostly one-to-four family and home equity loans:"

→ Our asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers.

| Ratio | NYCB<br>At 12/31/2022 | S&P U.S. BMI Banks Index [b]<br>At 9/30/2022 | Peers [b]<br>At 9/30/2022 |
|---|---|---|---|
| NCOs/Average Loans | 0.00% | 0.08% | 0.11% |
| Cumulative losses [a] | 107 bp | 2,433 bp | 1,363 bp |
| NPAs/Total Assets | 0.17% | 0.37% | 0.46% |
| NPLs/Total Loans | 0.20% | 0.57% | 1.03% |
| ALLL/NPLs | 279% | 321% | 143% |

282.    During the Q4 2022 Earnings Call, the Exchange Act Defendants discussed the closing of the Flagstar Merger and touted NYCB's earnings results, underwriting, asset and credit quality, capital ratios, and its ability to maintain the Company's high dividend.

283.    Specifically, Defendant Cangemi described NYCB's "solid" credit quality, "conservative" underwriting, and "high quality" balance sheet, stating:

123

*Our credit quality remains -- metric remain solid, and reflect the strong credit culture of both legacy organizations.* NPAs to total assets equaled 17 basis points, while NPLs to total loans were 20 basis points, continuing to rank us among the best in the industry. *These metrics are proof positive that our conservative underwriting standards have served us well over various business cycles. This one is a high quality balance sheet should serve us well in the event of a downturn in the economy*.

284.    Cangemi also praised NYCB's multi-family loan portfolio and its strength despite the recent trends in New York City real estate, stating that "*our bread and butter nonluxury rent regulation niche remains very strong*."

285.    Later during the call, an analyst asked Cangemi and Pinto for the Bank's credit perspective on office-related CRE loans. In response, Defendant Pinto stated that NYCB's *"office and really throughout the CRE and portfolio has been unbelievably strong from a credit perspective*." Defendant Pinto further stated that "*the performance in th[e CRE] portfolio has been better than we originally expected coming out of the pandemic*." Defendant Cangemi also responded, stating that "*we're not seeing any negative trends* and the LTV is relatively low. And in the event that we have to sit down and deal with a situation that has maybe some of *[sic]* credit deterioration, *we think we're well protected as a sponsorship as well as overall value. I haven't seen any negative trends . . . . It's been very, very solid*."

286.    The Exchange Act Defendants' statements identified in ¶¶278-285 about the Bank's assessment and characterization of its loan portfolio asset quality and allowance and provision for credit losses were materially false, misleading, and omitted material facts for the reasons stated in ¶261.

287.    The materiality of Defendants' false and misleading statements and omissions of material facts is clear. For example, when NYCB began implementing the remediation steps required to correct the material weaknesses in the Company's loan review processes, NYCB

reported $683 million in non-GAAP net losses for the fourth quarter of 2023 through the second quarter of 2024, together with a dramatic spike in NYCB's ACL, provision for credit losses, net losses, nonperforming loans, past due loans, and net charge-offs, which new CFO Gifford acknowledged would continue to worsen throughout 2024. *See, e.g.*, ¶204. The reported ACL and PCL violated GAAP and net income was inflated because of the Bank's admitted "[in]ability to accurately disclose loan rating classifications [and] identify problem loans," which impacted NYCB's "recognition of the allowance for credit losses on loans and leases." Conservatively, at least 25% of the $1.257 billion increase to the PCL in the fourth quarter of 2023 and the first two quarters of 2024 was attributable to earlier periods (*i.e.*, approximately $314 million of that increase, which equates to an additional reserve of $52 million per quarter). An allocation of only that portion of the PCL increase to the fourth quarter 2022 would have resulted in corrected net income of $90 million as opposed to $139 million, missing analyst consensus as illustrated in the table immediately below and in ¶223:

| Net Income, $ in millions | 12/31/22 |
|---|---|
| As Reported | $139 |
| As Corrected | $90 |
| Difference Between Reported and Corrected | ($49) -35% |
| Analysts' consensus estimate | $141 |
| Difference Between Corrected Net Income and Consensus | ($52) |
| Outcome | **Miss Consensus** |

### 6.   March 1, 2023—2022 Form 10-K

288.   On March 1, 2023, the Company filed with the SEC its full-year and fourth quarter 2022 financial results on Form 10-K, signed by Defendants Cangemi, Pinto, and DiNello ("2022 Form 10-K"). The 2022 Form 10-K claimed that the Company's asset quality was "strong," and attributed the increase in NPAs, NPLs, ACL and PCL to recently acquired Flagstar assets and not

NYCB's CRE portfolio.  In relevant part, the 2022 Form 10-K "Executive Summary" section stated as follows:

**Asset Quality**

*Asset quality remained strong during 2022* as increases in [nonperforming assets ("NPAs")] were substantially due to changes in asset mix related to the Flagstar [Merger] and centered on non-performing one-to-four family residential and home equity loans. Total NPAs at December 31, 2022 were $153 million compared to $41 million at December 31, 2021, primarily driven by [Nonperforming loans ("NPLs")] and assets acquired in the Flagstar [Merger]. At December 31, 2022, NPAs to total assets equaled 0.17 percent and NPLs to total loans were 0.20 percent, compared to 0.07 percent for both metrics at December 31, 2021.

289.   With respect to NYCB's ACL and PCL, the 2022 Form 10-K further stated:

*"[b]ased upon all relevant and available information at the end of this December, management believes that the [following] allowance for losses on loans was appropriate at that date:"*

Partially reflecting the net recoveries noted above, and *the provision of $133 million for the allowance for loan losses, the allowance for credit losses increased $194 million, equaling $393 million at December 31, 2022 from $199 million at December 31, 2021*.  The majority of the increase is related to the initial provision for credit losses of $117 million and the adjustment for PCD loans acquired in the Flagstar [Merger]. *The allowance for credit losses on loans and leases represented 278.87 percent of non-performing loans at December 31, 2022, as compared to 611.79 percent at the prior year-end*.

290.   The Exchange Act Defendants' statements about the Bank's "strong" asset quality and directly related ACL and PCL identified in ¶¶288-289 were materially false, misleading and omitted material facts for the reasons stated above in paragraph ¶¶286-287.

291.   The 2022 Form 10-K purported to warn investors that "*our allowance for credit losses might not be sufficient to cover our actual losses, which would adversely impact our financial condition and results of operations*."  However, the Company then assured investors that "*Based upon all relevant and available information at the end of this December, management believes that the allowance for losses on loans was appropriate at that date*."  This statement was not sufficient to insulate Defendants from liability for their materially false and

126

misleading statements because the risk that the Company's credit losses were insufficient had already materialized because throughout the Class Period, the Company lacked internal loan review processes that allowed for the accurate risk rating of loans, identification of problem loans and, therefore, adequate recognition of the allowance for credit losses, and related provision for credit losses.

### 7. March 20, 2023—Signature Transaction Press Release

292. On March 20, 2023, NYCB filed a current report on Form 8-K ("March 20, 2023 8-K") with the SEC announcing that on the previous day, the Company's banking subsidiary had entered into a definitive agreement to acquire Signature's assets from the FDIC, only four months after the Flagstar Merger closed. The Signature Transaction catapulted NYCB into a Category IV bank classification overnight. Under the terms of the purchase agreement, the FDIC would receive NYCB stock in consideration for the Signature Transaction. In the press release attached to the March 20, 2023 8-K ("March 20, 2023 Press Release"), the Company emphasized that the transaction was expected to be "significantly accretive to both earnings per share and tangible book value." Defendant Cangemi was quoted as stating that NYCB's "asset quality remains solid:"

> Both the Company and the Bank were well positioned prior to the recent market turmoil, with strong capital, a stable retail deposit franchise, and ample liquidity. ***Moreover, our asset quality metrics remain solid, as they have over multiple business cycles.*** After this transaction, we will be even better positioned to deal with any residual market issues, including by now operating with a significantly lower loan-to-deposit ratio. Overall, we are happy that our conservative business model and balance sheet put us in a position to quickly consummate this important transaction.

293. The Exchange Act Defendants' statements about the Bank's asset quality metrics identified in the paragraph above were materially false, misleading, and omitted material facts for the reasons stated above in paragraph ¶¶286-287.

### 8.    April 21, 2023—2023 Proxy Statement and 2022 Annual Report

294.    On April 21, 2023, NYCB filed its 2022 Annual Report for the fiscal year ending December 31, 2022.  The 2022 Annual Report stated that as of December 31, 2022, NYCB had "$90.1 billion of assets, $69 billion of loans, deposits of $58.7 billion, and total stockholders' equity of $8.8 billion."  The 2022 ARS included a letter to stockholders from Defendant Cangemi. Therein, Cangemi stated:

> Despite our growth over the past several months, there is one thing we will not outgrow – our conservative underwriting criteria. ***We have an enviable track record of historically low levels of non-performing loans and an even lower level of losses on our loan portfolio. At the end of last year, our asset quality metrics remained among the strongest in the industry***.

295.    The 2023 Proxy Statement, issued on the same day, discussed how the Signature Transaction would "enhance and quicken [NYCB's] growth."

> ***Management maintained the Company's superior loan growth and credit quality, maintaining our hallmark asset quality*** and a solid capital position.
>
> ***By successfully closing the Flagstar merger, management was able to take advantage of the strategically important opportunity to improve loan portfolio diversity*** (at December 31, 2022, multi-family, CRE and constructions loans represented 70% of total loans held for investment, compared with 91% at December 31, 2021), ***while continuing to maintain strong credit quality, with lowest net charge offs to average loans among peers*** (1st among 18 in peer group) and ratio of average non-performing loans to total loans of 0.45%, compared to S&P U.S. BMI Banks Index of 1.57%.

296.    The Exchange Act Defendants' statements about the Bank's assessment and characterization of its loan portfolio asset quality and allowance and provision for credit losses identified in ¶¶294-295 were materially false, misleading, and omitted material facts for the reasons stated above in ¶¶286-287.

### 9.    April 28, 2023—First Quarter 2023 Earnings Release

297.    On April 28, 2023, NYCB released its first quarter results for 2023, along with "CEO Commentary" by Defendant Cangemi, in a press release attached to a Form 8-K ("Q1 2023

Earnings Release"). Also on April 28, 2023, Defendants Cangemi, and Pinto participated in an earnings call to discuss NYCB's first quarter results for 2023 ("Q1 2023 Earnings Call"), which was accompanied by an Investor Presentation, also filed on Form 8-K ("Q1 2023 Investor Presentation").

298.   In the Q1 2023 Press Release, NYCB reported the following "asset quality" results for the quarter ended March 31, 2023:

- *Nonperforming assets of $161 million*, equal to 0.13% of total assets ($123.8 billion);
- *Nonperforming loans of $148 million*, equal to 0.18% of total loans ($82.5 billion);
- *Total loans past due 30 to 89 days of $175 million*;
- *ACL of $550 million*, representing 370.38% of total non-performing loans and 0.45% of total loans ($82.5 billion)[61];
- *PCL of $170 million*, which included a $132 million initial provision for credit losses for the acquired portion of the Signature loan portfolio;
- Net charge-offs (recoveries) of ($1 million).

299.   The Company also reported non-GAAP net income for the three months ended March 31, 2023, stating in the Q1 2023 Press Release that adjusted *net income was $159 million* and non-GAAP diluted earnings per share was $0.23. Moreover, the Company's Board of Directors declared a quarterly cash dividend of $0.17 per share on the Company's common stock.

300.   The Q1 2023 Press Release further reiterated the strength of NYCB's asset quality, stating: "*Our asset quality metrics remained strong during the first quarter of 2023*."

301.   In the "CEO Commentary" portion of the press release, Defendant Cangemi touted NYCB's ability to "successfully navigate[] the turmoil" despite a purportedly "challenging period

---

[61] The ACL increased by $157 million in the first quarter of 2023. Approximately $140 million of the increase was directly connected to the Signature transaction.

for the entire banking industry."  Cangemi further championed the Company's asset and credit quality, stating:

> While we have closed two acquisitions over the past four months, **we have remained focused on our fundamentals including asset quality.  Our asset quality metrics remain strong** with total non-performing assets increasing only slightly compared to year-end and net charge-offs remaining at near zero. **We continue to be laser focused on credit quality across all lending verticals**.

302.   The Q1 2023 Investor Presentation echoed the same statements about NYCB's asset and credit quality, stating that the Company's: (1) "**asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers**[;]" (2) "**asset quality over various credit cycles has consistently been better than our industry peers**[;]" (3) "**current and historical net charge-offs demonstrate non-performing loans result in low levels of actual losses**[;]" and (4) "**[l]ow risk credit culture and business strategy has resulted in superior asset  quality through past cycles**[.]"

303.   During the Q1 2023 Earnings Call, the Exchange Act Defendants touted NYCB's earnings results, underwriting, asset and credit quality, capital ratios, and its ability to maintain the Company's high dividend.  Specifically, Defendant Cangemi stated that "**[a]s for the quality of our loan portfolio, both our asset quality metrics and trends remain strong**."  Cangemi also stated that:

> Importantly, **we reported another quarter of low or no loan losses as net charge-offs was zero during the current [sic] first quarter compared to $1 million during the previous quarter**.  **Our office exposure remains very manageable, and we remain comfortable with the credit trends in this sector**. Our office exposure at quarter end was $3.4 billion or approximately 4% of total loans.  We provided some details in our investor presentation, but to summarize, the average loan size is $11 million with a weighted average coupon of 4.62%.  The weighted average LTV is 56% and the weighted average debt service coverage ratio was 1.73x.
>
> Furthermore, we have no delinquencies and no charge-offs in this portfolio.  As you can see, **these metrics are proof positive that our conservative underwriting standards have served us well over numerous credit cycles, this along with a high-**

*quality balance sheet should serve us well in the event of an economic downturn.*
*Regardless, we will continue to be laser-focused on credit quality across all the*
*new verticals, especially those that we have recently entered.*

304.    During the earnings call, an analyst asked the Exchange Act Defendants about

NYCB's customers with office related loans.  In response, Defendant Cangemi stated that "*I think*

*the messaging is that we know our customers very well. We're very comfortable with the LTV,*

*the debt service coverage ratio. . . .*"  Further, Defendant Cangemi emphasized once again NYCB's

asset and credit quality, stating:

> *Again, we feel really confident in it.  But right now, we're seeing very strong*
> *performance, no delinquencies, no late pay*, and we're working with our
> customers in the event there is some issues on just changes in square foot rent rolls.
> However, *the LTVs are very low and the relationships are very strong and we*
> *know the customer very well*.

305.    Later during the call, an analyst asked the Exchange Act Defendants how NYCB's

debt service coverage ratios for its regulated multi-family portfolio were holding up as a result of

higher interest rates.  In response, Defendant Cangemi touted the Company's underwriting, stating

that "Given that we're a low leverage lender, LTVs are traditionally lower, are *[sic]* we underwrite

very differently than some of our competitors . . . rates are elevated, but *we're still seeing 100%*

*consistency on no delinquencies, no late pays*."

306.    The Exchange Act Defendants' statements identified in ¶¶298-305 above about the

Bank's assessment and characterization of its loan portfolio asset quality and allowance and

provision for credit losses were materially false, misleading, and omitted material facts for the

reasons stated above in ¶261.

307.    The materiality of Defendants' false and misleading statements and omissions of

material facts is clear.  For example, when NYCB began implementing the remediation steps

required to correct the material weaknesses in the Company's loan review processes, NYCB

reported $683 million in non-GAAP net losses for the fourth quarter of 2023 through the second quarter of 2024, together with a dramatic spike in NYCB's ACL, provision for credit losses, net losses, nonperforming loans, past due loans, and net charge-offs, which new CFO Gifford acknowledged would continue to worsen throughout 2024. *See, e.g.*, ¶¶195, 350.  The reported ACL and PCL violated GAAP and net income was inflated because of the Bank's admitted "[in]ability to accurately disclose loan rating classifications [and] identify problem loans," which impacted NYCB's "recognition of the allowance for credit losses on loans and leases." Conservatively, at least 25% of the $1.257 billion increase to the PCL in the fourth quarter of 2023 and the first two quarters of 2024 was attributable to earlier periods (*i.e.*, approximately $314 million of that increase, which equates to an additional reserve of $52 million per quarter).  An allocation of only that portion of the PCL increase to the first quarter 2023 would have resulted in corrected net income of $107 million as opposed to $159 million, missing analyst consensus as illustrated in the table immediately below and in ¶223:

| Net Income, $ in millions | 3/31/23 |
|---|---|
| As Reported | $159 |
| As Corrected | $107 |
| Difference Between Reported and Corrected | ($52) -33% |
| Analysts' consensus estimate | $153 |
| Difference Between Corrected Net Income and Consensus | ($47) |
| Outcome | **Miss Consensus** |

## 10.    May 10, 2023—First Quarter 2023 Form 10-Q

308.    On May 10, 2023, NYCB filed its Form 10-Q for the Company's financial results for the first quarter of 2023, repeating the same financial metrics described above in ¶¶306-307. With respect to asset quality, the Company's Q1 2023 Form 10-Q reassured investors that the Company's "***asset quality metrics remained strong during the first quarter of 2023 with increases in NPLs and NPAs attributable to the Signature Transaction***."  With respect to

allowance for credit losses, the Company's Q1 2023 Form 10-Q stated: "***Based upon all relevant and available information at March 31, 2023, management believes that the allowance for losses on loans was appropriate at that date***."

309.   The Exchange Act Defendants' statements identified in ¶308 above about the Bank's assessment and characterization of its loan portfolio asset quality and allowance and provision for credit losses were materially false, misleading, and omitted material facts for the reasons stated above in ¶¶306-307.

**11.    July 27, 2023—Second Quarter 2023 Earnings Release**

310.   On July 27, 2023, NYCB released its second quarter results for 2023, along with "CEO Commentary" by Defendant Cangemi, in a press release attached to a Form 8-K ("Q2 2023 Earnings Release").   Also on July 27, 2023, Defendants Cangemi and Pinto participated in an earnings call to discuss NYCB's second quarter results for 2023 ("Q2 2023 Earnings Call"), which was accompanied by an Investor Presentation, also filed on Form 8-K ("Q2 2023 Investor Presentation").

311.   In the Q2 2023 Press Release, NYCB reported the following "asset quality" results for the quarter ended June 30, 2023:

- ***Nonperforming assets of $246 million***, equal to 0.21% of total assets ($118.8 billion);
- ***Nonperforming loans of $233 million***, equal to .38% of total loans ($83.3 billion);
- ***Total loans past due 30 to 89 days of $335 million***;
- ***ACL of $594 million***, representing 255.4% of total non-performing loans and 0.71% of total loans ($83.3 billion);
- ***PCL of $49 million***;
- ***Net charge-offs (recoveries) of ($1 million)***.

312.     The Company also reported non-GAAP net income for the three months ended September 30, 2022, stating in the Q2 2023 Press Release that ***adjusted net income was $345 million, up 117%, and adjusted diluted earnings per share was $0.47, up 104%***.  Moreover, the Company's Board of Directors declared a quarterly cash dividend of $0.17 per share on the Company's common stock.

313.     In reporting the Bank's asset quality metrics, the Q2 2023 Press Release stated that the Company's "***asset quality trends remain among the best in the industry, despite the slightly higher NPLs***."  In the "CEO Commentary" portion of the press release, Defendant Cangemi touted the Company's asset and credit quality, stating that "***[o]ur asset quality remains strong.  Our overall metrics are still among the best in the industry, with NPAs at a mere 21 basis points of total assets, even though we had an uptick in non-performing loans. Additionally, we had a net recovery of $1 million during the quarter***."

314.     In the Q2 2023 Investor Presentation, NYCB continued to tout the Company's underwriting and asset and credit quality, stating that the Company had (1) "***[d]isciplined client selection and underwriting***[;]" (2) "***asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers***[;]" (3) "***asset quality over various credit cycles has consistently been better than our industry peers***[;]" (4) "***[n]on-performing assets (NPAs) as a percent of total assets ranked in the top quartile compared to industry peers reflecting disciplined client selection and underwriting***[;]" (5) "***current and historical net charge-offs demonstrate non-performing loans result in low levels of actual losses***[;]" and (6) "***[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles***."

315.    During the Q2 2023 Earnings Call, the Exchange Act Defendants touted NYCB's earnings results, underwriting, asset and credit quality, capital ratios, and its ability to maintain the Company's high dividend.  Specifically, Defendant Cangemi stated: "*As for asset quality, our metrics remain strong . . . and also best in the industry, despite an uptick in NPLs off of historical low levels in legacy NYCB*."  Cangemi explained that the increase of NPAs, up from $174 million in the prior quarter to $246 million in the second quarter, were not attributable to historic NYCB loans but "resulted largely from the inclusion of acquired loans from both our acquisitions." Cangemi noted that "[d]*espite this uptick, NPAs and total assets rank in the top quartile compared to industry peers, reflecting our disciplined underwriting and client selection*." Cangemi further praised the Company's low credit losses, stating that "*[i]mportantly, this was another quarter of low or no loan losses as we recorded a net recovery of $1 million compared to 0 net charge-offs last quarter*."

316.    Defendant Cangemi, in response to an analyst question about the "increase in the CRE NPLs and if any of that was tied to office," attributed the quarter's increase to the Company's recent acquisitions of assets from Flagstar and Signature, noting the Company was "*covered there when it comes to any potential loss*" related to the Signature and Flagstar deals, and further explaining that when it came to office-related CRE, "*it was flat when you take out the acquisitions*."

317.    During the call, another analyst asked about NYCB's "disciplined client selection underwriting" and "outlook for loan growth" moving forward.  In response, Defendant Cangemi described NYCB's businesses as "thriving," stating:

> But I would say, in theory, right now, as expected, based on our growth trajectory, as according to plan, I think I said it last quarter, *we don't have to make a loan this year and we'll do very well.  The good news is that our businesses are thriving*

135

*and we're looking forward to allocate capital to this opportunity at much higher spreads*. . . .

318.     Cangemi then added that the Company has "seen players pull back as they're looking to sort of preserve capital."  However, he then informed investors that NYCB would not need to engage in the capital preservation efforts of its peers, stating that "*[w]e've got a very strong capital position*."

319.     When asked about the status of NYCB's office portfolio and whether the Company was seeing any stress on its multi-family loans, Defendant Cangemi responded by assuring investors that NYCB's portfolio was "resilient" despite pressure from interest rates, stating:

> I'll start and I'll defer to John, CFO.  **But clearly, it's been resilient**.  On the multi-family side, it's been an environment where we have a lot of wealthy customers.  They're going through this journey of no activity.  There's a 3% coupon from the lowest going into, let's say, close to 7% and 8%.  **So there is a substantial change and they're weathering the storm, they're paying their bills**.
>
> *           *           *
>
> **We're not seeing any late pays. We're not seeing delinquencies on multi-family. The commercial real estate portfolio is doing extremely well. It's resilient. We have statistics in the deck**.  We talked about that.  We're not going to be perfect because obviously, it's an environment where it's fluid but it seems like, as we reappraise buildings, as we get deep into the portfolio and we deal with some one-off issues, **it's been a very resilient portfolio**.  So with that, I'm going to have John go through the statistics.  **But I will tell you that we're very pleased with the asset quality given the ramp-up of interest rates**.

320.     Defendant Pinto also responded to this question and reiterated the point that the Company's office portfolio has been "**very strong**" despite seeing some delinquencies, stating:

> **So the portfolio has been strong**.  We have seen some early delinquencies.  We think the bulk of them will be cleared in the third quarter but we are working through a couple of items, as you can imagine.  **But still, it's been very strong.  It's bread-and-butter type lending for us.  It's the same structure that we did and that we've done historically for decades with multi-family just with a different collateral base**.

136

321. The Exchange Act Defendants' statements about the Bank's assessment and characterization of its loan portfolio asset quality and allowance and provision for credit losses identified in ¶¶311-320 were materially false, misleading, and omitted material facts for the reasons stated above in paragraph ¶261.

322. The materiality of Defendants' false and misleading statements and omissions of material facts is clear. For example, when NYCB began implementing the remediation steps required to correct the material weaknesses in the Company's loan review processes, NYCB reported $683 million in non-GAAP net losses for the fourth quarter of 2023 through the second quarter of 2024, together with a dramatic spike in NYCB's ACL, provision for credit losses, net losses, nonperforming loans, past due loans, and net charge-offs, which new CFO Gifford acknowledged would continue to worsen throughout 2024. *See, e.g.*, ¶¶195, 350. The reported ACL and PCL violated GAAP and net income was inflated because of the Bank's admitted "[in]ability to accurately disclose loan rating classifications [and] identify problem loans," which impacted NYCB's "recognition of the allowance for credit losses on loans and leases." Conservatively, at least 25% of the $1.257 billion increase to the PCL in the fourth quarter of 2023 and the first two quarters of 2024 was attributable to earlier periods (*i.e.*, approximately $314 million of that increase, which equates to an additional reserve of $52 million per quarter). An allocation of only that portion of the PCL increase to the second quarter 2023 would have resulted in corrected net income of $301 million as opposed to $345 million, as illustrated in the table immediately below and in ¶223:[62]

---

[62] NYCB's reported earnings for Q2 2023 outperformed expectations due to the inclusion of a full quarter's results from Signature, which had closed on March 20, 2023. *See, e.g.*, Q2 2023 Earnings Release ("Net interest income during second quarter 2023 totaled $900 million, up 62% as compared to $555 million during the previous quarter of 2023, primarily due to a full quarter's benefit from the Signature transaction and higher average cash balances."). Additionally, NYCB

Footnote continued on next page

| Net Income, $ in millions | 6/30/23 |
|---|---|
| As Reported | $345 |
| As Corrected | $301 |
| Difference Between Reported and Corrected | ($44)<br>-13% |

### 12.    August 9, 2023—Second Quarter Form 10-Q

323.    On August 9, 2023, after the market closed, NYCB filed its Form 10-Q for the second quarter of 2023, which was signed by Defendants Cangemi and Pinto ("Q2 2023 Form 10-Q").  In the Q2 2023 Form 10-Q, the Company repeated the same asset quality metrics described above in ¶¶311-312.  With respect to asset quality, the Company's Q2 2023 Form 10-Q reassured investors that the Company's "*asset quality metrics remained strong during the second quarter of 2023 despite increases in NPLs and NPAs attributable to certain loans acquired in the Signature Transaction and Flagstar acquisition*."  With respect to allowance for credit losses, the Company's Q2 2023 Form 10-Q stated: "*Based upon all relevant and available information at June 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as that date*."  For the reasons stated above in ¶¶321-322, those statements were false and misleading when made.

### 13.    October 26, 2023—Third Quarter 2023 Earnings Release

324.    On October 26, 2023, NYCB released its third quarter results for 2023, along with "CEO Commentary" by Defendant Cangemi, in a press release attached to a Form 8-K ("Q3 2023 Earnings Release").  Also on October 26, 2023, Defendants Cangemi and Pinto participated in an earnings call to discuss NYCB's second quarter results for 2023 ("Q3 2023 Earnings Call"), which

---

recorded a reduced PCL in Q2 2023 as compared to the prior period (*i.e.*, recording a PCL that increased the ACL only $49 million in Q2 2023 versus $170 million in Q1 2023), which propelled earnings higher.  Regardless, an adjustment of $52 million in Q2 2023 would have been notable as the provision would have more than doubled.

was accompanied by an Investor Presentation, also filed on Form 8-K ("Q3 2023 Investor Presentation").

325.    In the Q3 2023 Press Release, NYCB reported the following "asset quality" results for the quarter ended September 30, 2023:

- *Nonperforming assets of $404 million*, equal to 0.36% of total assets ($111.2 billion);
- *Nonperforming loans of $392 million*, equal to .47% of total loans ($84 billion);
- *Total loans past due 30 to 89 days of $169 million*;
- *ACL of $619 million*, representing 158% of total non-performing loans and 0.74% of total loans ($84 billion);
- *PCL of $62 million*;
- *Net charge-offs (recoveries) of $24 million*.

326.    The Company also reported non-GAAP net income for the three months ended September 30, 2022, stating in the Q2 2023 Press Release that *adjusted net income was $266 million, and adjusted diluted earnings per share was $0.36*. Moreover, the Company's Board of Directors declared a quarterly cash dividend of $0.17 per share on the Company's common stock.

327.    In "CEO Commentary" portion of the press release, Defendant Cangemi touted the Company's "conservative" underwriting and asset quality, despite issues associated with two CRE loans, stating:

> On the asset quality front, while we experienced a significant decline in early-stage delinquencies compared to the previous quarter, non-performing loans increased on a linked-quarter basis, owing primarily to two commercial real estate loans in the office sector. Despite this, *our asset quality metrics continue to be among the best in the industry with non-performing loans at 47 basis points of total loans and net charge-offs of only three basis points. This reflects our conservative underwriting practices*.

328.    In the Q3 2023 Investor Presentation, NYCB continued to tout the Company's underwriting, asset and credit quality, and capital levels, stating that the Company had (1)

"*[d]isciplined client selection and underwriting*[;]" (2) "*asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers*[;]" (3) "*asset quality over various credit cycles has consistently been better than our industry peers*[;]" (4) "*[n]on-performing Loans (NPLs) as a percent of total loans held-for-investment (LHFI) favorable compared to industry peer median reflecting disciplined client selection and underwriting* [;]" (5) "*current and historical net charge-offs demonstrate non-performing loans result in low levels of actual losses*[;]" and (6) "*[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles*."

329.    During the Q3 2023 Earnings Call, the Exchange Act Defendants touted NYCB's earnings results, underwriting, asset and credit quality, capital ratios, and its ability to maintain the Company's high dividend.

330.    Specifically, Defendant Cangemi touted NYCB "strong" asset quality metrics and "conservative" underwriting, stating:

> *Despite the increase in NPLs, our asset quality metrics remained strong as NPLs to total loans were 47 basis points compared to 28 basis points last quarter, while our net charge-offs were also up or a mere 3 basis points of average loans*.

> Also, as you can see on Slides 9 to 12 in our investor presentation material, *our asset quality metrics remain solid and continue to rank among the best relative to the industry and our peers. These strong metrics reflect our conservative underwriting standards, which have served us well over multiple business cycles*.

331.    During the Earnings Call, an analyst asked the Exchange Act Defendants about NYCB's asset quality and the health of its office and multi-family portfolio given the rent regulation changes and environment.  In response, Defendants Cangemi touted the Company's "very strong portfolio" that he claimed they "monitored carefully," stating:

> With that being said, *we have a very strong portfolio with low LTVs and we monitor it carefully, and we're seeing consistencies of payment*.  We're seeing the reaction to higher interest rates on the [indiscernible] option or a fixed rate option,

then having the capacity and the ability to continue to pay. And that's what we're seeing*. So we're not seeing any delinquency trends with any material at all in the multi-family space, which is a positive. Again, rates have significantly risen over the past year or so and it does have an impact to the cash flow, but these are well in tune.  Operators have been able to manage through that*.

332.     Defendant Pinto also answered this question by reassuring investors that NYCB has a "very strong portfolio" that was performing "extremely well relevant to the marketplace[,]" stating:

So there was no -- I don't think it was a related charge-offs to that particular credit, but it's one loan.  So *we have a very strong portfolio*.  We have statistics that we put out in our slide presentation material.  *It was very clear on the overall strength of the portfolio, relatively low LTVs, strong debt service coverage ratios, a very strong sponsorship, but it's not a trend, and we're monitoring it*. No question rates are much higher.  We're still coming out of the pandemic.  We're evaluating overall square footage in rentals.  And as far as leases coming due and exits of certain large clientele, but it's been a relatively stable scenario. *And despite the negativity you're reading about, our portfolio is performing extremely well relevant to the marketplace*.

333.     Cangemi also described during the call how the Company was conducting "enhanced monitoring" of its portfolio and referred to the two problem loans as a "one-offs[,]" stating the Company was "*very cognizant of what's coming due when it comes to refinancing in respect to coupons as well as the tenancy, we evaluate that.  Feel pretty good about the portfolio*."

334.     Analysts on the call pressed Cangemi on the health of the Bank's rent-stabilized multi-family loan book.  An analyst asked whether the Company was "[s]tarting to see any sort of cracks there?" adding "It just feels like there's a pile-up of issues from the 2019 rent law."  In response, Defendant Cangemi attributed any distress to "one-off families", noting that the Company was only seeing a "handful" of problematic loans and dispelled any notion of a "systemic" issue:

The reality is that it's one off families -- maybe 1 or 2 families that one's going through a marital dispute that's going through the court system and with a handful

141

of those credits tied to the relationship. ***It's a handful of relationships, it's not systemic, it's not something we're seeing yet.  We're clearly monitoring*.. . .**

***So it's been a relatively strong book, like I said, a very powerful position regarding the consistency of performance.  We're not seeing trends.***

335.    Defendant Cangemi then asked Exchange Act Defendant John T. Adams, Senior Executive Vice President and President of Commercial Real Estate Finance (and who served prior to that role as Director of Indirect Multi-Family Lending and Chief Lending Officer and Chief Credit Officer) to weigh in.  Adams, speaking directly to investors for the only time during the Class Period, added that "outside of those isolated instances," NYCB was not seeing "a lot of cracks" in the multi-family rent regulation portfolio, stating:

> So it's not really rapid. ***And for the rest of the portfolio outside of those isolated instances***, the market rents, like Tom mentioned earlier, are up, I think, 4% month-over-month and you just can't kill the New York multi-family market. ***So we're monitoring the rent-regulated properties closely, but there's not really a lot of cracks in that particular portfolio that is really raising anything for us to have any real concern right at this time***.

336.    Defendants Adams and Cangemi continued to discuss the strength of NYCB's multi-family loan portfolio in response to an analyst question concerning "where the [multi-family and CRE loan portfolio] debt service coverage ratios are shaping out."  Adams acknowledged that interest rates had doubled, but assured investors that the Bank was tracking the loans and reserving appropriately: "of course, if they're just repricing and they're leaving a three-handle, four-handle coupon and today, it's seven plus, sure the debt service coverage isn't where it was typically when the loan was originated, but there's still enough coverage for them to meet all their obligations, operating as well as debt service.  ***And obviously, we tracked that on an annual basis and if they are less than what we would expect, they get risk graded accordingly, and they get reserved the way that they should be based on our model***."

337.    When asked about NYCB's office loans and the reserves allocated to that portfolio, Defendant Pinto explained that "performance has been extremely strong" despite the fact that the Company took an allowance build for the quarter, stating:

> But like we talked about before, these -- prior to this quarter, **_the performance has been extremely strong.  So we continue to look at that.  We continue to look at the SCRs and the LTVs in the portfolio as well, as well as the deep dive we've been doing into the underlying leases in the portfolio.  So we're comfortable with where we are right now_**, but we did start to see a bit of a build -- an allowance build here this quarter.

338.    The Exchange Act Defendants' statements about the Bank's assessment and characterization of its loan portfolio asset quality and allowance and provision for credit losses identified in ¶¶325-337 were materially false, misleading, and omitted material facts for the reasons stated above in paragraph ¶261.

339.    The materiality of Defendants' false and misleading statements and omissions of material facts is clear.  For example, when NYCB began implementing the remediation steps required to correct the material weaknesses in the Company's loan review processes, NYCB reported $683 million in non-GAAP net losses for the fourth quarter of 2023 through the second quarter of 2024, together with a dramatic spike in NYCB's ACL, provision for credit losses, net losses, nonperforming loans, past due loans, and net charge-offs, which new CFO Gifford acknowledged would continue to worsen throughout 2024. *See, e.g.*, ¶¶195, 350.  The reported ACL and PCL violated GAAP and net income was inflated because of the Bank's admitted "[in]ability to accurately disclose loan rating classifications [and] identify problem loans," which impacted NYCB's "recognition of the allowance for credit losses on loans and leases." Conservatively, at least 25% of the $1.257 billion increase to the PCL in the fourth quarter of 2023 and the first two quarters of 2024 was attributable to earlier periods (*i.e.*, approximately $314 million of that increase, which equates to an additional reserve of $52 million per quarter).  An

allocation of only that portion of the PCL increase to the third quarter 2023 would have resulted in corrected net income of $226 million as opposed to $266 million, as illustrated in the table immediately below and in ¶223:

| Net Income, $ in millions | 9/30/23 |
|---|---|
| As Reported | $266 |
| As Corrected | $226 |
| Difference Between Reported and Corrected | ($40) -15% |
| Analysts' consensus estimate | $253 |
| Difference Between Corrected Net Income and Consensus | ($27) |
| Outcome | **Miss Consensus** |

**14.    November 9, 2023—Third Quarter Form 10-Q**

340.    On November 9, 2023, NYCB filed its Form 10-Q for the third quarter of 2023, which was signed by Defendants Cangemi and Pinto ("Q3 2023 Form 10-Q").  In the Q3 2023 Form 10-Q, the Company repeated the same asset quality metrics described above in ¶¶325-326. With respect to allowance for credit losses, the Company's Q3 2023 Form 10-Q stated: "***Based upon all relevant and available information at September 30, 2023, management believes that the allowance for credit losses on loans and leases represents a reasonable estimate based upon our judgment as of that date***."  For the reasons stated above in ¶¶338-339, those statements were false and misleading when made.

**D.    The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About NYCB's Internal Controls Over Financial Reporting and Their Effectiveness**

341.    In each quarterly report filed on Form 10-Q during the Class Period (the Q2 2022 Form 10-Q, Q3 2022 Form 10-Q, Q1 2023 Form 10-Q, Q2 2023 Form 10-Q, and Q3 2023 Form 10-Q) and the 2022 Form 10-K, each of which was signed by Defendants Cangemi and Pinto, NYCB, Cangemi, and Pinto made the following representations concerning NYCB's purported

disclosure controls and procedures and internal controls over financial reporting.  Specifically,

they stated:

> (a) *Evaluation of Disclosure Controls and Procedures*
>
> Disclosure controls and procedures are the controls and other procedures that are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the U.S. Securities and Exchange Commission's (the "SEC's") rules and forms.  Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.
>
> As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Rule 13a-15(e), as adopted by the SEC under the Securities Exchange Act of 1934 (the "Exchange Act").  ***Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period.***

342.    **Sarbanes-Oxley Certifications**: In Exhibits 31.1 and 31.2 of each quarterly report

filed on Form 10-Q and annual report filed on Form 10-K during the Class Period, Defendants

Cangemi and Pinto further certified under §§ 302 and 906 of the Sarbanes-Oxley Act of 2002

("Sarbanes-Oxley") that the quarterly or annual report was accurate and complete, and that they

had established appropriate internal controls, stating that they: (i) were responsible for establishing

and maintaining internal control over financial reporting, and (ii) had designed such internal

controls over financial reporting to provide reasonable assurance regarding the reliability of

NYCB's financial reporting and the preparation of NYCB's financial statements during the Class

Period.  Furthermore, Defendants Cangemi and Pinto represented that: (i) they had reviewed the

Bank's filings; (ii) ***the filings did not contain any "untrue statement of a material fact or omit to***

145

*state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*"; (iii) NYCB's financial statements "*fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of NYCB, as required by Rule 13a-14(a) / 15(d)-15(a)*; and (iv) NYCB's financial statements "*fairly present[ed], in all material respects, the financial condition and results of operations of" NYCB, as required by 18 U.S.C. § 1350*.

343.    Finally, in each of the SOX Certifications, Defendants Cangemi and Pinto further made positive representations to investors that they had: (i) evaluated the "effectiveness of [NYCB's]'s disclosure controls and procedures"; (ii) *designed or caused to be designed "disclosure controls and procedures" to "ensure" that material information about NYCB was made known to them*; (iii) *designed or caused to be designed "internal control over financial reporting" to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ["GAAP']"*; and (iv) "*disclosed any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting*."

344.    NYCB's 2022 Form 10-K also attested that NYCB's management had assessed and concluded that NYCB's internal control over financial reporting was effective, stating:

> As of December 31, 2022, management assessed the effectiveness of the Company's internal control over financial reporting based upon the framework established in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based upon its assessment, *management concluded that the Company's internal*

*control over financial reporting as of December 31, 2022 was effective using this criteria.*

345.     The Exchange Act Defendants' statements identified in ¶¶341-344 were materially false, misleading, and omitted material facts because contrary to Defendants' representation that "***the Company's disclosure controls and procedures were effective***," in reality, "the Company did ***not*** maintain effective internal control over financial reporting."   Cangemi's and Pinto's certifications that they had designed disclosure controls and procedures "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities" and "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles [GAAP]" were directly contradicted by the Company's admissions that NYCB's internal controls suffered from four material weaknesses that "create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis."

346.     Further, contrary to the Sarbanes-Oxley Certifications, NYCB's financial statements that were the subject of the Sarbanes-Oxley Certifications violated GAAP and misrepresented NYCB's true financial condition, including because (a) NYCB "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" (b) NYCB lacked "leadership resources to conduct effective risk assessment and monitoring activities;" (c) NYCB lacked "effective" "recurring monitoring activities over process level control activities, including internal loan review;" and (d) NYCB's internal loan review processes operated without an appropriate risk management "framework to

ensure that ratings were consistently accurate, timely, and appropriately challenged," which meant that the Company lacked the "ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases."

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

347.    The Exchange Act Defendants acted with scienter in that they knew, or recklessly disregarded, that the public statements set forth in Section V, *supra,* were materially false and misleading when made, and knowingly, or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In conjunction with, and in addition to, the facts set forth above, the Exchange Act Defendants' scienter is evidenced by the following facts.  The cumulative knowledge regarding the matters addressed herein of all members of the Company's senior management team, including the Officer Defendants, is properly imputed to NYCB.

348.    ***First***, throughout the Class Period, the Officer Defendants repeated materially false representations concerning: (a) management and board oversight of credit risk and loan portfolio (*e.g.*, ¶¶236, 246, 249, 301, 331-32, 334-37); (b) the strength of their risk management of the loan portfolio (*e.g.*, ¶¶241-42, 245, 267, 304); and (c) Defendants' monitoring of the market conditions impacting NYCB's loan portfolio, including changes in rent regulations, rising interest rates, and post-COVID office vacancies (*e.g.*, ¶¶259-60, 269, 280, 283, 285, 292, 319).  These statements are directly contradicted by the NYCB's own admissions at the end of the Class Period and thereafter.

349.    During the Class Period, Defendant Cangemi told investors that "***[w]e continue to be laser focused on credit quality across all lending verticals***[,]" and "***we have a very strong portfolio***" that "***we monitor [] carefully***."  Management's oversight of NYCB's loan portfolio was

touted throughout the Class Period, and in March 2023, Defendant Cangemi reiterated that NYCB "*remained focused on [its] fundamentals including asset quality*."  With respect to NYCB's risk management framework, the Exchange Act Defendants stated that NYCB had already "*developed a comprehensive risk framework*" and "*built a very strong risk management team, and we strengthened it every day*[.]"  In fact, in response to an analyst question about the Signature transaction, Defendant Cangemi acknowledged risk management was his "priority," stating: "*there's no question that['s] my priority as CEO*[.]" The Exchange Act Defendants further dispelled any concern about market conditions impacting the asset quality of the loan portfolio, assuring investors that NYCB was insulated from many challenges experienced by other banks. For example, NYCB's Q2 2022 Investor Presentation assured investors that 2019 rent regulation legislation was not a threat to NYCB's loan portfolio, stating: "*Our Multi-Family Portfolio is Well Insulated Against Recent Changes in the Rent Regulation Laws*."  On the Company's Q2 2023 Earnings Call, Defendant Cangemi further stated that NYCB's portfolio was "resilient[,]" and that "*we're very pleased with the asset quality given the ramp-up of interest rates*[,]" confirming that rising interest rates were not putting undue or unmanageable stress on the asset quality of NYCB's multi-family loans.  As late as October 2023, Defendant Adams addressed analyst concerns regarding the multi-family market and confirmed that the Bank was "*monitoring the rent-regulated properties closely, but there's not really a lot of cracks in that particular portfolio that is really raising anything for us to have any real concern right at this time*." Defendant Cangemi similarly shrugged off analyst concerns about high interest rates increasing repricing risk in the CRE market, stating, "*despite the negativity you're reading about, our portfolio is performing extremely well relevant to the marketplace*."

350.     Despite these assurances, on February 29, 2024, NYCB *admitted* that the Company had "material weaknesses" in "internal controls related to internal loan review, resulting from ineffective oversight, risk assessment and monitoring activities[,]" delayed the filing of the Company's Form 10-K, and wrote off an incredible 100% of its $2.4 billion in Goodwill.  *See* Sections IV.G.3-IV.H.4.  Following this admission, new CEO Otting expanded on the admissions of material weaknesses, stating that NYCB needed to "clean up [its] house and get it in order[,]" and acknowledged that "[w]e have a lot of work to do in this organization to put that risk structure in place."  During the same call, NYCB's new CFO Gifford explained that "there wasn't as much visibility to the developing situation" in the office and multi-family markets, the Company's "internal infrastructure still has a lot of improvement to go," and "we have a ways to go. . . . [but] we've done a lot of work to make up for some of the previous deficiencies."  These statements stood in stark contrast to the Exchange Act Defendants' Class Period statements about NYCB's asset quality, management oversight of the Company's credit risk and loan portfolio, and the impact of market stressors on NYCB's loan portfolio—strengthening the inference of scienter.

351.     *Second*, Defendants repeatedly spoke to investors and analysts prior to and throughout the Class Period regarding NYCB's highly concentrated CRE portfolio asset quality, touting the low PCL and ACL needed to protect against expected losses.  These communications with the investing public not only reflected that the Exchange Act Defendants were hands-on managers with specific knowledge of (or direct access to) data and facts regarding the Company's business, but consistently focused market attention on NYCB's asset quality and low reserves against losses.  For example, every quarter throughout the Class Period, the Exchange Act Defendants touted NYCB's asset quality as "*stellar*," "*strong*," "*superb*," and "*among the best in the industry*."  Further, Defendant Cangemi acknowledged that asset quality was one of the

Company's "*fundamentals*" and a "*hallmark*" of NYCB's business.   NYCB's investor presentations repeatedly represented that NYCB's "*asset quality in any credit cycle has consistently been better than our industry peers*" (additional emphasis in original).

352.   The Exchange Act Defendants similarly touted NYCB's risk management framework throughout the Class Period.   For example, NYCB's 2022 Form 10-K stated that NYCB's Board, of which Defendants Cangemi and DiNello were members with each serving as Chairman of the Board for portions of the Class Period, was "*actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department*."   Further, on March 20, 2023, Defendant Cangemi stated he was "*confident that we built a very strong risk management team and we strengthen it every day*[.]"   On April 28, 2023, Defendant Cangemi stated that "*risk management is #1 focus*," and that NYCB has "*been working on [risk management] for quite some time*[.]"   Moreover, before the Class Period even began, Defendant Cangemi explained that he had dedicated significant time and effort toward NYCB's risk management, stating that "*we spent a lot of time getting comfortable on the risk management side . . . [a]nd I think that's something that we've got [] good arms around it*."

353.   *Third*, former NYCB employees have confirmed that during the Class Period, the Exchange Act Defendants were aware of the operational challenges faced by the Company prior to and throughout the Class Period.

354.   For example, leading up to and during the Class Period, CW-1 produced a "Board Report" for then-President of Commercial Real Estate Finance, Defendant Adams.   CW-1's Board Report contained high-level information about all of the Company's loans.    This report was presented by Adams to NYCB's Board of Directors (which included Defendants Cangemi and DiNello) at their monthly meetings on every third Thursday of each month.   According to CW-1,

the Board Report detailed the "delta" (*i.e.*, changes) for the loan report.  CW-1 then explained that the Board Reports were "very high level," but the "data dumps" that she used to compile these reports included the "nitty gritty" details of the entire loan portfolio.  CW-1 added that Adams did not want a "negative light shown on his world [the area of NYCB that he was responsible for]." Regarding issues with NYCB's deteriorating loan portfolio, CW-1 stated that "he [Adams] knew, he had to" based on the specific questions that he asked about the loan portfolio.

355.    Similarly, CW-3 worked on an "Issue Management Report," which summarized risk management issues at the Company.  CW-3 explained this Issue Management Report contained numerous slides and covered all "risk stripes" across the Bank, including credit risk, noting that some of the risk management issues included in the report were labeled "past due" and "critical."  CW-3 was surprised that this type of thorough report did not previously exist at NYCB. CW-3 stated that the final version of the Issue Management Report was sent to Defendant Cangemi and other senior NYCB officials shortly before CW-3's departure.

356.    Defendant Adams, in his role as Head of Commercial Real Estate Finance and previously as Director of Indirect Multi-Family Lending and Chief Lending Officer, had direct oversight over NYCB's loan portfolio and, specifically, NYCB's relationship with Meridian, the now-troubled loan broker that originated and maintained relationships with the borrowers of up to 80% of NYCB's loans.  CW-6 explained that any time Meridian wanted a deal pushed through, there were direct conversations between current Executive Vice President at Meridian Capital Group Avi Weinstock and Head of Commercial Real Estate Adams.  According to CW-6, if NYCB gave any pushback to Meridian brokers that they went directly to Weinstock, who then spoke directly with Adams.  CW-6 explained that Adams was leading the relationship with Weinstock from the NYCB side.

357.    *Fourth*, as explained in Section IV.H.3, the Exchange Act Defendants were aware of the FDIC's concerns regarding NYCB's lending practices in connection with the Bank's merger application for Flagstar Bank, and that those concerns fueled the FDIC's thwarted disapproval of the Flagstar Merger.  With this knowledge, the Exchange Act Defendants engaged in "regulatory arbitrage" to evade the FDIC's rejection and push the Flagstar Merger through by converting the Bank into a nationally chartered bank, subjecting it to approval and oversight by the OCC.

358.    Although this strategy was successful in obtaining regulatory approval for the Flagstar Merger, the Exchange Act Defendants knew or should have known that the Merger would subject the Bank to increased scrutiny from a new regulator that was historically strict with banks with high levels of CRE concentration, especially in light of the significant risk associated with those loans at the time.  Defendant Cangemi admitted as much on the March 20, 2023 call to discuss the Signature Transaction, where he stated: "***We know what our obligations are as a large institution***" and "***[w]e're going to ensure that we have all of the appropriate risk management tools to be a $100 billion bank***."

359.    Nonetheless, the Exchange Act Defendants recklessly took on the increased scrutiny that came with OCC oversight in order to push through the Flagstar Merger.  Moreover, as a condition of the OCC approval for the Flagstar Merger, and the later Signature Transaction, Defendants jeopardized the Bank's ability to issue shareholder dividends, an unusual concession.

360.    *Fifth*, the fact that NYCB purged its executive management within weeks of the corrective disclosures, forcing out NYCB's highest ranking officers, including Defendants Cangemi, Pinto, and Adams, as well as the vast majority of NYCB's Board of Directors— including the Chairmen of the Board's Risk Assessment Committee, Credit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Audit

Committee—adds to the overall inference of scienter, especially when, as here, those departures were highly unusual and directly tied to the Company's admitted risk management and loan review failures. Moreover, Defendant DiNello, who was appointed CEO on February 29, 2024, lasted in that position for only one week before being replaced. Such remedial measures further support a strong inference of scienter. This type of "house-cleaning" does not typically follow innocent instances of mismanagement. Indeed, NYCB's new management admitted that the removal of these executives was a responsive effort to hold those responsible for the material weaknesses "accountable" when, on June 24, 2024, new CEO Otting admitted that the departures of "most of the executive management" and the "majority of the board" were part of an effort "of holding people accountable" "for material weaknesses and other items associated with the company."

361.    **Sixth**, NYCB's asset quality and risk management framework were critical to its business such that it is reasonable to infer that the Exchange Act Defendants would be aware of the mounting problems with the Company's deteriorating asset quality and ineffective internal controls. The Exchange Act Defendants knew that sound risk management practices were essential to NYCB's operations, as they acknowledged repeatedly throughout the Class Period. Risk management is essential for banks as they face a wide range of risks, such as credit risk, market risk, operational risk, and reputational risk. Effective risk management, as NYCB acknowledged in SEC filings and in reports to investors, is crucial for banks to identify, assess, and mitigate these risks. The importance of risk management to NYCB is evident by regulatory scrutiny surrounding risk management (*see* Section IV.C); the committees the Company set in place to manage risks, which included NYCB's most senior personnel (*see* Section IV.H.2); and the Exchange Act Defendants' many statements emphasizing the need to employ "sound" risk management practices. Specifically, Defendant Cangemi stated "risk management is [NYCB's]

"#1 focus" and management's "#1 priority." In fact, Defendant Cangemi acknowledged risk management was his "priority as CEO" and stated "[t]hat's our job[,] to be risk managers."

362.    Further, the Exchange Act Defendants recognized the need for NYCB to "employ heightened risk management practices that address elements, including board and management oversight and strategic planning, portfolio management, development of underwriting standards, risk assessment and monitoring through market analysis and stress testing, and maintenance of increased capital levels as needed to support the level of CRE lending" given the Company's abnormally high concentration in CRE.

363.    As discussed herein, NYCB's asset and loan quality was critical to the Company's operations and success. For example, during the Company's earnings call for first quarter earnings results for fiscal year 2022 on April 27, 2022 ("Q1 2022 Earnings Call"), Defendant Cangemi discussed the importance of monitoring NYCB's multi-family and non-residential CRE portfolio, a large portion of which was subject to repricing risk, stating that "[i]t is very important to note that we have approximately $8 billion of multi-family and CRE loans that come up on their contractual maturity date or option repricing date over the next 2 years. So borrowers have to act within that timeframe."

364.    Moreover, the Exchange Act Defendants themselves acknowledged the importance of strong credit quality and conservative underwriting standards. For example, during a March 20, 2023 call discussing the Signature Transaction, CEO Cangemi emphasized that the Company's "investment made on the risk management, regulatory oversight" component was his "*priority*," stating: "[t]his is important." Further, on April 28, 2023, Cangemi reiterated the importance of risk management on NYCB's Q1 2023 Earnings Call, stating "***the most important aspect of this company going forward is handling risk***."

365.    That the Exchange Act Defendants' false and misleading statements concerned a fundamental aspect of its business further strengthens the inference of scienter.

366.    ***Seventh***, the temporal proximity between the Exchange Act Defendants' false and misleading statements and omissions and the revelation of the relevant truth concealed by those statements and omissions further strengthens the scienter inference.  On July 27, 2023, during NYCB's Q2 2023 Earnings Call, Defendant Cangemi stated that "right before the Flagstar transaction, ***we were prepared to be a $100 billion bank, under the new rules. . . . clearly, we're prepared for it***."  Likewise, on October 26, 2023, during NYCB's Q3 2023 Earnings Call, Defendant Cangemi touted the Company's "conservative" underwriting and "strong" asset quality metrics, stating that "***[d]espite [an] increase in NPLs, our asset quality metrics remained strong*** and ***"continue to rank among the best relative to the industry and our peers.  These strong metrics reflect our conservative underwriting standards***. . . ."  Further, for every quarter during the Class Period, the Exchange Act Defendants represented that there were no changes in NYCB's internal controls and that the Company's "current disclosure controls and procedures were effective" to ensure accurate reporting of required information.  The Exchange Act Defendants attested to the effectiveness of NYCB's internal controls and disclosure controls and procedures on November 9, 2023 in its Q3 2023 Form 10-Q.

367.    Notwithstanding these representations, only three months later, the Company reported a dramatic deterioration in its CRE assets, reporting an 800% increase in its PCL and slashing its dividend by 71% in an attempt to preserve capital to cover additional losses.  After a string of additional bad news hit the market, including the downgrade of NYCB debt to junk, news of "mounting pressure" from the OCC leading to the reserves and capital preservation steps, the demotion of Defendant Cangemi, revelations concerning the regulatory arbitrage NYCB engaged

in to win approval of the Flagstar Merger, and surprising revelations that NYCB had secretly removed its Chief Risk Officer and Lead Audit Executive, the Company finally admitted, on February 29, 2024, that it lacked the foundational internal controls required to perform NYCB's "internal loan review, [which] result[ed] from ineffective oversight, risk assessment and monitoring activities."

368.    The proximity of the Exchange Act Defendants' statements and the disclosures between January 31, 2024 and February 29, 2024 support a strong inference of scienter.

369.    **Eighth**, the Officer Defendants' knowledge of the Bank's failing risk management function and faltering asset quality is evident from their roles overseeing NYCB's loan review and risk management functions. Defendant Cangemi served as CEO, a member of the Board, and a member of the Credit Committee. As both CEO and as a member of the Credit Committee, Cangemi was tasked with important risk oversight functions and the authority to oversee the administration and implementation of loan policies, credit management policies and procedures, lending activities, the risks associated with loans approved by management, and the delegation of credit authority. Cangemi attended most, if not all, of the Credit Committee meetings that occurred 26 times in 2022—12 regular monthly meetings and 14 special meetings—and 13 times in 2023.

370.    Further, while the Board of Directors as a whole was responsible for risk management oversight, "management is responsible for the day-to-day management of the risks faced by the Company." As explained in NYCB's 2023 Proxy Statement, "[a]s part of [NYCB's] risk oversight processes, [the] Chief Risk Officer reports to the Risk Assessment Committee; the Chairman of the Board's Risk Assessment Committee meets regularly with management to discuss the risks facing the Company and strategies to address these risks; and senior members of management attend Board meetings and are available to address questions or concerns raised by

the Board on risk management and other matters."  Management specifically includes Defendants Cangemi, Pinto, and Adams (NYCB's Chief Lending Officer and later, President of CRE Finance), who were the only three legacy NYCB "named executive officers" (per NYCB's Proxy Statement) during the Class Period.

371.   **Ninth**, Defendants Cangemi and Pinto personally affirmed NYCB's internal controls over financial reporting throughout the Class Period.  In NYCB's 2022 Annual Report on Form 10-K, Defendants Cangemi and Pinto represented that they had: (i) evaluated the "effectiveness of [NYCB's]'s disclosure controls and procedures;" (ii) designed or caused to be designed "disclosure controls and procedures" to "ensure" that material information about NYCB was made known to them; (iii) designed or caused to be designed "internal control over financial reporting" to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ["GAAP"];" and (iv) "disclosed . . . any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting." These representations, pursuant to which Defendants Cangemi and Pinto held themselves out as knowledgeable about and responsible for NYCB's internal controls and financial reporting, further supports a strong inference of scienter.

372.   **Tenth**, a significant portion of Defendants Cangemi's, Pinto's, and Adams' compensation was directly tied to their ability to maximize NYCB's 2022 and 2023 financial results.  In 2022, 78% of Defendant Cangemi's total compensation was at-risk and directly linked to NYCB's performance, as was 67% of Defendants Pinto's and Adams' total compensation (on

average).[63]   Likewise, in 2023, 80% of Cangemi's total compensation was at-risk and directly

linked to NYCB's performance, as was 69% of Pinto's and Adams' total compensation (on

average).[64]   However, on April 26, 2024, as reported in NYCB's 2024 Proxy Statement and Notice

of Annual Meeting of Shareholders on Form DEF 14A ("2024 Proxy Statement"), NYCB's newly-

composed Compensation Committee determined that no incentive payments would be made to

Defendants Cangemi, Pinto, or Adams.   The Compensation Committee's decision was tied to the

fact that not only had NYCB "failed to achieve the threshold performance level of $1.13 per share,"

but also because "any positive achievements . . .  were overshadowed by a significant number of

negative factors, *including the serious risk management issues that emerged in the 4th quarter*

*of 2023 and the adverse impact of the 4th quarter and full-year results on shareholder value*."[65]

This decision significantly impacted these Defendants' compensation, reducing Cangemi's cash

compensation 42% from 2022, reducing Pinto's compensation 50% from 2022, and reducing

Adams' compensation 56% from 2022.

373.    In addition, as reported in the 2024 Proxy Statement, NYCB "adopted a robust

clawback policy under NYSE rules to provide that the Company can recover incentive

compensation erroneously paid on the basis of misstated financial results," signaling the potential

for clawbacks of these Defendants' past compensation in the future.

374.    *Eleventh*, the magnitude of Defendants' alleged fraud and the fact that it involved

the core operations of NYCB's business—its $80 billion loan portfolio—also support a strong

---

[63] NYCB 2023 Proxy Statement at 31-45.

[64] NYCB 2024 Proxy Statement at 45-46.

[65] The Company noted in the 2024 Proxy Statement that Defendant Cangemi relinquished his rights to incentive compensation by virtue of his February 23, 2024 resignation.  Defendants Pinto and Cangemi, who had been removed from their positions, had not relinquished the right to the compensation, if it had been awarded.

inference of scienter.  Defendants masked the startling deterioration of the CRE loan portfolio, which allowed NYCB to report better-than-market loan performance and expected losses until January 31, 2024, when NYCB announced a net income loss of $252 million due to a $552 million provision for loan losses—up 800% from the prior quarter.  The Company further disclosed $185 million in net charge-offs in stark contrast to a mere $19 million in the prior seven quarters. NYCB's ACL was $992 million for the quarter, up $373 million from the previous quarter, which the Company stated was to address the precise nature of their misstatements and omissions, namely to "build reserves during the quarter to address weaknesses in the office sector, potential repricing risk in the multi-family portfolio and an increase in classified assets."  These disclosures brought the bank to the brink of collapse—forcing NYCB to slash its historically high dividend and sending its stock price plummeting to its worst one-day drop on record.

## VII.   LOSS CAUSATION

375.   Throughout the Class Period, as detailed herein, the Exchange Act Defendants made false and misleading statements and omissions.  These false and misleading statements and omissions created a misleadingly positive view of the investment value of NYCB's common stock throughout the Class Period and artificially inflated and/or artificially maintained the price of NYCB's common stock.

376.   Class members unknowingly and in reliance upon the Exchange Act Defendants' materially false or misleading statements and/or omissions purchased or otherwise acquired NYCB common stock at the artificially inflated prices at which it traded during the Class Period.

377.   The relevant truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between January 31, 2024 and February 29, 2024.  As detailed above in Section IV.G, the declines in NYCB's common stock price on January 31 – February 1, 2024, February 6, 2024, February 23, 2024, and March 1

and March 4, 2024, were a direct and foreseeable result of the nature and extent of the Exchange Act Defendants' prior misstatements and omissions being disclosed to investors on January 31, 2024 (both before the market opened and after the market closed), February 5, 2024 (after the market closed), February 22, 2024 (shortly before the market closed), and February 29, 2024 (after the market closed).

378.    During this period, NYCB's stock price fell precipitously as the artificial inflation caused by the Exchange Act Defendants' unlawful conduct exited NYCB's stock price.  It was not until the final partial corrective disclosure and/or materialization of concealed risk on February 29, 2024, that the full truth was known to the market, such that there was no longer any artificial inflation in NYCB's stock price attributable to the fraud.

379.    The declines in NYCB's stock price during this period are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

380.    The timing and magnitude of NYCB's stock price declines evidence the impact that the Exchange Act Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to the Exchange Act Defendants' fraudulent conduct.

381.    The below chart demonstrates that NYCB's stock price outperformed the S&P U.S. BMI Bank Index—an index that compares the Bank to its peers—throughout the Class Period as a result of the Exchange Act Defendants' misstatements and dropped significantly in comparison to this index after the market absorbed information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions:

161



382.    As a result of their purchases of NYCB common stock at artificially inflated and/or artificially maintained levels during the Class Period, and the subsequent declines in NYCB's common stock price as the truth was revealed, Plaintiffs and Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.   PRESUMPTION OF RELIANCE

383.    To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    NYCB's common stock traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of NYCB's common stock;

(e)     Plaintiffs and other members of the Class purchased NYCB common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)     NYCB common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)     as a regulated issuer, NYCB filed periodic public reports with the SEC and the NYSE;

(h)     NYCB regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(i)     NYCB was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to those brokerage firms' sales force and certain customers and that were publicly available and entered the public marketplace; and

(j)     unexpected material news about NYCB was reflected in and incorporated into the Company's stock price during the Class Period.

384.    As a result of the foregoing, the market for NYCB common stock promptly digested current information regarding NYCB from publicly available sources and reflected such information in the price of NYCB common stock.  All persons and entities who or which purchased or otherwise acquired NYCB common stock during the Class Period suffered similar injuries through their purchase of NYCB common stock at artificially inflated prices, and thus, the presumption of reliance applies.

385.    A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

386.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

387.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

388.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the statement was authorized or approved by an executive officer of NYCB who knew that the statement was false when made, and/or the statement omitted material adverse information whose disclosure was necessary to render the statement not misleading.

389.    None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by NYCB and the Exchange Act Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

X.     **CONTROL PERSON ALLEGATIONS**

390.    The Officer Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, including its business, operations, internal controls, and financial statements.  The Officer Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omission therefrom, and were aware of their materially false and misleading nature.

391.    The Officer Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements issued by or on behalf of NYCB during the Class Period.  The Officer Defendants were provided copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Officer Defendants are responsible for the accuracy of the public statements detailed herein.

392.    The Officer Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about NYCB's

business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

393.    As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Officer Defendants each had a duty to promptly disseminate accurate and truthful information with respect to NYCB's operations and business, and to correct any previously-issued statements that were or had become materially misleading or untrue, so that the market price of NYCB common stock would be based upon truthful and accurate information. The Officer Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

394.    The Officer Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired NYCB common stock during the Class Period, by disseminating materially false and misleading statements and omitting material adverse facts.  The scheme deceived the investing public regarding NYCB's business, operations, and management, and the intrinsic value of NYCB's common stock, and caused Plaintiffs and members of the Class to purchase NYCB common stock at artificially inflated prices.

395.    In making the statements complained of herein, the Officer Defendants, who were senior officers and controlling persons of NYCB, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by the Officer Defendants is attributable to the Company.

XI.     **CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against the Exchange Act Defendants**

396.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

397.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and the Class, against the Exchange Act Defendants.

398.    During the Class Period, Defendant NYCB and the Officer Defendants disseminated or approved the materially false or misleading statements alleged herein, among others, which they knew or recklessly disregarded were misleading in that they misrepresented and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

399.    Defendant NYCB and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of NYCB common stock during the Class Period.  Defendant NYCB and the Officer Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

400.    During the Class Period, Defendant NYCB and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of

conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made materially false statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase or sale of NYCB common stock, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the other Class members; (b) artificially inflate and maintain the market price of NYCB common stock; and (c) caused Plaintiffs and other members of the Class to purchase NYCB common stock at artificially inflated prices and to suffer losses when the true facts became known.

401.    Defendant NYCB is liable for all materially false or misleading statements made during the Class Period, as alleged above.

402.    The Officer Defendants are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

403.    As alleged above, the Exchange Act Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth.  The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers and sellers of NYCB common stock, were either known to the Exchange Act Defendants or were so obvious that the Defendants should have been aware of them.

404.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at NYCB, establish a strong inference that the Exchange Act Defendants acted with scienter in making the materially false or misleading statements alleged above during the Class Period.

405.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased NYCB common stock and were harmed when the truth about NYCB negatively impacted the price of those securities.   Plaintiffs and the Class would not have purchased NYCB common stock at the prices they paid, or at all, had they been aware of the truth about NYCB.

406.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered harm in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Officer Defendants

407.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

408.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Plaintiffs and the Class, against each of the Officer Defendants.

409.    As set forth above, each of the Officer Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.   The Officer Defendants acted as controlling persons of NYCB within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above.   The Officer Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading.   The Officer Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these

statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

410.   In particular, the Officer Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about NYCB and the actions of NYCB and its employees.   Moreover, the Officer Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by NYCB during the Class Period.   As a result of the foregoing, the Officer Defendants each were controlling persons of NYCB within the meaning of Section 20(a) of the Exchange Act.

411.   As alleged above, NYCB violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons of NYCB and as a result of their own aforementioned conduct, the Officer Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired NYCB common stock.   Moreover, as alleged above, during the respective times that the Officer Defendants served as officers and/or directors of NYCB, or in the case of Defendant DiNello, prior to the Flagstar Merger, spoke directly to NYCB investors during analyst conference calls and by signing the joint Offering Materials in connection with the Flagstar Merger as an incoming Non-Executive Chairman of the Company's Board of Directors, each of the Officer Defendants culpably participated in the material misstatements and omissions made by NYCB, as set forth above.

412.   As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of NYCB common stock during the Class Period.

## XII.   CLAIMS UNDER THE SECURITIES ACT OF 1933

413.   In this section of the Complaint, the Securities Act Plaintiff asserts a series of strict liability and negligence claims based on violations of the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who acquired NYCB common stock in exchange for Flagstar securities pursuant to the effective amended S-4 registration statement, 424B3 prospectus, and materials incorporated therein (collectively, the "Offering Documents," defined further below) issued in connection with the December 2022 transaction through which NYCB acquired and merged with Flagstar (the "Flagstar Merger" or the "Offering"), and were damaged thereby.

414.   The Securities Act Plaintiff expressly disclaims any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded independently in this Complaint from Plaintiffs' Exchange Act claims.  This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the Offering.

415.   Sections 11 and 12(a)(2) of the Securities Act create liability against each of the Securities Act Defendants (defined below) for each (i) misstatement, (ii) omission in contravention of an affirmative legal disclosure obligation, and (iii) omission of information that is necessary to prevent existing disclosures from being misleading, in the Offering Documents. *See* 15 U.S.C. § 77k.  Specifically, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements

therein not misleading." 15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(1-5).

416.   Pursuant to SEC Regulation C, the Offering Documents were required to disclose material information necessary to ensure that representations in the Registration Statement were not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

417.   Separately, NYCB and the other Securities Act Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303 and the SEC's related interpretive releases thereto, imposes on issuers an affirmative obligation to disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause the issuer's financial information not to be indicative of future operating results. Section 11(a) of the Securities Act imposes liability for pure omissions of information required to be disclosed by Item 303.

418.   Moreover, NYCB and the Securities Act Defendants were also separately required to comply with Item 105 (formerly 503) of Regulation S-K, 17 C.F.R. § 229.105. Specifically,

Item 105 required that the Offering Documents furnish, among other things, a discussion of the most significant factors that made the Merger speculative or risky.

A.      **The Securities Act Parties**

419.    Securities Act Plaintiff Indiana is described above at ¶22.

420.    In addition to Defendant NYCB, (described above at ¶23), each of the following Defendants were signatories of the Offering Documents that contained materially untrue and misleading statements and omitted material facts, and each is statutorily liable under the Securities Act for the materially untrue statements or omissions contained in and incorporated in the Offering Documents.

421.    Defendant Thomas R. Cangemi ("Cangemi") served as President and CEO of NYCB from December 31, 2020 until February 23, 2024, when he resigned effective immediately. When he was appointed CEO in December 2020, Cangemi was also appointed as member of NYCB's Board of Directors ("Board") and served as Chairman of the Board from March 26, 2021 to November 30, 2022.  Cangemi resigned as a member of NYCB's Board on March 11, 2024. Cangemi first joined NYCB on July 31, 2001, and from April 5, 2005 through December 30, 2020, served as the Company's Senior Executive Vice President and CFO.  Defendant Cangemi reviewed, contributed to, and signed the Offering Documents.

422.    Defendant John J. Pinto ("Pinto") served as NYCB's CFO from December 31, 2020, and Senior Executive Vice President from February 5, 2021, until he ceased serving in those roles on or about April 12, 2024.  After joining NYCB on July 31, 2001, Pinto served as Executive Vice President and Chief Accounting Officer of the Company from April 5, 2005 until he was promoted to CFO.  Defendant Pinto reviewed, contributed to, and signed the Offering Documents.

423.    Defendant Alessandro P. DiNello ("DiNello") was President and CEO of Flagstar prior to the Merger.  DiNello joined NYCB's Board of Directors as a Non-Executive Chairman in

connection with the Flagstar Merger.  DiNello signed a "Consent of Prospective Director" pursuant to Rule 438 of the Securities Act in which he consented to being named in the Registration Statement as a prospective director.  He reviewed, contributed to, and signed the Offering Documents, and he was named in the Registration Statement as the incoming Non-Executive Chairman of the NYCB Board of Directors.

424.    Defendant Robert Wann ("Wann") was Senior Executive Vice President, Chief Operating Officer ("COO") until his retirement from that position at the end of 2022, and was a member of NYCB's Board of Directors since at least December 2007 until his retirement, effective March 11, 2024.  Defendant Wann reviewed, contributed to, and signed the Offering Documents.

425.    Defendant David Treadwell ("Treadwell") was a Director of Flagstar prior to the Merger.  Treadwell joined NYCB's Board of Directors as the Chairman of the Risk Assessment Committee in connection with the Flagstar Merger.  Treadwell signed a "Consent of Prospective Director" pursuant to Rule 438 of the Securities Act in which he consented to being named in the Registration Statement as a prospective director.  He reviewed and contributed to the Offering Documents and was named in the Registration Statement as an incoming Director at NYCB and incoming Chairman of the Bank's Risk Assessment Committee.

426.    Defendant Dominick Ciampa ("Ciampa") was a Director of NYCB since 1995. Leading up to the Flagstar Merger, Ciampa served as a member of NYCB's Audit Committee, Nominating and Corporate Governance Committee, and Risk Assessment Committee.  Defendant Ciampa left the Board in connection with the Merger.  Defendant Ciampa reviewed, contributed to, and signed the Offering Documents.

427.    Defendant Hanif W. Dahya ("Dahya") was a Director of NYCB from March 2007 until he resigned in February 2024.  Leading up to the Flagstar Merger, Dahya served as Chairman

of NYCB's Compensation Committee and as a member of the Audit Committee, Nominating and Corporate Governance Committee, and Risk Assessment Committee.  At that time, Dahya was designated as a Risk Committee Expert, pursuant to the Dodd-Frank Act.  Defendant Dahya reviewed, contributed to, and signed the Offering Documents.

428.    Defendant Leslie D. Dunn ("Dunn") was a Director of NYCB from 2015 until her resignation, effective March 11, 2024.  Leading up to the Flagstar Merger, Dunn served as Chairwoman of NYCB's Nominating and Corporate Governance Committee and as a member of the Audit Committee, Compensation Committee, and Risk Assessment Committee.  Defendant Dunn reviewed, contributed to, and signed the Offering Documents.

429.    Defendant Marshall J. Lux ("Lux") was a Director of NYCB from February 2022. Leading up to the Flagstar Merger, Lux served as a member of NYCB's Audit Committee and Risk Assessment Committee.  Defendant Lux reviewed, contributed to, and signed the Offering Documents.

430.    Defendant James J. O'Donovan ("O'Donovan") was a Director of NYCB since 2003.  Leading up to the Flagstar Merger, O'Donovan served as the Chairman of NYCB's Credit Committee.  Defendant O'Donovan left the Board in connection with the Merger. Defendant O'Donovan reviewed, contributed to, and signed the Offering Documents.

431.    Defendant Lawrence Rosano, Jr. ("Rosano") was a Director of NYCB from July 2014 until his resignation, effective March 11, 2024.  Leading up to the Flagstar Merger, Rosano served as the Chairman of NYCB's Risk Assessment Committee and as a member of the Compensation Committee, Nominating and Corporate Governance Committee, and Credit Committee.  Defendant Rosano reviewed, contributed to, and signed the Offering Documents.

432.    Defendant Ronald A. Rosenfeld ("Rosenfeld") was a Director of NYCB from January 2012 until he resigned, effective March 11, 2024.  Leading up to the Flagstar Merger, Rosenfeld served as a member of NYCB's Audit Committee, Nominating and Corporate Governance Committee, and Risk Assessment Committee.  Defendant Rosenfeld reviewed, contributed to, and signed the Offering Documents.

433.    Defendant Lawrence J. Savarese ("Savarese") was a Director of NYCB from March 2013 until his resignation, effective March 11, 2024.  Leading up to the Flagstar Merger, Savarese served as Chairman of NYCB's Audit Committee and as a member of the Compensation Committee, Nominating and Corporate Governance Committee, Risk Assessment Committee, and Credit Committee.  At that time, Savarese was designated as an Audit Committee Financial Expert under relevant SEC rules and a Risk Committee Expert pursuant to the Dodd-Frank Act. Defendant Savarese reviewed, contributed to, and signed the Offering Documents.

434.    The individuals described in ¶¶421-433 are collectively referred to herein as the "Signer Defendants."  NYCB and the Signer Defendants are collectively referred herein to as the "Securities Act Defendants."  Each of the Signer Defendants participated in the preparation of the Registration Statement and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein.  The Signer Defendants signed the Registration Statement, participated in the Offering, and solicited the exchange of Flagstar shares for NYCB common stock issued pursuant to the Registration Statement to serve their financial interests and those of NYCB.  The Signer Defendants, in their capacity as senior executives and/or directors of NYCB reviewed, edited, and approved the Registration Statement.

435.    Further, as members of NYCB's Risk Assessment Committee, Defendants Ciampa, Dahya, Dunn, Lux, Rosano, Rosenfeld, and Savarese were tasked with assisting the Board in

fulfilling its responsibilities "with respect to oversight of the Company's risk management program[.]"  The Bank's Risk Assessment Committee was responsible for, *inter alia*, oversight of risk management activities through "active and frequent engagement" and for "designing, implementing, and maintaining an effective risk management program."

436.   The Signer Defendants failed to conduct a reasonable investigation of the statements contained in the Offering Documents and documents incorporated therein by reference, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.  Had these Signer Defendants conducted a reasonable investigation, they would have known that the Offering Documents contained material misstatements and omissions concerning NYCB and (a) the FDIC's disapproval of the Flagstar Merger and NYCB's decision to switch regulators before that approval was made public; (b) the Company's materially deficient risk management practices with respect to managing and reporting credit losses in its CRE portfolio; (c) the Company's materially deficient internal loan review processes and related inability to properly risk rate its CRE portfolio loans, identify problem loans, and recognize adequate levels of ACL and PCL, in violation of GAAP; and (d) the Company's materially deficient processes that prevented NYCB from responding to emerging risks in the CRE market, including specifically changes in rent regulation laws, post-pandemic office vacancies, and the impact of a series of interest rate hikes.  These Signer Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's misstatements and omissions notwithstanding numerous "red flags," including the unexpected amendment to the Merger Agreement to avoid FDIC rejection of the Merger Agreement, rising negative trends in the CRE market, including changes to the New York rent regulation laws, post-pandemic office vacancies, and a series of interest rate hikes, and the

Company's—and the Board's—now admitted material weaknesses in risk management and internal loan review processes.

### B.     The Flagstar Merger Offering Documents

437.     Prior to the Flagstar Merger, Defendant NYCB was the holding company of New York Community Bank, and Flagstar was the holding company for Flagstar Bank, FSB.  Following the Flagstar Merger, NYCB was the holding company for the merged Flagstar Bank, N.A.

438.     On April 26, 2021, NYCB and Flagstar announced a merger of the two companies approved by each company's respective Boards of Directors (the "Flagstar Merger").   In connection with the Flagstar Merger, Flagstar shareholders were to receive 4.0151 shares of NYCB common stock for each Flagstar share.  Immediately following the transaction, NYCB shares held by NYCB's legacy shareholders would constitute 68% of the combined company and NYCB shares issued to former Flagstar shareholders would constitute 32% of the combined company. The completion of the Flagstar Merger was conditioned upon the approval of NYCB's regulators: the Federal Reserve, the FDIC, and the NYDFS.

439.     On June 11, 2021, NYCB filed with the SEC a preliminary registration statement on Form S-4.  On June 24, 2021, NYCB filed an amendment to the registration statement on Form S-4/A with the SEC.  The SEC declared the registration statement effective on June 25, 2021.

440.     On June 25, 2021, NYCB filed a joint proxy statement and prospectus on Form 424B3.  On August 4, 2021, the shareholders of NYCB and Flagstar voted to approve the Flagstar Merger.  Subsequently, NYCB filed several prospectus supplements, including on November 3, 2021, November 4, 2021, February 2, 2022, and March 4, 2022.

441.     On April 27, 2022, NYCB filed a current report on Form 8-K announcing an April 26, 2022 amendment to the April 24, 2021 merger agreement between NYCB and Flagstar (the

"April 26, 2022 Amended Merger Agreement").  Pursuant to this amendment, NYCB and Flagstar agreed to:

- Extend the Merger Termination Date to October 31, 2022.

- Change the structure of the Merger, so that Flagstar Bank, FSB would initially convert to a national bank charter and New York Community Bank would merge with and into the national bank, with the national bank as the surviving entity in the Bank Merger.

- Amend the definition of "Requisite Regulatory Approvals" such that approvals of the FDIC and NYDFS were no longer required, replacing such approvals with the approval of the OCC.

442.    On August 3, 2022, NYCB filed a post-effective amendment to the registration statement on Form S-4 as originally declared effective by the SEC on June 25, 2021 to: (i) update the pro forma condensed combined financial information that was originally included in the Joint Proxy Statement/Prospectus; (ii) incorporate by reference the information contained in NYCB's and Flagstar's 2021 Forms 10-K; and (iii) update the Joint Proxy Statement/Prospectus to incorporate by reference the information contained in certain other documents regarding NYCB and Flagstar that NYCB and Flagstar, respectively, had filed with the SEC.

443.    On September 28, 2022, NYCB filed another post-effective amendment to the registration statement on Form S-4 as originally declared effective by the SEC on June 25, 2021, to also update certain information in the Registration Statement and include certain information required to be included in a registration statement on Form S-4 in response to SEC comments that NYCB include all disclosures required by Form S-4.

444.    On October 11, 2022, the SEC declared the September 28, 2022 amended registration statement effective.

445.    On October 12, 2022, NYCB filed an amended prospectus on Form 424B3 (which forms part of the Offering Documents) for the NYCB shares issued and exchanged for Flagstar

shares in the Merger.  This final, effective September 28, 2022 Registration Statement and October 12, 2022 Prospectus incorporated by reference, among other documents, NYCB's annual report on Form 10-K for the year ended December 31, 2021 and filed with the SEC on February 25, 2022; NYCB's Definitive Proxy Statement on Schedule 14A filed with the SEC on April 21, 2022; NYCB's quarterly report on Forms 10-Q for the quarters ended March 31, 2022 and June 30, 2022; and NYCB's current reports on Form 8-K and 8-K/A, filed with the SEC on January 26, 2022 (only with respect to Item 8.01), March 1, 2022, April 27, 2022 (only with respect to Item 1.01 and Exhibit 2.1), April 27, 2022 (only with respect to Item 8.01), June 3, 2022, June 8, 2022, and July 27, 2022.

446.    The September 28, 2022 Registration Statement and the October 12, 2022 Prospectus Supplement, and documents incorporated by reference therein, are referred to herein as the "Offering Documents."  On October 27, 2022, NYCB and Flagstar amended the Merger Agreement again, this time to extend the Merger Termination Date to December 31, 2022.

447.    On December 1, 2022, Defendants completed the Merger, issuing approximately 214 million new shares of NYCB common stock directly to former shareholders of Flagstar.  On that date, Flagstar shareholders became irrevocably committed to the purchase of new NYCB shares and received 4.0151 shares of NYCB common stock in exchange for each share of Flagstar common stock, pursuant to the terms of the Merger.  The final closing price of Flagstar stock, on November 30, 2022, was $37.54 per share.  The final closing price of NYCB stock (not adjusted for the July 2024 reverse stock split), on December 1, 2022, was $9.19 per share.

448.    The completion of the Flagstar Merger created a regional banking franchise that ranked among the top 25 banks in the country based on total assets.

**C.    Materially False and Misleading Statements and Omissions in the Offering Documents**

449.    The background of NYCB's operations and CRE loan portfolio, the Flagstar Merger, and the market for CRE loans at the time of the Flagstar Merger, as well as the Company's eventual disclosures and admissions on January 31, 2024 and thereafter are set forth in detail above in Sections IV.A-B & G-H.  Those allegations are incorporated herein except that the Securities Act Plaintiff expressly disclaims any allegations of fraud in these non-fraud Securities Act claims.

450.    The materials presented to investors in the Offering Documents in connection with the Flagstar Merger contained untrue statements of a material fact or omitted to state a material fact required to be stated therein, or necessary to make the statements therein not misleading. Specifically, the Offering Documents contained the following materially false and misleading statements and omissions by the Securities Act Defendants.

451.    In relevant part, the Offering Documents falsely portrayed and misrepresented the (a) FDIC's decision to reject NYCB's application for approval of the Flagstar Merger; (b) NYCB's risk management framework and practices; (c) the asset quality of NYCB's highly concentrated CRE loan portfolio and the Company's unreliable estimation of its ACL and PCL; and (d) NYCB, Cangemi and Pinto's creation and maintenance of effective internal controls over financial reporting.

452.    ***First***, the Offering Documents described the regulatory approval required for the Flagstar Merger to proceed following the April 26, 2022 Amended Merger Agreement, which changed the structure of the Flagstar Merger so that the Merger required the approval of the OCC, and no longer required the approval of the FDIC and NYDFS. The Offering Documents stated: "***neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals***

*required to consummate the transactions contemplated by the merger agreement in a timely*

*manner*." The Offering Documents continued:

> Subject to the terms of the merger agreement, NYCB and Flagstar have agreed to cooperate with each other and use reasonable best efforts to promptly prepare and file all necessary documentation, to effect all applications, notices, petitions and filings (and in the case of the applications, notices, petitions and filings in respect of the requisite regulatory approvals (as defined in "The Merger—Regulatory Approvals"), use their reasonable best efforts to make such filings by May 16, 2022), to obtain as promptly as practicable all permits, consents, approvals and authorizations of all third parties and governmental entities which are necessary or advisable to consummate the transactions contemplated by the merger agreement, and to comply with the terms and conditions of all such permits, consents, approvals and authorizations of all such governmental entities.   ***Pursuant to the original merger agreement, these approvals included, among others, the approval of*** (i) the Board of Governors of the Federal Reserve System (the "Federal Reserve Board"), ***(ii) the Federal Deposit Insurance Corporation (the "FDIC"), (iii) the New York State Department of Financial Services ("NYDFS")***, (iv) Ginnie Mae, Fannie Mae, Freddie Mac, the Federal Housing Authority of the U.S. Department of Housing and Urban Development, the United States Department of Agriculture and the United States Department of Veterans Affairs (collectively, the "Mortgage Agencies") with respect to mortgage banking and mortgage servicing activities of Flagstar and certain subsidiaries of Flagstar and (v) the Texas Department of Insurance and the Vermont Department of Financial Regulation with respect to the change of control of certain Flagstar subsidiaries that hold licenses to engage in certain insurance activities.  The initial submission of regulatory applications to the Federal Reserve Board, FDIC and NYDFS occurred on May 19, 2021, and the initial regulatory submissions with the Mortgage Agencies had been made as of June 11, 2021, the date of the initial filing of the registration statement on Form S-4 of which this amended prospectus forms a part.

> ***Pursuant to the amendments to the merger agreement effected by the merger agreement amendment, the approvals of the FDIC and the NYDFS are no longer required to consummate the transactions contemplated by the merger agreement. The requirement to obtain these approvals has been replaced, pursuant to the merger agreement amendment, with the approval of the Office of the Comptroller of the Currency (the "OCC"), which is required to consummate the transactions contemplated by the merger agreement.***  The merger agreement amendment made no other changes to the approvals required to consummate the transactions contemplated by the merger agreement, including those described in the previous paragraph.  The initial submission of regulatory applications to the OCC occurred on May 10, 2022.

> Although ***neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals required to consummate the transactions contemplated by the merger agreement in a timely manner,*** NYCB and Flagstar cannot be

certain when or if they will be obtained, or that the granting of these regulatory approvals will not involve the imposition of conditions on the completion of the merger, the holdco merger, the conversion or the bank merger.

453.    The Offering Documents further stated: "***NYCB and Flagstar believe that the merger does not raise significant regulatory concerns and that they will be able to obtain all requisite regulatory approvals***."   Moreover, in an April 27, 2022 Form 8-K, incorporated by reference into the Offering Documents, NYCB issued a press release, attached thereto, announcing the replacement of the FDIC and NYDFS approvals with OCC approval, stating in relevant part: "***The Company and Flagstar each believe that a national bank charter is an appropriate charter for the combined company's banking operations***."

454.    The statements in the preceding paragraphs (¶¶452-453) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made.   It was misleading to state that the Company was unaware of "***any reason it would not be able to obtain regulatory approval***," that there were no "***significant regulatory concerns***" about the Flagstar Merger, and that NYCB "believe[d] that ***a national bank charter is an appropriate charter for the combined company's banking operation***."   In truth, the Securities Act Defendants failed to disclose that NYCB's pivot to OCC regulatory approval was due to the FDIC's opposition to the Merger due to "NYCB's exposure to multi-family loans" and the banks' lending practices.   Indeed, as reported in a letter sent to the OCC on April 15, 2024 by Senators Elizabeth Warren and Richard Blumenthal, "No one at the FDIC was comfortable recommending a merger approval for [NYCB and Flagstar]."   This pivot was aimed exclusively on finding a new regulator who would greenlight the deal despite the FDIC's significant regulatory concerns.   By electing to speak about these subjects—and thereby putting these subjects into play—the Securities Act Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject so as not to mislead investors.   As a result of the foregoing undisclosed material facts, these statements in the

Offering Documents lacked a reasonable basis when made and were materially false and misleading at all relevant times.

455. ***Second***, the Company's Form 10-K for the year end 2021 ("2021 Form 10-K"), which was incorporated by reference into the Offering Documents, made the following representations about the Company's risk management practices:

**Enterprise Risk Management**

***The Company's and the Bank's Boards of Directors are actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department to identify, measure, monitor, mitigate, and report risk***. ***The Company has established an ERM program that reinforces a strong risk culture to support sound risk management practices***. The Board is responsible for the approval and oversight of the ERM program and framework.

ERM is responsible for setting and aligning the Company's Risk Appetite Policy with the goals and objectives set forth in the budget, and the strategic and capital plans. ***Internal controls and ongoing monitoring processes capture and address heightened risks that threaten the Company's ability to achieve our goals and objectives, including the recognition of safety and soundness concerns*** and consumer protection. Additionally, ***ERM monitors key risk indicators against the established risk warning levels and limits, as well as elevated risks identified by the Chief Risk Officer***.

456. The statements identified in ¶455 were materially false, misleading, and omitted material facts. NYCB and NYCB's Board of Directors were not "***actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department to identify, measure, monitor, mitigate, and report risk***;" the ERM program did not "***reinforce[] a strong risk culture to support sound risk management practices***;" "***[i]nternal controls and ongoing monitoring processes***" did not "***capture and address heightened risks that threaten the Company's ability to achieve our goals and objectives***;" and the Company's ERM department did not "***monitor key risk indicators against the established risk warning levels and limits***." In fact, as the Company has now admitted: (a) NYCB's "Board of Directors did not exercise sufficient oversight responsibilities, which led to [NYCB] lacking a sufficient complement of qualified

leadership resources to conduct effective risk assessment and monitoring activities;" (b) NYCB "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" (c) NYCB's "recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively;" and (d) NYCB "did not sufficiently maintain effective control activities related to internal loan review" such that the Bank's "internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged," and which "impacted the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases."

457.   NYCB's new management has also admitted how, contrary to Class Period representations, NYCB lacked a working risk management structure and needed to build it out from the start.  On May 1, 2024, new CEO Otting explained that NYCB lacked "good risk management infrastructure" and that he and new management needed to "clean up our house and get it in order" as "we build infrastructure here."  On that same call, new CFO Gifford agreed that NYCB's "internal infrastructure still"—after two months of work—"has a lot of improvement to go and we continue to work on those action plans."  Otting also clearly admitted that NYCB "was not ready to be regulated by the OCC."  During the next quarterly earnings call on July 25, 2024, Otting again described how, since March, the Bank had built a risk management structure because during the Class Period, "both the talent and infrastructure in the risk organization was not in

place."  In order to build that out, Otting explained how NYCB first had to even "underst[an]d the loan book" and then "build out the Company's infrastructure."

458.    ***Third***, the Company's 2021 Form 10-K identified as a mere contingent and future "risk" that ***"[o]ur enterprise risk management framework may not be effective in mitigating the risks to which we are subject***."

459.    The statements in the Offering Documents identified in ¶458 were materially false, misleading, and omitted material facts.  It was false and misleading to tell investors that NYCB's "enterprise risk management framework may not be effective in mitigating risk" when in reality, NYCB's risk management was already "not effective" for the reasons stated above in ¶¶456-457.

460.    ***Fourth***, the Company's April 22, 2022 Definitive Proxy Statement, which was incorporated by reference into the Offering Documents, stated:

> Management of risk is important to the success of our operations and business strategies and ***our Board devotes significant attention to the oversight of risks inherent in our banking business, including, but not limited to, information security risk, credit risk***, model risk, interest rate risk, liquidity risk, operational risk, strategic risk, compliance risk and reputational risk.
>
> The Board reviews the key risks associated with the Company's strategic plan annually and regularly throughout the year ***as part of its consideration of the strategic direction of the Company as well as reviewing the output of the Company's risk management processes each year and reviewing risks associated with specific business units and corporate functions***.
>
> ***While the Board of Directors as a whole is responsible for risk management oversight, management is responsible for the day-to-day management of the risks faced by the Company.  As part of our risk oversight processes, our Chief Risk Officer reports to the Risk Assessment Committee; the Chairman of the Board's Risk Assessment Committee meets regularly with management to discuss the risks facing the Company and strategies to address these risks; and senior members of management attend Board meetings and are available to address questions or concerns raised by the Board on risk management and other matters***.  In carrying out its responsibilities in this area, the Board has delegated important duties to its committees.
>
> The Risk Assessment Committee has responsibility to oversee the functioning of the Company's enterprise risk management program and ***to ensure that risk is***

186

***appropriately identified, measured, mitigated, monitored, and reported within approved governance structures***.   Among its duties, the Risk Assessment Committee reviews with management Company policies regarding risk assessment and management of risks that may be material to the Company, the Company's system of disclosure controls and system of internal controls over financial reporting, the Company's governance structure and processes, related person transactions, certain compliance issues and Board and committee structures, and the Company's compliance with legal and regulatory requirements.

461.     The statements in the Offering Documents identified in ¶460 were materially false, misleading, and omitted material facts.  It was false and misleading to tell investors, for example, that the Company and its Risk Assessment Committee "***ensure[d] that risk is appropriately identified, measured, mitigated, monitored, and reported within approved governance structures***," when in reality, NYCB's Board of Directors, including its Risk Assessment Committee, "did not exercise sufficient oversight responsibilities, which led to [NYCB] lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities."  These statements were also false and misleading for the additional reasons stated above in ¶¶456-457.

462.     ***Fifth***, the Securities Act Defendants made false and misleading statements and omitted material facts about the NYCB's CRE loan portfolio asset quality in the Offering Documents.  The 2021 Form 10-K touted the Company's "leadership position in the multi-family and CRE markets as "instrumental to our production of solid earnings and ***our consistent record of exceptional asset quality***."  Further, the 2021 Form 10-K stated: "***Our Asset Quality Metrics Remain Strong***."

463.     The Q2 2022 Form 10-Q, which was incorporated by reference into the Offering Documents, similarly touted the following positive asset quality metrics for the quarter ended June 30, 2022:

- ***Nonperforming assets of $56 million***, equal to nine basis points (0.09%) of total assets ($63.1 billion);

187

- ***Non-performing loans of $50 million***, equal to ten basis points (0.10%) of total loans ($48.5 million);

- ***Total loans past due 30 to 89 days of $30 million***;

- ***ACL of $216 million***, representing 434% of total non-performing loans and 0.45% of total loans ($48.5 billion);

- ***PCL of $9 million***;

- ○ ***Net charge-offs (recoveries) of ($7 million)***.

464.    In addition, the Offering Documents purported to warn of potential risks that, "***if***" they were to occur, "***could***" or "***may***" adversely affect the Company, while failing to disclose that these very "risks" had already materialized before the effectiveness date of the Registration Statement.  For example, the Company's 2021 10-K stated that: "***[o]ur allowance for credit losses might not be sufficient to cover our actual losses, which would adversely impact our financial condition and results of operations***."  The 2021 Form 10-K also stated that NYCB's concentration in multi-family loans and CRE loans ***could*** expose the Company to "***increased lending risks and related loan losses***."  For example, the Offering Documents stated that "***[A]n adverse development with respect to one loan or one credit relationship can expose us to a significantly greater risk of loss compared to an adverse development with respect to a one-to-four family residential real estate loan***."

465.    The statements in the preceding paragraphs (¶¶462-464) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made.  It was misleading to discuss how NYCB's "asset quality metrics remain strong" and "exceptional" when, in truth, the Securities Act Defendants failed to disclose that NYCB lacked effective controls over its internal loan review processes such that they could not timely identify and respond to financial reporting risks.  The statements in ¶¶462-464 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made because the Company has since admitted: (a) NYCB's "internal loan review processes lacked an appropriate framework to ensure that ratings

were consistently accurate, timely, and appropriately challenged" and "these ineffective controls impact the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately [impact] the recognition of the allowance for credit losses on loans and leases;" (b) NYCB's "recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively;" (c) NYCB "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" and (d) NYCB "lack[ed] a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities."   The statements in ¶¶462-464 were also false and misleading because NYCB's new management has since begun remediating the Company's failed internal controls over financial reporting through an assessment of the CRE loan portfolio asset quality—exactly what the Exchange Act Defendants represented had been done throughout the Class Period.  The results of new management's review, which covers approximately 80% of NYCB's loan portfolio, demonstrated that *nearly $2 billion* of the portfolio are NPLs, and the Company has taken a provision for credit losses of $1.257 billion, with additional expected losses and reserves still to come.  On June 5, 2024, new CFO Gifford acknowledged in an investor day conference call that "the principal drivers" of the NPLs, losses and loss reserves were the same pre-Class Period market events that the Defendants claimed to have been well-insulated from: New York's rent regulation laws, COVID-related office vacancies, and federal interest rate hikes.

466.   The materiality of Defendants' false and misleading statements and omissions of material facts is also clear.  For example, when NYCB began implementing the remediation steps

required to correct the material weaknesses in the Company's loan review processes, the Company reported $683 million in non-GAAP net losses for the fourth quarter of 2023 through the second quarter of 2024, attributable to a dramatic spike in NYCB's provision for credit losses of $1.257 billion over those three quarters. *See, e.g.* ¶204. The reported ACL and PCL violated GAAP and net income was inflated because of the Bank's admitted "[in]ability to accurately disclose loan rating classifications [and] identify problem loans," which impacted NYCB's "recognition of the allowance for credit losses on loans and leases." As discussed in ¶¶220-222, *supra*, application of only 25% of the $1.257 billion increase to the PCL to earlier periods would have resulted in a $39 million reduction in NYCB's net income in the second quarter of 2022, which would have missed analysts' consensus estimates, as illustrated in the table immediately below and in ¶223:

| *Net Income, $ in millions* | **6/30/22** |
|---|---|
| As Reported | $166 |
| As Corrected | $127 |
| Difference Between Reported and Corrected | **($39)** **-23%** |
| Analysts' consensus estimate | $150 |
| Difference Between Corrected Net Income and Consensus | ($23) |
| Outcome | **Miss Consensus** |

467.    **Sixth**, in addition to rendering the Offering Materials affirmatively false and misleading, Defendants' omission of these and related material facts violated several mandatory duties to disclose. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure in the Offering Documents of "the material factors that ma[d]e an investment in [the Merger] speculative or risky" and an explanation of "how [the] risk

affect[ed] [NYCB] or the securities being offered."  The Offering Documents failed to disclose material facts necessary to apprise investors with Flagstar shares—that would be exchanged for NYCB shares pursuant to the terms of the Merger—of the true risks inherent in investing in the Company in violation of Item 303 and Item 105.

468.    The obligations of Items 303 and 105 required the Offering Documents to disclose that NYCB (a) "lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates;" (b) NYCB lacked "leadership resources to conduct effective risk assessment and monitoring activities," and lacked "effective" "recurring monitoring activities over process level control activities, including internal loan review;" (c) NYCB's internal loan review processes operated without an appropriate risk management "framework to ensure that ratings were consistently accurate, timely, and appropriately challenged," which meant that the Company lacked the "ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases," and (d) that this would cause NYCB to slash dividends if and when the Company was forced to admit that their misleading statements and omissions about weaknesses in the Company's internal controls and threatened regulatory approval for the Merger had inflated its Class Period results.

469.    Separately, Items 303 and 105 also required disclosure of the trends and uncertainties related to regulatory concerns regarding the Flagstar Merger, the reasons for NYCB and Flagstar's pivot to OCC approval, and NYCB's underwriting standards and exposure to multi-family loans in violation of Item 303 "create misleading half-truths" as to the affirmative

disclosures made by Defendants as to NYCB's business in the MD&A, as alleged above.  It was misleading for Defendants to discuss the Company's "prudent" credit standards for underwriting and lending practices while failing to provide fully the information required by Item 303 that NYCB lacked the ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of allowance for credit losses on loans and leases, and that this would cause NYCB to slash dividends if and when the Company was forced to, or chose to, admit that their misleading statements and omissions about NYCB's weaknesses in internal controls had inflated its Class Period results.

470.    **Seventh**, the violations of Item 303 also made misleading Defendants' certifications as to the accuracy and completeness of the SEC filings.  Specifically, Defendants Cangemi and Pinto certified under criminal penalty that the Company's SEC filings did "fully compl[y] with the requirements of Section 13(a)," which included Items 303's disclosure obligations:

> In connection with the Annual Report of New York Community Bancorp, Inc. (the "Company") on Form 10-K for the fiscal year ended December 31, 2021 as filed with the Securities and Exchange Commission (the "Report"), the undersigned certify, pursuant to 18 U.S.C. Section 1350, as added by Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> (1) The Report **fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934**; and
>
> (2) **The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report**.

471.    The Company further stated in its Form 10-K that it maintained effective disclosure controls to ensure that its SEC filings provided the information required to be disclosed under SEC regulations:

> Under the supervision, and with the participation, of our Chief Executive Officer and Chief Financial Officer, our management evaluated the effectiveness of the

design and operation of the Company's disclosure controls and procedures pursuant to Rule 13a-15(b), as adopted by the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934 (the "Exchange Act"). ***Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this annual report***.

472.    NYCB's Forms 10-Q listed above and incorporated by reference in the Offering Documents (¶445) likewise stated:

As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Rule 13a-15(e), as adopted by the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"). ***Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period***.

473.    In addition, these SEC filings contained additional certifications from Defendant Cangemi and Pinto that:

1. I have reviewed this annual report on Form 10-K of New York Community Bancorp, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

474.    The statements in the preceding paragraphs (¶¶470-473) were materially false and misleading, omitted material facts, and lacked a reasonable basis when made.  It was materially false and misleading to state that each report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" when Defendants failed to comply with Item 303 of Regulation S-K.  Contrary to the assurances that, *e.g.*, the Company maintained adequate disclosure controls and that the information required to be disclosed was disclosed, the Company's SEC filings at issue did not disclose all information required to be disclosed by the

Exchange Act and SEC reporting requirements in Item 303.  Likewise, contrary to the assurances that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," the filings failed to provide fully the information required to be disclosed by Item 303, which prescribe the disclosures necessary to ensure that the publicly-filed reports fairly present the financial condition and results of the Company's operations.  Finally, the disclosures in the SEC filings were made in the circumstances of the disclosure requirements prescribed by Regulation S-K, including specifically Item 303. Thus, the certifications that the finings "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" were false and misleading because the filings did not provide fully the information required by Item 303 and those Item 303 violations rendered misleading and "create[d] misleading half-truths," as described above.

### D.  Defendants' Misstatements and Omissions Were Material

475.    Below is a summary of the disclosures and related news that demonstrate the materiality of the false and misleading statements and omissions, with a more detailed discussion in Sections IV.G-H, *supra*.

476.    On January 31, 2024, NYCB issued its Q4 2023 Press Release disclosing that the Company recorded a $552 million provision for loan losses and $992 million in ACLs, which constituted *790%* and *60%* QoQ increases, respectively.  Critically, the Q4 2024 Press Release also disclosed that NYCB was slashing its highly coveted dividend by *70%*, from $0.17 per share to $0.05 per share.

477.    On the same day, during NYCB's Q4 2023 Earnings Call, Defendant Cangemi explained that the Company increased its reserve build after conducting "a deep dive in the office portfolio as well as thinking through payment shock and interest rate shock given the rise of interest

rates that we've experienced over the past few quarters, in particular the impact to our customers in respect to repricing."   As a result, Defendant Cangemi informed investors that NYCB "had moved some of these loans into a status of criticized because of the nature of looking – thinking about the office sectors and the reserve build out with the anticipation of office still having difficulties within the marketplace."

478.    On this news, the market price of NYCB common stock declined precipitously, falling approximately $11.73 per share, or *38%*, to close at $19.41 per share on January 31, 2024, on unusually high trading volume of more than 128.6 million shares traded, or 17 times its average trading volume over the preceding ten trading days.

479.    After the close of trading on January 31, 2024, Moody's Investors Service announced that it had placed all of NYCB's corporate debt ratings, including the bank's long-term issuer rating of Baa3—the lowest investment-grade level—on review for possible downgrade to junk status, citing the Company's surprising Q4 2023 loss and slashing of its dividend.   On this news, the market price of NYCB common stock closed down another $2.16 per share, to close at $17.25 per share, with nearly 126 million shares traded on February 1, 2024.

480.    Then, on February 5, 2024, after the close of trading, Bloomberg reported, citing "people with direct knowledge of the matter," that it had been "mounting pressure from a top US watchdog" that had "led to [NYCB's] surprise decision to slash its dividend and stockpile cash in case commercial real estate loans [went] bad."   According to Bloomberg, "[t]he drastic financial moves . . . followed behind-the-scenes conversations with officials from the Office of the Comptroller of the Currency [ the "OCC"] . . ."   Bloomberg also revealed that NYCB's chief risk officer and chief audit executive left the Company in the fourth quarter of 2023.

481.    On these media reports, the Company's stock price dropped $3.60 per share, or approximately *22%*—from $16.20 per share at close on February 5, 2024 to $12.60 per share at close on February 6, 2024—on unusually high trading volume.  NYCB shares had not closed that low since 1997.

482.    On February 6, 2022, after the close of trading, Moody's Investor Service slashed the Company's corporate debt rating to junk status.  NYCB also announced that DiNello, the former head of Flagstar, would take over as executive chairman.

483.    More information came to light when, on February 22, 2024, a prominent independent watchdog, *Better Markets*, published a report revealing that the Flagstar Merger was made possible only by NYCB's "regulatory arbitrage," whereby NYCB, knowing its longtime regulators at the FDIC were about to prevent the Flagstar Merger, maneuvered to replace the FDIC with OCC regulators.  Not only did this arbitrage allow a new regulator with no historical exposure to NYCB allow the Flagstar Merger to occur, but it now created the situation where the OCC would be applying new and heightened scrutiny on NYCB as a large regional bank that was close to reaching the $100 billion Category IV status.  More recently, on April 15, 2024, Senators Elizabeth Warren and Richard Blumenthal demanded answers from the OCC about why its regulators approved the Flagstar Merger when "No one at the FDIC was comfortable recommending a merger approval for [NYCB and Flagstar]."  The price of NYCB stock dropped on the first full trading day following the *Better Markets* report, closing at $13.56 per share on February 23, 2024, down 2.2%.

484.    On February 29, 2024, NYCB announced that Defendant Cangemi had resigned as President and CEO on February 23, 2024, and that DiNello would take over as Executive Chairman of the Board, President, and CEO, effective immediately.

485.    On the same day, NYCB admitted that it had material weaknesses in its internal controls from ineffective oversight, risk assessment, and monitoring activities.   NYCB also announced in SEC filings that the Company was required to take a goodwill impairment charge of $2.4 billion—belatedly recognizing that the entirety of its goodwill from historical transactions (2007 and prior) was fully impaired.   Further, NYCB disclosed that it would be unable to file its 2023 Form 10-K on time because of the time it needed to evaluate and plan for remediating the Company's now admitted material weaknesses.

486.    With these further admissions, the price of NYCB common stock declined even further.   After closing at $14.37 per share on February 29, 2024, the price of NYCB shares declined $3.72 per share (or *26%*) to a close of $10.65 per share on March 1, 2024, and an additional $2.46 per share (or *23%*) on March 4, 2024 to close at $8.19 per share.   On March 6, 2024, trading halted as NYCB shares further plunged and traded as low as $5.10 per share.

487.    Accordingly, the Securities Act Plaintiff and former Flagstar investors suffered losses as result of Defendants' false and misleading statements and omissions.

488.    On March 14, 2024, NYCB belatedly filed its 2023 Form 10-K.   Among other matters, the 2023 Form 10-K represented that NYCB's CEO and CFO had concluded that NYCB disclosure controls and procedures were not effective because of the material weaknesses in the Company's internal control over financial reporting:

> As of December 31, 2023, management assessed the effectiveness of the Company's internal control over financial reporting based upon the framework established in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").
>
> A material weakness (as defined in Rule 12b-2 under the Exchange Act) is a deficiency or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement in our annual or interim financial statements will not be prevented or detected on a timely basis.

*Based on this assessment, because of the following material weaknesses, management concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2023.*

Control environment - *Our Board of Directors did not exercise sufficient oversight responsibilities, which led to us lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities.*

Risk assessment - *We lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates.*

Monitoring - *Our recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively.*

Control activities - *We did not sufficiently maintain effective control activities related to internal loan review.* Specifically, *our internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged.* These ineffective controls *impact the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases.*

These control deficiencies create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis, and therefore we concluded that the deficiencies represent material weaknesses in our internal control over financial reporting and our internal control over financial reporting was not effective as of December 31, 2023.

The Company's independent registered public accounting firm, ***KPMG*** LLP, which audited the 2023 consolidated financial statements included in this Form 10-K*, has expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.*

489.    The 2023 Form 10-K also set forth the following regarding the steps taken to

remediate NYCB's ineffective internal controls and material weaknesses:

The Company is currently working to remediate the material weaknesses described above, including assessing the need for additional remediation steps and implementing additional measures to remediate the underlying causes that gave rise to the material weaknesses. The Company is committed to maintaining a strong internal control environment and to ensuring that proper oversight and a consistent

tone is communicated throughout the organization. The Company expects that existing deficiencies will be remediated through implementation of processes and controls designed to ensure strict compliance with U.S. GAAP.

Specifically, we are in the process of strengthening our internal control over financial reporting as follows:

- Appointed several new members to the Board of Directors with extensive experience as financial experts in our industry and backgrounds in risk management. Additionally, several members of the Board of Directors resigned.

- Appointed a new Chief Risk Officer and Chief Audit Executive, both of whom have large bank experience. We are in the process of identifying and appointing a new Director of Loan Review who has prior large bank commercial loan experience.

- Increasing the frequency and nature of reporting from our internal loan review team and first line business units to the Board Risk Committee to support the Board's risk oversight role.

- Expanding the use of independent credit analysis and reducing the Company's reliance on tools and analysis prepared by our lines of business.

- Improving the internal loan review team's ability to independently challenge risk rating scorecard model methodologies and results.

- Assessing the adequacy of staffing levels and expertise within the internal loan review program, taking into account, among other things, the size, complexity, and risk profile of the Company's loan portfolio.

- Providing additional risk rating process training for all internal loan review employees.

***We have enhanced our control environment, risk assessment and monitoring activities by addressing our Board composition and key members of executive management, including the Chief Risk Officer and Chief Audit Executive***. Progress has been made on our remedial actions, but we are still in the process of developing and implementing enhanced processes, procedures and controls related to internal loan review. We believe our actions will be effective in remediating the material weaknesses, and we continue to devote significant time and attention to these efforts. In addition, the material weaknesses will not be considered remediated until the applicable remedial processes, procedures and controls have been in place for a sufficient period of time and management has concluded, through testing, that these controls are effective.

490.    The full scope of Defendants' misrepresentations and omissions has continued to emerge across a series of disclosures, executive departures, dividend cuts, and other materialization of risks, and related stock price declines.  The Securities Act Plaintiff and other former Flagstar investors have suffered severe losses as a result of the Securities Act Defendants' misconduct

### E.    Claims For Relief Under the Securities Act

### COUNT III

**For Violation of Section 11 of the Securities Act Against the
Securities Act Defendants**

491.    The Securities Act Plaintiff repeats and realleges each and every allegation contained above in Section XII, above, as if fully set forth herein but only to the extent that such allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants named in this claim to defraud the Securities Act Plaintiff or members of the Class within the scope of this cause of action.

492.    This cause of action is brought by the Securities Act Plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of itself and relevant members of the Class within the scope of this cause of action, against each of the Securities Act Defendants in connection with the Offering.

493.    This cause of action does not sound in fraud.  For purposes of this cause of action, the Securities Act Plaintiff does not claim that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent.  This cause of action is based solely on strict liability as to NYCB and negligence as to the remaining Defendants.  The Securities Act Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or

belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

494.    The Offering Documents issued in connection with the Offering were inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

495.    NYCB is the registrant and issuer of the common stock offered pursuant to the Offering Documents.  As such, NYCB is strictly liable under Section 11 of the Securities Act to the Securities Act Plaintiff and to relevant members of the Class within the scope of this cause of action for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.

496.    None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

497.    The Signer Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of each of the Signer Defendants' failure to exercise reasonable care, the Offering Documents contained misstatements of material facts and omissions of material facts.  As such, each of the Signer Defendants is liable under Section 11 of the Securities Act to the Securities Act Plaintiff and to the relevant members of the Class within the Scope of this cause of action.

498.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement.   Rather, each such statement concerned existing facts.   Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

499.    Each of the Securities Act Defendants named in this cause of action issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Offering Documents, which misstated and failed to disclose, *inter alia*, the facts set forth above.   By reason of the conduct herein alleged, each Securities Act Defendant violated Section 11 of the Securities Act.

500.    The Securities Act Plaintiff and other members of the Class within the scope of this cause of action acquired NYCB common stock pursuant to, or traceable to, the defective Offering Documents.

501.    The Securities Act Plaintiff and Class members within the scope of this cause of action have sustained damages.   The value of NYCB common stock has declined substantially subsequent to and due to violations by Defendants named in this cause of action.

502.    At the time the Securities Act Plaintiff and other members of the Class within the scope of this cause of action purchased or otherwise acquired NYCB common stock, they were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.   Less than one year has elapsed between the time that the Securities Act Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based and the time that this action was commenced.   Less

than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time this action was commenced.

## COUNT IV

### For Violation of Section 12(a)(2) of the Securities Act Against NYCB

503.   The Securities Act Plaintiff repeats and realleges each and every allegation contained above in Section XII, above, as if fully set forth herein, but only to the extent that such allegations do not allege fraud, scienter, or the intent of Defendant NYCB named in this claim to defraud the Securities Act Plaintiff or members of the Class within the scope of this cause of action.

504.   This cause of action is brought by the Securities Act Plaintiff pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class against NYCB in connection with the Offering.

505.   This cause of action does not sound in fraud.  For purposes of this cause of action, the Securities Act Plaintiff does not claim that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent.  This cause of action is based solely on strict liability as to NYCB and negligence as to the remaining Defendants.  The Securities Act Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

506.   NYCB was a seller, offeror, and/or solicitor of purchasers of the Company's common stock pursuant to the defective Prospectus.  The actions of solicitation by the Defendant named in this Count included participating in the preparation of the false and misleading Prospectus, which are part of the Offering Documents, and marketing the Offering to Flagstar

investors, such as the Securities Act Plaintiff and the other members of the Class within the scope of this cause of action.

507.    The Offering Documents contained untrue statements of material fact, omitted to state other facts necessary to make statement made therein not misleading, and omitted to state material facts required to be stated therein.

508.    NYCB owed to the Securities Act Plaintiff and other members of the Class within the scope of this cause of action the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  By virtue of each of NYCB's failure to exercise reasonable care, the Offering Documents contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading.

509.    The Securities Act Plaintiff and other members of the Class within the scope of this cause of action acquired NYCB common stock pursuant to and traceable to the defective Offering Documents.  The Securities Act Plaintiff did not know, nor in the exercise of reasonable diligence could the Securities Act Plaintiff have known, of the untruths and omissions contained in the Offering Documents at the time the Securities Act Plaintiff acquired NYCB shares.

510.    By reason of the conduct alleged herein, the Defendants named in this cause of action violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violation, the Securities Act Plaintiff and the other members of the Class within the scope of this cause of action who acquired NYCB shares pursuant to the Offering Documents sustained substantial damages.  Accordingly, the Securities Act Plaintiff and the other members of the Class within the scope of this cause of action who hold the shares issued

pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members within the scope of this cause of action who have sold their NYCB shares seek damages to the extent permitted by law.

511.    This cause of action is brought within one year of when the Securities Act Plaintiff discovered or reasonably could have discovered the untrue statements and omissions in the Offering Documents and within three years of their effective dates.

**COUNT V**

**For Violation of Section 15 of the Securities Act**
**Against the Signer Defendants**

512.    The Securities Act Plaintiff repeats and realleges each and every allegation contained in Section XII, above, as if fully set forth herein, but only to the extent that such allegations do not allege fraud, scienter, or the intent of the Signer Defendants named in this claim to defraud the Securities Act Plaintiff or members of the Class within the scope of this cause of action.

513.    This cause of action is brought by the Securities Act Plaintiff pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of itself and relevant members of the Class within the scope of this cause of action, against each of the Signer Defendants in connection with the Merger.

514.    This cause of action does not sound in fraud.  For purposes of this cause of action, the Securities Act Plaintiff does not allege that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent.  This cause of action is based solely on strict liability as to NYCB and negligence as to the remaining Defendants.   The Securities Act Plaintiff expressly disclaims any allegations of scienter or

206

fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Merger are alleged to have been materially misstated statements of opinion or belief when made.

515.    The Signer Defendants were each control persons of NYCB by virtue of their positions as directors and/or senior officers of NYCB signed a "Consent of Prospective Director" pursuant to Rule 438 of the Securities Act in which he consented to being named in the Registration Statement as a prospective director.  The Signer Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of NYCB.

516.    Each of the Signer Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the Flagstar Merger and Offering.  Because of their positions of control and authority as senior officers and/or directors each of the Signer Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

517.    Each of the Signer Defendants were culpable participants in the violations of Section 11 and 12(a)(2) of the Securities Act alleged above, based on having signed the Offering Documents and/or having otherwise participated in the process that allowed the Merger and Offering to be completed.

518.    As control persons of NYCB, each of the Signer Defendants are liable jointly and severally with and to the same extent as NYCB for its violation of Section 11 and 12(a)(2) of the Securities Act.

519.    As a result of the foregoing, Plaintiff and other members of the Class within the scope of this cause of action have suffered damages.

## XIII.   CLASS ACTION ALLEGATIONS

520.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of (i) for Exchange Act Claims, all persons and entities that purchased or otherwise acquired NYCB common stock during the period from July 27, 2022 through February 29, 2024, inclusive, and who were damaged thereby; and (ii) for Securities Act Claims, all persons and entities that acquired NYCB common stock in exchange for their common shares of Flagstar pursuant to the S-4 registration statement, 424B3 prospectus, and materials incorporated therein (collectively, the "Registration Statement" or "Offering Materials") in connection with the Flagstar Merger, and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of NYCB and/or Flagstar during the Class Period; (iv) any firm, trust, corporation, or other entity in which any excluded person or entity has or had a controlling interest and/or beneficial interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

521.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the class members.  During the Class Period, NYCB had more than 790 million shares of common stock outstanding, owned by many thousands of investors.  Throughout the Class Period and in connection with the Offering, NYCB's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by NYCB or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

522.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are: (a) whether Defendants violated the federal securities laws; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of NYCB's securities was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

523.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

524.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel experienced in class-action securities litigation.   Plaintiffs have no interests that conflict with those of the Class.

525.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Labaton Keller Sucharow LLP as Class Counsel pursuant to Rule 23(g);

(b)     Awarding Plaintiffs and the Class compensatory damages and equitable relief, including all damages and relief provided for under the Exchange Act and the Securities Act, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Plaintiffs' consulting and testifying expert witnesses; and

(d)     Granting such other and further relief as the Court deems just and proper.

## XV.     JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: September 25, 2024                    Respectfully submitted,

*/s/ Lauren A. Ormsbee*
**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee
Lisa Strejlau
Charles J. Stiene
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lormsbee@labaton.com
lstrejlau@labaton.com
cstiene@labaton.com

*Counsel for Plaintiffs and Lead*
*Counsel for the Proposed Class*