



Lauren A. Ormsbee
Partner
Labaton Keller Sucharow LLP
140 Broadway
New York, New York 10005
212.907.0864
lormsbee@labaton.com

June 6, 2025

**VIA ECF**

Honorable Nina R. Morrison
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE: *In re New York Community Bancorp, Inc. Securities Litigation*, No. 24-cv-00903-NRM-JRC (E.D.N.Y.)

Dear Judge Morrison:

Lead Plaintiff Boston Retirement System and additional plaintiff Indiana Public Retirement System ("IPRS" and, collectively, "Plaintiffs")[1] write in response to Defendants' letters requesting a pre-motion conference regarding their anticipated motion(s) to dismiss.[2] Defendants' boilerplate legal challenges to Plaintiffs' well-pled complaint fail, and the case may proceed directly to discovery. *See Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 514 (S.D.N.Y. 2016) (sustaining securities fraud claims following pre-motion letter briefing because the arguments raised in defendants' letter, including challenges to forward-looking statements, scienter, and loss causation, were "unpersuasive"); *see also Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *1 (S.D.N.Y. June 17, 2020).

The Complaint asserts two distinct sets of claims on behalf of damaged NYCB investors: (i) securities-fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants NYCB, former CEO Cangemi, former CFO Pinto, former Head of Commercial Real Estate Financing Adams, and non-Executive Chairman of the Board and interim CEO following Cangemi's termination, DiNello (collectively defined as the "Exchange Act Defendants"); and (ii) strict liability claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") against NYCB and the "Signer Defendants" (collectively defined as the "Securities Act Defendants"), who are statutorily liable for materially untrue statements and misleading omissions made in connection with the December 1, 2022 Flagstar Merger (the "Merger").

---

[1] The terms referenced herein shall have the same definition as those terms defined in the Amended Consolidated Class Action Complaint (ECF No. 69) (the "Complaint" or "Compl.").

[2] Defendants filed the following letters: NYCB ("NYCB PMCL," ECF No. 106); Cangemi and Dahya ("C&D PMCL," ECF No. 107); Wann, Ciampa, O'Donovan, Rosano, and Savarese ("Wann, et al. PMCL," ECF No. 108); Pinto and Adam ("P&A PMCL," ECF No. 109); and the Director Defendants ("DD PMCL," ECF No. 110).



New York | Delaware | London | Washington, D.C.

I.     **The Exchange Act Claims Are Adequately Alleged and Should Proceed to Discovery**

   A.     **Summary of the Exchange Act Claims**

NYCB is a leading producer of commercial real estate ("CRE") loans collateralized by multi-family apartment buildings (its self-described "bread and butter" product) and other non-residential commercial office and retail spaces. ¶31. NYCB's concentration of CRE loans, both prior to and during the Class Period (July 27, 2022 through February 29, 2024, inclusive), was exceedingly high—more than double the 300% threshold for a "high" concentration designation—creating a significant level of risk to the Bank should its CRE loans fail. ¶¶32-35. To ease concerns, the Bank described its risk rating processes, touted its "***heightened risk management practices***," and claimed that NYCB's portfolio of CRE loans was "instrumental to [NYCB's] production of solid earnings and [its] ***consistent record of exceptional asset quality***." ¶¶35-37.

Prior to the Class Period, a series of events, including some with no historical precedent—stark new rent regulation laws, skyrocketing interest rates, and the lasting impacts of the COVID-19 pandemic—placed significant stress on NYCB's CRE loan portfolio, increasing the need for NYCB to implement and sustain the required "heightened risk management practices" to ensure that NYCB's loan portfolio review adequately assessed asset quality risks to the Bank and its investors. ¶¶38-45. Yet, the Exchange Act Defendants repeatedly assured investors that these market forces did not negatively impact NYCB's portfolio. ¶45.

Despite these negative market forces, Defendants looked to radically accelerate the Bank's growth-by-acquisition strategy. Starting in mid-2022, NYCB experienced a self-imposed radical growth spurt orchestrated by Defendant Cangemi, first merging with Flagstar (through the use of regulatory arbitrage when the Bank's historic regulator balked at the Merger) (¶¶46-59) and, just a few months later, acquiring billions of dollars of the assets of recently collapsed competitor Signature Bridge Bank ("Signature"), the last of three U.S. banks that collapsed in March 2023, in large part as the result of those banks' risk management failures. ¶¶60-69.

The Flagstar and Signature transactions catapulted NYCB into "Category IV" regulatory status virtually overnight, and the Bank was also now under the supervision of entirely new regulators at the OCC, after successfully employing "regulatory arbitrage" to force out the FDIC, which had stood in the way of the Merger approval. ¶¶59, 175-77. Category IV status, applicable to banks with over $100 billion in assets, subjected NYCB to stricter Federal Reserve standards, including risk-based and leverage capital requirements, liquidity standards, and requirements for overall risk management and stress testing. ¶68.

To minimize the significant stressors on the CRE and multifamily portfolios, and NYCB's now heightened Category IV scrutiny, the Exchange Act Defendants assured compliance with the heightened regulatory requirements during the Class Period, and expressly assured investors that NYCB maintained a "***stellar***" CRE portfolio, a "***comprehensive risk framework***," and was "***laser focused on credit quality***." *See* Compl., §§IV.D-E. For example, NYCB CEO, Defendant Cangemi, during an October 26, 2022 call, described NYCB's credit quality as the Bank's "hallmark," stating that "***[o]ur asset quality and credit trends remain superb and continue to rank the company as among the best in the industry***." ¶¶72, 272. Similarly, during a January 31, 2023 call, Defendant Pinto told analysts and investors that "***the performance in th[e CRE] portfolio has been better than we originally expected coming out of the pandemic***," and stated

that "*we're not seeing any negative trends*." ¶285. As late as October 26, 2023, Defendant Cangemi told investors that "we have a very strong portfolio with low LTVs and *we monitor it carefully, and we're seeing consistencies of payment*." ¶331.

Upon announcing the Signature transaction, Defendant Cangemi acknowledged the increased regulatory scrutiny, and emphatically assured investors that risk management was his "priority as CEO," and that NYCB's "job" was "to be risk managers" such that NYCB had already "*built a very strong risk management team, and we strengthen it every day, and we're up for the challenge and we're open to the regulatory landscape changing*." ¶¶76, 241. NYCB was not "up for the challenge." To the contrary, former NYCB employees set forth in the Complaint describe how NYCB lacked a risk framework, had "zero controls" in place, and failed to effectively identify the multitude of problem loans through its loan review process. *See* Compl., §IV.F.

At the end of January 2024, NYCB shocked the market when it reported *a net loss of $252 million* due to *a $552 million provision for loan losses—an 800% increase from the prior quarter*. NYCB slashed its dividend by 71%, rattling investors and analysts alike. Days later, Moody's slashed the Company's corporate debt rating to "junk." NYCB shook up its leadership, instantly demoting and then terminating Defendant Cangemi as CEO. NYCB stock dropped 38% on the initial news release, and another 22% days later as the additional truth emerged. On February 29, 2024, NYCB delayed the filing of its Form 10-K, *wrote off $2.4 billion in goodwill* (reducing income by the same amount), and *admitted to "material weaknesses in the Company's internal controls related to internal loan review, resulting from ineffective oversight, [ineffective] risk assessment and [ineffective] monitoring activities*," revealing the Company's "comprehensive risk framework" was a fallacy. *See* Compl., §IV.G.

Information made known only after these disclosures has further confirmed and corroborated the inference that Defendants' misstatements were made with scienter. For example, NYCB's top officers and directors responsible for risk management and credit risk assessment "resigned" or were otherwise removed from their positions in the space of four months between late 2023 and April 12, 2024, including Defendants Cangemi (CEO & Chairman), Pinto (CFO), Adams (Head of CRE Financing), and the Chairmen of the Board's Risk Assessment, Audit, and Credit Committees (¶¶173-74), a circumstance that this Court has previously found "raise[s] a strong inference of scienter that is at least as strong as any opposing inference." *Infra*, at 7-8.

Moreover, shortly after the February 2024 disclosures, NYCB almost followed the path of Signature and the other collapsed banks. On March 6, 2024, trading in NYCB stock was halted several times as observers questioned whether the Bank could survive. Hours later, the Bank was saved after being bailed out by a $1 billion capital infusion made necessary because of the newly disclosed CRE losses and weaknesses in internal controls. ¶¶161-69. Since then, NYCB has detailed in public filings how its *admitted material weaknesses* impacted the Company's internal loan review capabilities and processes, and the adequacy of its accounting for credit losses ("ACL") and non-performing loans ("NPL"). ¶¶178-83. The Bank's financial results over the past year demonstrate how its previously hidden aggressive underwriting, poor asset and credit quality, and deficient risk management framework harmed the Bank and its investors (¶¶184-97), with the new CEO remarking that the Bank was trying to right past wrongs by "*clean[ing] up our house and get[ting] it in order*," emphasizing "*[w]e have a lot of work to do in this organization to put the risk structure in place*." ¶189.

### B. The Exchange Act Statements Were False and Misleading When Made

In assessing the sufficiency of the Complaint's allegations, the Court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). To adequately allege falsity, a complaint must plead facts "sufficient to support a *reasonable belief* as to the misleading nature of the statement or omission," *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015) (emph. in original). Statements may only be dismissed if "reasonable minds could not differ" on whether they were misleading. *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). Defendants challenge whether the Complaint's allegations of materially false and misleading statements and omissions are adequate. **They are**.

*First*, Defendants' statements discussing the Flagstar Merger and the status of its regulatory approval (and disapproval) were false and misleading because they failed to disclose that the FDIC opposed the Merger over concerns based in part on "NYCB's exposure to multi-family loans" and the banks' lending practices. ¶¶225-235. To avoid the imminent rejection of the Flagstar Merger by the FDIC, Defendants strategically restructured NYCB's and Flagstar's charters in order to replace NYCB's historic regulators at the FDIC with the OCC. ¶¶8, 225-235. *See United Indus. Workers Pension Plan v. Waste Mgmt., Inc.*, 2024 WL 1312593, at *4 (S.D.N.Y. Mar. 27, 2024) (defendants' statements concerning progress of regulatory approval and anticipated merger were false and misleading in light of DOJ's expressed concerns).

In response, NYCB argues that two of these statements expressing confidence in the merger are inactionable opinions. NYCB PMCL at 2 (citing ¶¶226, 234). However, Plaintiffs sufficiently allege that Defendants' statements did not "fairly align[] with the information in the issuer's possession at the time," namely, that the FDIC opposed the Merger. *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *14 (S.D.N.Y. Sept. 30, 2021) (opinion statements about bank's compliance with regulatory requirements were actionable given regulator's communications detailing defendants' continued failures). As the Second Circuit has made clear, "secret information renders prior public statements materially misleading." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993).

NYCB also incorrectly asserts that the Merger statements are forward-looking and thus protected by the safe-harbor and bespeaks caution doctrines. NYCB PMCL at 3. Defendants' misstatements are not forward-looking but rather representations of NYCB's present understanding of and belief in the Flagstar Merger. *See, e.g.*, ¶¶226-27, 229-30, 233. For example, the statement that "NYCB and Flagstar believe that the merger does not raise significant regulatory concerns and that they will be able to obtain all requisite regulatory approvals" is a false representation that the merger did not *currently* raise regulatory concerns. ¶231. The safe harbor and bespeaks doctrines do not protect misleading statements of "present or historical facts," even if "the statements are couched as predictions of future events." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 568-69 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016). Even if these statements could be considered forward-looking, they were not accompanied by meaningful cautionary language and are not entitled to the safe harbor. *Wells Fargo*, 2021 WL 4482102, at *15-18.

***Second***, Defendants misrepresented the adequacy of NYCB's risk management practices and controls. ¶¶236-54. Rather than "simply describ[ing] NYCB's policies," as NYCB asserts (NYCB PMCL at 2), the Bank depicted its risk management practices as "***strong***," "***sound***," "***robust***," and "***exacting***." ¶¶236, 246. But, as the Bank later admitted, NYCB lacked meaningful risk management controls or infrastructure, leaving the Bank vulnerable to massive losses that nearly destroyed the institution. Statements claiming strong internal controls are actionable when defendants were aware of "red flags" that "highlighted significant problems." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468–69 (S.D.N.Y. 2017). Additionally, NYCB's arguments that the risk management statements were forward-looking (NYCB PMCL at 3) fail for the reasons explained above—they are not forward looking, lack meaningful cautionary language, and were made with actual knowledge.

To the extent that Defendants argue the misstatements concerning risk management practices and controls are inactionable statements of corporate policies and culture, that argument also fails. C&H PMCL at 2. Statements made regarding a company's policies and procedures are actionable when made in context to provide "comfort to investors." *See In re Virtu Fin., Inc. Sec. Litig.*, 2025 WL 847824, at *12 (E.D.N.Y. Mar. 17, 2025). Defendants' statements regarding NYCB's risk management practices and controls provided "comfort to investors" when made in response to analysts' questions and concerns regarding market pressures on the Bank's highly concentrated CRE portfolio. For example, Defendant Cangemi's statements in ¶249 were made after analysts asked about NYCB's "risk management infrastructure" due to a series of recent bank failures (¶¶60-64) and a month after the Bank entered the heavily regulated Category IV banking class (¶¶2, 65-69). For the same reasons, these misstatements do not constitute inactionable puffery or corporate optimism. C&H PMCL at 2. For example, Cangemi's statements that "I'm very confident that ***we've built a very strong risk management team and we strengthened it every day***" and "***We're now a $100 billion bank. We're going to ensure that we have all of the appropriate risk management tools to be a $100 billion bank***" (¶241) were made in response to an analyst's question concerning NYCB's ability to meet enhanced risk management expectations. *Virtu*, 2025 WL 847824, at *9-10 (statements that "may first appear to be mere puffery" were not inactionable when "made repeatedly in an effort to reassure the investing public"). Defendants' citation to *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (NYCB PMCL at 2) does not help their case. In *Ong*, Chipotle's statements that it had established "food-safety programs and procedures," without characterizing the adequacy or success of those policies and procedures, were not false. *Id. Ong* is inapposite because here, Defendants repeatedly spoke as to the strength and soundness of the Bank's risk management practices and controls while, in reality, the Complaint alleges that NYCB had "***zero controls***" in place. ¶91; *see* ¶¶89-96.

***Third***, Defendants made false and misleading statements about the robustness of NYCB's loan review process, strong asset quality, and performance of its CRE loan portfolio. ¶¶255-340. Defendants incorrectly argue that these are inactionable puffery or statements concerning general corporate practices. NYCB PMCL at 2; P&A PMCL at 2. Once again, these arguments fail because the threats of heightened regulatory scrutiny, market volatility, and higher interest rates made Defendants' statements about its "strong" portfolio material and significant to investors. For example, Defendant Adams' statement that NYCB was not seeing "***a lot of cracks***" in its portfolio (¶335) was made in response to questions regarding the Bank's asset quality given the stress market factors had on similar banks. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("defendants did more than just offer rosy predictions; the defendants stated the inventory situation

was 'in good shape' or 'under control' while they allegedly knew the contrary was true."); *Virtu*, 2025 WL 847824, at *12; *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11-12 (S.D.N.Y. Nov. 26, 2018) (describing credit portfolio as "very strong," and "very healthy" was "not puffery at all" but rather "purported descriptions of the health of the business.").

Defendants also contend that these misstatements were inactionable opinion statements. NYCB PMCL at 2; C&D PMCL at 2. Not so. These misstatements are not "pure opinions" because they make representations as to present fact. For example, Cangemi states that NYCB's "***portfolio has been unbelievably strong from a credit perspective***" and "***we're not seeing any negative trends*** and the LTV is relatively low." ¶¶285, 335. "[O]ne of the more straightforward ways a statement of opinion may be actionable is if it contains an embedded statement of fact that is not true." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 42 (2d Cir. 2023). Even if these misstatements are opinions, they are actionable because Defendants did not have a reasonable basis for their misleading assertions. *See In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *11 (S.D.N.Y. Mar. 22, 2023). For example, Defendants' statement in ¶323 regarding the reasonableness of NYCB's "allowance for credit losses on loans and leases" is actionable because Defendants knew or were reckless in not knowing that the Bank's "inability to accurately disclose loan rating classifications [and] identify problem loans," significantly undermined its ability to properly recognize such allowances (¶322). *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 491–92 (S.D.N.Y. 2011) ("To the extent Bear Stearns knowingly used flawed models that would produce unreliable and skewed results, or recklessly disregarded such flaws, the results produced by those models and reported to investors are actionable misstatements.").

NYCB additionally argues that its financial statements reporting the amount of credit risk the Bank faced were not misleading because it never issued a restatement. NYCB PMCL at 2-3. However, falsity is not negated by the mere absence of a restatement. *See, e.g., Bear Stearns*, 763 F. Supp. 2d at 457 (finding falsity without a restatement). While NYCB never issued a restatement, the Bank's failure to adequately assess and calculate risk ultimately caught up to them, forcing them to disclose an ***800% increase in PCL, a 60% increase in ACL, a write off of $2.4 billion in goodwill, and admit to material weaknesses***. ¶¶125-28, 137, 153-60. A write off and other disclosures of this magnitude supports falsity and scienter. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (finding that a $73.8 million write-off supported plaintiffs' claim of fraudulent intent).

***Fourth***, NYCB made a series of false and misleading statements and omissions about its internal controls over financial reporting and their effectiveness. ¶¶341-46. In reality, NYCB's internal controls suffered from material weaknesses that "create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis." ¶345. These statements are actionable. *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (statements about a company's "effective" and "adequate" internal controls were actionable where defendants were aware of "numerous weaknesses" undermining the accuracy of these statements). Defendants do not even explicitly challenge the falsity of these statements and therefore they must proceed as ***unchallenged***.

### C. The Exchange Act Defendants' Scienter Is Adequately Alleged

In determining whether scienter is pled, "courts must, as with any motion to dismiss . . ., accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. Scienter is pled where a complaint alleges facts that give rise to a strong inference of recklessness by pleading that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 307, 311. Such a showing supports "the inference that the defendant[s] knew, or more importantly, should have known that they were misrepresenting material facts." *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 237 (S.D.N.Y. 2023). The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. "When the competing inferences rest in equipoise, the tie . . . goes to the plaintiff." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

The Complaint contains at least ***eleven*** independent allegations that, when viewed holistically, support a strong inference of scienter for each of the Exchange Act Defendants. For example, the Complaint alleges that Defendants repeatedly spoke about the issues at the center of the alleged fraud in response to analysts' inquiries and concerns (¶¶348-52). *See, e.g.*, *Signet Jewelers*, 2018 WL 6167889, at *15 (scienter regarding omission of negative credit exposure when defendants had said "[w]e fully understand the credit risk," "[w]e watch it closely," "we have every confidence in the way we manage our credit portfolio," "management monitors [its] credit exposure").

Moreover, the Complaint also contains allegations from multiple former employees, who confirmed that Defendants were aware of, *inter alia*, NYCB's deteriorating loan portfolio, risk management issues, and poor asset quality throughout the Class Period (¶¶353-56).[3] *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (scienter found where strong circumstantial evidence that defendants were receiving "some kind of information" on the topic existed).[4] Defendants' argument that these allegations are insufficient because none of the former employees had "direct personal contact" with certain Defendants (C&D PMCL at 3; P&A PMCL at 2) misconstrues clear guidance that "there is no baseline requirement of such contact" in order to allege scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015) (rejecting argument that witness allegations cannot be credited without contact with defendants).

Notably, NYCB purged its executive management within weeks of the corrective disclosures. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 322 (S.D.N.Y. 2024) (mass executive departures support strong inference of scienter); *see*

---

[3] These contemporaneous accounts negate Defendants' argument that Plaintiffs' allegations are limited to "fraud by hindsight." (NYCB PMCL at 3; C&D PMCL at 3).

[4] Defendants' case law is inapposite. *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 373 (S.D.N.Y. 2018) (broad allegations concerning data insufficient when each of the events upon which the falsity of misstatement depends occurred after the alleged misstatement).

*also Owen v. Reconnaissance Energy Africa Ltd. et al*, No. 1:21-cv-06176-NRM (E.D.N.Y. Nov. 14, 2024), ECF No. 68-10 at 66-67 (Morrison, J.) (motion to dismiss opinion issued following oral argument) (finding that two suspiciously timed executive departures "raise a strong inference of scienter that is at least as strong as any opposing inference.") (attached hereto as Exhibit 1).

Collectively, these allegations, and the importance of NYCB's asset quality and risk management framework to the Bank's business and operations, support a strong inference of scienter. *See Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) (misstatements concerning core aspects of Bank's operations provides "supplemental support for allegations of scienter.").

Defendants also argue that the Complaint is insufficient because the scienter allegations are directed "at groups of defendants." C&D PMCL at 3. First, these Defendants fail to realize that the Complaint does not, and need not, contain scienter allegations for the Signer Defendants because the claims against those defendants do not allege fraud. ¶¶413-15; *see also City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2016 WL 6652731, at *15 (S.D.N.Y. Nov. 10, 2016). Moreover, the Complaint's scienter allegations are not impermissibly grouped as Defendants contend. Rather, the Complaint contains specific allegations that are explicitly attributed to each of the Exchange Act Defendants by name. *See, e.g.*, ¶349 (attributed to Cangemi & Adams); ¶351 (Cangemi); ¶352 (Cangemi & DiNello); ¶354 (Adams, Cangemi, & DiNello); ¶355 (Cangemi); ¶356 (Adams); ¶358 (Cangemi); ¶360 (Cangemi, Pinto, Adams, & DiNello); ¶¶363-64, 366-67 (Cangemi); ¶371 (Cangemi & Pinto); ¶372 (Cangemi, Pinto, & Adams).

While the Complaint is focused on Defendants' actionable misstatements under Rule 10b-5(b), the Complaint adequately alleges that the Officer Defendants participated in a scheme to defraud NYCB investors pursuant to Rule 10b-5(a) and (c). ¶¶394, 399-400. A complaint "state[s] a scheme liability claim" if it adequately alleges: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). These claims succeed for the same reasons as stated above, and because, in addition, *inter alia*, the Complaint alleges that the individuals colluded to force through the Flagstar Merger over regulator resistance, professed readiness to meet Category IV standards when they knew that the Bank was simply not ready for the scrutiny and oversight, and concealed major loan deficiencies and internal controls weaknesses that nearly collapsed the Bank. This is enough and NYCB's unspecified challenge to the contrary (NYCB PMCL at 4) fails.

### D.     The Complaint Adequately Alleges Loss Causation

The Complaint sufficiently pleads loss causation by alleging that, *inter alia*, a series of disclosures occurred between January 31, 2024 and February 29, 2024, each of which disclosed new information related to, and materialized risks concealed by, the Exchange Act Defendants' misrepresentation and omissions, resulting in direct declines in NYCB's stock price (¶¶123-60, 375-82). This is sufficient. *See Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *14-15 (E.D.N.Y. Sept. 30, 2022) ("burden of pleading loss causation is a low one at the pleading stage"). NYCB's unspecified claim that the Complaint does not "connect" the corrective disclosures to the misstatements (NYCB PMCL at 3-4) is belied by the Complaint's plain language. *See, e.g.*, ¶135 (analysts noting disclosures conflicted with prior statement that "asset quality remained strong").

### E.     The Complaint Adequately Alleges Control Person Claims

Plaintiffs have adequately alleged a Section 20(a) "control person" claim by pleading (1) a primary violation, (2) control, and (3) culpable participation. *See Bear Stearns*, 763 F. Supp. 2d at 509. *First*, for the reasons stated above, Plaintiffs have pled a primary violation. *Second*, Defendants' control is established by, *inter alia*, the fact that they signed SEC filings and served as officers and/or directors of the Company. *See Behrendsen v. Yangtze River Port & Logistics Ltd.*, 2021 WL 2646353, at *17 (E.D.N.Y. June 28, 2021). *Third*, Defendants' culpable participation is established by the facts supporting their scienter. *See Wells Fargo*, 2021 WL 4482102, at *30.[5]

## II.    The Securities Act Claims Are Adequately Plead and Should Proceed to Discovery

### A.     Securities Act Misstatements and Omissions Are Adequately Alleged

The Complaint separately alleges violations of the Securities Act in connection with the Flagstar Merger. ¶¶413-519. The less exacting notice pleading standard of Rule 8 applies to Securities Act claims when, like here, the Complaint expressly pleads negligence, disclaims fraud, eschews language implying fraud, and separates allegations supporting negligence claims. *See Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024). "Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Arqit Quantum Inc. Sec. Litig.*, 2025 WL 977995, at *12 (E.D.N.Y. Mar. 28, 2025). The Complaint sufficiently alleges that the Offering Documents contained materially false and misleading statements and omissions, which are a subset of the Exchange Act misstatements. ¶¶449-90. *See In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 308 (E.D.N.Y. 2002) (false statements can "provide the basis for both the Section 10(b) claims and the Section 11 claims."); *see also Arqit*, 2025 WL 977995, at *21 (finding plaintiffs adequately alleged Section 12(a)(2) violation under Court's analysis of Section 11 claim).

Defendants DiNello and Treadwell seek dismissal because they signed the Merger offering documents pursuant to a Rule 438 "Consent of Prospective Director" form. NYCB PMCL at 4. This fails entirely. *See In re GigaCloud Tech. Inc. Sec. Litig.*, 2025 WL 307378, at *9 (S.D.N.Y. Jan. 27, 2025) ("for purposes of a Section 11 claim, there is no material difference between a director who signs the registration statement and someone … who signs the written consent required by 17 C.F.R. § 230.438 to be submitted with the registration statement."). NYCB's own case corroborates this obvious point. *City of Roseville Emps.' Ret. Sys. v. EnergySolutions*, Inc., 814 F. Supp. 2d 395, 408, n.4 (S.D.N.Y. 2011) (consent to be named is sufficient).

### B.     Securities Act Control Person Claims Are Adequately Alleged

The Complaint sufficiently pleads violations of Section 15 by establishing primary violations and alleging that the Signer Defendants exercised "control over the primary violator." *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *11 (E.D.N.Y. Aug. 12, 2021). Defendants fundamentally misrepresent what is required to allege "control" under Section 15. Plaintiffs do not need to show that Defendants had a role in the making of the challenged statements (DD PMCL at 3), but rather that they had "control over the *primary violator*," *i.e.*, NYCB. "It is well settled

---

[5] DiNello's observation that he "only" made four statements is not exculpatory. DD PMCL at 2. What matters is that he made them and is liable under prevailing law. *See* ¶¶227, 229, 234, 236, 288-89, 291.

law that officers and directors of the primary violator who signed the registration statements containing alleged violations fulfill the control prong." *Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*, 2012 WL 601448, at *20 (E.D.N.Y. Feb. 23, 2012). Moreover, the Director Defendants' reliance on *Behrendsen* is not only misplaced, but it also explicitly undermines their own position. *Behrendsen*, 2021 WL 2646353, at *17 (finding that plaintiffs satisfied the "control" element of a Section 20(a) claim because "control is pled adequately where an officer or director has signed SEC filings.").

### C.   IPRS's Standing to Bring Securities Act Claims Is Adequately Alleged

To plead a § 11 claim, a plaintiff must plead that she purchased or otherwise acquired "shares traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020). Additional plaintiff IPRS has satisfied this pleading requirement, and then some. IPRS "purchased or otherwise acquired over 145,000 shares of NYCB common stock during the Class Period, including 44,435 shares of NYCB traceable to the Offering when Indiana's shares of Flagstar common stock were converted into NYCB shares pursuant to and traceable to the Offering Documents." ¶22. IPRS also submitted a certification attached to the Complaint where IPRS's Executive Director declared "under penalty of perjury" that he was attaching a list of IPRS's Class Period transactions, which reflected the December 1, 2022 acquisition of 44,434 shares of NYCB common stock traceable to the December 1, 2022 Offering. ECF No. 69-1. NYCB's fractional shares argument is frivolous. NYCB PMCL at 4. There is no dispute that IPRS was a Flagstar shareholder whose Flagstar shares were converted to NYCB shares in the Merger. ¶22. Those Flagstar shares did not disappear; they had to be converted to NYCB shares. "Because the only securities that [IPRS] could have [acquired] . . . were those issued pursuant to the Registration Statement, Plaintiffs have established traceability." *Arqit*, 2025 WL 977995, at *14.

### III.   Conclusion

For the reasons stated herein, the Court should sustain the Complaint as adequately alleged and allow this case to proceed to discovery.

This letter is not intended to exhaustively detail the sufficiency of the Complaint's allegations, and Plaintiffs reserve the right to make additional arguments in opposition to any motion to dismiss, if allowed. Further, while Plaintiffs believe that the Complaint's allegations satisfy the requisite pleading standards, should the Court identify deficiencies that prevent any or all of Plaintiffs' claims from proceeding, Plaintiffs respectfully request the opportunity to amend the Complaint pursuant to Rule 15 to cure any such deficiencies and to reflect additional information resulting from Plaintiffs' continued investigation into Defendants' wrongdoing.

Respectfully submitted,

 /s/ *Lauren A. Ormsbee*
cc: Counsel of Record (via ECF)
Encl.