**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NEW YORK COMMUNITY BANCORP, INC. SECURITIES LITIGATION | Case No. 24-cv-00903-NRM-JRC<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**Served October 7, 2025** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS


GLOSSARY OF CERTAIN DEFINED TERMS ........ xi

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

SUMMARY OF RELEVANT FACTS ........ 5

A. NYCB's Asset Quality Was A Critical Marker Of NYCB's Financial Health ........ 5

B. NYCB Doubled Its Size, Inviting Increased Regulatory Oversight ........ 6

C. Defendants Touted "Stellar" Asset Quality In The Face Of A Volatile Market ........ 7

D. The Truth Is Revealed As NYCB Purges Its Leadership And Admits To Material Weaknesses In Its Loan Review And Risk Management Processes ........ 8

ARGUMENT ........ 10

I. THE COMPLAINT ADEQUATELY ALLEGES EXCHANGE ACT CLAIMS ........ 10

A. Defendants Made Materially False And Misleading Statements ........ 11

1. Misstatements Concerning The Flagstar Merger (Misstatements 1-7) ........ 11

2. Misstatements About NYCB's Risk Management (Misstatements 8-18) ........ 16

3. Misstatements About NYCB's Asset Quality And Loan Review Process (Misstatements 19-77) ........ 20

4. Misstatements About NYCB's Internal Controls (Misstatements 78-81) ........ 27

5. Misstatements About NYCB's Ineffective Policies (Misstatements 8, 9, 13, 15, 17, 70, 75-76, 78, 80-81) ........ 29

B. The Complaint Adequately Alleges A Strong Inference of Scienter ........ 31

1. Defendants' Own Admissions Establish Scienter ........ 32

2. The Officer Defendants Had Direct Knowledge of Falsity ........ 32

3. The Executive Exodus Supports Scienter ... 35

4. Defendants Repeatedly Spoke About Fraud-Related Issues ... 36

5. Temporal Proximity Of Statements And Disclosures Supports Scienter ... 37

6. The Magnitude Of The Fraud And Core Operations Support Scienter ... 37

7. Defendants' SOX Certifications Support Scienter ... 38

8. NYCB's Compensation Plan Supports Scienter ... 39

9. Confidential Witnesses Provide Compelling Support For Scienter ... 39

10. The Knowledge Of NYCB Employees Can Be Imputed To The Bank ... 40

11. GAAP Violations Contribute to a Strong Inference of Scienter ... 41

12. The Competing Inference Of Ignorance Is Implausible ... 41

C. The Complaint Adequately Alleges Loss Causation ... 42

D. The Complaint Adequately Alleges Scheme Liability ... 45

E. The Officer Defendants Are Liable As Control Persons ... 46

II. THE COMPLAINT ADEQUATELY ALLEGES SECURITIES ACT CLAIMS ... 47

A. IPRS Has Standing To Assert Securities Act Claims ... 47

B. The Offering Documents Misstatements Were False And Misleading ... 49

1. Plaintiffs' Securities Act Claims Are Subject To Rule 8 Notice Pleading ... 49

2. The Offering Documents Misstatements Were False Or Misleading ... 49

3. The Securities Act Defendants Are Liable For Material Omissions ... 50

C. Plaintiffs Allege Control Person Claims Against The Signer Defendants ... 52

CONCLUSION ... 52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)....................22

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)....................37

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009)....................34

*Alaska Elec. Pension Fund v. Flowserve*,
572 F.3d 221 (5th Cir. 2009)....................43, 44

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023)....................14

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 271 (S.D.N.Y. 2010)....................26, 34

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)....................10, 17

*In re Arqit Quantum Inc. Sec. Litig.*,
774 F. Supp. 3d 505 (E.D.N.Y. 2025)....................48

*In re Avon Prods., Inc. Sec. Litig.*,
2009 WL 848017 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009)....................19

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)....................32, 36

*Bettis v. Aixtron SE*,
2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016)....................37

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)....................3, 17

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)....................13

*Buhrke Fam. Revocable Tr. v. U.S. Bancorp*,
726 F. Supp. 3d 315 (S.D.N.Y. 2024)....................18

*In re CIT Grp., Inc. Sec. Litig.*,
349 F. Supp. 2d 685 (S.D.N.Y. 2004)....................37

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)....................48

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................33

*In re Coinbase Glob., Inc. Sec. Litig.*,
2024 WL 4053009 (D.N.J. Sept. 5, 2024), *reconsideration denied*, 2025 WL 1040633 (D.N.J. Apr. 8, 2025)....................48

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................38

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
738 F. Supp. 2d 614 (D. Md. 2010)....................18

*In re CRM Holdings, Ltd. Sec. Litig.*,
2012 WL 1646888 (S.D.N.Y. May 10, 2012)....................45

*Diabat v. Credit Suisse Grp. AG*,
2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)....................28, 33, 34, 37

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)....................38, 41

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522090 (E.D. Pa. Sept. 3, 2010)....................44

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....................18

*Eden Alpha CI LLP v. Polished.com Inc.*,
763 F. Supp. 3d 270 (E.D.N.Y. 2025)....................36

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)....................10

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)....................30

*Esfandiari v. Edgio Inc.*,
2025 WL 2444072 (D. Ariz. Aug. 25, 2025)....................28, 29

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)....................15

*In re Fannie Mae 2008 Sec. Litig.*,
742 F. Supp. 2d 382 (S.D.N.Y. 2010)....................22

*Freedman v. Value Health, Inc.*,
958 F. Supp. 745 (D. Conn. 1997)....................38

*Freidus v Barclays Bank PLC*,
734 F.3d 132 (2d Cir. 2013)....................51

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)....................35

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................23, 25, 32

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)....................27

*Gimpel v. The Hain Celestial Grp., Inc.*,
2025 WL 2749562 (2d Cir. Sept. 29, 2025) .................... *passim*

*In re Glob. Brokerage, Inc.*,
2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) ....................22

*In re Glob. Crossing Ltd. Sec. Litig.*,
2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005)....................47

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021)....................44

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021)....................19

*Gross v. GFI Grp., Inc.*,
162 F. Supp. 3d 263 (S.D.N.Y. 2016)....................4

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)....................36, 41

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
2021 WL 4341500 (S.D.N.Y Sept. 22, 2021)....................36

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ....................29, 36

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ....................24

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)....................................................................................................51

*In re Hub Cyber Sec. Ltd.*,
2025 WL 872078 (S.D.N.Y. Mar. 20, 2025) ...............................................................48, 49

*In Estée Lauder Co., Inc. Sec. Litig.*,
2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) ...............................................................43, 45

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)..........................................................................................40

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991)........................................................................................10

*Kuriakose v. Fed. Home Loan Mortg, Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd*, 543 F. App'x 72 (2d Cir. 2013)........................22

*Lasker v. N.Y. State Elec. & Gas Corp.*,
85 F.3d 55 (2d Cir. 1996)............................................................................................18

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
650 F.3d 167 (2d Cir. 2011)........................................................................................51

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)...................................................................................10, 42

*Lorenzo v. SEC*,
587 U.S. 71 (2019)...................................................................................................45, 46

*Malin v. XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009)...............21, 37

*In re Marsh & Mclennan*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)..........................................................................40

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).......................................................................................................10

*In re Merrill Lynch & Co. Rsch. Rpts. Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008)..........................................................................45

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)..............................................................................12, 16, 30

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013)..........................................................................28

*In re Mylan N.V. Sec. Litig.*,
2025 WL 1874621 (W.D. Pa. July 8, 2025) ....................46

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019)....................45

*In re Nevsun Res. Ltd.*,
2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013)....................39

*New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011)....................36

*Noto v. 22nd Century Grp., Inc.*,
35 F.4th 95 (2d Cir. 2022) ....................13, 14

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).................... *passim*

*Nutriband, Inc. v. Kalmar*,
2020 WL 4059657 (E.D.N.Y. July 20, 2020)....................34

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)....................18, 38

*Omnicare, Inc., v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)....................18, 22, 50

*Ong v. Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018), *aff'd*, 970 F.3d 133 (2d Cir. 2020)....................30

*Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*,
2025 WL 2613530 (S.D.N.Y. Sept. 10, 2025)....................51

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012)....................50

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)....................51

*Pappas v. Qutoutiao Inc.*,
2024 WL 4588491 (2d Cir. Oct. 28, 2024)....................49, 51

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................17

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)....................40

*Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*,
2012 WL 601448 (E.D.N.Y. Feb. 23, 2012)....................52

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................16

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)....................19, 31

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024)....................35, 42

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)....................36

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007)....................38

*SEC v. Martino*,
2025 WL 2782348 (S.D.N.Y. Sept. 30, 2025)....................22, 23, 27

*SEC v. Mercury Interactive, LLC*,
2011 WL 5871020 (N.D. Cal. Nov. 22, 2011)....................52

*SEC v. Rio Tinto plc.*,
41 F.4th 47 (2d Cir. 2022)....................21, 45

*SEC v. Sequential Brands Grp., Inc.*,
2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021)....................21

*SEC v. Sugarman*,
2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020)....................46

*SEC v. Terraform Labs Pte. Ltd.*,
708 F. Supp. 3d 450 (S.D.N.Y. 2023)....................46

*In re Shanda Games*,
128 F.4th 26 (2d Cir. 2025), *petition for cert. filed sub nom. Shanda Games Ltd. v. Monk*, No. 25-351 (Sept. 24, 2025)....................24

*Sharette v. Credit Suisse Int'l*,
127 F. Supp. 3d 60 (S.D.N.Y. 2015)....................11

*Sharma v. Rent the Runway, Inc.*,
751 F. Supp. 3d 82 (E.D.N.Y. 2024), *on reconsideration on other grounds*, 2025 WL 2637971 (E.D.N.Y. Sept. 12, 2025)....................50, 52

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)....................................................................................38

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)....................................................21, 23, 25, 35

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
2025 WL 2554474 (S.D.N.Y. Sept. 4, 2025)....................................................................44

*Slack Techs., LLC v. Pirani*,
598 U.S. 759 (2023)...........................................................................................................47

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010)......................................................................................20, 27

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010)...............................................................................19

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*,
941 F. Supp. 1369 (S.D.N.Y. 1996)..................................................................................46

*Stevelman v. Alias Res. Inc.*,
174 F.3d 79 (2d Cir. 1999)................................................................................................32

*In re SVB Fin. Grp. Sec. Litig.*,
2025 WL 1676800 (N.D. Cal. June 13, 2025)..................................................................17

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008)...............................................................................44

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...........................................................................................................31

*In re Tenaris S.A. Sec. Litig.*,
493 F. Supp. 3d 143 (E.D.N.Y. 2020)...............................................................................46

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)..............................................................................................14

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)...............................................................................14

*United Indus. Workers Pension Plan v. Waste Mgmt. Inc.*,
2024 WL 1312593 (S.D.N.Y. Mar. 27, 2024)...........................................................12, 27

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)...............................................................................33

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009)....................24

*In re Virtu Fin., Inc. Sec. Litig.*,
770 F. Supp. 3d 482 (E.D.N.Y. 2025) .................... *passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016)....................19

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)....................15, 32, 39

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023)....................32

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)....................12, 19, 27

*In re Williams Sec. Litig.-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ....................44

*zCap Eq. Fund LLC v. LuxUrban Hotels Inc.*,
2025 WL 2097951 (S.D.N.Y. July 25, 2025) ....................38

**Statutes**

15 U.S.C. § 78u-5(i)(1)(B)....................15, 26

**Other Authorities**

17 C.F.R. § 240.10b–5(b) ....................11

Arnold S. Jacobs, *Disclosure & Remedies Under the Sec. Laws* § 3:14 (Apr. 2025) ....................52

## GLOSSARY OF CERTAIN DEFINED TERMS[1]

| | |
|---|---|
| ACL | Allowance for credit losses on loans and leases, a valuation allowance reported on a company's balance sheet set aside to account for expected losses on loans, the calculation of which is governed by Accounting Standards Codification ("ASC") 326. |
| Category IV Banks | Risk-based category of U.S. banking organizations and holding companies of banks with $100 billion to $250 billion in total assets. |
| Charge-off | Refers to the amount of a loan balance that has been written off against the ACL. |
| Class Period | July 27, 2022 through February 29, 2024, inclusive |
| Complaint | Plaintiffs' Amended Consolidated Class Action Complaint For Violations of the Federal Securities Laws. ECF No. 69. References to the Complaint herein appear as "¶__". |
| CRE | Commercial Real Estate Loans, as defined in the CRE Guidance, which includes loans secured by real estate for multifamily residential properties, non-residential properties, and construction, development, and other land loans. |
| CRE Concentration Ratio | Refers to the sum of multi-family, non-owner occupied CRE, and acquisition, development, and construction ("ADC") loans divided by total risk-based capital. |
| CRE Guidance | Guidance issued by the Federal Banking Agencies (defined herein) in 2006: *Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580 (Dec. 12, 2006). |
| CW | Confidential Witness who was a former employee of NYCB. CWs are referred to in the masculine to preserve their anonymity. |
| CW-1 | Former member of NYCB's Regulatory Lending & Compliance Team from July 2020 until March 2024. ¶90, n.32.<br>Allegations attributable to CW-1: ¶¶11, 90-92, 94, 96, 99, 106-108, 118-120, 122, 239, 354. |
| CW-2 | Former employee in a senior role that supported the Chief Risk Officer from before the Class Period until the end of 2022. ¶96, n.35.<br>Allegations attributable to CW-2: ¶¶11, 96, 112, 239. |
| CW-3 | Former employee in Enterprise Risk Management (ERM) Governance from Fall 2021 to Fall 2022. ¶93, n.33.<br>Allegations attributable to CW-3: ¶¶93, 355. |
| CW-4 | Former employee since 2010 as a Vice President – Financial Loan Analyst, worked prior to the Class Period in NYCB's Loan Recovery department, and later as Vice President – Senior Internal Loan Review ("ILR") Analyst many years before the Class Period. CW-4 was employed with NYCB until Q1 2023. ¶94, n.34.<br>Allegations attributable to CW-4: ¶¶95, 122. |
| CW-5 | Former member of the Appraisal team from before the Class Period through |

[1] Capitalized terms have the meanings given in the above Glossary and the Complaint. Unless otherwise noted, all emphasis is added, and internal punctuation, quotations and citations are omitted.

| | |
|---|---|
| | the latter part of 2022. ¶99, n.36.<br>Allegations attributable to CW-5: ¶¶99-100, 103. |
| CW-6 | Former employee employed from Spring 2019 until Fall 2021, initially as a Junior Underwriter before being elevated to a Commercial Real Estate Underwriter in 2020. ¶101, n.37.<br>Allegations attributable to CW-6: ¶¶101-102, 104, 356. |
| CW-7 | Former Senior Asset Manager from Spring 2022 until Fall 2022. ¶117, n.39.<br>Allegations attributable to CW-7: ¶¶109-110, 117. |
| CW-8 | Former employee employed in a variety of roles between May 2015 and October 2022. Between September 2020 until July 2021, CW-8 was a Financial Coordinator. From July 2021 until his departure, CW-8 was a member of the Income and Expense ("I&E") Department (renamed to the CRE Analysis Department shortly before his departure) and had the role of CRE Financial Analyst II. ¶113, n.38.<br>Allegations attributable to CW-8: ¶¶113-116. |
| CW-9 | Former Commercial Loan Processor I from Fall 2020 to Spring 2021 and Commercial Loan Processor II from Spring 2021 to Fall 2021. ¶121, n.40.<br>Allegations attributable to CW-9: ¶121. |
| Defendants | Collectively, the Exchange Act Defendants and the Securities Act Defendants. |
| DX | Citations to "DX __" refer to the exhibits to the Declaration of Nina Yadava served by Defendants on August 8, 2025. |
| Exchange Act Defendants | Collectively, Defendants NYCB and the Officer Defendants. |
| Federal Banking Agencies | Collectively, the FDIC, Federal Reserve, and OCC. |
| Federal Reserve | The Federal Reserve System, the central bank of the United States that, *inter alia*, promotes the stability of the financial system. |
| FDIC | Federal Deposit Insurance Corporation, the regulator responsible for oversight of NYCB up and until the Flagstar Merger on December 1, 2022. |
| Flagstar | Flagstar Bancorp, Inc. |
| Flagstar Merger | NYCB's acquisition of and merger with Flagstar, which closed on December 1, 2022, also referred to as the "Offering." |
| IPRS | Plaintiff Indiana Public Retirement System |
| LTV | Loan-to-Value Ratio, which measures the balance of a loan as a percentage of the appraised value of the underlying property. |
| Misstatements | Misstatements numbered 1-81 are pled as actionably false and misleading under the Exchange Act and can be found in PX 1.<br><br>Misstatements numbered 82 through 93 are pled as material misstatements and omissions actionable under the Securities Act and can be found in PX 2. |
| MTD | Defendants' Motion to Dismiss the Amended Complaint, served by Defendants on August 8, 2025. |
| Multifamily | Multifamily real estate, including mortgage loans secured by a rental or cooperative apartment building with more than four units. |
| NPA | Non-Performing Assets consist of non-performing loans, Other Real Estate |

| | |
|---|---|
| | Owned (assets acquired through foreclosure), and other repossessed assets. |
| NPL | Non-Performing Loans consist of non-accrual loans and loans that are 90 days or more past due and still accruing interest. |
| NYCB | Defendant New York Community Bancorp, Inc. (referred to herein as "NYCB," the "Bank," or the "Company"). NYCB was also the Company's stock symbol on the New York Stock Exchange. After the Complaint was filed, NYCB legally became known as Flagstar Financial, Inc. *See* ECF No. 82. |
| OCC | Office of the Comptroller of the Currency, the regulator responsible for oversight of NYCB following the Flagstar Merger on December 1, 2022. |
| Officer Defendants | Collectively, Exchange Act Defendants Thomas R. Cangemi, John J. Pinto, Alessandro P. DiNello, and John T. Adams |
| PCL | Provision for credit losses, a reserve that reflects the increase in the ACL and is reported as an expense on a company's income statement, which is governed by ASC 326. |
| Plaintiffs | Collectively, Lead Plaintiff Boston Retirement System and additional plaintiff Indiana Public Retirement System ("IPRS") |
| PX | Citations to "PX __" refer to the exhibits attached to the Declaration of Lauren A. Ormsbee, filed herewith. |
| PX 1 | The Exchange Act Misstatements in PX 1 are numbered 1-81 and identify (1) the full Misstatement language and context, (2) all Complaint citations that relate to the Misstatement, (3) the original Defendant speaker and source where the Misstatement was made, (4) Defendants' legal challenges to the Misstatement, and (5) page references in the MTD and Plaintiffs' Opposition Brief that address Defendants' challenges. |
| PX 2 | The Securities Act Misstatements in PX 2 are numbered 82-93 and identify (1) the full Misstatement language and context, (2) all Complaint citations that relate to the Misstatement, (3) the original Defendant speaker and source where the Misstatement was made, (4) Defendants' legal challenges to the Misstatement, and (5) page references in the MTD and Plaintiffs' Opposition Brief that address Defendants' challenges. |
| Sarbanes-Oxley or "SOX" | Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 |
| Securities Act Defendants | Collectively, Defendants NYCB and the Signer Defendants |
| Signature | Signature Bridge Bank (formerly Signature Bank, N.A prior to the bank's failure) |
| Signer Defendants | Collectively, Defendants Thomas R. Cangemi, John J. Pinto, Alessandro P. DiNello, Robert Wann, David Treadwell, Dominick Ciampa, Hanif W. Dahya, Leslie D. Dunn, Marshall J. Lux, James J. O'Donovan, Lawrence Rosano, Jr., Ronald A. Rosenfeld, and Lawrence J. Savarese |

## PRELIMINARY STATEMENT

This securities class action arises from material Misstatements that NYCB and its most senior executives made to investors throughout the Class Period, the truth of which was revealed in a series of partial disclosures leading to the Bank's near collapse in the first quarter of 2024. This case is not about hindsight. It is about Defendants' admitted failure to maintain basic risk management controls while repeatedly assuring investors the opposite. When new management took over, they immediately discovered what the Exchange Act Defendants knew all along—the Bank was operating with "material weaknesses" that NYCB had concealed from Plaintiffs and the Class. Plaintiffs assert two distinct sets of claims on behalf of damaged NYCB investors: (i) securities fraud claims against the Exchange Act Defendants; and (ii) strict liability claims against the Securities Act Defendants, in connection with the Flagstar Merger.

In the first months of the Class Period, NYCB recklessly embarked on a dramatic growth-by-acquisition strategy, an approach that doubled NYCB's assets to over $100 billion, but which also subjected the Bank to heightened federal regulatory scrutiny for which it had "zero controls" in place. At the start of the Class Period, Defendants pushed through the Flagstar Merger after changing its charter and switching regulators, while hiding that the switch was necessary to avoid NYCB's longtime regulators at the FDIC from publicly rejecting the Merger out of concern over its lending practices. Defendants then orchestrated NYCB's ascent into heightened regulatory oversight by acquiring nearly $40 billion of a failed bank's assets, while telling investors that risk management was the Bank's "***#1 focus***," such that its "***comprehensive risk management framework***" and "***very strong risk management team***" supported Defendants' statements that NYCB was "***laser focused on credit quality***," and NYCB's critical CRE loan portfolio was "***sound***," "***unbelievably strong***," "***superb***," "***stellar*,**" and "***among the best in the industry***."

This aggressive growth spurt ultimately led to $1.2 billion in loss reserves, a write-down

of $2.4 billion in goodwill, the Bank's admission of "material weaknesses in the Company's internal controls related to internal loan review, resulting from ineffective oversight, [ineffective] risk assessment and [ineffective] monitoring activities," the untimely departure of fifteen executives (including three of four Officer Defendants), and NYCB's near collapse. As the truth was revealed in a series of disclosures, Plaintiffs and the Class suffered substantial losses.

In their MTD, Defendants ask this Court to ignore what they themselves admit: that NYCB operated with "material weaknesses" in internal loan review processes, "ineffective oversight, risk assessment and monitoring," and "lacked [an] appropriate framework" throughout the Class Period. ¶¶153, 181. They ask the Court to ignore that the FDIC rejected the Flagstar Merger for the very lending practice deficiencies they told investors did not exist. ¶¶53-59, 175-77. They ask the Court to ignore that new management fired virtually every risk and audit executive for "accountability" and took $1.257 billion in provisions after previously proclaiming over 18 months that NYCB's portfolio was "unbelievably strong," "superb," "stellar," and "among the best in the industry." ¶¶125, 212, 366-67, 374. This is not fraud by hindsight. This is fraud by admission.

Defendants' challenges to the Exchange Act and Securities Act claims should be rejected.

***First***, Defendants insist that they should never face any discovery into the alleged fraud that nearly collapsed the Bank, ***despite the fact that Defendants concede that 56 of the 81 alleged Misstatements are sufficiently alleged to be plausibly false and misleading***. *See* PX 1 (Defendants challenge only 25 of 81 Misstatements as "not false as pled"); MTD 28-31. Defendants contend instead that they are fully inoculated from liability because these Misstatements are either immaterial corporate puffery, inactionable statements of opinion, or are forward-looking and therefore entitled to the PSLRA's safe harbor. Defendants are wrong, and their arguments mischaracterize the statements at issue, ignore key facts, and misstate the law.

As an initial matter, the 25 Misstatements challenged as not adequately pled to be false and misleading[2] are just that, as supported by the Complaint's particularized allegations. Defendants' arguments that certain Misstatements are immaterial puffery[3] fare no better because statements are material when "made repeatedly . . . to reassure the investing public about matters particularly important to the company and investors." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017). Defendants repeatedly discussed each category of Misstatements, including the Bank's "bread and butter" CRE loan portfolio and focus on risk management, often in direct response to analysts raising concerns, clear indicia of materiality. Moreover, most of the statements Defendants challenge as inactionable opinions[4] or forward-looking statements entitled to a safe harbor[5] either lack the indicia of opinion or forward-looking statements, or are otherwise not the type of protected statements for which these doctrines were created. *See infra*, Argument §I.A.

***Second***, Defendants wrongly argue that the Complaint fails to plead their scienter. To the contrary, the Complaint details a strong inference of scienter; negating any weak claims of "mismanagement." First, Defendants admitted that NYCB lacked any effective loan review, underwriting and risk management practices during the Class Period, and the Complaint further alleges a host of facts establishing that each Defendant had access to facts that contradicted their public representations, such as through their receipt of monthly "Board Reports" detailing changes in information about all the Company's loans, information on "risky" and "non-performing" loans, and an "Issue Management Report" identifying "risk stripes" that highlighted "past due" and "critical" classifications. These facts alone suffice to plead scienter, but there is more, including that: (i) NYCB purged its executive leadership within days and weeks of the Bank's revelations,

[2] Misstatements 1-3, 5-7, 14, 19, 20, 24-25, 33-34, 45-46, 52, 54-55, 59, 65-66, 78-81.
[3] Misstatements 1, 6-10, 12-18, 21-22, 26-31, 35-40, 42-44, 47-51, 53, 56-58, 60-64, 67-74, 76.
[4] Misstatements 1-2, 4-10, 12-13, 15-16, 18-19, 21-24, 26-45, 47-51, 53-56, 57-58, 60-65, 67-74, 76-81.
[5] Misstatements 3, 5-7, 9-12, 15-18, 22, 27, 37, 39, 50, 59-61.

including three of four Officer Defendants; (ii) multiple FEs reported additional facts confirming Defendants' knowledge and that the Bank had "zero controls" in place; (iii) Defendants repeatedly spoke about central issues, including specifically denying NYCB's weakening asset quality; (iv) Defendants were responsible for the Bank's risk and asset review management functions, core operations of the Bank; (v) Defendants personally attested to the accuracy of the Company's financial statements and effectiveness of its internal controls; and (vi) Defendants' compensation was largely dependent on NYCB's performance. *See infra,* Argument §I.B.

***Third***, Defendants' assertion that the Complaint fails to establish loss causation is meritless. The "burden to plead loss causation is not a heavy one." *Gross v. GFI Grp., Inc.,* 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016). "[T]here is no heightened pleading standard" for loss causation and because Plaintiffs "allege[] declines in [NYCB's] stock price following [NYCB's] negative disclosures, the Plaintiffs have met the pleading standard." *Gimpel v. The Hain Celestial Grp., Inc.*, 2025 WL 2749562, at *18 (2d Cir. Sept. 29, 2025). *See infra,* Argument §I.C.

***Fourth***, the Complaint sets forth a scheme liability claim against the Exchange Act Defendants based on both the adequately pled false statements and omissions, together with deceptive acts in furtherance of the fraud, such as Defendants Cangemi's and Pinto's regulatory arbitrage that forced through the Flagstar Merger. *See infra,* Argument §I.D. ***Fifth***, as C-Suite level officers who spoke directly to investors on the key issues implicated in Defendants' fraud, the Officer Defendants are adequately alleged to be control persons. *See infra,* Argument §I.E.

Defendants' challenges to the Securities Act claims are equally hollow. IPRS has standing to bring these claims; indeed, Defendants make no credible challenge to the plainly alleged fact that IPRS was a Flagstar shareholder who acquired NYCB shares through the conversion effectuated through the Offering Documents, which completely proves its standing. *See infra,*

Argument §II.A. The Securities Act claims, subject only to Rule 8 notice pleading standard, are based on material Misstatements for the same reasons as their Exchange Act counterparts, as well as on actionable omissions required to be made pursuant to Items 105 and 303 of Regulations S-K, which mandates the disclosure of known risks, trends and uncertainties. *See infra,* Argument §II.B. Finally, the Signer Defendants' control cannot credibly be challenged. *See id.,* §II.C.

This Court should deny the motion to dismiss in full and allow the case to proceed.

## SUMMARY OF RELEVANT FACTS

### A. NYCB's Asset Quality Was A Critical Marker Of NYCB's Financial Health

NYCB is a leading producer of CRE (commercial real estate) loans collateralized by multi-family apartment buildings (its self-described "bread and butter" product) and other nonresidential commercial office and retail spaces. ¶31. NYCB's concentration of CRE loans, both prior to and during the Class Period was exceedingly high—more than double the 300% threshold for a "high" concentration designation—creating a significant level of risk to the Bank should its CRE loans fail. ¶¶32-35. To ease concerns, NYCB described its risk rating processes, touted its "heightened risk management practices," and claimed that its CRE portfolio was "instrumental to [NYCB's] production of solid earnings and [its] consistent record of exceptional asset quality." ¶¶35-37.

Intensifying the need for robust risk management protocols was a trifecta of market events—stark new rent regulation laws, skyrocketing post-pandemic office vacancies, and rising interest rates—all of which put stress on the CRE loan market. ¶¶38-45. Despite acknowledging in NYCB's public filings the need for proper internal controls and sound risk management processes, and even against a backdrop of volatile market conditions, Cangemi emphasized the strength of NYCB's CRE Portfolio—telling investors "***our multi-family portfolio is well insulated against recent changes in rent regulation laws***." ¶260 (citation modified).

### B. NYCB Doubled Its Size, Inviting Increased Regulatory Oversight

Despite these negative market forces, Defendants looked to radically accelerate the Bank's growth-by-acquisition strategy. Starting in mid-2022, NYCB experienced a radical growth spurt orchestrated by Cangemi, first merging with Flagstar (through the use of secret regulatory arbitrage when the Bank's historic regulator was set to reject the Merger) (¶¶46-59) and, just a few months later, acquiring billions of dollars of the assets of recently collapsed Signature, the last of three banks that collapsed in March 2023 from their own glaring risk management failures. ¶¶60-69.

The need for an adequate risk management framework and strong internal controls over financial reporting was already critical for a bank like NYCB with such a high CRE loan concentration. But NYCB's rapid and dramatic expansion during the Class Period would make the need for effective risk management even more pressing.

On December 1, 2022, NYCB completed a $2.6 billion merger with Flagstar (the biggest in NYCB's history), creating a regional banking franchise that ranked among the top 25 banks in the country. ¶448. Announced back in April 2021, Defendants never explained the reason for switching NYCB's bank charter from the FDIC to the OCC after a one-year delay. ¶¶53-55. Instead, NYCB lied, stating "***neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals***" required for the merger. ¶¶229, 452. Defendant DiNello assured investors that there were "***no complication[s]***" with obtaining regulatory approval. ¶¶56, 227. Meanwhile, Defendant Cangemi answered analyst inquiries about regulatory approval and the decision to switch federal regulators by saying "***we feel very confident where we are***." ¶226.

NYCB's expansion did not stop with Flagstar. In March 2023, three similarly sized U.S. banks collapsed: Silvergate Capital Bank, SVB, and NYCB peer, Signature. ¶¶60-64. Just eight days after Signature's collapse, the FDIC awarded NYCB the rights to buy $38 billion of dollars of Signature loans and regional bank branches (the "Signature Transaction"). ¶¶63, 65.

At the same time NYCB was proceeding with the Signature Transaction, regulators at the Federal Reserve and FDIC published "postmortem" reports that highlighted the risk management failures that precipitated the three banks' demise. ¶61. In Signature's postmortem report, the FDIC explained that Signature's senior management "did not prioritize appropriate risk management practices and internal controls" but was "reactive, rather than proactive." ¶63. Ultimately, the FDIC Report explained that Signature's death knell was the fact that the Board's "primary focus on growth, deposits, and profits took priority over the responsibility to ensure sound risk management." *Id.* This string of alarming bank collapses sent a strong message to the market that effective risk management practices and internal controls were essential to a bank's survival.

The Signature Transaction caused NYCB's total assets to surge beyond the $100 billion threshold, which meant that NYCB became a Category IV bank overnight, a status that rendered it subject to heightened regulatory standards and stricter supervision by the Federal Reserve. ¶68. For example, NYCB would be required to abide by stringent leverage capital requirements, liquidity standards, and other requirements for overall risk management and stress testing. *Id.*

### C. Defendants Touted "Stellar" Asset Quality In The Face Of A Volatile Market

To minimize the significant stressors on the CRE and multifamily portfolios, and NYCB's now heightened Category IV scrutiny, the Exchange Act Defendants assured compliance with the heightened regulatory requirements during the Class Period, and expressly assured investors that NYCB maintained a "stellar" CRE portfolio, a "***comprehensive risk framework***," and was "***laser focused on credit quality***." *See* Compl., §§IV.D-E. For example, CEO Cangemi, during an October 26, 2022 call, described NYCB's credit quality as the Bank's "hallmark," stating that: "***[o]ur asset quality and credit trends remain superb and continue to rank the company as among the best in the industry***." ¶¶72, 272. Similarly, during a January 31, 2023 call, CFO Pinto, told analysts and investors that "***the performance in th[e CRE] portfolio has been better than we***

***originally expected coming out of the pandemic***," and "***we're not seeing any negative trends***." ¶285. As late as October 26, 2023, Cangemi told investors that: "***we have a very strong portfolio with low LTVs and we monitor it carefully, and we're seeing consistencies of payment***." ¶331.

Upon announcing the Signature Transaction, Defendant Cangemi acknowledged the increased regulatory scrutiny, and emphatically assured investors that risk management was his "priority as CEO," and that NYCB's "job" was "to be risk managers" such that NYCB had already "***built a very strong risk management team, and we strengthen it every day, and we're up for the challenge and we're open to the regulatory landscape changing***." ¶¶76, 241. In truth, NYCB was not "up for the challenge." To the contrary, former employees describe how NYCB lacked a risk framework, had "zero controls" in place, and failed to effectively identify the multitude of problem loans through its loan review process. *See* Compl., §IV.F.

### D. The Truth Is Revealed As NYCB Purges Its Leadership And Admits To Material Weaknesses In Its Loan Review And Risk Management Processes

On January 31, 2024, NYCB shocked the market when it reported ***a net loss of $252 million due to a $552 million provision for loan losses—an 800% increase from the prior quarter***. NYCB slashed its dividend by 71%, rattling investors and analysts alike. Days later, Moody's slashed the Company's corporate debt rating to "junk." ¶¶125-27. NYCB stock dropped 38% on the initial news release, and another 11% following the Moody's downgrade. ¶128. While Defendants Cangemi and Pinto initially attributed these drastic financial moves to the Bank's decision to do a "deep dive on the office portfolio" (¶¶130-31), on February 5, 2025, *Bloomberg* reported that the "surprise decision to slash its dividend and stockpile cash" followed behind-the-scenes conversations with and "mounting pressure" from OCC officials and an unreported deterioration in the Bank's loan quality. ¶137. The article further explained that NYCB's Chief Risk Officer and Chief Audit Executive had clandestinely left the Company just weeks earlier, a

trend that had precipitated the demise of failed bank SVB. ¶¶138-39. NYCB stock dropped another 22% on this news. ¶141. In the wake of this news, NYCB shook up its leadership, instantly demoting and then weeks later terminating Defendant Cangemi as CEO. ¶¶143-44.

NYCB stock prices fell again when, on February 22, 2024, an industry watchdog revealed that the Flagstar Merger occurred through "***blatant regulatory arbitrage***" when NYCB evaded the FDIC's public rejection by "moving from an unfriendly federal banking regulator to a much more friendly one." ¶¶151-52. On February 29, 2024, NYCB delayed the filing of its Form 10-K, wrote off $2.4 billion in goodwill (reducing income by the same amount), and admitted to "material weaknesses in the [Company's] internal controls related to internal loan review, resulting from ineffective oversight, [ineffective] risk assessment and [ineffective] monitoring activities," revealing that the Company's "comprehensive risk framework" was a fallacy. ¶¶153-60, 212.

Information made known after has further confirmed and corroborated the inference that Defendants acted with scienter. For example, NYCB's top officers and directors responsible for risk management and credit risk assessment "resigned" or were otherwise removed from their positions in the space of four months between late 2023 and April 12, 2024, including CEO Cangemi, CFO Pinto, Adams, and the Chairmen of the Board's Risk Assessment, Audit, and Credit Committees. ¶¶173-74. Moreover, shortly after the February 2024 disclosures, NYCB almost followed the path of Signature and the other collapsed banks when, on March 6, 2024, trading was halted as observers questioned whether the Bank could survive. Hours later, the Bank was bailed out by a $1 billion capital infusion made necessary because of the newly disclosed CRE losses and weaknesses in internal controls. ¶¶161-69. Since then, NYCB has detailed in public filings how its admitted material weaknesses impacted the Company's internal loan review capabilities and processes, and the adequacy of its accounting for credit losses ("ACL") and non-performing loans

(“NPL”). ¶¶178-83. The Bank’s financial results over the past year demonstrate how its previously concealed failing underwriting, asset and credit quality, and deficient risk management harmed the Bank’s investors (¶¶184-97), with the new CEO explaining that NYCB was “***clean[ing] up our house and get[ting] it in order***,” emphasizing “***[w]e have a lot of work to do in this organization to put the risk structure in place***.” ¶189.

NYCB is still struggling to right the ship. As a result of Defendants’ scheme, investors lost billions of dollars and NYCB’s stock price has not recovered, closing at $12.10 per share on October 6, 2025—down from its Class Period high of $41.61 per share. ¶15.

## ARGUMENT

### I. THE COMPLAINT ADEQUATELY ALLEGES EXCHANGE ACT CLAIMS

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b), a plaintiff must allege: “(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.” *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). On a motion to dismiss, a court must “accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff’s favor.” *Emps.’ Ret. Sys. of Gov’t of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). “Fact-specific question[s] cannot be resolved on the pleadings.” *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).[6] The “alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities.” *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emph. in original).

[6] To the extent Defendants request the Court consider 21 documents appended to the MTD (*see* MTD 24 n.8), the Court may consider these documents “not to prove the truth of their contents but only to determine what the documents stated.” *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

### A. Defendants Made Materially False And Misleading Statements

It is unlawful to (1) "make any untrue statement of a material fact," or (2) "omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5(b). "These prongs correspond to two actionable theories . . .: (1) a false statement, *i.e.*, 'an actual statement . . . that is . . . 'untrue' outright,' and (2) a half-truth, *i.e.*, a 'representation[ ] that state[s] the truth only so far as it goes, while omitting critical qualifying information.'" *Hain Celestial*, 2025 WL 2749562, at *9. Plaintiffs need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). The Complaint identifies the Misstatements and details why each was materially false, misleading, or incomplete.

#### 1. Misstatements Concerning The Flagstar Merger (Misstatements 1-7)

The Bank was forced to amend the Merger Agreement by eliminating the need for FDIC approval because "the FDIC had already privately vetoed the transaction over concerns about the banks' lending practices" and "[n]o one at the FDIC was comfortable recommending a merger approval for [NYCB and Flagstar]." ¶¶176-77; 228. Defendants chose to discuss the Bank's decision to amend the Flagstar Merger terms while concealing the existential regulatory opposition that caused the amendment. Misstatements 1-7, made near the start of the Class Period, set the stage for NYCB's near collapse at the end of the Class Period. *See* ¶¶46-59; 151; 175-77; 225-35. On the first day of the Class Period, analysts asked for a "temperature check on obtaining regulatory approval" for the still-pending Merger, and specifically asked Defendants Cangemi and DiNello to "speak to . . . that national bank charter switch." ¶226. In response, Defendant DiNello denied any regulatory pushback, stating "***don't read anything into the National Bank piece of it. It's just an easy way to get there***. . . . ***There's no complication associated with the application because of the National Bank piece of it***" and further claimed that "***the National Bank target just***

***makes a lot more sense for our organization and for the combined organization as well*.**" ¶227 (Misstatement 2); *see also* ¶¶226, 233-34 (Misstatements 1, 6-7). The Offering Documents for the Flagstar Merger similarly failed to disclose the FDIC's opposition to the Merger while discussing the decision to amend the Merger Agreement, framing the change to a national bank charter as "***an appropriate charter for the combined company's banking operations***" (¶230 (Misstatement 4)), denied knowledge of "***any reason why [the banks] cannot obtain the regulatory approvals required***" (¶229 (Misstatement 3)) and confirmed that "***the merger does not raise significant regulatory concerns***" (¶231 (Misstatement 5)).

"Once a company speaks on an issue or topic," "there is a duty to tell the whole truth" in a "complete and accurate" manner. *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). Therefore, once Defendants chose to speak about the decision to amend the Merger Agreement and switch from FDIC to OCC approval and oversight, they were under a legal obligation to "speak truthfully about material issues" related to that change. *Id.*; *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *13-14 (S.D.N.Y. Sept. 30, 2021) (finding defendant did not have to speak about Wells Fargo's compliance with a regulatory order, "but instead, he chose to speak" and "assumed a duty to be both accurate and complete") (quoting *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002)); *United Indus. Workers Pension Plan v. Waste Mgmt. Inc.*, 2024 WL 1312593, at *4 (S.D.N.Y. Mar. 27, 2024) (finding defendants liable when they spoke about the anticipated timing of a merger's regulatory approval without disclosing that the DOJ had expressed strong antitrust concerns that would impact that timing). The FDIC's opposition to the Merger and concerns over the banks' lending practices was "material information that a reasonable investor would have wanted to know" and "[b]y not disclosing" that the FDIC opposition to the Merger caused the switch to the OCC when discussing the change in regulators,

especially in direct response to analyst questions, Defendants' statements about the switch "were not accurate and complete." *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022).

Defendants' self-incriminating position that six of these seven statements (Misstatements 1-3, 5-7) were "entirely true" because NYCB's decision to abandon of FDIC oversight in the face of its opposition to the Merger was in fact "just an easy way to get there" (¶227), and "the merger d[id] not raise significant regulatory concerns" (¶231) because it was then approved by new regulators ***at the OCC***, provides no cover here. *See* MTD 29. To the contrary, these arguments as to the statements' "literal truth" only solidify their materially misleading nature. The fact that Defendants' scheme to avoid FDIC's rejection of the Merger becoming public worked in no way absolves Defendants from their duty to disclose that NYCB's longtime regulator was so concerned about the banks' lending practices and CRE Concentration that it refused to approve the Merger.

Defendants' other challenges to Misstatements 1-7 all fail.

**Not immaterial puffery (Misstatements 1, 6, 7)**. Defendants argue that Cangemi's July 27, 2022 statement that "***we feel very confident where we are***" in response to an analyst's question about the "national charter switch" (¶226), and Cangemi's and Pinto's obfuscatory responses about "the regulatory process" in response to analyst questions about whether "anything [had] changed" (¶¶233-34) were inactionable "general corporate optimism." MTD 16. Not so. Materiality is a "delicate, fact-intensive" question that depends on all surrounding circumstances, and a determination of immateriality must be applied with "great caution." *See Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). The fact that analysts asked specifically about the regulatory process and switch away from the FDIC at a time when the market was concerned that the Merger would not receive approval provides direct evidence that Defendants' responses were material to a reasonable investor. *See In*

*re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 504 (E.D.N.Y. 2025) (not puffery when statements were made "during a time of concern" in an "effort to reassure the investing public"); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022) (not puffery "where a company makes a statement in direct response to concerns raised by investors about a specific risk"). Indeed, "defendants' false public denial of any knowledge" of any regulatory concerns or complications "amounts to an admission of the materiality of its nondisclosure [because] [o]therwise, the Company would not have tried to hide it." *Noto*, 35 F.4th at 106.

**Not inactionable opinions (Misstatements 1-2, 4-7)**. Defendants argue that certain of these Misstatements were "quintessential statements of opinion" and make the convoluted assertion that "a reasonable investor" would not "take from any of the statements at issue that the FDIC had expressed no misgivings about the merger." MTD 19-20. Misstatement 2 (¶227) is not an "opinion" statement at all. DiNello asserted that "the National Bank target just makes a lot more sense for our organization," commanded analysts not to "read anything into the National Bank piece of it. It's just an easy way to get there," and stated that "[t]here's no complication associated" with the switch. ¶227. Those are not opinions, by any measure. The remaining challenged Misstatements are not protected opinions under the securities laws because Defendants "omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016) (quoting *Omnicare, Inc., v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-87, 195 (2015)). "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.*; *see also In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *11 (S.D.N.Y. Mar. 22, 2023). As alleged, and as logic dictates, Defendants' failure to disclose that the FDIC was poised to reject the Merger would "conflict" with the reasonable investor's

understanding of Defendants' statements about the appropriateness of the regulatory switch and the lack of "significant regulatory concerns."

**No Safe Harbor (Misstatements 3, 5-7)**. The PSLRA safe harbor offers protection ***only*** if a statement is actually forward-looking, meaning that the statement discusses "the plans and objectives of management for future operations" (15 U.S.C. § 78u-5(i)(1)(B)), ***and*** (1) is "identified and accompanied by meaningful cautionary language;" or (2) "the plaintiff fails to prove that [the forward-looking statement] was not made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016). No safe harbor is available here because the four challenged Misstatements fail the first critical threshold—they are not forward-looking. Each contains and is derived from present or historical statements of fact. *See, e.g.*, ¶229 ("neither NYCB nor Flagstar ***knows*** of any reason why it cannot obtain the regulatory approvals required to consummate the transactions"); ¶231 ("NYCB and Flagstar ***believe*** that the merger ***does not*** raise significant regulatory concerns"); ¶233 ("***we're*** very comfortable that the business combination ***is*** [a] powerful opportunity for two companies to come together…"); ¶234 ("[t]he regulatory process ***is*** what it is" and "I ***don't think*** you should read anything into any of our comments today, other than ***we're still hopeful*** because we see that the -- ***as we always have, we've seen*** that the opportunity and power of the combined organization ***is*** really something special.").

Even if forward-looking, these Misstatements were not accompanied by "meaningful cautionary language." The only applicable cautionary language cited by Defendants (MTD 25) is meaningless because those risk factors do not warn of the already transpired regulatory arbitrage or that NYCB switched regulators to avoid FDIC rejection of the Merger. Cautionary language does not "insulate from liability the failure to disclose that the risk ha[d] transpired." *In re*

*Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Defendants also knew their positive statements about the FDIC rejection of the Merger and its role in the Merger amendment, removing safe harbor protection. *See infra*, Argument §I.B.

**2. Misstatements About NYCB's Risk Management (Misstatements 8-18)**

Defendants misrepresented the adequacy of NYCB's risk management practices and controls. ¶¶236-54. The Bank depicted its risk management practices as "***strong***," "***sound***," "***robust***," and "***exacting***." ¶¶236, 246. But NYCB has admitted that it lacked meaningful risk management controls or infrastructure, which left the Bank vulnerable to massive losses that nearly destroyed the institution. ¶¶88-122, 153-60, 178-83, 238. Defendants ***concede*** that the Complaint plausibly alleges that ten of the eleven Misstatements regarding the efficacy of NYCB's risk management practices were false and misleading. *See* PX 1 (no challenge based on "not false as pled" for Misstatements 8-13, 15-18). Therefore, it is undisputed that Defendants' representations that, for example, NYCB has "***sound risk management practices***" (¶236, Misstatement 8), has "***a very good risk management plan in place***" (¶242, Misstatement 10), and that NYCB was "***ready to be at that $100 [b]illion mark***" (¶250, Misstatement 16) are adequately alleged to be false.

Defendants make a single, yet improper, factual challenge to the falsity of Misstatement 14 (¶247). MTD 28. Cangemi assured investors that NYCB was ready to withstand increased regulatory scrutiny brought on by the Signature acquisition by claiming that the rushed approval of the acquisition "***speaks volumes of the faith and confidence our regulators have in our management team and business model***." ¶247. This was misleading and failed to "tell the whole truth" in a "complete and accurate" manner (*Meyer*, 761 F.3d at 250-51) because the approval said nothing about regulators' "faith and confidence" since they were statutorily compelled to accept NYCB's lowest bid for the Signature assets. ¶¶66, 247. Defendants ask the Court to consider an

extraneous press release to make a factual determination that the FDIC was not statutorily compelled to accept NYCB's lower bid for Signature Assets. MTD 28 & n.13. However, this press release is ambiguous, inconsistent with the Complaint's allegations, and raises improper questions of fact at this stage. *Am. Media*, 680 F.3d at 185.

Defendants' other challenges to Misstatements 8-18 all fail.

**Not immaterial puffery (Misstatements 8-10, 12-18)**. Defendants' claim that all but one of the risk management Misstatements are immaterial puffery (MTD 13-14) fails because their context elevates them well beyond puffery. These Misstatements were repeated throughout the Class Period—a time of major market volatility—to reassure investors that: (i) NYCB's risk management framework was ready for the increased regulatory scrutiny applied to Category IV banks (¶¶65-69, 76); (ii) NYCB's risk management was adequate, unlike the three banks that had recently failed (¶¶60-64, 72-75); and (iii) the Flagstar Merger did not raise any regulatory concerns (¶¶52-59). These statements were highly material to investors. For example, Cangemi's statements that "***I'm very confident that we've built a very strong risk management team and we strengthened it every day***" and "***We're now a $100 billion bank. We're going to ensure that we have all of the appropriate risk management tools to be a $100 billion bank***" (¶241) were made in response to an analyst's question concerning NYCB's ability to meet enhanced risk management expectations. Statements that, "viewed in isolation, may be mere puffery," "become material to investors" if repeated in a way that reassures investors about important matters. *BHP Billiton*, 276 F. Supp. 3d at 79; *Virtu*, 770 F. Supp. 3d at 503-04 (clearly material to boast about "high quality" of assets when opposite is true); *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *11-12 (N.D. Cal. June 13, 2025) (court should be "skeptical that Defendants' statements regarding the efficacy of its monitoring programs were unimportant to a reasonable investor"); *In re Petrobras*

*Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (rejecting puffery defense when statements repeated "to reassure the investing public about the Company's integrity"). Defendants' cases are inapposite. For example, in *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, generic risk management statements did not respond to specific concerns or misrepresent admittedly defective then-present risks. 553 F.3d 187, 197, 205-06 (2d Cir. 2009).[7]

**Not inactionable opinions (Misstatements 8-10, 12-13, 15-16, 18)**. The Court can quickly dispose of Defendants' challenge to eight of the eleven risk management Misstatements as inactionable opinions (MTD 20-21) because not one single risk management Misstatement conveyed "a belief, a view, or sentiment" that is protected under this doctrine. *Omnicare*, 575 U.S. at 183 (opinions are beliefs or views that do not imply certainty and often include "I believe" or "I think"). Defendants made concrete, present-tense representations about, *e.g.*, NYCB's internal controls (Misstatements 8, 12, 13), investments in its risk management framework and team (Misstatement 9), pledgeability of its portfolio and attendant risk management plan (Misstatement 10), and its capabilities as a Category IV bank (Misstatements 15, 16, 18). Defendants' citation to *Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.* is entirely inapposite as the statements at issue there—such as "I think [California's] operating well" and "Now, in my view, we're making visible progress here"—were "quintessential statements of opinion" that are lacking here. 300 F. Supp. 3d 551, 575 (S.D.N.Y. 2018), *aff'd*, 771 F. App'x 51 (2d Cir. 2019).

**No Safe Harbor (Misstatements 9-12, 15-18)**. Finally, there is no safe harbor protection

[7] The same is true of the Defendants' other cases. *Lasker v. New York State Electric & Gas Corp.* also involved only broad statements about earnings opportunities and prosperity, 85 F.3d 55, 59 (2d Cir. 1996). Defendants' description of *Buhrke Family Revocable Trust v. U.S. Bancorp* omits that the court there found that statements concealing the possibility that the company's "risk management framework might be ineffective" were not puffery, 726 F. Supp. 3d 315, 342-44 (S.D.N.Y. 2024). And in *In re Constellation Energy Group, Inc. Securities Litigation*, unlike here, plaintiffs failed to tie the company's "general" statements about strong risk management to systemic deficiencies tied directly to the Company's near collapse. 738 F. Supp. 2d 614, 631 (D. Md. 2010).

applicable to these Misstatements (MTD 25-27) because they are simply not forward-looking; the plain language of each Misstatement makes clear that each contains present or historical statements of fact.[8] The safe harbor does not protect misleading statements "about historical and present facts," whether or not they are "couched as predictions of future events." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010) ("[W]hen an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply."); *see also Wells Fargo*, 2021 WL 4482102, at *18 (statements not forward-looking when "describing the Bank's current or past progress—*e.g.*, '*we're in* complete agreement'; '*we're in the midst* of implementing that'; '*we're continuing to* actively work and implement the new risk management framework.'") (emph. in original).[9]

Even if viewed as forward-looking (which they are not), these Misstatements were not accompanied by relevant and "meaningful cautionary" disclosures. General references to NYCB's 2022 Form 10-K are insufficient, as Defendants "cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings, because such a broad disclaimer fails to alert investors to the specific risks they are facing." *In re*

---

[8] *See, e.g.*, Misstatement 9 ("***We're now*** a $100 billion bank…***We've made*** sizeable investments."); 10 ("our portfolio ***is*** pledgeable…***we have*** a very good risk management plan ***in place***"); 12 ("management ***has formed*** a highly capable and effective program….The Company ***has maintained*** a high level of enterprise risk management incorporating best practices from NYCB and Flagstar procedures. The Company ***has developed*** a comprehensive risk framework….).

[9] Defendants' cases require no different result as they do not involve "any representation they make regarding present or historical fact." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 386 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021); *see also In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848017, at *16-17 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009) (statements about "the effect of a decision by the Chinese government" on a company's "expected future performance" forward-looking).

*Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016). And neither boilerplate disclosures about the ways in which NYCB is "supervis[ed]" and "regulat[ed];" nor vague warnings about NYCB's ability to "meet applicable capital guidelines;" nor handwaving at "general economic conditions," "changes in interest rates," "changes in real estate values," and "changes in the quality or composition of our loan or investment portfolios" (MTD 26-27) constitute the "extensive and specific" disclosures required of NYCB. *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010).

### 3. Misstatements About NYCB's Asset Quality And Loan Review Process (Misstatements 19-77)

Defendants made 58 Misstatements about the robustness of NYCB's loan review process, NYCB's "***strong***," "***unbelievably strong***," "***stellar***," "***superior***," and "***superb***" asset quality that was "***better than our industry peers***," and the Bank's net income and CRE credit metrics, including its ACL, PCL, which were reported in violation of GAAP. ¶¶255-340 (Misstatements 19-77). Defendants ***concede*** that 45 of these 58 Misstatements are adequately alleged to be false and misleading, arguing only that they should be dismissed as puffery, opinions, or forward-looking. *See* PX 1 (Misstatements 21-23, 26-32, 35-44, 47-51, 53, 56-58, 60-64, & 67-77 ***not*** challenged as "not false as pled"). Indeed, Defendants would be hard-pressed to challenge their falsity when, for example, NYCB admitted at the end of the Class Period that it "did not sufficiently maintain effective control activities related to internal loan review," and escaped collapse only by virtue of a $1 billion capital infusion made in direct response to these now-disclosed CRE losses and material weaknesses. ¶¶123-69, 178-97.

The thirteen Misstatements Defendants do challenge as "not false as pled" are NYCB's quarterly statements reporting the Bank's understated ACL and PCL, and overstated net income, each of which were false and misleading because they failed to reflect NYCB's true asset quality

deterioration and losses. *See* Misstatements 19-20, 24-25, 33-34, 45-46, 54-55, 65-66. In conceding that the 45 other asset quality and loan review process Misstatements are adequately alleged to be false, Defendants ***nowhere*** challenge the Complaint's allegations that the reported ACL and PCL violated GAAP. Therefore, the reported ACL, PCL, and net income were misstated because of the Bank's admitted "[in]ability to accurately disclose loan rating classifications [and] identify problem loans," which impacted NYCB's "recognition of the allowance for credit losses on loans and leases." *See, e.g.*, ¶¶198–211, 262. By failing to contest the falsity of the GAAP violations or the statements describing Defendants' methodology for assessing the credit quality upon which ACL and PCL were derived, Defendants have waived the right to otherwise challenge the falsity of these 13 Misstatements.

In support, Defendants argue only that these Misstatements cannot be false because the Bank issued no restatement. MTD 30. To the contrary, courts have consistently held that restatements are not required to plead falsity. *See SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *8 (S.D.N.Y. Sept. 30, 2021) (rejecting argument that lack of restatement precludes falsity "because [t]o hold otherwise would shift to accountants the responsibility that belongs to the courts"); *SEC v. Rio Tinto plc*, 2019 WL 1244933, at *19 (S.D.N.Y. Mar. 18, 2019) (finding that plaintiff plausibly alleged that business was misvalued and metrics were materially false in company's financial report in absence of a restatement); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018) (rejecting argument that the lack of a restatement or dramatic increase to reserves exonerates defendants from falsity). Defendants' cited cases are not only unavailing, but they support falsity here. *See Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 148 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (falsity adequately alleged where, in lieu of restatements, a complaint alleges facts "indicat[ing] that the results reported by Defendants

were inaccurate at the time reported, or that Defendants had knowledge of any inaccuracy").[10] Defendants also ignore that Plaintiffs expressly alleged that Defendants should have restated (¶214), and ignore that the enormity of the disclosures, with more than $1.2 billion in write-downs and admitted grossly deficient internal controls that laid bare the Bank's deeply impaired assets and extreme credit risk, are sufficiently tantamount to a restatement to support material falsity.

**Not inactionable opinions (Misstatements 19, 21-24, 26-45, 47-51, 53-54, 56-58, 60-65, 67-74, 76)**. Defendants argue with little reasoning that 49 of the 58 Misstatements in this category are inactionable opinions, MTD 20-22. ***First***, the vast bulk of Misstatements about the "strength" of NYCB's asset quality are not protected opinions because they did not convey "a belief, a view, or sentiment" that is protected under this doctrine. *Omnicare*, 575 U.S. at 183.[11] ***Second***, to the extent they can be construed as opinions, they are actionable because they "contained embedded false statements of fact and/or did not align with objective financial information regarding the Bank that was in [Defendants'] possession at the time." *SEC v. Martino*, 2025 WL 2782348, at *7 (S.D.N.Y. Sept. 30, 2025); *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").

---

[10] *See also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (sustaining claims based on risk management and internal controls misstatements). Moreover, *Kuriakose v. Federal Home Loan Mortgage Corp.* expressly recognizes that the absence of a restatement is "not dispositive" of whether a company materially misstated its financials. 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012), *aff'd*, 543 F. App'x 72 (2d Cir. 2013). And, as opposed to the facts here, in *Kuriakose*, the "accounting violation, *by itself*, was the basis for, or not directly connected to, the plaintiff's adequately pleaded claims of securities fraud." *In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *12 (S.D.N.Y. Mar. 28, 2019) (emph. in original).

[11] *See, e.g.*, Misstatement 21 (asset quality "***remained***" "***strong***" and "***stellar***" "***[b]y almost any measure***"); 31 ("***strong asset quality metrics***"); 50 ("***[NPA and NPL] are proof positive***"); 51 ("***strong performance***" because "***very comfortable with the LTV, the debt service coverage ratio***"); 57 ("***superior asset quality***" due to strength in NPAs and low net Charge-offs); 58 ("***asset quality [] metrics remain strong***" due to NPAs and no net Charge-offs); 69 ("***our asset quality metrics remain solid and continue to rank among the best relative to the industry and our peers***" citing to low NPLs and net Charge-offs).

Defendants specifically argue that the Misstatements "related to NYCB's reserves and management's view of the adequacy of those reserves" are inactionable opinions. MTD 21 (challenging Misstatements 19, 23-24, 33, 41, 45, 53-54, 64-65 77). However, these Misstatements, *i.e.*, the reported ACL and PCL, omitted material information about NYCB's loan review processes and methodologies that concealed that the Bank could not effectively assess asset quality, which conflicts with the reasonable investor's understanding that Defendants' reserves were based on objective and reliable information related to the Bank's "superb" asset quality. *See Martino*, 2025 WL 2782348, at *7 (Silvergate CEO's false statements concerning bank's OTTI (an impairment measure) and numbers derived from the OTTI were actionable because statements about methodology behind calculation were false statements of fact, rendering the opinion statements actionable and lacking sufficient cautionary language). Omitting information about the reality of the Company's internal controls would conflict with what a reasonable investor would infer from these metrics—that they were accurate as reported. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 188 (S.D.N.Y. 2010) ("[F]alse statements regarding loan loss reserves" actionable where "[d]efendants represented that the loan loss allowance was based on careful monitoring of the quality of the portfolio and other relevant conditions"); *Signet Jewelers*, 2018 WL 6167889, at *13 (finding reserve misstatements actionable where allegations supported conclusion that defendants knew that reserves did not account for losses that it was likely to incur). As Defendants admitted, NYCB's loan review procedures were deficient and unable to accurately capture and measure these metrics or restate them even if they wanted to. While, as Defendants contend, a risk of some "lapse" in assessing reserves may be inevitable, MTD 21, there is a profound difference between "lapses" and a wholesale inability to generate accurate figures because core loan review processes are fundamentally flawed. Additionally, accounting metrics,

such as ACL, PCL, and net income, are actionable where they "create the misleading impression that [] projections were prepared using acceptable accounting techniques." *In re Shanda Games*, 128 F.4th 26, 45–46 (2d Cir. 2025), *petition for cert. filed sub nom. Shanda Games Ltd. v. Monk*, No. 25-351 (Sept. 24, 2025) (amortization and depreciation metrics misleading as "basic accounting principles were violated in the[ir] preparation"). Defendants' Misstatements that they were "comfortable" with the reported ACLs and PCLs are similarly actionable as Defendants could not provide a genuine assessment of comfort given NYCB's deficient review processes.

Defendants also fail to meaningfully challenge as opinions the other alleged hard financial metrics in each Misstatement—including the ***precise amounts and values*** of NPAs, NPLs, past due loans, and net Charge-offs. The concrete values of these figures are "presently existing, objective facts" about NYCB and its loan portfolio. *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *13 (E.D.N.Y. Sept. 27, 2019); *see also Hain Celestial*, 2025 WL 2749562, at *13 (misstated financial results, compliance with GAAP, descriptions of revenue-recognition policies are all viable material misstatements of present fact). It is clear that "[m]isreported financial information clearly amounts to a false statement of fact." *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) ("financial misstatements," coupled with misstatements "regarding the progress of internal control improvements" satisfy a Rule 10b-5 claim, especially where defendants "knew or recklessly disregarded that [the company's] financial statements were not prepared in accordance with GAAP").

**Not immaterial puffery (Misstatements 21-22, 26-31, 35-40, 42-44, 47-51, 53, 56-58, 60-64, 67-74, 76)**. Defendants cherry pick some words from a few Misstatements and broadly claim, without any substantive discussion of the actual Misstatements or their context, that 40 of the 58 Misstatements in this category are inactionable because (a) they are "broad, generic

statements [that] are too vague to be actionable" or (b) they are statements about "NYCB's 'conservative' underwriting policies, its '[l]ow risk credit culture,' and its general 'business strategy'" are "mere puffery." MTD 14-15. These arguments fail because the threats of heightened regulatory scrutiny facing the Bank, market volatility, and higher interest rates made Defendants' dozens of affirmative statements about NYCB's "***strong***," "***unbelievably strong***," "***stellar***," "***superior***," and "***superb***" asset quality that was "***better than our industry peers***" highly material and significant to investors.

For example, on July 27, 2023, Cangemi responded to an analyst question about the increase in non-performing loans and assured investors that NYCB "was covered there when it comes to any potential loss," its "businesses were thriving," and it had "a very strong capital position." Misstatements 59-61. Months later, Defendant Adams' October 26, 2023 statement that NYCB was not seeing "a lot of cracks" in its portfolio was made in direct response to questions regarding the Bank's asset quality given the stress market factors had on similar banks. *See* ¶335, Misstatement 74. These types of statements are highly material and cannot be dismissed as immaterial puffery. *See Freudenberg*, 712 F. Supp. 2d at 191 (finding statements touting asset quality actionable where defendants misrepresented specific credit characteristics and denied increased riskiness of loan portfolio despite knowing risk had risen); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("[D]efendants did more than just offer rosy predictions; the defendants stated the inventory situation was 'in good shape' or 'under control' while they allegedly knew the contrary was true."); *Virtu*, 770 F. Supp. 3d at 506-07; *Signet Jewelers*, 2018 WL 6167889, at *11-12 (describing credit portfolio as "very strong," and "very healthy" was "not puffery at all" but rather "purported descriptions of the health of the business").

Moreover, Defendants' misstatements about NYCB's "conservative" underwriting and

"low-risk credit culture" are actionable because, as admitted (***and as not challenged at all by Defendants***), these statements were false as pled. "[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play'" because, "[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241 271 (S.D.N.Y. 2010). Here, like in *Ambac*, "given that [defendants] characterized the company's underwriting standards as…'conservative,' the failure to disclose a lowering of such standards was a material omission." *Id.* NYCB's statements were not mere "generalizations," as Defendants contend (MTD 15); they were concrete misrepresentations that concealed the dismantling of the Company's underwriting standards, asset quality, and risk assessment framework.

**No Safe Harbor (Misstatements 22, 27, 37, 39, 50, 59-61)**. PSLRA's safe harbor does not protect NYCB's six challenged asset quality and loan review Misstatements because they are not forward-looking. All are plainly past- and- present-tense descriptions of the Company's conditions and operations. *See, e.g.*, Misstatements 22, 27 ("Our Multi-Family Portfolio ***is*** Well Insulated Against Recent Changes in the Rent Regulation Laws"); 37 ("Our credit quality ***remains*** **--** metric ***remain*** solid, and ***reflect*** the strong credit culture of both legacy organizations..."); 39 ("really throughout the CRE and portfolio ***has been*** unbelievably strong from a credit perspective;" "***we're not seeing*** any negative trends…"); 50 ("these metrics ***are*** proof positive that our conservative underwriting standards ***have served*** us well over numerous credit cycles"); 60 ("The good news is that our businesses ***are thriving***. . ."). These statements are obviously not "plans and objectives" for the "future," as required for a statement to be forward-looking. 15 U.S.C. § 78u-5(i)(1)(B); *see Wells Fargo*, 2021 WL 4482102, at *18 (statements not forward-looking where

speaker "was describing the Bank's current or past progress—*e.g.*, 'we're in complete agreement;' 'we're in the midst of implementing that;' 'we're continuing to actively work and implement the new risk management framework.'").

Nor can Defendants rely on boilerplate risk disclosures. The generic warnings offered by Defendants—"the effect of the COVID-19 pandemic," "remedial actions" by governments, "changes in interest rates," "comprehensive…supervision and regulation," and risks posed by "changes in the quality or composition of [] loan or investment portfolios"—do not shield misrepresentations about current conditions. MTD 24-27;[12] *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) (boilerplate risk disclosures do "not rise to the level of 'meaningful' cautionary language"); *Martino*, 2025 WL 2782348, at *8 (disclaimers insufficient where they did not warn of inaccurate statements and calculations that "bore some risk resulting from [defendant's flawed] methodology").

Regardless, the Complaint's particularized allegations regarding Defendants' actual knowledge (*see infra*, Argument §I.B.) renders the PSLRA safe harbor inapplicable. *See Waste Mgmt.*, 2024 WL 1312593, at *5 ("actual knowledge precludes the safe harbor" and rejecting application of PSLRA safe harbor and bespeaks caution doctrine for the same reasons).

**4. Misstatements About NYCB's Internal Controls (Misstatements 78-81)**

Defendants' representations concerning NYCB's internal controls over financial reporting and disclosure controls and procedures were also materially false and misleading. In every quarter throughout the Class Period, Defendants represented that "***the Company's disclosure controls and procedures were effective***." ¶341. NYCB's 2022 Form 10-K likewise attested that management

[12] *Slayton*, which Defendants cite to support that their cautionary language warrants safe harbor protection, MTD 25, actually supports Plaintiffs because the court held that defendants' cautionary language did not provide protection because it was vague and "verges on the mere boilerplate." *Slayton*, 604 F.3d at 771-73.

had assessed the effectiveness of the Company's internal controls over financial reporting and "***concluded that the Company's internal control over financial reporting as of December 31, 2022 was effective using this criteria***." ¶344. Cangemi and Pinto signed Sarbanes-Oxley ("SOX") certifications for each 10-Q and 10-K, which represented that NYCB's filing was "accurate and complete;" NYCB had appropriate internal controls, disclosure controls and procedures; and its financial statements fairly presented, in all material respects, *inter alia*, the Bank's financial condition and results of operations. ¶¶342-44.

These Misstatements are actionable because they were flatly contradicted by NYCB's admissions that the Bank's internal controls suffered from four material weaknesses that "create a reasonable possibility ***that a material misstatement to the consolidated financial statements will not be prevented or detected*** on a timely basis." ¶345. These statements are also false and misleading because the financial statements subject to these certifications violated GAAP, which is uncontested by Defendants. *Id.*[13] Statements regarding the effectiveness of a company's internal controls over financial reporting have been found to be materially false where Defendants subsequently admit material weaknesses, as they did here. *See Hain Celestial*, 2025 WL 2749562, at *10 n.13; *Esfandiari v. Edgio Inc.*, 2025 WL 2444072, at *6 (D. Ariz. Aug. 25, 2025); *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (statements touting a company's "effective" and "adequate" internal controls are actionable where defendants knew of "numerous weaknesses" undermining their accuracy).

The SOX certifications are not inactionable opinions (MTD 30-31) because the Complaint adequately alleges that the certification "does not rest on the issuer's 'meaningful inquiry' or 'fairly

[13] *See Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *63 (S.D.N.Y. Sept. 19, 2024) (finding SOX certifications can be materially false and misleading when complaint alleges that defendants violated a specific GAAP or SEC provision and defendants did not genuinely hold such opinions).

align with the information in the issuer's possession at the time,'" as evidenced, *inter alia*, by "disclosure of material weaknesses in internal controls." *Hain Celestial*, 2025 WL 2749562, at *10 n.13; *see also Edgio*, 2025 WL 2444072, at *6 (SOX certifications actionable where defendants "later admitted that '[company] did not maintain sufficient internal controls over the financial reporting process'"); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021) (SOX certifications addressing internal controls actionable where defendant "admitted that its internal controls were materially deficient"). As explained herein and in the Complaint, Defendants Cangemi and Pinto were aware of facts that contradicted the certifications when they were signed. *See infra*, Argument §I.B.

#### 5. Misstatements About NYCB's Ineffective Policies (Misstatements 8, 9, 13, 15, 17, 70, 75-76, 78, 80-81)

Defendants invent a new defense that the Company's affirmative representations of the existence of "policies and procedures that ultimately proved ineffective" "does not work" as a theory of falsity. MTD 16-17. ***First***, this is nothing more than a flimsy attempt to relitigate their puffery argument and should not be credited. *See Virtu*, 770 F. Supp. 3d at 509-10 ("To the extent Defendants intend to argue that general statements about compliance policies are inactionable, they are arguing that [they] are immaterial puffery without stating so."). These statements are not puffery for the reasons discussed *supra*, Argument §I.A.1-4.

***Second***, these Misstatements are not inoffensive descriptions of policies but were made to reassure investors that the Bank had effective safeguards in place during a period of heightened risk. Given the context in which these policies and procedures were affirmed, and the ineffectiveness of such policies, these misstatements are actionable. For example, in *Virtu*, the Court sustained descriptions of policies because they were not "isolated remarks about [] policies and procedures" but were made "in the context of [the company's] merger…to provide assurances

to potential, as well as existing clients, and investors that [company] had the necessary policies and procedures in place…" when in fact those measures had failed. *Id.* at 507-08.

So too here: Defendants' repeated descriptions of NYCB's risk management and internal control policies were specifically made to assuage investor concerns over, *inter alia*, NYCB's overnight transition to a Category IV status, the dramatic collapses of peer banks, and the Bank's exceedingly high CRE Concentration amid rising interest rates and stark rent regulation laws—all while NYCB's controls were so deficient as to be virtually non-existent.[14] *See Meyer*, 761 F.3d at 251 (description of equipment and monitoring teams actionable where it "gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations"). Defendants' sole legal support for the proposition that these repeated misstatements "simply describe" internal controls which "ultimately proved ineffective"—*Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018), *aff'd*, 970 F.3d 133 (2d Cir. 2020)—is inapposite and has been cabined and criticized by numerous courts. For example, as the *Virtu* court in this District recently explained, *Ong* involved descriptions of policies that the company had actually enacted and with which the plaintiffs "merely quibble[d]." *Virtu*, 770 F. Supp. 3d at 509. By contrast, NYCB had "nothing in place" in terms of effective controls. ¶¶11, 93. Another court, in sustaining "policy" statements affirming a commitment to cybersecurity and finding such statements actionable, also found *Ong* "unpersuasive". *See In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1225 (N.D. Ga. 2019) (noting that *Ong* "provided little analysis"

---

[14] Defendants' attempt to discredit FE-1's description of how NYCB had "no controls" and "nothing in place" for risk management is a thinly veiled attempt to disqualify a credible witness. Defendants' only argument countering FE-1's allegations is circular, reasoning that if NYCB had a risk management department, the lack of effective risk management controls was impossible. MTD 17. But the mere *existence* of a department has no bearing on its capabilities and does not neutralize accounts that the department was an ineffective, understaffed shell, as recounted by a credible former employee. *Hain Celestial*, 2025 WL 2749562, at *2 (credible CW accounts must be accepted as true at the pleading stage).

about why policy statements were inactionable, and affirming that such statements "are not so obviously unimportant to investors given the repeated nature of these statements, the context of [the] business, and the widespread nature of the deficiencies alleged in the Amended Complaint").

Here, the Complaint alleges widespread, systemic deficiencies preventing the Bank from performing its core functions of risk management and internal controls over financial reporting. ¶¶89-122. Against this backdrop, Defendants' repeated assurances of effective policies and procedures were not inoffensive descriptions and were materially false and misleading.

### B. The Complaint Adequately Alleges A Strong Inference of Scienter

The Complaint alleges devastating admissions, contemporaneous knowledge, and conscious disregard that collectively establish a strong inference of scienter. Defendants knew, or recklessly disregarded, that NYCB operated with multiple material weaknesses in its risk management, loan portfolio assessment, and internal controls that rendered their statements touting "stellar" asset quality and "#1 focus" of its risk management capabilities false and misleading.

Scienter allegations must be viewed holistically and "courts must, as with any motion to dismiss . . . , accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). The issue is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emph. in original). The inference of scienter need not be "irrefutable" or "of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. If competing inferences are equal, "the tie . . . goes to the plaintiff." *Salix*, 2016 WL 1629341, at *13.

Recklessness is adequately pled where defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. Such a showing supports "the inference 'that the

defendants knew, or more importantly, should have known that they were misrepresenting material facts.'" *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 233 (S.D.N.Y. 2023). "[M]otive is not required to plead scienter." *Freudenberg*, 712 F. Supp. 2d at 200.

### 1. Defendants' Own Admissions Establish Scienter

NYCB acknowledged operating with "material weaknesses in the Bank's internal controls related to internal loan review" throughout the Class Period, "resulting from ineffective oversight, risk assessment and monitoring activities." ¶¶153, 181. These are not minor deficiencies—they are fundamental failures that Defendants admit existed while they touted "strong" risk management and "stellar" asset quality. ¶¶348-50. These admissions are devastating in scope and were unmissable during the Class Period: (a) material weaknesses in internal controls "related to internal loan review;" (b) ineffective oversight of the loan portfolio; (c) ineffective risk assessment; and (d) a lack of appropriate framework for managing a $100+ billion institution. These "[a]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter." *Stevelman v. Alias Res. Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999); *see also In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019); *Vivendi*, 381 F. Supp. 2d at 181 (plaintiffs may "rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period," as holding otherwise would "reward [Defendants] for their successful concealment"). NYCB's new management expanded on these admissions, admitting that while they had "done a lot of work to make up for some of the previous deficiencies," "we have a ways to go." ¶350.

### 2. The Officer Defendants Had Direct Knowledge of Falsity

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308; *In re Van der Moolen Holding N.V.*

*Sec. Litig.*, 405 F. Supp. 2d 388, 406 (S.D.N.Y. 2005) (scienter from "facts which come to a defendant's attention that would place a reasonable party in defendant's position on notice"). The Complaint alleges that Defendants had actual knowledge of NYCB's deteriorating asset quality, inadequate loan review process, and ineffective risk management framework by virtue of the information presented to them throughout the Class Period. ¶¶93-94, 101-08, 353-56; *see City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (scienter found where "strong circumstantial evidence that [defendants] were receiving some form of specific information" on the topic existed).

Each Officer Defendant personally received information that was contrary to their public statements during the Class Period. For example, Adams presented a monthly "Board Report" to NYCB's Board of Directors (including Cangemi and DiNello) that detailed changes in information about all the Company's loans. ¶¶106, 354. CW-1 confirmed that Adams, based on specific questions he asked of CW-1 about NYCB's CRE portfolio, "knew, he had to" know about the portfolio's deterioration. ¶¶107, 354. CW-1 also discussed how at these same monthly Board meetings, NYCB's Chief Credit Officer, who reported directly to Cangemi, provided the Board with detailed information pertaining to "risky" and "non-performing" loans in reporting that had "no sugar coating." ¶¶108-10. Cangemi, along with other NYCB officials, also received an "Issue Management Report" beginning in Fall 2022, which covered, according to an original author, all "risk stripes" across the Bank, including credit risk, and noted that some of the risk management issues included in the report were labeled "past due" and "critical." ¶355.[15] Monthly reports

[15] As to Defendant Pinto, he was responsible with Defendants Cangemi for certifying the accuracy of NYCB's financials such that he would have been similarly aware that Defendants' statements were false when made. *See Diabat*, 2024 WL 4252502, at *145 (questions regarding internal control over financial reporting "are normally the subject of internal discussion in the C Suite of any public corporation."). Indeed, as CFO, "it strains credulity that he could remain ignorant of the company's [challenged practices] while the CEO and other senior managers were aware of them." *Ambac*, 693 F. Supp. 2d at 268-69.

highlighting, *e.g.*, "critical" loans, are precisely the type of information that supports a compelling inference of scienter. *See, e.g.*, *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (scienter based on meetings where defendants "received . . . monthly sales projection and monthly inventory reports"). The Complaint further alleges how the Bank's senior management "freaking knew" but "just didn't care" how overwhelmed the Bank was when it transitioned to OCC and Category IV oversight (¶94).[16]

Further, it is ***undisputed*** that the FDIC rejected NYCB's Merger application due to concerns regarding NYCB and Flagstar's lending practices and CRE Concentration. As a result, NYCB and Flagstar, ***under the direction of Cangemi and DiNello***, pivoted to a charter that eliminated the need for FDIC approval. ¶¶54-55, 59. Therefore, their Misstatements that "there's no complication associated with the application" for the merger approval, and the "merger does not raise any regulatory concerns" (¶¶226-34) were made with knowledge of their falsity.

Moreover, the Complaint alleges that NYCB's "drastic financial moves" at the end of the Class Period were taken in response to "behind-the-scenes conversations with" and in the face of "mounting pressure" from the Bank's onsite regulators at the OCC. ¶¶7, 367. Any suggestion that the Officer Defendants were unaware of problems of this magnitude rings hollow. *See Nutriband, Inc. v. Kalmar*, 2020 WL 4059657, at *11 (E.D.N.Y. July 20, 2020) ("[I]t would 'strain[ ] credulity' to believe [the highest-ranking executives] were not involved (and aware of) these misrepresentations."); *Diabat*, 2024 WL 4252502, at *145 (scienter as to Officer Defendants "who were in charge" based on correspondence with regulators). This is particularly true where the Complaint alleges that Defendants repeatedly spoke about the issues at the center of the alleged

---

[16] These allegations amount more than "vague," "generic," and "conclusory" CW allegations, or allegations that "merely parrot[] the conclusory allegations contained in the complaint," such that Defendants' authority is readily distinguishable. MTD 35 (citing *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019) and *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007)).

fraud in response to analysts' inquiries and concerns. ¶¶348-52. *See, e.g.*, *Signet Jewelers*, 2018 WL 6167889, at *15 (scienter regarding omission of negative credit exposure when defendants had said "we fully understand the credit risk," "[w]e watch it closely," and "management monitors [its] credit exposure").

**3. The Executive Exodus Supports Scienter**

The undisputed fact that NYCB purged its highest-ranking officers, including Defendants Cangemi, Pinto, and Adams, as well as the vast majority of NYCB's Board of Directors, in the weeks surrounding the disclosures raises a strong inference of scienter. ¶¶170-74, 360. *See Hain Celestial*, 2025 WL 2749562, at *17 (scienter supported by "suspicious personnel changes" including the departure of "the Officer Defendants and other key personnel under suspicious circumstances"). Further, NYCB's new management directly linked the removal of these executives to an effort "of holding people accountable" "for material weaknesses and other items associated with the company" (¶¶174, 360), and after the Class Period, stripped Cangemi, Pinto, and Adams of incentive payments due to these "serious risk management issues," reducing their compensation by 42%, 50%, and 56%, respectively (¶372). There are "too many departures to say that they were coincidental with a straight face," particularly where key executives "leave in rapid succession." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 321-22 (S.D.N.Y. 2024) ("[S]uch house-cleaning and reforms do not follow innocent mistakes" but "customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls"); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (untimely resignations support scienter, especially when characterized as

"remedial measures" tied to "improving 'accounting and internal control practice'").[17]

### 4. Defendants Repeatedly Spoke About Fraud-Related Issues

The inference of scienter is more compelling where, as here, the alleged misstatements concern "a subject about which investors and analysts often inquired." *New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011); *Hedick*, 2021 WL 3566602, at *13. Here, investors and analysts were hyper focused on: (a) the decision to switch the national bank charter in getting the Flagstar Merger (¶¶56, 226-27); (b) the Bank's ability to assess the quality and performance of its loan portfolio (¶¶82, 84, 285, 304, 331, 334); and (c) the Bank's risk management practices and their sufficiency as the Bank fell under Category IV supervision (¶¶83, 241, 249, 252). Indeed, Defendants made many of the alleged Misstatements in direct response to analyst questions on these key issues. *See, e.g.*, ¶¶134, 241-42, 252, 285, 304.

Given their repeated statements on these key issues of investor and analyst focus, "this Court can reasonably conclude either that Defendants [had] access to information regarding [the subject of the Misstatements], or . . . were recklessly indifferent to the truth or falsity of their [] statements and never bothered to investigate [them]." *Avon*, 2019 WL 6115349, at *20; *see also Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) ("[T]o speak so knowledgeably regarding [the basis of the alleged fraud], [defendant] must have educated himself . . . presumably by reviewing data given to him . . . [and] performing his own due diligence."). Defendants do not address these facts.

[17] This Court has also held that suspiciously timed departures may "raise a strong inference of scienter" in a holistic analysis. *See Owen v. Reconnaissance Energy Africa Ltd. et al*, No. 1:21-cv-06176-NRM (E.D.N.Y. Nov. 14, 2024) (PX 3). Defendants' cases (MTD 37) are inapposite. In *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 315 (E.D.N.Y. 2025), departures were not suspiciously timed or accompanied by other compelling indicia of scienter. *See also In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *23 (S.D.N.Y Sept. 22, 2021) (resignation insufficient when "devoid of facts tying that event" to the alleged fraud); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) (acknowledging that "highly unusual and suspicious" resignations can support scienter").

#### 5. Temporal Proximity Of Statements And Disclosures Supports Scienter

Scienter is also strongly supported by the temporal proximity between Defendants' October 26, 2023 false statements about the Bank's "disciplined client selection and underwriting" and "very strong portfolio" that was "performing extremely well" (¶¶328, 331-32) and the Bank's January 2024 disclosures. ¶¶366-67. This three-month about-face, viewed holistically with the other allegations, supports scienter. *See Diabat*, 2024 WL 4252502, at *143 (short gap between affirmation of effective internal controls and disclosure of material weaknesses in internal controls, together with other allegations, was "a valuable indicator of scienter"); *Bettis v. Aixtron SE*, 2016 WL 7468194, at *16 (S.D.N.Y. Dec. 20, 2016) (temporal proximity relevant to scienter).[18]

#### 6. The Magnitude Of The Fraud And Core Operations Support Scienter

NYCB's loan portfolio quality and risk management capabilities were not peripheral—they were the company's core. The Second Circuit recently held that "the size of the alleged fraud, coupled with its importance to [a company's] operations, provides supplemental support" for scienter. *Hain Celestial*, 2025 WL 2749562, at *16, n.19. Not only are NYCB's asset quality and risk management framework critical to its business (¶¶361-65), but CRE lending constituted 70-90% of the business. ¶36 (describing quality and performance of CRE portfolio as "instrumental" to "solid earnings"). NYCB's fraud related to this core operation and threatened the Bank's very existence: it faced debilitating losses and a 70% stock price decline in three months, admitted to material weaknesses in internal controls, ousted leadership, and faced near-total failure, only to be bailed out by an emergency, $1 billion capital infusion. ¶¶163-64, 374. "Simply put, the magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation by [NYCB] and

[18] Defendants' authorities are inapposite. MTD 36-37; *see In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *7-9 (E.D.N.Y. Aug. 6, 2019) (no scienter based on temporal proximity where no corroborative allegations to bolster inference); *Malin*, 499 F. Supp. 2d at 148 (same); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (same).

its executives." *Lexmark*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019); *see also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) ("[T]he magnitude of the write-off rendered 'less credible' the proposition that defendants there were somehow surprised by their sudden reversal of fortune.") (*citing Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir. 2000)).[19] The discrepancy between the Company's statements that, *e.g.*, NYCB's asset quality was "stellar," "strong," "superb," and "among the best in the industry," and its post-Class Period admissions is significant. *See Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 757 (D. Conn. 1997) (executive's admissions of "shortcomings" in due diligence and that company "blew it" gave rise to "strong inference" of scienter for company's earlier statements that its due diligence consisted of a "full review"). It is "virtually inconceivable" that the Officer Defendants were "unaware" of NYCB's deteriorating asset quality and inadequate risk management framework as they continually touted the Bank's position. *zCap Eq. Fund LLC v. LuxUrban Hotels Inc.*, 2025 WL 2097951, at *22 (S.D.N.Y. July 25, 2025).

**7. Defendants' SOX Certifications Support Scienter**

Defendants Cangemi's and Pinto's SOX certifications attesting to the purported accuracy of the Company's financial statements and the effectiveness of internal controls, while glaring material weaknesses festered, also contributes to the scienter inference. ¶¶78-79; 341-46; *see Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012). Both Cangemi and Pinto had a duty to know—and were reckless in not knowing—that NYCB failed to maintain effective internal controls during the Class Period. *See In re Scottish Re Grp. Sec. Litig.,* 524 F. Supp. 2d 370, 392–95 (S.D.N.Y. 2007) (scienter supported by company's internal controls certifications).

[19] The mere "dimming of [ ] company's prospects" at issue in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (MTD 37) cannot be compared to the near destruction of the Bank.

### 8. NYCB's Compensation Plan Supports Scienter

Motive exists when "concrete benefits [] could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307. Here, an outsized portion of the Officer Defendants' compensation was directly linked to NYCB's performance. ¶372 (78-80% of Cangemi's and 67-69% of Pinto's and Adam's compensation on average was at risk in 2022-2023). This is far more than "wish[ing] to appear profitable" (MTD 33), but rather the "concrete and personal benefits" sufficient to support scienter. *See Hain Celestial*, 2025 WL 2749562, at *14 (allegations of compensation motive "move the needle [inferring scienter] because the significant bonuses and stock awards" that defendants received "were tied to the metrics that Hain overstated"); *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *13 (S.D.N.Y. Sept. 27, 2013) (scienter where defendants earned "concrete and personal benefits" from performance-driven compensation); *Vivendi*, 381 F. Supp. 2d at 185 (same).

### 9. Confidential Witnesses Provide Compelling Support For Scienter

Former employees confirm that NYCB was rife with other failures that Defendants knew of or were reckless in not knowing of: (i) it was clear internally that the Company was woefully underprepared for the transition to OCC regulation and Category IV status (¶¶91-92); (ii) NYCB's outsized relationship with chief broker Meridian (managed by Defendant Adams) allowed Meridian to hold NYCB "hostage," and NYCB's underwriting team knew that Meridian "skewed" its numbers to make deals look better absent supporting documentation (¶¶99, 101-04); (iii) the Bank lacked proper stress testing and credit reviews and would "trick" stress testing models to show regulators what they wanted to see (¶112); (iv) CRE Analysts were instructed by supervisors to skip semi-annual reviews for "high-priority" clients that lacked sufficient documentation (¶113); and (v) loans that should have otherwise been disqualified were commonly approved, particularly where those borrowers had a Meridian connection (¶121). In addition to the direct

knowledge (*see supra*, Argument §§I.B.1, 2, 4), the CWs paint a picture of a Bank lacking any effective risk or regulatory compliance structure while the Defendants assured investors risk management was their "number one focus" and asset quality was "stellar." ¶¶249, 259, 267. Defendants' challenge to the particularity of the CW allegations (MTD 34-36) is meritless; this Circuit credits "the allegations of the CWs so long as they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Hain Celestial*, 2025 WL 2749562 at *11. For each CW, the Complaint describes their roles, responsibilities, and dates of employment. *See* ¶¶90-122. Nothing more is required.[20]

#### 10. The Knowledge Of NYCB Employees Can Be Imputed To The Bank

The inference of scienter is especially compelling when the Complaint provides ample evidence that critical departments at NYCB knew about deteriorating asset quality and inadequate risk management functions. *See, e.g.*, ¶¶89-96 (risk management employees confirm NYCB lacked risk management framework); ¶¶99-102 (underwriting team knew NYCB's relationship with Meridian posed asset quality risks). Defendants cannot credibly argue that the Bank's fraud was compartmentalized to such a degree that its most senior executives would not have known about problems of this magnitude, and courts "readily attribute[ ] the scienter of management-level employees to corporate defendants." *In re Marsh & Mclennan,* 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006). Defendants' citation to *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020) (MTD 32) is inapposite where the complaint "offer[ed] only general allegations of warnings made to unidentified senior executives."

---

[20] Defendants' purported challenge to some of the CWs for not having direct contact with the Officer Defendants misstates the facts and the law (MTD 35), as there is "no baseline requirement" of contact with Officer Defendants to allege CW accounts with the requisite particularity. *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015).

### 11. GAAP Violations Contribute to a Strong Inference of Scienter

The Complaint alleges that NYCB's ACL and PCL—critical metrics for investors—violated GAAP because the Bank's material weaknesses in its loan review process prevented the accurate recognition and reporting of those metrics. ¶¶198-223. As revealed by NYCB's skyrocketing ACL after the Class Period, if NYCB had maintained effective internal controls over financial reporting, the necessary ACL increases would have been taken and NYCB would have missed its earnings targets in at least five quarters. ¶¶222-23. Defendants Cangemi and Pinto's scienter is bolstered by these GAAP violations (¶343), to which Defendants lodge no defense because to affirmatively represent that NYCB's statements complied with GAAP, Defendants "must have educated [themselves] . . . by performing [their] own due diligence," *AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d at 850, or were reckless by failing to investigate the necessary facts to make these representations. *Dobina*, 909 F. Supp. 2d at 246.

### 12. The Competing Inference Of Ignorance Is Implausible

Defendants suggest they were somehow unaware of fundamental failures at NYCB. This is not credible; either Defendants knew of the material weaknesses and other failures, or they were reckless in not knowing about fundamental failures in core operations that they personally monitored and spoke about throughout the Class Period. Either inference establishes scienter. Leading up to and at the start of the Class Period, Defendants took on more risk than they had any right to do, saddling the Bank with increased assets absent any system for assessing or regulating those assets. In the face of heightened regulations, NYCB evaded regulators though deceitful regulatory arbitrage, and rather than be honest with investors, mounted lie after lie, touting their "No. 1 focus" on risk management, "stellar asset quality," "comprehensive risk management framework," and "effective" internal controls—while knowing none of it was true.

All Defendants can muster in response is an unripe truth-on-the-market defense and

characterize this fraud as one by hindsight. MTD 38. Yet, in the face of an "unprecedented trifecta of market events," Defendants repeatedly touted NYCB's asset quality as better than their peers "in any credit cycle," (¶¶2, 72), assuring investors they were immune to that market pressure. While Defendants need not be "clairvoyant," Defendants were "responsible for revealing those facts reasonably available to them." *Novak*, 216 F.3d at 309. There is no innocent explanation for proclaiming "strong" what was admittedly weak, touting as "effective" what was admittedly "ineffective," or celebrating "disciplined" what was admittedly deficient.

### C. The Complaint Adequately Alleges Loss Causation

To plead loss causation, Plaintiffs need only allege that Defendants' fraud was revealed to the market through corrective disclosures that caused foreseeable losses. Here, four devastating disclosures revealed the truth about NYCB's concealed weaknesses and Misstatements, causing the stock to plummet and erasing billions in market value. The causal connection is direct and unmistakable. As this Circuit has long held, "there is no heightened pleading standard" for loss causation, and allegations of "declines in [a company's] stock price following [a company's] negative disclosures" satisfy this minimal Rule 8 pleading standard. *Hain Celestial*, 2025 WL 2749562, at *19; *Loreley*, 797 F.3d at 187 (pleading loss causation "is not a heavy [burden]"); *Dentsply Sirona*, 732 F. Supp. 3d at 324 (loss causation adequately pled "so long as the plaintiff's theory of causation is plausible"). Plaintiffs have exceeded this low burden, describing: (a) each corrective disclosure; (b) how the truth relating to the Flagstar Merger, NYCB's risk management practices, asset quality, loan review processes, and internal controls were partially revealed on those days; and (c) the resulting stock price declines. *See* ¶¶125-60; 375-82; *supra*, Facts §D.

The Complaint establishes a clear nexus between each disclosure and the concealed fraud.

On **January 31, 2024**, NYCB disclosed a quarterly net loss of $193 million, increased PCL of $552 million, and increased net Charge-offs of $185 million; slashed its dividend; admitted

office sector weaknesses and repricing risk in its portfolio; and saw its debt put on review for a downgrade to junk, resulting in a nearly 45% drop in NYCB's share price. This news partially disclosed some truth about, the Bank's "stellar" and "strong" asset quality, "disciplined underwriting," "strong capital position" and readiness "to be a $100 billion bank," by revealing that NYCB was not prepared for Category IV status, NYCB's loan portfolio had significant weaknesses, its risk management framework was inadequate, its prior reserves were grossly insufficient, and its asset quality was deteriorating, posing severe ratings risk. ¶¶125-36. Later disclosures on **February 5, 2024** revealing that key risk management executives had departed and that the OCC had exerted "mounting pressure" on the Bank in the months prior, similarly revealed that risk management practices were in disarray and that the Bank's regulators had known this for a while, revealing to the market "some part of the truth" of the fraud. ¶¶137-52. The **February 29, 2024** admissions of material weaknesses and $2.4 billion goodwill write-off further revealed how NYCB lacked a framework for accurate loan ratings, its risk assessment processes didn't exist, it was unable to identify problem loans, and its internal controls had failed. ¶¶153-60. NYCB's stock price declined as a result of each disclosure, showing, as Defendants' (albeit non-binding and procedurally inapposite) authority recognizes, "[c]learly, the market understood that there was some problem with [Defendants'] business (or its business environment) when the company reduced earnings guidance and the market reacted by driving down [the Company's] share price." *Alaska Elec. Pension Fund v. Flowserve*, 572 F.3d 221, 232 (5th Cir. 2009); *see also In Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *11 (S.D.N.Y. Mar. 31, 2025) ("The accompanying stock price drops . . . makes even more plausible that defendants' [alleged misrepresentations] lies behind plaintiffs' loss."). On **February 22, 2024**, a watchdog revealed for the first time that the FDIC was going to reject the Merger over concerns with the Bank's lending

practices, casting Defendants' prior statements about the switch being an "easy way" to complete the Merger and assuring investors that there were "no significant regulatory concerns" as misleading half-truths, if not outright lies (¶¶151-52).

Defendants' loss causation arguments (MTD 39-42) misrepresent both the law and the facts and should be strongly rejected. Defendants first misrepresent the pleading standard and Plaintiffs' burden by citing out-of-circuit or inapplicable decisions that address whether loss causation is adequately ***proven*** (following fact and expert discovery) at the class certification[21] or summary judgment[22] stages, while nowhere informing the Court of the disparate stage and burden of those cases. Defendants then worsen this obfuscation by claiming that loss causation is not adequately alleged because the disclosures in this Action do not sufficiently "match" the Misstatements. Defendants misrepresent the law again, as courts are clear that, even at the later, evidentiary class certification stage, "the law does not require a 'precise match.'" *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2025 WL 2554474, at *7 (S.D.N.Y. Sept. 4, 2025); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008) (defendants' own cited case holding that a disclosure need not "precisely mirror[] the substance of a prior undisclosed fraud," but only "somehow reveal to the market some part of the truth regarding the alleged fraud").[23]

Defendants' factual arguments are equally specious. They minimize and mischaracterize the first series of dramatic disclosures that brought the Bank to its knees as some inoffensive

[21] *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) (addressing evidence and burden of persuasion to demonstrate "price impact" ***at class certification***); *Flowserve,* 572 F.3d at 232 (reversing denial of ***class certification***).

[22] *See In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1142 (10th Cir. 2009) (affirming district court exclusion of a loss causation expert's testimony and granting ***summary judgment*** after finding expert's testimony unreliable in part); *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010) (denying defendants' motion for ***summary judgment*** on loss causation grounds).

[23] The link between disclosure and the fraud was severed in *Take-Two* because the disclosure of a subpoena that did not facially relate to options backdating was "far too tenuous to permit the inference that the former unveiled some part of the fraudulent nature of the latter." 551 F. Supp. 2d at 286-87.

"choice to increase loss reserves," and then claim that such a disclosure could only possibly correct a direct statement about setting loss reserves, and not about risk management, credit quality, loan review or internal controls which are all, of course, inextricably related to the ultimate decision to take reserves. This is not only logically untethered from reality, but inconsistent with the requirement to accept Plaintiffs' plausible "theory of causation." *See Estee Lauder*, 2025 WL 965686, at *11. Moreover, Defendants mischaracterize the February 22 disclosure as an "after-the-fact negative characterization of already-public information." MTD 41. Not so; the watchdog revealed new information about the FDIC's thwarted Merger rejection. *See In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 211 (S.D.N.Y. 2019) (loss causation sufficiently pled where announcement "reveal[ed] some then-undisclosed fact[s].").[24]

### D. The Complaint Adequately Alleges Scheme Liability

Defendants are liable under subsections (a) and (c) of Rule 10b-5 for disseminating false and misleading statements and engaging in other deceptive conduct, including by engaging in regulatory arbitrage to force through the Flagstar Merger and disseminating false statements to analysts. *See Lorenzo v. SEC*, 587 U.S. 71, 78-83 (2019). In *Lorenzo*, the Supreme Court clarified that provisions of Rule 10b-5(a) and (c) "capture a wide range of conduct" and firmly established that scheme liability claims may be brought in circumstances where false and misleading statements are part and parcel of the scheme. *Id.*

Contrary to Defendants' argument (MTD 42-43), the Complaint alleges that Defendants committed a deceptive act beyond the false and misleading statements, as required by *SEC v. Rio Tinto plc.*, 41 F.4th 47, 49 (2d Cir. 2022). For example, the Officer Defendants colluded to push

---

[24] Because new information was revealed, Defendants' cases where disclosed information was already public are inapposite. *See In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *31 (S.D.N.Y. May 10, 2012); *In re Merrill Lynch & Co. Rsch. Rpts. Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008).

through the Flagstar Merger because NYCB had "no choice but to grow," ¶95, even though NYCB was wholly unprepared for the costs and regulatory demands associated with becoming a larger bank. ¶¶53-59, 91, 95, 358–59; *see also* ¶¶175-77 (discussing news reports about NYCB's desire to grow and NYCB's shift to the OCC after failing to secure necessary approvals from the FDIC).

Indeed, Defendants' scheme to amend the terms of the Merger Agreement to conceal and avoid the FDIC rejection (¶¶52-59, 137-52) is similar to deceptive conduct that other courts have found to constitute a scheme. *See SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 478 (S.D.N.Y. 2023) (deceptive conduct when defendant secretly modified the terms of deal); *SEC v. Sugarman*, 2020 WL 5819848, at *7 (S.D.N.Y. Sept. 30, 2020) (a misleading memo was presented to the board of directors regarding an acquisition). Moreover, Defendants' knowing transmittal of false statements to analysts is precisely what the Supreme Court found counted as deceptive conduct in *Lorenzo*, 587 U.S. at 78-79. Accordingly, the Complaint adequately states a claim for scheme liability against the Officer Defendants that spans the length of the Class Period.[25]

### E. The Officer Defendants Are Liable As Control Persons

Plaintiffs adequately plead a primary violation of the Exchange Act; therefore, the control person claims under Section 20(a) against the four Officer Defendants are adequately alleged. *See Virtu*, 770 F. Supp. 3d at 527 (noting that scienter allegations satisfy culpable participation for control person liability). Corporate officers are "presumed to possess the ability to control the actions of their employees" and allegations of control need not be pleaded with particularity. *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 165 (E.D.N.Y. 2020). Defendants attempt to muddy the waters by citing cases where the issue of control was not that of a corporate officer, but that of a non-issuer lead manager of a securities offering (*Sloane Overseas Fund, Ltd. v. Sapiens Int'l*

[25] *See In re Mylan N.V. Sec. Litig.*, 2025 WL 1874621, at *9 (W.D. Pa. July 8, 2025) (declining to narrow scope of discovery in connection with scheme liability claim despite sustaining only one misstatement).

*Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996)) or a non-issuer minority shareholder corporation (*In re Glob. Crossing Ltd. Sec. Litig.*, 2005 WL 1907005, at *13 (S.D.N.Y. Aug. 8, 2005)). Those cases are completely inapplicable here. Defendants' claim that DiNello could not be a "control person" because he was "not even affiliated with NYCB" for the entire Class Period is also incorrect. At all times, Defendant DiNello spoke directly to NYCB investors about issues directly involving NYCB and, as to his July 27, 2022 statements made prior to signing the Offering Documents, he spoke alongside Defendant Cangemi on conference calls hosted by NYCB.

## II. THE COMPLAINT ADEQUATELY ALLEGES SECURITIES ACT CLAIMS

### A. IPRS Has Standing To Assert Securities Act Claims

IPRS's standing is clear and straightforward: it received NYCB shares through the Flagstar Merger when its Flagstar shares were automatically converted to NYCB shares pursuant to the Offering Documents. This direct conversion establishes the required traceability for Securities Act standing, which requires only that a plaintiff's shares be "traceable" to the allegedly defective registration statement. *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768-69 (2023). Here, that traceability is inherent in the Flagstar Merger structure itself.

On December 1, 2022, pursuant to the Offering Documents, all outstanding Flagstar shares were automatically converted into NYCB shares at a fixed exchange ratio. ¶¶22, 437-48. This was not a market purchase—it was a direct exchange mandated by the Offering Documents; every NYCB share received by Flagstar shareholders, including IPRS, necessarily traces to the Offering Documents because these shares could not exist but for the terms therein. ¶447. The Complaint clearly alleges that IPRS "purchased or otherwise acquired over 145,000 shares of NYCB common stock during the Class Period, including 44,435 shares of NYCB traceable to the Offering when Indiana's shares of Flagstar common stock were converted into NYCB shares pursuant to and traceable to the Offering Documents." ¶22. In its sworn certification, submitted "under penalty of

perjury," IPRS attached a list of its Class Period transactions, listing eleven entries reflecting the December 1, 2022 direct acquisition through conversion of NYCB common stock directly traceable to the December 1, 2022 Flagstar Merger, at the final closing conversion price of $9.19 per share. ECF No. 69-1; ¶447. Because no fractional shares were allowed to be converted, the sum of those transactions resulted in residual fractional positions of 0.30 and 0.81, which were later settled for cash, resulting in a total acquisition of 44,434 shares. *See* ECF No. 69-1 at 4.[26]

Courts are clear that identical allegations are sufficient to allege standing for ***both*** Section 11 and Section 12(a)(2) claims in situations where a corporate action, such as a merger, converts one company's shares into another, or where secondary offerings issue new shares into an already public market. *See In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 531 (E.D.N.Y. 2025); *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *19 (D.N.J. Sept. 5, 2024), *reconsideration denied*, 2025 WL 1040633 (D.N.J. Apr. 8, 2025); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020); *In re Hub Cyber Sec. Ltd.*, 2025 WL 872078, at *8 (S.D.N.Y. Mar. 20, 2025) (shares exchanged in a merger satisfy the direct "purchase" requirement of Section 12(a)(2) for claims against the issuer).

Defendants try and fail to poke holes in the way that IPRS' certification presents IPRS' conversion of Flagstar shares to NYCB shares. ***First***, as noted above, the certification does not represent that IPRS acquired fractional shares of NYCB in the Merger. MTD 45-46. Once the Flagstar shares were converted, the sum total of fractional positions (.81 and .30 of shares, respectively) were settled for cash. *See* ECF 69-1 at 4; 85-5 at 4. ***Second***, Defendants posit that the use of the word "Purchases" to denote the acquisition through conversion of the Merger shares is

[26] *See also* ECF No. 85-5 at 4 (showing a loss analysis of IPRS shares acquired pursuant to and traceable to the Merger Offering, reflecting that 44,435.11 shares were acquired, followed by corporate actions settling fractional positions of 0.30 and 0.81, resulting in the sum total of 44,434 shares acquired).

somehow insufficient. MTD 45. This is frivolous. Under the Securities Act, a conversion of shares in connection with a merger is ***synonymous*** with the "purchase" of securities "given the Securities Act's definition [of purchase] encompassing the 'disposition of a security or interest in a security [ ] for value.'" *Hub Cyber*, 2025 WL 872078, at *10.

**B. The Offering Documents Misstatements Were False And Misleading**

**1. Plaintiffs' Securities Act Claims Are Subject To Rule 8 Notice Pleading**

Plaintiff's' Securities Act claims "are framed in the classic language of negligence and strict liability," which are subject to Rule 8's notice pleading standard, not the heightened Rule 9(b) standard applicable to Exchange Act claims. *Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024). The Securities Act claims are segregated from the Exchange Act claims and Plaintiffs "expressly disclaim[] any allegations of fraud or intentional misconduct" (*e.g.*, ¶¶414, 491, 493, 505). Defendants cite a handful of out-of-date cases to argue that Rule 9(b)'s heightened pleading standard applies, claiming Plaintiffs' disclaimer of fraud is insufficient. MTD 47. Defendants' discussion of the law is misleading and, tellingly, Defendants fail to even acknowledge the Second Circuit's opinion in *Pappas* holding that a complaint that "expressly disclaims fraud, scienter, and the intent of Defendants to defraud investors and painstakingly segregates the fraud and negligence claims" such that "[e]ach claim is set forth under its own heading and incorporates only certain factual allegations such that . . . the Securities Act claims expressly do not incorporate the allegations supposedly supporting a finding of scienter and reliance" is subject to Rule 8's notice pleading only. *Pappas*, 2024 WL 4588491, at *2 (finding Rule 8 applies when complaint "expressly plead[s] negligence, disclaim[s] fraud, eschew[s] language . . . implying fraud or the elements thereof," and separating allegations). Rule 8 governs.

**2. The Offering Documents Misstatements Were False Or Misleading**

The Complaint adequately pleads that numerous statements in the Offering Documents

were materially false or misleading when made and that the Securities Act Defendants (other than NYCB, which is strictly liable) were negligent in allowing those statements to be made to investors. *See* PX 2 (Misstatements 82-93). Nothing more is required for Plaintiff to state Securities Act claims. In response, Defendants argue that these Misstatements are non-actionable because they were not false or misleading, are inactionable opinions, fall under the PSLRA's safe harbor, or constitute puffery. MTD 47-48. These arguments should be rejected for the same reasons discussed *supra*, Argument § I.A, especially given Rule 8's lesser notice pleading standard.

### 3. The Securities Act Defendants Are Liable For Material Omissions

The Securities Act Defendants are independently liable for material omissions. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *Omnicare*, 575 U.S. at 186 n.3. "Omissions of required disclosures under either Items 303 or 503 of Regulation S-K give rise to liability under the Securities Act." *Sharma v. Rent the Runway, Inc.*, 751 F. Supp. 3d 82, 102 (E.D.N.Y. 2024), *on reconsideration on other grounds*, 2025 WL 2637971 (E.D.N.Y. Sept. 12, 2025). The Securities Act Defendants violated Items 303 and 105 (formerly 503) by failing to disclose that: (1) NYCB lacked effective risk assessment processes; (2) NYCB lacked leadership resources to conduct effective risk assessment and monitoring including internal loan review; (3) NYCB's internal loan review processes lacked appropriate risk management; and (4) these deficiencies created a risk that NYCB would need to slash dividends if the company was forced to admit to misleading statements and omissions. The Securities Act Defendants also failed to disclose trends and uncertainties stemming from FDIC opposition to the Flagstar Merger, NYCB's deficient underwriting standards, and precarious CRE Concentration. ¶¶416-18; 467-73.

Defendants' arguments fail. ***First***, they argue that the Prospectus identified known trends or uncertainties with NYCB's portfolio. MTD 48 (citing DX 1 at 18-19). But the "Risk Factors" in the Prospectus contained only generic, boilerplate references to "the effects of the COVID-19

pandemic and regulatory considerations" and "interest rate . . . fluctuations," none of which address the ***specific*** trends, events, and uncertainties underpinning Items 303 and 105. *See Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7, *10 (S.D.N.Y. Sept. 27, 2020).

***Second***, Defendants dispute whether the risk management defects were known by NYCB at the time, claiming that the regulations "do not require managerial omniscience" and make the factual argument that the risks had a greater impact on NYCB than anticipated. MTD 49. It is well settled that an issuer's knowledge may be inferred from a complaint's allegations.[27] *See Jianpu*, 2020 WL 5757628, at *10; *Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 2025 WL 2613530, at *18 (S.D.N.Y. Sept. 10, 2025). Here, Plaintiffs' Item 303 and 105 claims are based on NYCB's admittedly deficient internal risk management practices, a subject under constant company review (by NYCB's own admission), and therefore NYCB necessarily "knew" before the Merger that these internal controls and monitoring were deficient. ¶¶93-94, 101-08, 353-56.

***Finally***, Defendants DiNello and Treadwell's arguments regarding "authority" over the contents of the Registration Statement (MTD 49-50) are frivolous. Section 11 liability extends to all "persons ***consenting*** to be named [in the Registration Statement] as about to become a director." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 175 (2d Cir. 2011). Defendants DiNello and Treadwell consented to be named in the Registration Statement as incoming directors (¶¶423, 425) and thus are proper Section 11 defendants. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983) (*citing* 15 U.S.C. §77k(a)(1)-(5)). Defendants' argument relies solely on cases interpreting Section 10(b) of the Exchange Act and the Supreme Court's analysis in *Janus* of what it means to "make" a statement under that distinct statute. MTD 49-50 (citing *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) and

[27] Items 303 and 105 do not require scienter showing to invoke a heightened pleading requirement. *See Pappas*, 2024 WL 4588491, at *2; *Freidus v Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013).

*In re Stillwater Cap. Partners Inc. Litig.*, 858 F. Supp. 2d 277, 288 (S.D.N.Y. 2012) (both Section 10(b) cases)). But "*Janus* may not be extended to statutes"—like Section 11—"lacking the very language that *Janus* construed." *SEC v. Mercury Interactive, LLC*, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011); Arnold S. Jacobs, *Disclosure & Remedies Under the Sec. Laws* § 3:14 (Apr. 2025) (*Janus* "addressed what persons within an entity can be in the class of 10b-5 defendants. Section 11(a) sets forth a statutory list of defendants, so we cannot use the *Janus* analysis to establish a list of Section 11 defendants").

### C. Plaintiffs Allege Control Person Claims Against The Signer Defendants

The Court can swiftly reject Defendants' arguments that the Complaint does not allege a control person claim against the Signer Defendants. MTD 50. First, the Complaint adequately alleges a primary violation of Sections 11 and 12 of the Securities Act, as shown above. Second, the fact that the Signer Defendants signed the Registration Statement is sufficient to plead Section 15 claims against them. "It is well settled law that officers and directors of the primary violator who signed the registration statements containing alleged violations fulfill the control prong" of Section 15. *Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*, 2012 WL 601448, at *20 (E.D.N.Y. Feb. 23, 2012). This is because "the act of signing a registration statement . . . is a manifestation of the signer's responsibility for the information contained in the document." *Sharma*, 751 F. Supp. 3d at 121-22. Defendants' own authority explicitly rejects their argument. *See* MTD 50 (citing *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 2021 WL 2646353, at *17 (E.D.N.Y. June 28, 2021) (holding "control is pled adequately where an officer or director has signed SEC filings")).

## <u>CONCLUSION</u>

Defendants' MTD should be denied. If this Court grants the Motion, Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15(a)(2). *See Loreley*, 797 F.3d at 190.

DATED: October 7, 2025

Respectfully submitted,

*/s/ Lauren A. Ormsbee*
**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee
Lisa M. Strejlau
Charles J. Stiene
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lormsbee@labaton.com
lstrejlau@labaton.com
cstiene@labaton.com

*Counsel for Lead Plaintiff and IPRS and Lead Counsel for the Proposed Class*

*/s/ Thomas L. Laughlin, IV*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Thomas L. Laughlin, IV
The Helmsley Building
230 Park Avenue
New York, New York 10169
(212) 223-6444
tlaughlin@scott-scott.com

*/s/ Laurence D. Paskowitz*
**THE PASKOWITZ LAW FIRM P.C.**
Laurence D. Paskowitz
The Contour
97-45 Queens Boulevard, Ste. 1202
Rego Park, New York 11374
(212) 685-0969
lpaskowitz@pasklaw.com

*/s/ Adam E. Polk*
**GIRARD SHARP LLP**
Adam E. Polk
601 California Street, Ste. 1400
San Francisco, California 94108
(415) 981-4800
apolk@girardsharp.com

*/s/ David W. Hall*
**THE HALL FIRM, LTD.**

David W. Hall
Four Embarcadero Center, Ste. 1400
San Francisco, California 94104
(415) 766-3534
dhall@hallfirmltd.com

*Additional Counsel for the Proposed Class*