UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NEW YORK COMMUNITY BANCORP, INC. SECURITIES LITIGATION | MEMORANDUM & ORDER<br>24-CV-00903 (NRM) |

NINA R. MORRISON, United States District Judge:

This securities class action arises from events between July 27, 2022 through February 29, 2024 (the "Class Period"), during which time New York Community Bancorp, Inc. ("NYCB") made a series of allegedly false and misleading statements amidst a period of rapid and unprecedented growth. Lead Plaintiff Boston Retirement System ("BRS") and additional Plaintiff Indiana Public Retirement System ("IPRS") brought this action on behalf of themselves and a class consisting of all persons and entities that purchased or otherwise acquired NYCB stock during the Class Period. The operative complaint alleges claims of fraud under the Exchange Act, as well as claims of strict liability and negligence under the Securities Act. Before the Court is Defendants' motion to dismiss.

For the reasons that follow, the motion to dismiss is denied in full.

## BACKGROUND

### I. Factual Background

NYCB is a publicly traded bank and a leading producer of commercial real estate ("CRE") loans, primarily for multi-family apartment buildings and other non-residential commercial office and retail spaces. Am. Compl. ("Compl.") ¶ 2, ECF No.

69. At the start of the Class Period, NYCB's asset size was approximately $50 billion. *Id.* ¶ 46. A large majority of those assets were comprised of CRE loans, with a CRE concentration more than double the threshold for a "high" concentration designation. *Id.* ¶ 32.

Leading up to the Class Period, a series of major market events took place that negatively impacted NYCB's CRE loan portfolio. First, on June 14, 2019, New York State enacted the Housing Stability and Tenant Protection Act of 2019 ("HSTPA"), which bolstered tenant protections for rent-stabilized properties by limiting landlords' ability to both increase rent and convert rent-regulated apartments to market-rate apartments. *Id.* ¶¶ 39–40. Half of NYCB's $38 billion multi-family loan portfolio was subject to HSTPA's new regulations. *Id.* ¶ 41. Second, the COVID-19 pandemic triggered an unprecedented wave of office vacancies, which affected approximately 20% of NYCB's CRE loans. *Id.* ¶ 42. Third, between March 2022 and July 2023, the Federal Reserve conducted eleven rate hikes in the span of twenty months, raising the Federal Fund Rate from 0.25% to 5.50%, and rates continued to increase during the Class Period. *Id.* ¶ 43. Plaintiffs describe the fallout from these events as a "perfect storm" of credit stress on the CRE lending market, with rent-stabilized property values sinking by between 20% and 65% by March 2023. *Id.* ¶ 44.

Plaintiffs allege that amidst these events, NYCB engaged in reckless behavior that furthered its risk exposure, while misleading investors about regulatory oversight, and the adequacy of its risk management practices, loan review process and asset quality, and internal controls.

In April 2021, NYCB announced a merger with its competitor Flagstar Bancorp, Inc. ("Flagstar"), which would nearly double NYCB's asset holdings to $88 billion (the "Flagstar Merger" or the "Merger"). *Id.* ¶ 53. NYCB was the acquiring entity, and thus the companies filed the merger application to NYCB's regulators under the state charter: the Federal Reserve, the FDIC, and the New York Department of Financial Services. *Id.* However, NYCB failed to get approval from either the FDIC or the Federal Reserve, and as a result, was "forced to extend the Merger closing deadline several times." *Id.* ¶ 54.

A year later, on April 27, 2022, NYCB and Flagstar announced a change in their corporate banking charters so that the merged entity would operate under a national bank charter rather than the state charter, which NYCB "had operated under since its inception." *Id.* ¶ 55. This removed the FDIC as a regulator and replaced it with the Office of the Comptroller of the Currency ("OCC"), "an agency that had no prior experience with NYCB." *Id.* When asked by analysts whether the FDIC was "a roadblock in getting th[e] deal approved," NYCB did not answer, *id.* ¶ 56, instead stating that "neither NYCB nor Flagstar kn[ew] of any reason why it [could not] obtain the regulatory approvals," *id.* ¶ 229, that "[t]here's no complication with the application because of the National Bank piece of it," *id.* ¶ 56, and that the switch to a national bank charter was "just an easy way to get there," *id.* ¶ 227. The OCC conditionally approved the merger transaction on October 27, 2022, and the merger was completed on December 1, 2022. *Id.* ¶¶ 57–58.

Following the Flagstar Merger, in March 2023, three large banks failed over

the course of five days. *Id.* ¶ 61. Two of these banks had between $100 and $250 billion in assets, and one, Signature Bank ("Signature"), was "a direct peer of NYCB with a similar CRE loan portfolio." *Id.* ¶ 61. Federal regulators reported that these failures were due to deficiencies in the banks' risk management practices and internal controls. *Id.* ¶¶ 61–64.

The FDIC, as Signature's receiver, auctioned off Signature's assets, including its $74 billion loan portfolio. *Id.* ¶ 65. Eight days after Signature's collapse, NYCB purchased $38.8 billion of Signature's assets, including $12.9 billion of Signature's loan portfolio, placing NYCB's total assets above the $100 billion threshold to be designated as a Category IV bank. *Id.* ¶¶ 65–66, 68. That subjected NYCB to more stringent Federal Reserve standards, "including risk-based and leverage capital requirements, liquidity standards, and requirements for overall risk management and stress testing." *Id.* ¶ 68. Additionally, NYCB became part of the Federal Reserve's and the OCC's large bank supervision program, which "ensured a greater, constant presence by OCC and Federal Reserve examiners." *Id.* ¶ 68.

During the period from July 27, 2022 to February 29, 2024 (the "Class Period"), Defendants NYCB and four corporate officers (collectively, the "Exchange Act Defendants" or "Defendants") allegedly made false and misleading statements reassuring investors about NYCB's superior risk management, asset quality, and internal controls.

As relevant here, Defendant Thomas Cangemi served as President and CEO of NYCB from December 31, 2020 until February 23, 2024. He was also on the Board

of Directors and served as Chairman of the Board from March 26, 2021 to November 30, 2022. *Id.* ¶ 25. Defendant John J. Pinto served as CFO of NYCB from December 31, 2020, and Senior Executive Vice President from February 5, 2021, until April 12, 2024. *Id.* ¶ 26. Defendant Alessandro P. DiNello was President and CEO of Flagstar prior to the Merger. DiNello then joined NYCB's Board of Directors on December 1, 2022. He served as Executive Chairman of the Board from February 6, 2024 until April 1, 2024, and also briefly served as NYCB's CEO (following Cangemi's departure) on February 29, 2024. *Id.* ¶ 27. Finally, Defendant John T. Adams served as NYCB's Senior Executive Vice President and President of Commercial Real Estate Finance during the Class Period and until April 12, 2024. He also served as Senior Executive Vice President and Director of Indirect Multi-Family Lending from December 1, 2022, and was previously the Chief Lending Officer in January 2020. *Id.* ¶ 28. These four Defendants shall hereinafter be referred to as the "Officer Defendants."

Because the Exchange Act Defendants' misstatements are the primary subject of dispute in this action, they are discussed separately in greater detail in the next section. *See infra* Section II. Here, the Court recounts the facts alleged in the Complaint as to NYCB's operations during this period.

First, the Complaint includes a variety of allegations from confidential witnesses ("CWs") who were formerly employed at NYCB. "As a general matter, courts consider and take as true the statements of [confidential] witnesses at [the pleadings] stage, even when applying the heightened standards of Rule 9(b) and the PSLRA." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261 (S.D.N.Y. 2023)

(citation omitted). The Second Circuit has held that the statements of such witnesses can be treated as those of any other "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). The Complaint has provided such descriptions for each of the CW's here, and Defendants do not contend otherwise. *See, e.g.*, Compl. ¶¶ 90 n.32, 93 n.33, 96 n.35. Thus, the Court accepts as true these allegations.

CW-1, a member of NYCB's Regulatory Lending & Compliance Team during the Class Period who had 24 years of experience at other large banks, broadly characterized NYCB's transition to Category IV status and the resulting oversight as the "straw that broke the camel's back." *Id.* ¶ 94. CW-1 stated that at the time of the switch, there were "zero controls" in place and "nothing prepared" with respect to the regulatory switch with Category IV classification and that she was asked to prepare a risk framework overnight following the Signature acquisition. *Id.* ¶¶ 90–92.

The CWs also noted significant problems with NYCB's processes for risk monitoring and identifying problem loans. For starters, both CW-1 and CW-4, a Vice President of Senior Internal Loan Review, noted deficiencies with staffing in their teams; for example, the Loan Recovery department responsible for working with borrowers to mitigate losses on bad loans, "was originally comprised of approximately 15 employees, [but] had only one or two employees by . . . Q1 2023." *Id.* ¶ 122. CW-7, a Senior Asset Manager during part of the Class Period, explained that NYCB's "Master Loan Inventory" "relied almost 'exclusively' on the original appraisal rather

than current financials," and that those appraisals often lacked third-party reports "which were common inclusions in his experience at other banks." *Id.* ¶ 117. CW-1 also regularly found and reported significant errors in loan document information, and found "mindboggling" that NYCB "didn't want to fix them." *Id.* ¶¶ 118–119. In fact, CW-2, who was employed in a senior role to support the Chief Risk Officer during the early part of the Class Period, explained that in conducting stress tests as required by federal law, "NYCB would 'trick' the models to show the regulators what they wanted to see" "if the [] models did not 'spit out' the information that would appease [them]." *Id.* ¶ 112.

Other CWs described what they perceived as NYCB's close and concerning relationship with Meridian Capital Group ("Meridian"), a commercial mortgage broker that was blacklisted in November 2023 "pending an investigation into allegations that some of its brokers falsified figures to help their clients get bigger mortgages." *Id.* ¶ 97. For example, CW-5, a member of NYCB's Appraisal team through part of the Class Period, noted various fraudulent practices used by Meridian brokers to inflate the value of rent, such as "including the superintendent's apartment in the rent calculation," or by classifying "one-off key replacement charges[] in ordinary income when they knew these charges were not going to be routine." *Id.* ¶ 100. CW-6, a CRE underwriter during the Class Period, stated that Meridian "'skewed' numbers to make deals look better and 'just slapped' a number on a piece of paper . . . [and] explained that the department had no idea whether or not the numbers were accurate." *Id.* ¶ 102.

CW-5 and CW-6 also described the unusual relationship between NYCB's C-Suite executives and Meridian, and that Defendant Adams, NYCB's then-Head of Commercial Real Estate, "would speak directly with Meridian management whenever NYCB gave any pushback to Meridian brokers." *Id.* ¶¶ 101, 103–104. Indeed, CW-5 described Meridian "as holding NYCB 'hostage,'" and that "for every 5 loans originated by Meridian, there was [only one] loan originated by some other originator." *Id.* ¶ 99. Media reports following the Class Period also include commentary that "Meridian was so close to NYCB that other brokers found it hard to get their clients loan from the bank." *Id.* ¶ 97.

Relatedly, the CWs also reported a pattern regarding NYCB's approach to large loans with high commissions. CW-8, a CRE financial analyst responsible for performing regular assessments of NYCB's CRE loans during the Class Period, reported that he was often instructed to skip the semi-annual review of "high priority" clients, despite the fact that those clients "always appeared to be a red flag to him[] and he suspected that they may be hiding something." *Id.* ¶¶ 114–115. When CW-8 raised such issues with upper management, he was told that NYCB "would consider not loaning to a client again, but ultimately did if they were large enough." *Id.* ¶ 116. CW-9, a Commercial Loan Processor during portions of the Class Period, recalled that "NYCB approved loans from certain 'big shot' borrowers 'no matter what' because the Company did not want to lose their business." *Id.* ¶ 121.

Towards the end of the Class Period, public concerns began to surface regarding NYCB's CRE loan portfolio. To start, on January 31, 2024, NYCB "shocked

the market" with its 2023 Q4 results, recording a provision for credit losses ("PCL") of $552 million, an 800% increase from the prior quarter. *Id.* ¶¶ 6, 125. NYCB also reported net charge-offs of $185 million, compared to $19 million in total charge-offs for the prior seven quarters combined, as well as an allowance for credit loss ("ACL") of $992 million, up $373 million from last quarter's $619 million.[1] *Id.* ¶ 125. Based on this asset deterioration, NYCB also slashed its historically high dividend by 71%, from $0.17 to $0.05 per quarter. *Id.* ¶ 127.

Defendants initially claimed that these surprising metrics were not reflective of any changes in NYCB's underlying asset quality. For example, Defendant Cangemi, NYCB's then-CEO, stated that the increased reserves were "necessary enhancements that come with being a $100 billion plus Category IV bank." *Id.* ¶ 129. He also noted that with respect to "the actual performance of the portfolio, there hasn't been a whole lot of change in respect to the NPAs and delinquencies."[2] *Id.*

[1] The allowance for credit loss ("ACL") is an amount set aside on a bank's balance sheet to account for expected losses from its loans. The ACL at any given point is a snapshot of the bank's expectations of losses from its borrowers' failures to pay back their loans. Each quarter, a bank adds a provision for credit losses ("PCL") to account for expected losses greater than what was set aside. When a borrower defaults and money is definitively lost, the bank reports that amount as a "charge-off." Because money has already been set aside as the ACL on the bank's balance sheet, charge-offs simply draw down that reserve. In short, a bank's ACL at any given point is equal to the reserve at the start of the period, plus the PCL, less actual charge-offs.

[2] NPA stands for "non-performing asset," a classification given to serious delinquencies. A loan is typically classified as an NPA when it is 90 or more days past due, or when the bank has concluded that it can no longer reasonably expect to collect interest and principal payments in the normal course. A related metric that looks only at loans is non-performing loans ("NPL").

¶ 130. Defendant Pinto, NYCB's then-CFO, stated about the multi-family portfolio that the additional reserves reflected "repricing risk in that portfolio" and that they were "not seeing any significant trends in the multi-family portfolio besides the repricing risk . . . ." *Id.* When asked by analysts about whether the slashed dividends "ha[d] anything to do with [NYCB's] outlook for credit," Cangemi expressly denied the allegation, maintaining that the changes were "razor focused on looking at the company's long term plan and being part of the new Category IV banking institutions . . . ." *Id.* ¶ 134.

However, over the next few days, media reports revealed serious concerns over NYCB's credit risk and outlook. On February 5, 2024, *Bloomberg* published an article that NYCB's Q4 2023 metrics were a result of "[m]ounting pressure" from the OCC, suggesting that the additional reserves "were not just an attempt to increase reserves to reach parity with peers, but reflected a previously unreported deterioration in the Bank's loan quality." *Id.* ¶ 137. The article also revealed that months prior to the January 31 announcement, both NYCB's Chief Risk Officer and Chief Audit Executive had left their posts, and no replacement had been announced. *Id.* ¶ 138. Following this and other similar reports, NYCB's stock plummeted, and Moody's downgraded NYCB's debt ratings to junk. *Id.* ¶¶ 128, 141–142.

Immediately after the Moody's downgrade, NYCB announced that it had appointed Defendant DiNello, NYCB Board member and former Flagstar CEO, as its executive chairman and that the Chief Risk Officer and Chief Audit Officer positions were filled by interim personnel. *Id.* ¶ 143. DiNello similarly denied the allegations

made in the media reports, stating that NYCB's January 31 announcement was not a result of regulatory pressure and that he "d[idn't] have any idea of what th[e] need might be" to further increase loan loss provisions in 2024. *Id.* ¶¶ 146–147.

On February 22, 2024, industry watchdog *Better Markets* published a report calling NYCB a "Frankenstein Monster" in light of the spate of recent acquisitions, and "revealed that this growth would not have occurred absent [NYCB's] decision to strip itself of FDIC oversight just before the regulator was set to publicly announce that it was not going to approve the Flagstar Merger." *Id.* ¶ 151. This was the first time that the FDIC's opposition to the Merger was revealed to the public. The report further accused NYCB of "blatant regulatory arbitrage" for its decision to switch to a national bank charter to change regulators. *Id.* ¶ 151.

On February 29, 2024, NYCB filed a Form 8-K/A revealing that: "(a) management had 'identified material weaknesses in the [NYCB]'s internal controls related to internal loan review, resulting from ineffective oversight, risk assessment and monitoring activities;' (b) NYCB would write off 100% of its $2.4 billion in goodwill; and (c) [NYCB] would delay filing its Form 10-K in order to further assess the impact of its material weaknesses." *Id.* ¶ 153. The goodwill write-off increased NYCB's previously reported 2023 GAAP ("Generally Accepted Accounting Principles") net loss from $252 million to $2.71 billion. *Id.* ¶ 153. NYCB then filed another Form 8-K revealing that Cangemi had resigned as CEO one week prior and was replaced by DiNello. *Id.* ¶ 154. The news resulted in another dramatic drop in stock price. *Id.* ¶ 159.

Amidst fears of NYCB's potential collapse, on March 6, 2024, NYCB announced that it was receiving a $1 billion capital infusion from a consortium of investors. *Id.* ¶ 163. It also announced a new CEO, Joseph M. Otting — the second change in less than a week — and four new directors. *Id.* ¶ 163. Otting "later confirmed that this cash injection saved [NYCB] from failing," as NYCB experienced a deposit outflow of $6 billion between February 5, 2024 and March 5, 2024. *Id.* ¶¶ 168–169.

During this same period, eight Board members resigned, including Cangemi and six of the Board members who had served on the Risk Assessment Committee during the Class Period. *Id.* ¶¶ 170–171. Five of the seven members of NYCB's Credit Committee also resigned. *Id.* ¶ 171. On a call with shareholders on June 5, 2024, Otting "admitted that the departures of 'most of the executive management' . . . and the 'majority of the board' were part of an effort 'of holding people accountable' 'for material weaknesses and other items associated with the company.'" *Id.* ¶ 174.

On March 15, 2024, NYCB filed an amended Form 10-K for the company's 2023 financial results, which revealed that NYCB had identified four out of the five possible material weaknesses in internal controls relating to its control environment, risk assessment, monitoring, and control activities.[3] *Id.* ¶¶ 178–180. The 10-K described the material weaknesses as follows:

[3] Under the widely used framework called the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), a bank's internal controls are separated into five components: control environment; risk assessment; control activities; information and communication; and monitoring activities.

> Control environment – Our Board of Directors did not exercise sufficient oversight responsibilities, which led to us lacking a sufficient complement of qualified leadership resources to conduct effective risk assessment and monitoring activities.
>
> Risk assessment – We lacked effective periodic risk assessment processes to identify and timely respond to emerging risks in certain financial reporting processes and related internal controls, including internal loan review, that were responsive to changes in the business operations and regulatory and economic environments in which the Company operates.
>
> Monitoring – Our recurring monitoring activities over process level control activities, including internal loan review, were not operating effectively.
>
> Control activities – We did not sufficiently maintain effective control activities related to internal loan review. Specifically, our internal loan review processes lacked an appropriate framework to ensure that ratings were consistently accurate, timely, and appropriately challenged. These ineffective controls impact the Company's ability to accurately disclose loan rating classifications, identify problem loans, and ultimately the recognition of the allowance for credit losses on loans and leases.

*Id.* ¶ 181. Plaintiffs assert that it is "uncommon for public companies in the United States to disclose any material weaknesses in their internal controls" and that "it is very rare for any company to report more than three material weaknesses." *Id.* ¶ 179.

NYCB's financial results for the first two quarters of 2024 appears to reflect these admitted weaknesses. NYCB's ACL and PCL, as well as the number of non-performing and delinquent loans, "rose astronomically," "indicating that the Class Period figures were woefully underreported." *Id.* ¶¶ 185–186. In the second quarter, NYCB reported net charge-offs of $349 million and an NPL of $2 billion, up from $800 million in the first quarter. *Id.* ¶ 195. In calls with analysts, CEO Otting and the newly appointed CFO Craig noted the deficiencies with the circumstances they had

inherited; they also stated that NYCB "[was] not ready to be regulated by the OCC" during the Class Period and that prior management "didn't have people that could visualize the end game or work in a work environment that ha[d] proper regulatory infrastructure." *Id.* ¶¶ 189–191. At NYCB's annual general meeting on June 5, 2024, Gifford stated that the "principal drivers of portfolio stress" that led to the "catastrophic financial results were present and increasing throughout the Class Period." *Id.* ¶ 192.

## II. The Alleged Misstatements

Defendants' alleged misstatements under the Exchange Act are the primary subject of the parties' dispute, and accordingly, the Court's analysis. The Complaint lays out four categories of allegedly false and misleading statements and/or omissions made by Defendants NYCB, Cangemi, Pinto, Adams, and DiNello during the Class Period. These relate to: (1) FDIC's opposition to the Flagstar Merger; (2) NYCB's risk management practices and controls; (3) NYCB's loan review process and asset quality; and (4) NYCB's creation and maintenance of internal controls. In total, the Complaint identifies 81 alleged misstatements in support of its Exchange Act claims. As is the practice in this circuit, the Court will address the statements by category, both here and in the analysis section *infra*. *See, e.g.*, *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482 (E.D.N.Y. Mar. 17, 2025); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283 (S.D.N.Y. 2019).

1. <u>FDIC Opposition to Flagstar Merger</u>

Plaintiffs' first category of misstatements pertains to Defendants' statements

and omissions as to the FDIC's opposition to the Flagstar Merger. As discussed above, NYCB announced its merger in April 2021, announced the change in regulators in April 2022 after failing to get approval from FDIC, and then got conditional approval from the OCC on October 27, 2022, with the merger completing on December 1, 2022.

On the Q2 2022 earnings call on July 27, 2022, Defendants Cangemi and DiNello (then-CEO of Flagstar) responded to analyst questions about the status of regulatory approval. For example, one analyst asked for "a temperature check on obtaining regulatory approval for the [Flagstar] deal," and whether NYCB could speak to the "national bank charter switch." Cangemi responded, "we feel very confident where we are." Compl. ¶ 226. DiNello then added, "[D]on't read anything into the National Bank piece of it. It's just an easy way to get there. . . . So again stop, don't read anything into that. There's no complication associated with the application because of the National Bank piece of it." *Id.* ¶ 227. Cangemi, Pinto, and DiNello made similar comments in response to questions about regulatory approval in the Q3 2022 earnings call. *See, e.g.*, *id.* ¶¶ 233, 234.

Further, NYCB's prospectus form for the Merger signed by Cangemi and DiNello, dated October 12, 2022, stated that "neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals required to consummate the transactions contemplated by the merger agreement in a timely manner," *id.* ¶ 229, and that "NYCB and Flagstar believe that the merger does not raise significant regulatory concerns and that they will be able to obtain all requisite regulatory

approvals," *id.* ¶ 231. That same prospectus included background information on the switch in regulators, and stated only that "NYCB and Flagstar each believe that a national bank charter is an appropriate charter for the combined company's banking operations, especially taking into account Flagstar's national mortgage banking business . . . ." *Id.* ¶ 230.

2. Risk Management Practices

The next category of misstatements relate to Defendants' statements around NYCB's risk management practices, particularly in the wake of the Signature acquisition, which led to the classification of NYCB as a Category IV bank subject to heightened scrutiny.

On a March 20, 2023 conference call to discuss the Signature acquisition, analysts asked Cangemi and Pinto what "enable[d] [them] to execute on this transaction." Compl. ¶ 241. Cangemi responded that "there's no question that [risk management is] my priority as CEO, I'm very confident that we've built a very strong risk management team and we strengthened it every day," and that, "We're now a $100 billion bank. We're going to ensure that we have all of the appropriate risk management tools to be a $100 billion bank. We've made sizable investments." *Id.* In response to whether NYCB was concerned about the "outside noise" and "almost panic on deposit trends" brought about by the collapse of Signature and other peer banks, Cangemi stated that "in the event if we had to pull a liquidity situation, we would literally take down the securities without any real consequence of the capital and be in a very unique position with significant lines available because our portfolio

is pledgeable [sic] on the multifamily side. So we have a very good risk management plan in place." *Id.* ¶ 242.

NYCB's April 21, 2023 Proxy Statement filed with the SEC further emphasized NYCB's "[h]igh standards of regulatory compliance" and stated that the company had "developed a comprehensive risk framework that aligns strategy with risk appetite." *Id.* ¶ 245. It also described the Board's involvement in risk management, noting that the "Board of Directors as a whole is responsible for risk management oversight" and that the "Chief Risk Officer reports to the Risk Assessment Committee; [and] the Chairman of the Board's Risk Assessment Committee meets regularly with management to discuss the risks facing the Company and strategies to address these risks." *Id.* ¶ 246.

In a letter to stockholders on the same date, Cangemi addressed the recent failures of NYCB's peer banks, noting that those failures "stemmed from each of these banks' . . . substantially high levels of uninsured deposits and the lack of an appropriate risk management framework," and that by contrast, the FDIC's approval of NYCB's Signature acquisition "speaks volumes of the faith and confidence our regulators have in our management team and business model." *Id.* ¶ 247–48.

On the Q1 2023 earnings call, analysts asked about NYCB's "risk management infrastructure" and how much investment was required based on the new Category IV classification. Pinto responded that "there will always be some incremental add, but we don't think it will be a material add given the structure and the backbone that we already have in place," and Cangemi added that "we were ready to be at that $100

[b]illion mark . . . we were there, as far as operationally, moving from that direction." *Id.* ¶¶ 249–250. And on the Q3 2023 earnings call, analysts similarly inquired about the expenses involved with the expansion, and Pinto stated that "we have a significant stress testing group that we've put in place a long time ago and have added 2 [*sic*] to be ready for the plan to be ready to be over $100 billion." *Id.* ¶ 252.

3. Loan Review Process and Asset Quality

The third category of misstatements pertains to Defendants' statements and omissions regarding NYCB's loan review process and high asset quality. The complaint alleges 59 misstatements in this category, consisting largely of the following: NYCB's quarterly press releases reporting on various asset quality metrics; statements made by the Officer Defendants at the corresponding investor presentations; NYCB's Form 10-Qs; and statements made during quarterly earnings calls.

At every quarterly press release, NYCB reported strong metrics for asset quality, including low NPAs, NPLs, and loss reserves, as depicted in the table below. In each Form 10-Q and 10-K, NYCB affirmed that "[b]ased upon all relevant and available information as of the end of the [relevant period], management believes that the allowance for losses on loans was appropriate at that date." Compl. ¶¶ 263, 275, 288, 308, 323, 340.

| | '22 Q2 | '22 Q3 | '22 Q4 | '23 Q1 | '23 Q2 | '23 Q3 |
|---|---|---|---|---|---|---|
| NPA | $56M | $50M | $153M | $161M | $246M | $404M |
| NPL | $50M | $45M | $141M | $148M | $233M | $392M |

| | | | | | | |
|---|---|---|---|---|---|---|
| ACL | $216M | $218M | $393M | $550M | $594M | $619M |
| PCL | $9M | $2M | $124M | $170M | $49M | $62M |
| Net charge-offs | ($7M) | $0 | $1M | ($1M) | ($1M) | $24M |
| Net income | $166M | $147M | $139M | $159M | $345M | $266M |

*Id.* ¶¶ 257–258, 265–266, 278–279, 298–299, 311–312, 325–326. Despite an increase in loan losses following the Signature acquisition, NYCB continued to record low figures. For example, by Q3 2023, NYCB's NPAs peaked at 0.36% of total assets, NPLs peaked at 0.47% of total loans, and ACL peaked at just 0.74% of total loans. *Id.* ¶ 325. For reference, by Q2 2024, following the Class Period, NYCB was reporting an NPL of $2B, a PCL of $390M, net charge-offs of $349M, and a net income loss of $308M. *Id.* ¶ 195.

At each quarterly investor presentation, Defendants largely repeated the same statements, claiming that their "asset quality metrics compare very favorably to both the S&P U.S. BMI Banks Index and our regional bank peers," and often including charts demonstrating that NYCB's percentage of nonperforming loans as a percentage of total loans was many times lower than those of peer banks. *See, e.g.*, *id.* ¶¶ 260, 269, 281. They also repeatedly represented that "current and historical net charge-offs demonstrate non-performing loans result in low levels of actual losses," and that the company's "[l]ow risk credit culture and business strategy has resulted in superior asset quality through past cycles." *See, e.g.*, *id.* ¶¶ 302, 314, 328.

On earnings calls, the Officer Defendants made representations regarding

NYCB's purportedly superior asset quality. For example, they repeatedly emphasized that NYCB's "asset quality and credit trends remain superb and continue to rank the company as among the best in the industry," and that the strong metrics "reflect our conservative underwriting practices and historically low level of losses in our core portfolios." *Id.* ¶ 272; *see also id.* ¶ 283 ("These metrics are proof positive that our conservative underwriting standards have served us well over various business cycles.").

The Officer Defendants responded to analysts' concerns on these calls with similar reassurances. When asked about concerns related to office-related CRE loans during the Q4 2022 call, Pinto stated that "the performance in [the CRE] portfolio has been better than we originally expected coming out of the pandemic," and that "I haven't seen any negative trends. . . . It's been very, very solid." *Id.* ¶ 285. On the Q1 2023 call, Cangemi attempted to allay the same concerns, adding that, "right now, we're seeing very strong performance, no delinquencies, no late pay," and that "the LTVs are very low and the relationships are very strong and we know the customer very well."[4] *Id.* ¶ 304. Following the Signature acquisition, analysts inquired whether the increase in NPL was tied to changes in the office-related CRE loans, and Cangemi denied that that was the case, stating that "it was flat when you take out the acquisitions." *Id.* ¶ 316.

Defendants said largely the same in response to concerns over the multi-family

---

[4] LTV refers to "loan-to-value" ratio, which is calculated by dividing a loan amount by the value of its corresponding collateral.

portfolio. On the Q1 2023 call, analysts expressed concerns regarding higher interest rates and NYCB's debt service coverage for its rent-regulated multi-family portfolio, and Cangemi responded that "we're still seeing 100% consistency on no delinquencies, no late pays." *Id.* ¶ 305. Cangemi reaffirmed the same on the Q2 2023 call, stating, "We're not seeing any late pays. We're not seeing delinquencies on multi-family." *Id.* ¶ 319. And again on the Q3 2023 call, Cangemi noted that "we have a very strong portfolio with low LTVs and we monitor it carefully, and we're seeing consistencies of payment. . . . [W]e're not seeing any delinquency trends with any material at all in the multi-family space." *Id.* ¶ 331. Pinto added that "despite the negativity you're reading about, our portfolio is performing extremely well relevant to the marketplace." *Id.* ¶ 332.

When further pressed by an analyst given the pile-up of issues from the rent regulations, the pandemic, and higher interest rates, Cangemi attributed any concerns to "one-off families," stating, "It's a handful of relationships, it's not systemic, it's not something we're seeing yet. . . . So it's been a relatively strong book, like I said, a very powerful position regarding the consistency of performance. We're not seeing trends." *Id.* ¶ 334. And on that same call, Defendant Adams, then-Senior Executive Vice President and President of Commercial Real Estate Finance, added, "we're monitoring the rent-regulated properties closely, but there's not really a lot of cracks in that particular portfolio that is really raising anything for us to have any real concern right at this time." *Id.* ¶ 335.

4. Internal Controls

The final category of misstatements consists of Defendants' statements and omissions about the effectiveness of NYCB's internal controls over financial reporting. All these statements are contained in the Form 10-Qs and 10-K filed by NYCB.

On each of the Form 10-Qs, which were signed by Cangemi and Pinto, Defendants represented that "the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period." Compl. ¶ 341. Attached to each 10-Q were certifications pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2022 ("SOX") attesting to the establishment of sufficient internal controls, and that Cangemi and Pinto had reviewed NYCB's filings for any untrue statements or omissions of material fact. *Id.* ¶ 342. Specifically, Cangemi and Pinto represented that they had:

> designed or caused to be designed 'disclosure controls and procedures' to 'ensure' that material information about NYCB was made known to them; [] designed or caused to be designed 'internal controls over financial reporting' to 'provide reasonable assurance regarding the reliability of financial statements for external purposes in accordance with [GAAP]', and [] 'disclosed any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.'

Opp'n to Mot. to Dismiss ("Opp'n"), Ex. 1 at 48, ECF No. 124 (quoting Compl. ¶ 343). NYCB's 10-K similarly attested that management had "concluded that the Company's internal controls over financial reporting as of December 31, 2022 was effective using this criteria." Compl. ¶ 344.

## III. Procedural History

This case initially began as two separate actions, one brought by Walter Edward Lemm, Jr., and another by Dale Miskey, both individually and on behalf of others who purchased NYCB stock during the Class Period. *See Miskey v. N.Y. Cmty. Bancorp, Inc.*, No. 24-CV-1118 (E.D.N.Y.). On April 8, 2024, two separate Movants moved to consolidate the actions and appoint a lead plaintiff, one on behalf of the Boston Retirement System ("BRS") and another on behalf of Sand Hollow Management, LLC ("Sand Hollow"). ECF No. 13; ECF No. 21.

On May 7, 2024, Magistrate Judge James R. Cho granted the motion to consolidate and appointed BRS as the lead plaintiff, finding that BRS had successfully rebutted Sand Hollow's presumptive adequacy. *See Lemm v. New York Cmty. Bancorp, Inc.*, 733 F. Supp. 3d 107, 114 (E.D.N.Y. 2024). Sand Hollow shortly moved for reconsideration, which Judge Cho denied on March 31, 2025. *Lemm*, No. 24-CV-903 (NRM) (JRC), 2025 WL 964091 (E.D.N.Y. Mar. 31, 2025).

On September 25, 2024, Plaintiffs filed their operative Amended Complaint ("Complaint"). On November 21, 2025, Defendants filed the instant motion to dismiss. Mem. of L. in Supp. of Mot. to Dismiss ("Mot."), ECF No. 122.

## DISCUSSION

The Complaint alleges two claims under the Exchange Act and three claims under the Securities Act. For the reasons that follow, the Court finds that Plaintiffs have sufficiently stated each of these claims.

## I. Exchange Act Claims

Plaintiffs allege a claim of fraud under Section 10(b) of the Exchange Act against Defendants, as well as control-person liability under Section 20(a) against the Officer Defendants. The Court begins with the Section 10(b) claim.

A. Legal Standard

To state a claim under Section 10(b), the Exchange Act's implementing rule, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). Here, the first, second, and sixth prongs are contested, with the first two prongs comprising the vast majority of the issues addressed in parties' briefing.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") outlines unique requirements for stating a Section 10(b) claim under the Exchange Act. A complaint alleging false or misleading statements under this statute must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. §§ 78u-4(b)(1)–(2)). The "alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original). However,

for purposes of pleading scienter, a "strong" inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

The Court now considers the first, second, and sixth prongs in turn.[5]

B. Material Misstatements or Omissions

Section 10(b) makes it unlawful for a person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "[T]he Second Circuit's reading of the [PSLRA] focuses on whether the facts alleged are sufficient to support a *reasonable belief* as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Intern.*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015) (emphasis in original) (citation omitted).

As a general matter, even under the heightened pleading standards under the PSLRA, the Court must still accept as true the allegations made in the complaint. As such, Plaintiffs have little issue showing that many of the alleged misstatements are false as pled. Indeed, three of the four categories of misstatements are the direct subject of NYCB's post-Class Period disclosures in which NYCB admitted material weaknesses. Such a disclosure at least establishes the bare falsity of a significant

[5] Plaintiffs separately allege a theory of scheme liability under Section 10(b). *See* 17 C.F.R. § 240.10b-5(a), (c). However, as the Court finds that Plaintiffs sufficiently allege liability under the misstatement subsection of Section 10(b), it need not address Plaintiffs' claim of scheme liability.

portion of the alleged misstatements.

Nevertheless, the parties heavily dispute the materiality of and other those misstatements: whether the false statements concerned material facts, whether any omissions were of the kind that a reasonable investor would care about, and whether any of the statements fall into the categories of misstatements that courts have held to be protected from liability under Section 10(b). More specifically, outside of generally disputing the materiality of the subject of these statements, Defendants variously argue that the statements are nonetheless inactionable as fraud because they are immaterial puffery, opinion statements, and/or subject to PSLRA's safe harbor for forward-looking statements.

The Court now turns to each category of misstatement.

1. FDIC Opposition to Flagstar Merger

Plaintiffs allege that Defendants made seven misstatements with respect to regulatory opposition to the Flagstar Merger.

As an initial matter, Defendants contest whether some of these statements were false as pled, because they may have been true in a literal sense. For example, because NYCB had switched charters to no longer require FDIC approval, it was technically true that the companies believed "they w[ould] be able to obtain all requisite regulatory approvals," Compl. ¶ 231, and that going through the National Bank was "just an easy way to get there," *id.* ¶ 227.

However, "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and

in context. Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (citation modified). And although "[i]n general there is no duty to disclose a fact . . . 'merely because a reasonable investor would very much like to know that fact,' . . . once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).

Here, not only did Cangemi and DiNello choose to speak about regulatory approval for the merger, explicitly claiming that "neither NYCB nor Flagstar knows of any reason why it cannot obtain the regulatory approvals required," Compl. ¶ 229, and that "NYCB and Flagstar believe that the merger does not raise significant regulatory concerns," *id.* ¶ 231, they directly answered questions from analysts regarding the potential impact of the switch in regulators. For example, on the Q2 2022 earnings call, when an analyst asked whether Defendants could speak to "that national bank charter switch," DiNello flatly denied any relevance, stating, "don't read anything into the National Bank piece of it. It's just an easy way to get there. . . . So again, stop, don't read anything into that. There's no complication associated with the application because of the National Bank piece of it." *Id.* ¶ 226-27.

Plaintiffs include more than enough allegations to support the materiality of this omission. For one, NYCB was "forced to extend the Merger closing deadline

several times" as a direct result of the companies' failure to get approval from the FDIC and the Federal Reserve. *Id.* ¶ 54; *see United Indus. Workers Pension Plan v. Waste Mgmt. Inc.*, No. 22-CV-4838 (LGS), 2024 WL 1312593, at *4 (S.D.N.Y. Mar. 27, 2024) (finding material defendants' omission that DOJ had raised antitrust concerns, "thereby necessitating the renegotiation of the merger"). The Complaint also incorporates by reference various articles noting the significance of FDIC's opposition after the fact. For example, a report published on *Better Markets* accused NYCB of engaging in "blatant regulatory arbitrage" by "moving from an unfriendly banking regulator to a much more friendly one." Compl. ¶ 151. Articles from *Bloomberg* and *Reuters* dated March 4 and March 7, 2024, further highlighted that NYCB proceeded with the merger despite "red flags" regarding the "banks' lending practices." *Id.* ¶¶ 175–177.

a) Puffery

Defendants next argue that a large portion of these misstatements were mere "puffery," and thus inactionable. Indeed, it is well established that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (quoting *City of Pontiac Policemen's & Firemens' Ret. Sys. V. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)), and "expressions of puffery and corporate optimism do not give rise to securities violations," *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In considering whether a representation constitutes puffery, the key factor is whether the statement in question "is so general that a reasonable investor would not depend

on it" in assessing a potential investment. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

This argument is unpersuasive. Defendants cherry-pick certain excerpts of statements from the Q3 2022 earnings call that, when viewed in isolation, indeed appear to be general statements of corporate optimism. *See* Mot. at 16 (citing Compl. ¶ 233 ("we're very comfortable that the business combination is [a] powerful opportunity for two companies to come together"); and *id.* ¶ 234 ("we're hopeful because we see that the . . . opportunity and power of the combined organization is really something special")). However, these statements were in response to analysts pressing Defendants, eighteen months after the initial announcement of the merger, on whether NYCB "expect[ed] to close the deal" and whether "anything [had] changed . . . that would make [them] think differently about the strategic merits of the deal today or November 1 versus when the deal was announced." Compl. ¶ 233. Cangemi responded only with the platitude that they were "very comfortable that the business combination is [a] powerful opportunity" for the two companies. *Id.* ¶ 233. And later, when asked whether "regulators were 'slow-playing the approvals,'" DiNello responded, "[t]he regulatory process is what it is," and "I don't think you should read anything into any of our comments today, other than that *we're still hopeful because we see that the . . . opportunity and power of the combined organization is really something special*." *Id.* ¶ 234 (emphasis added).

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y.

2015). "Therefore, even if some statements, 'viewed in isolation, may be mere puffery, . . . when . . . the statements [a]re made repeatedly in an effort to reassure the investing public . . . , a reasonable investor could rely on them as reflective of the true state of affairs." *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 392 (S.D.N.Y. 2022) (citation omitted). Plaintiffs have adduced substantial allegations that this was a particular time of concern for investors, given the background conditions of changing regulations and higher interest rates, as well as the very fact of FDIC's opposition to the merger, which was based on concerns regarding "NYCB's exposure to multi-family loans." Compl. ¶¶ 175–177, 228. And indeed, as the Second Circuit has previously found in a similar context, "[D]efendants' false public denial" regarding regulatory approval in the face of direct questioning "amounts to an admission of the materiality of its nondisclosure. Otherwise, the Company would not have tried to hide it." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022).

b) Inactionable Opinion

Defendants next claim that some of these misstatements were inactionable opinions. In *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), the Supreme Court clarified what distinguishes a statement of fact from a statement of opinion, and how a statement of opinion can nevertheless be materially misleading. For this category of alleged misstatements, the parties do not dispute that certain of the representations constitute opinions. However, an opinion can nevertheless be false or misleading if "(1) the speaker does not hold the belief

professed; (2) the facts supplied in support of the belief possessed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (summary order) (citation modified) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)); *see Omnicare*, 575 U.S. at 186–91.

Defendant's claim is thus unpersuasive for the same reasons that these statements do not constitute mere puffery; Defendants "omitted [information that] would have been material to a reasonable investor." *Omnicare*, 575 U.S. at 196. "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Tongue*, 816 F.3d at 209 (quoting *Omnicare*, 575 U.S. at 189). It is quite plain that in response to specific questions about the delay in regulatory approval and a switch in regulators, reasonable investors would want to know about FDIC's opposition to and concerns about the merger. Plaintiffs have sufficiently established the materiality of such omissions.

c) The PSLRA Safe Harbor

Finally, Defendants argue that certain misstatements in this category fall within PSLRA's safe harbor for forward-looking statements. "Forward-looking statements include those containing 'projection[s] of revenues . . . or other financial items,' 'plans and objectives of management for future operations,' and discussions of 'future economic performance.'" *Mangrove Partners Master Fund, Ltd. v. Bristol-Myers Squibb Co.*, No. 24-826, 2025 WL 1420914, at *3 (2d Cir. May 16, 2025) (summary order) (quoting 15 U.S.C. §§ 77z-2(i)(1), 78u-5(i)(1)). The PSLRA includes

a provision that shields such statements from liability if "(1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the statement was made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (citation modified).

The third prong collapses into the scienter analysis, so will be discussed accordingly in the subsequent section. Similarly, the second prong of materiality is captured by the analyses for puffery and opinion. The only relevant issues are therefore whether the misstatements were genuinely "forward-looking" under the PSLRA, and whether they were accompanied by "meaningful cautionary language." *See* Mot. at 34 (discussing only the first prong of the safe-harbor provision).

The parties dispute whether some of the statements here were genuinely forward-looking. However, the Court need not address that question, because it is apparent that the misstatements did not include sufficient cautionary language. The only potential cautionary language identified by Defendants are the various general risk factors enumerated by NYCB in discussing the merger. *See* Mot. at 36; Decl. of Nina Yadav in Supp. of Def.'s Mot. to Dismiss, Ex. 2 at 10–11, ECF No. 123-2. Such language is insufficient to shield Defendants from liability for this category of misstatements, as the misleading nature of these statements arises not from NYCB's failure to address potential future risks, but to disclose one that had already occurred — namely, that the FDIC had rejected its application for the Merger. It is well established that "[c]autionary words about future risk cannot insulate from liability

the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173; *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010) ("[C]autionary language that is misleading in light of historical fact cannot be meaningful . . . ."). Therefore, Defendants' misstatements with respect to FDIC's opposition to the Merger does not qualify for the PSLRA's safe-harbor protection.

2. NYCB's Risk Management Practices

Plaintiffs next allege that Defendants made eleven misstatements with respect to the strength of NYCB's risk management practices, mostly relating to the Signature acquisition and NYCB's corresponding classification as a Category IV bank. Generally speaking, it is not in dispute that NYCB lacked adequate risk management practices during the Class Period, a fact to which NYCB admitted in its 2024 Form 10-K/A noting material weaknesses. *See* Compl. ¶¶ 178–183, 238. Defendants instead challenge the materiality of the specific statements and/or omissions related to risk management practices.

a) Puffery

Defendants first argue that these statements constitute immaterial puffery. They primarily rely on *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), in which the Second Circuit affirmed the district court's finding that plaintiffs failed to plead materiality with regards to JP Morgan's statements about its integrity and risk management. Many of the statements in *ECA* are indeed facially similar to the alleged misstatements in this case. *See id.* at 205–06 (noting JPMC's statements that its "'risk management

practices [were] highly disciplined . . . ,' that it 'set the standard for integrity,' and that it would 'continue to reposition and strengthen [its] franchises with a focus on financial discipline'").

However, in *ECA*, plaintiffs alleged no other surrounding contextual facts suggesting that JP Morgan's integrity or risk management practices were in question or of particular interest to investors at the time. The Second Circuit thus found that these statements "did not, and could not, amount to a guarantee that [JP Morgan's] choices would prevent failures in its risk management practices." *Id.* at 206.

Here, by contrast, NYCB's statements took place in the context of its Signature acquisition that came with heightened regulatory scrutiny, as well as the failures of three large peer banks resulting from those banks' risk management practices and internal controls. *See* Compl. ¶¶ 61–64. For example, in response to analyst questions regarding the Signature transaction and the then-recent collapse of peer banks, Cangemi assured investors that "there's no question that [risk management was] [his] priority as CEO," *id.* ¶ 241, and that NCYB had a "very good risk management plan in place" for its multifamily portfolio, *id.* ¶ 242. Cangemi also later directly addressed the failure of peer banks, acknowledging that they resulted from a "lack of an appropriate risk management framework" and that by contrast, FDIC's approval of the Signature acquisition "sp[oke] volumes of the faith and confidence [that] regulators ha[d] in [NYCB]." *Id.* ¶ 247. In 2023, analysts inquired about potential additional investments in NYCB's risk management infrastructure that would be necessary given its new Category IV classification, and Pinto assured them

on multiple earnings calls that NYCB "w[as] ready to be at that $100 [b]illion mark," *id.* ¶¶ 249–250, and that it "ha[d] a significant stress testing group that [they'd] put in place a long time ago," *id.* ¶ 252.

Again, "even if some statements, 'viewed in isolation, may be mere puffery, . . . when . . . the statements were made repeatedly in an effort to reassure the investing public . . . , a reasonable investor could rely on them as reflective of the true state of affairs." *Karimi*, 607 F. Supp. 3d at 392. Indeed, "statements made on a conference call, in investor presentations, or in response to direct questions by analysts are materially misleading when 'made in an effort to soften the significant financial impact' of a development and 'to reassure investors.'" *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 502 (E.D.N.Y. 2025) (quoting *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023)). The case here is thus unlike *ECA*, in which plaintiffs argued that the mere "importance of a bank's reputation for integrity" was enough to "render a particular statement by a bank regarding its integrity per se material." 553 F.3d at 206.

Furthermore, the cases on which Defendants rely emphasize that statements of puffery and corporate optimism cannot be understood as guarantees of success. *See, e.g.*, *ECA*, 553 F.3d at 206 ("[T]hese statements did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices."); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) ("Nor did it certify that the company would not suffer losses when it touted its 'commitment to create earnings opportunities.'"); *In re Constellation Energy Grp., Inc. Sec. Litig.*,

738 F. Supp. 2d 614, 631 (D. Md. 2010) ("A reasonable investor could not assume from [the company's] general optimism about its risk management and internal control practices that the company would never lapse in these tasks."). But here, Plaintiffs are not arguing that NYCB's statements on adequacy of its risk management were misleading because of some discrete failure or lapse in otherwise sufficient risk management practices. Rather, they are alleging that NYCB's risk management system as a whole was materially deficient or entirely lacking, and that Defendants knowingly covered up that fact amidst investor concerns.

In touting NYCB's purportedly robust risk management practices, "[Defendants] did not couch [their] assertion in the language of optimism or hope, but as statements of fact, describing the standards by which [NYCB] operated." *In re Virtu*, 770 F. Supp. 3d at 503 (citation modified); *see, e.g.*, Compl. ¶ 241 ("we've built a very strong risk management team and we strengthened it every day"); *id.* ("We've made sizable investments."); *id.* ¶ 242 ("So we have a very good risk management plan in place."); *id.* ¶ 252 ("we have a significant stress testing group that we've put in place a long time ago . . . ."). In other words, as in *Novak v. Kasaks*, Defendants "stated that [NYCB's risk management structure] was 'in good shape' or 'under control' while they allegedly knew that the contrary was true. Assuming, as we must at this stage, the accuracy of [P]laintiffs' allegations about [NYCB's] practices, these statements were plainly false and misleading." 216 F.3d 300, 315 (2d Cir. 2000); *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) ("By touting its commitment to safety to such a degree, [the company] put the topic 'at

issue' such that we cannot say that, as a matter of law, investors would not find these representations material.").

b) Inactionable Opinion

Defendants next argue that these misstatements are inactionable opinions. The parties here primarily dispute whether the statements in question constitute "opinions" in the relevant sense.

In *Omnicare*, the Supreme Court defined an opinion as "a belief, a view, or a sentiment which the mind forms of person or things. Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare*, 575 U.S. at 183 (citation modified). Plaintiffs emphasize that opinion statements as defined under *Omnicare* typically include prefaces like "I believe" or "I think." *See* Opp'n at 32. By contrast, Defendants appeal to the commonplace understanding of the word "opinion," pointing out that statements like "chocolate is the best flavor" is clearly an opinion, even without any explicit qualifier that it is an expression of a person's view or belief. Reply in Supp. of Mot. to Dismiss ("Reply") at 18, ECF No. 125. They cite to a different paragraph in *Omnicare*, in which the Court distinguished a statement that it would *not* characterize as an opinion by noting that it was "a determinate, verifiable statement." *Omnicare*, 575 U.S. at 184.

The Court is not unpersuaded by Defendants' position that the term "opinion" as it is typically used encompasses a broad universe of subjective statements. However, reading *Omnicare* in context, it is evident that the Supreme Court did not

set out to define a standard for "opinions" in the securities-fraud context by equating it with how the term is used colloquially, but to characterize the particular distinction between a person making a statement of fact and a person hedging against that fact by converting the statement into one of that person's belief or position — in other words, to avoid "express[ing] certainty." *Omnicare*, 575 U.S. at 183. To use the Supreme Court's own example, while a person claiming that "our TVs have the highest resolution available on the market" is stating a fact that could be verifiably true or false, that same person stating "I *believe* our TVs have the highest resolution available on the market" would simply be expressing his or her opinion, which could be "true" in the sense that that genuinely reflects the person's belief, even if the underlying fact was false. *See generally id.* at 182–84. Under the *Omnicare* standard, however, that statement could still be materially false or misleading if it is shown that "(1) the speaker does not hold the belief professed; (2) the facts supplied in support of the belief possessed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." *Martin*, 732 F. App'x at 40 (citation modified).

The *Omnicare* test thus concerns statements that put forth a "determinable, verifiable" statement couched as a person's view or belief. It does not apply to the kind of traditional "opinion" statement that cannot be determinably true or false simply by virtue of the statement's use of some terms that are subjective in nature. *See, e.g.*, Compl. ¶ 242 ("we have a *very good* risk management plan in place" (emphasis added)); *id.* ¶ 245 ("management has formed a *highly capable and effective*

*program* to maintain and enhance our regulatory compliance culture" (emphasis added)).

To be sure, Defendants are correct that many of the alleged misstatements about NYCB's risk management are not strictly statements of facts in the sense that they include subjective descriptions, and thus cannot be determinably true or false. But the materiality of such statements depends on whether they constitute puffery, which has already been discussed. Indeed, the Court in *Omnicare* at least indirectly acknowledged this framework, noting that a traditional statement of fact "after all, is not mere puffery, but a determinate, verifiable statement." *Omnicare*, 575 U.S. at 184. And accordingly, courts in this circuit frequently analyze the actionability of such "opinions" using the puffery standard. *See, e.g.*, *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, No. 12-CV-6811 (CM) (JCF), 2013 WL 791462, at *6–7 (S.D.N.Y. Mar. 5, 2013) ("Words such as 'flexible' or 'lower premium payments' alone may be nonactionable opinions, but when considered in their full context, these statements could be more than mere sales puffery."). Therefore, the alleged misstatements in this category are materially misleading, even if they are not statements of fact.

c) Safe Harbor

Last, Defendants again invoke PSLRA's safe harbor for forward-looking statements with respect to the misstatements in this category. However, even a cursory review of the alleged misstatements here shows that they do not qualify under the safe harbor provision.

Simply put, these alleged misstatements are not forward-looking. At best,

Defendants identify one or two sentences in a handful of the misstatements that allude to future projections, but "[i]t is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010) (quoting *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003)). This is because "[i]t would be perverse indeed if an offeror could knowingly misrepresent historical [or present] facts but at the same time disclaim those misrepresented facts with cautionary language." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

For example, the single statement in this category that Defendants characterize as being "forward-looking" is Cangemi's response to an analyst question about the Signature transaction on a March 2023 conference call, in which he stated, "We're going to ensure that we have all of the appropriate risk management tools to be a $100 billion bank." Compl. ¶ 241. However, Cangemi made that statement in between other representations about past and present facts:

> So, we're pleased and proud about the investment made on the risk management [and] regulatory oversight. But that's my priority. . . . We're now a $100 billion bank. We're going to ensure that we have all of the appropriate risk management tools to be a $100 billion bank. We've made sizable investments. . . . We know what our obligations are as a large institution, and we convey it with confidence and professionalism with our regulatory constituents.

*Id.* Thus, because Cangemi's assertions included "both a forward looking aspect and an aspect that encompasses a representation of present fact," *In re SLM Corp. Sec.*

*Litig.*, 740 F. Supp. 2d at 556, Defendants are not entitled to immunity under the PSLRA's safe harbor provision.

3. Asset Quality

The Complaint next identifies fifty-nine alleged misstatements regarding the adequacy of NYCB's loan review process and its associated high asset quality. As mentioned above, these statements consist of reports of NYCB's quarterly and annual metrics underlying its assets, as well as Defendants' statements at quarterly investor presentations and earnings calls regarding these metrics and NYCB's underwriting practices.

Defendants first challenge whether Plaintiffs have plausibly pled that NYCB's quarterly reported metrics — which included, among other things, its NPAs, NPLs, ACLs, PCLs, and net income — were false. *See* Compl. ¶¶ 257–258, 265–266, 278–279, 298–299, 311–312, 325–326. Their sole argument here is that if these metrics were false, NYCB would have issued a restatement, which it did not do.

That argument is unpersuasive. While a restatement "is sufficient basis for pleading that those statements were false when made," *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017), the lack of a restatement does not require a Court (or a trier of fact) to find that the initial statements were true. Indeed, even the principal case on which Defendants rely, *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012), notes that a lack of a restatement is "not dispositive." As other courts have explained, the conduct of a company's internal auditors "are not dispositive of [falsity], because

to hold otherwise would shift to accountants the responsibility that belongs to the courts." *SEC v. Sequential Brands Grp., Inc.*, No. 20-CV-10471 (JPO), 2021 WL 4482215, at *8 (S.D.N.Y. Sep. 30, 2021) (quoting *SEC v. Rio Tinto plc*, No. 17-CV-7994 (AT), 2019 WL 1244933, at *19 (S.D.N.Y. Mar. 18, 2019)); *see also In re Signet Jewelers Ltd. Sec. Litig. (Signet I)*, No. 16-CV-6728 (CM), 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018) (holding that disputing falsity based on "the fact that [the company] has not restated its financials or dramatically increased its reserves . . . . misconstrue[s] Plaintiff's pleading obligations under the PSLRA and Rule 9(b)").

The Complaint otherwise alleges facts more than sufficient to show that these metrics were false or misleading as stated. For starters, NYCB admitted material weaknesses in both its internal loan review process as well as its monitoring activities, expressly conceding that "these ineffective controls impact[ed] [NYCB]'s ability to accurately disclose loan rating classifications, identify problem loans, and ultimately [impact] the recognition of the allowance for credit losses on loans and leases." Compl. ¶ 261. Plaintiffs' confidential witnesses also described a number of practices reflecting NYCB's deficient loan review process and resulting asset quality, including that management overlooked Meridian's artificial inflation of loans, *id.* ¶¶ 100–102, and instructed employees to skip assessments of "high priority clients" despite red flags being raised about the associated loans, *id.* ¶¶ 114–15.

Furthermore, the Complaint includes extensive allegations that NYCB violated GAAP in calculating these metrics, a fact that is largely undisputed by Defendants. *See* Compl. ¶¶ 200–223. Namely, Defendants stated on the Q4 2023

earnings call that the sudden surge in loan reserve metrics was due to NYCB's recent classification as a Category IV bank. *Id.* ¶ 213. NYCB also admitted in its Q1 2024 Earnings Presentation that $1.5 billion of its multi-family loan loans were repriced to a higher (more than double) rate, out of the $2.1 billion that was subject to repricing risk during the Class Period. *Id.* ¶ 219. This was "inconsistent with the requirements imposed by GAAP, which requires the estimate of a company's expected credit losses and related ACL to be driven by the company's specific portfolio of financial assets, and the specific credit risks related to those assets" at the time of calculation. *Id.* ¶ 213. In other words, the substantial increases in ACL and PCL — a quarterly increase of 60% and 800%, respectively — "did not result from new information in Q4 but was instead the result of the misuse of facts existing in earlier quarters." *Id.* ¶¶ 212, 214. Notably, the Complaint thus alleges that "NYCB should have restated prior period financial statements." *Id.* ¶ 214.

Finally, Plaintiffs contend that even the raw numbers alone constitute substantial circumstantial evidence that the pre-Q4 2023 metrics were inaccurate, as subsequent reporting made up for increases in loss reserves that should have been included in prior quarters. For example, NYCB's PCL in just Q4 2023 "significantly exceeded the cumulative increase to the PCL over the *prior eleven quarters*." *Id.* ¶ 212 (emphasis added). Further, increases in NYCB's ACL in Q1 2024 and Q2 2024 occurred at five times the rate of ACL increases prior to Q4 2023. *Id.* ¶ 216. In the six quarters preceding Q4 2023, NYCB reported net income that beat analyst expectations in four of those quarters, and met expectations in two. But as calculated

in the Complaint, if even 25% of the PCLs recorded in Q4 2023, Q1 2024, and Q2 2024 were attributable to those six preceding quarters (an additional reserve of $52 million per quarter), five of the six quarters would have missed expectations. *Id.* ¶¶ 222–223. Particularly in light of the other allegations of falsity in the Complaint, the Court agrees that the sudden and stark increases in loss reserves in Q4 2023 onward constitute strong circumstantial evidence that those numbers were misreported.

The Court thus finds that Plaintiffs have met their burden of pleading facts establishing that NYCB's quarterly reported metrics were false.

a) Puffery

Defendants identify two aspects of the alleged misstatements in this category as potentially constituting immaterial puffery. First, they note the various times that NYCB and Defendants described its "strong," "superb," and "stellar" asset quality. *See, e.g.*, Compl. ¶¶ 259, 260, 267, 269, 271. Defendants argue that such generic statements are too vague to be actionable, and that because investors were also provided with the "actual 'asset quality metrics' at issue," they could not have been misled by the characterization of those metrics. Mot. at 26. They cite, among other cases, in *In re Sanofi-Aventis Sec. Litig.*, No. 07-CV-10279 (GBD), 2009 WL 3094957 (S.D.N.Y. Sep. 25, 2009), *on reconsideration*, No. 07-CV-10279 (GBD), 2010 WL 2985912 (S.D.N.Y. July 27, 2010), in which the court found unpersuasive plaintiffs' claim that defendants failed to disclose relevant information about the side effects of rimonabant because their allegations "unequivocally demonstrate[d] that accurate rimonabant study data was made available to the public through Sanofi's press

releases, S.E.C. filings, and various medical publications." *Id.* at *5.

An obvious problem with this argument is that here, the Complaint plausibly alleges that the disclosed underlying metrics were inaccurate. Moreover, courts have regularly found that even generic statements about a company's asset quality or overall capital position can be material based on "context-specific factors, including specificity, emphasis, and whether certain statements are designed to distinguish the company in some fashion that is meaningful to the investing public." *In re Signet Jewelers Sec. Litig. (Signet II)*, 389 F. Supp. 3d 221, 230 (S.D.N.Y. 2019). For example, in *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012), the court found that defendant's "various descriptions of GE's loan portfolio as 'fantastic,' 'great,' 'robust,' 'strong', and 'really high quality,'" were materially misleading given that GE later disclosed that 42% of their consumer loans were made to non-prime borrowers. *Id.* at 386. The court held that although GE "had no independent duty to 'break out' details concerning its subprime exposure[,] . . . . once a company chooses to speak—as GE insistently did with respect to the 'high quality' of [its] portfolio—it has a duty to disclose any additional material fact necessary to make the statements already contained therein not misleading." *Id.* (citation modified) (quoting *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 590 (S.D.N.Y. 2010)); *see also Novak*, 216 F.3d at 315 (finding material defendants' statements "that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").

That is just the case here. As already discussed, the Complaint plausibly

alleges that NYCB failed to account for predicted loan losses from its portfolio in the quarters prior to Q4 2023. And indeed, in Q1 2024, NYCB admitted that it had repriced $1.5 billion of its multi-family loans to more than double the previous rate. Compl. ¶ 219. Not only that, many of Defendants' statements about NYCB's purportedly high asset quality were made as direct reassurances to investor concerns about whether the quality of those loans would suffer in the wake of the Covid-19 pandemic, *e.g.*, *id.* ¶¶ 285, 304, the Signature acquisition, *id. e.g.*, ¶ 316, new rent regulations, *e.g.*, *id.* ¶¶ 305, 319, and higher interest rates, *e.g.*, *id.* ¶ 305. Because these statements "were made in an effort to reassure the investing public . . . during a time of concern, . . . 'a reasonable investor could rely on them as reflective of the true state of affairs at the Company.'" *In re Banco Brandesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (quoting *Petrobas*, 116 F. Supp. 3d at 381). "[T]o apply the puffery rule to such allegations would deny that 'high quality' has any meaning." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010) (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008)).

Defendants also raise the same challenge as to the various instances in which NYCB highlighted its "conservative" underwriting policies and "low risk credit culture," arguing that statements about a company's "culture" and "integrity" are mere puffery. *See, e.g.*, Compl. ¶¶ 236, 260, 267, 268, 270. This argument fails for the same reasons just described. Indeed, courts frequently interpret statements about a company's conservative underwriting and disciplined culture as making

similar representations to statements about its high asset quality and strong credit portfolio, thus finding that they are materially misleading for the same alleged contrary facts. *See, e.g.*, *Signet I*, 2018 WL 6167889, at *11–12; *Freudenberg*, 712 F. Supp. 2d at 190–91. "In light of [D]efendants' touting of the company's 'conservative' and 'very cautious' underwriting standards that remained 'the same . . . over the years,' the failure to disclose the lowering of such standards is actionable under § 10(b)." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 270 (S.D.N.Y. 2010); *see, e.g.*, Compl. ¶ 272 (strong metrics "reflect our conservative underwriting practices and historically low level of losses in our core portfolios"); *id.* ¶ 283 ("These metrics are proof positive that our conservative underwriting standards have served us well over various business cycles.").

b) Inactionable Opinion

Defendants next argue that the misstatements in this category with respect to NYCB's loan loss reserves — the reported ACLs and PCLs — were opinions, and that Plaintiffs failed to identify specific and material facts going to the basis for those opinions that were omitted.

Though the Complaint sufficiently alleges that ACLs and PCLs were false as pled, the Second Circuit has indeed found that "loan loss reserves reflect management's opinion or judgment about what, if any portion of amounts due on the loans ultimately might not be collectible." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011), *abrogated on other grounds by Omnicare*, 575 U.S. 175. As such, for the purposes of materiality under the PSLRA, unlike other metrics, a bank's

reported ACL and PCL inherently reflect management's view about the underlying loan portfolio. Nevertheless, Defendants' statements about loan loss reserves are actionable under *Omnicare* because Defendants "omitted contrary facts [that] substantially undermine the conclusion a reasonable investor would reach" from those statements. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020).

First and foremost, these misstatements included other metrics like NPAs, NPLs, past due loans, and net charge-offs, which, as explained above, the Complaint has sufficiently alleged to be false as pled. *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) ("Misreported financial information clearly amounts to a false statement of fact."). In *Signet I*, the court held that plaintiff "adequately ple[d] that Signet misstated its reserves, because . . . based on Signet's loss history and the proportion of sub-prime loans in its portfolio, Defendants knew that its reserves did not account for losses that it was likely to incur." *Signet I*, 2018 WL 6167889, at *13. Similarly, here, the Complaint alleges that Defendants were aware that NYCB's metrics on non-performing assets and loans were false — or at least, significantly understated — yet continued to tout low loss allowances for the company's loan portfolio.

Furthermore, NYCB lacked the loan review procedures necessary to make accurate, good-faith projections about losses in its loan portfolio, as demonstrated by NYCB's later disclosure of material weaknesses as well as the various confidential witness descriptions of management's cavalier attitude and willful ignorance with

regards to high-commission loans. Metrics that constitute opinions can still be material when they "create the misleading impression that the projections were prepared using acceptable accounting techniques." *In re Shonda Games Ltd. Sec. Litig.*, 128 F.4th 26, 45 (2d Cir. 2025); *see also Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 87–88 (D. Conn. 2019) ("[A] projection that is seriously undermined by undisclosed facts or unreasonable assumptions or that does not follow generally accepted accounting principles is likely to be false." (quoting *In re Hot Topic, Inc. Sec. Litig.*, No. 13-CV-02939 (SJO) (JCS), 2014 WL 7499375, at *6 (C.D. Cal. May 2, 2014)).

For example, in *Freudenberg*, the court found material the defendants' representations regarding loan loss reserves because "[d]efendants represented that the loan loss allowance was based on careful monitoring of the portfolio and other relevant conditions." 712 F. Supp. 2d at 188. Here, the Complaint asserts that Defendants repeatedly affirmed that their loss reserves were "based upon all relevant and available information," *e.g.*, Compl. ¶¶ 263, 275, 291, 323, and in their annual Form 10-K, represented NYCB's allowance for credit losses as percentages of NPLs, which were false as pled, *id.* ¶ 289. Ultimately, even these allegations leave some ambiguity as to whether a reasonable investor would indeed have viewed Defendants' projections on loan losses as materially misleading, the Court errs in favor of Plaintiffs at this stage of the litigation, as "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him . . . are peculiarly ones for the trier of fact". *TSC Indus., Inc.*

*v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

Finally, Defendants' passing claim that some of the other statements here regarding NYCB's asset quality and the strength of its portfolio were also inactionable opinions is meritless, as these — as explained in Section I.B.2(b) *supra* — are not opinions in the relevant sense under *Omnicare*. And any dispute as to those statements' materiality is thus addressed by the Court's preceding analysis of Defendants' puffery defense as to these misstatements.

c) Safe Harbor

Defendants next argue that these misstatements fall within the PSLRA's safe harbor provision. But once again, the handful of misstatements identified by Defendants do not qualify as meaningfully forward-looking under the PSLRA because, at best, these statements include both future projections as well as representations of present or historical fact.

Consider two of the statements identified by the Defendants (with Defendants' excerpts in bold, and the present/historical facts in italics):

> *Our credit quality remains – metric remain solid, and reflect the strong credit culture of both legacy organizations. . . . These metrics are proof positive that our conservative underwriting standards have served us well over various business cycles.* This one is **a high quality balance sheet should [*sic*] serve us well in the event of a downturn in the economy**.

Compl. ¶ 283 (emphases added).

> *[W]e reported another quarter of low or no loan losses as net charge-offs was zero during the current first quarter compared to $1 million during the previous quarter. Our office exposure remains very manageable, and we remain comfortable with the credit trends in this sector. . . . [T]hese metrics are proof positive that our conservative underwriting standards*

> *have served us well over numerous credit cycles*, **this along with a high-quality balance sheet should serve us well in the event of an economic downturn. Regardless, we will continue to be laser-focused on credit quality across all the new verticals, especially those that we have recently entered**.

*Id.* ¶ 303 (emphases added).

In any case, the only cautionary language identified by Defendants are the boilerplate disclosures included in their Forms 8-K as incorporated in the investor presentations and conference calls. *See* Mot. at 38 n.12. Such "boilerplate language likely does not rise to the level of 'meaningful' cautionary language." *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018); *see Vivendi*, 838 F.3d at 247 ("To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." (quoting *Slayton v. Am. Express C.*, 604 F.3d 758, 772 (2d Cir. 2010))). Moreover, these generic risk disclosures regarding interest rates, government action, and changes in the composition of the portfolio, warn only of lapses that may occur as a result of these factors. Such cautionary language about future risk cannot "insulate from liability the failure to disclose that the risk has transpired" — for example, the fact that NYCB's loan portfolio was already incurring significant losses due to poor loan review and oversight. *Rombach*, 355 F.3d at 173.

The Complaint thus sufficiently alleges that the statements in this category are materially false or misleading.

4. Internal Controls

Finally, Defendants challenge the materiality of their SOX certifications in NYCB's Form 10-Qs and 10-Ks, in which Cangemi and Pinto attest to the effectiveness of NYCB's internal controls and GAAP compliance in their financial reporting. Defendants make only one argument as to this category of misstatements, which is that SOX certifications constitute opinions and are inactionable because there is no reason to believe that NYCB management did not in fact make the requisite evaluations and conclude that the company's financial controls were, at the time of certification, adequate. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 230 (S.D.N.Y. 2022) (noting that "SOX certifications do not provide a stand-alone basis for liability" (quoting *Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LJL), 2021 WL 1177505, at *21 (S.D.N.Y. Mar. 29, 2021))).

That argument is unpersuasive. NYCB admitted that its internal control suffered from four of five material weaknesses, such that there was "a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis." Compl. ¶ 181. Plaintiffs have also plausibly alleged that NYCB calculated at least some of its quarterly metrics in violation of GAAP. Moreover, Plaintiffs point to decisions by two out-of-circuit courts finding that subsequent admissions of material weakness in internal controls are largely sufficient to plead falsity of SOX certifications. *See Esfandiari v. Edgio Inc.*, No. 23-CV-00691 (PHX) (DJH), 2025 WL 2444072, at *6 (D. Ariz. Aug. 25, 2025); *Hedick v. Kraft Heinz Co.*, No. 19-CV-1339, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021). And notably, neither of those cases involved admissions of material

weaknesses as thorough and as broad as the admissions made by NYCB.

Finally, even assuming that Defendants could show that they lacked scienter with respect to these material weaknesses, SOX certifications, as with any opinion statements, can still be actionable if they were not based on "some meaningful [] inquiry" or do not "fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 188–89; *see New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 41 (2d Cir. 2023) (describing *Omnicare*'s holding as such). Plaintiffs have alleged that Defendants had broad knowledge of the deterioration of NYCB's portfolio based on, *inter alia*, the FDIC rejection of the Flagstar merger application, employees raising flags with problematic loans and errors in documentation, and the Officer Defendants' personal surreptitious dealings with Meridian brokers. "Such allegations, coupled with the later disclosure [of material weaknesses], suggest that 'the speaker kn[ew] or reasonably should [have] know[n] of different material facts' about [NYCB's] internal controls and accounting practices." *Gimpel v. Hain Celestial Group*, 156 F.4th 121,140 n.13. (2d Cir. 2025).

The Court thus finds that Plaintiffs have also sufficiently alleged that this category of misstatements was materially false or misleading.

C. <u>Scienter</u>

Under the PSLRA, a plaintiff must "state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This "state of mind requires a showing of intent to deceive, manipulate, or defraud, or recklessness." *Employees' Ret. Sys. Of Gov't of the Virgin*

*Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (citation modified). Recklessness under the PSLRA requires "an extreme departure from the standards of ordinary care. . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

"[P]laintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). For corporation defendants, "the pled facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). In other words, the Complaint must sufficiently allege scienter for an individual whose intent could be imputed to NYCB to establish scienter as to NYCB.

To establish scienter, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Rombach*, 355 F.3d at 176 (quoting *Rothman*, 220 F.3d at 90).

Plaintiffs cannot establish scienter through the second prong. Although it is "generally presume[d] that high-level corporate insiders, such as C-suite executives, have the opportunity to commit fraud," Plaintiffs have not established the requisite motive. *Hain*, 156 F.4th at 144 (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63,

74 (2d Cir. 2001)). The Complaint only alleges that Defendants Cangemi, Pinto, and Adams had a significant majority of their total compensation tied to NYCB's performance during 2022 and 2023. *See* Compl. ¶ 372 (noting that 67% to 80% of Defendants' total compensation was tied to NYCB's performance). However, "Plaintiffs [cannot] proceed based on motives possessed by virtually all corporate insiders," such as "the desire to maintain a high stock price in order to increase executive compensation." *Novak*, 216 F.3d at 307.

The Court thus turns to the first prong and considers whether the Complaint otherwise establishes "strong circumstantial evidence of conscious misbehavior or recklessness." *Rombach*, 355 F.3d at 176 (citation omitted). As an initial matter, Defendants misleadingly suggest that Plaintiffs are held to a higher standard under this prong due to the Complaint's failure to establish motive and opportunity, citing an excerpt from the Second Circuit's opinion in *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), that "[w]here motive is not apparent, . . . the strength of the circumstantial allegations must be correspondingly greater." *Id.* at 142 (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)). But the Second Circuit has made clear that a plaintiff's failure to satisfy the first prong "does not raise the bar for allegations made under the recklessness prong alone, which remains sufficient for establishing scienter if pleaded adequately." *Virtu*, 770 F. Supp. 3d at 524 (citing *ECA*, 553 F.3d at 198). The aforementioned excerpt from *Kalnit* suggests only the inverse: that motive itself can be strong circumstantial evidence, such that successfully pleading some level of motive would correspondingly diminish the

remaining burden for circumstantially proving recklessness. Plaintiffs are thus subject only to the ordinary circumstantial-evidence standard for showing scienter.

In considering whether Plaintiffs have adduced sufficient evidence under this prong, a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original). In so doing, the court "must consider plausible, nonculpable explanations for the defendant's conduct," but "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citation omitted). "[I]f a plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the tie goes to the plaintiff." *City of Brockton Ret. Sys. v. Shaw Grp.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (citation modified).

"At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 199 (citation modified) (quoting *Novak*, 216 F.3d at 311).

Plaintiffs advance their Exchange Act claims against four Officer Defendants,

as well as NYCB itself. The Complaint adequately pleads scienter as to all five Exchange Act Defendants. While Plaintiffs may lack specific smoking-gun evidence as to each individual Defendant for each individual category of misstatement, the Complaint presents an overwhelming amount of circumstantial evidence that senior management — which necessarily includes the Officer Defendants — was aware, or should have been aware, of the material weaknesses that NYCB admitted following the Class Period.

As a preliminary matter, there is no question that Defendants Cangemi, Pinto, and DiNello were aware of FDIC's opposition to the Flagstar Merger.[6] Defendants make no attempt to dispute this fact. Thus, the misstatements related to the Flagstar Merger, in which Defendants denied the existence of any regulatory problems with the merger or the significance of the national bank charter switch, were made with knowledge of their falsity or materially misleading nature.

As for the remaining misstatements regarding NYCB's internal controls, risk management, and loan review and asset quality, the Court analyzes the evidence of scienter presented in the Complaint by considering it within three broad categories: (1) direct allegations of Defendants' knowledge; (2) the "core operations" theory; and (3) individual circumstantial factors indicating scienter.[7]

1. Direct Allegations of Knowledge

---

[6] Defendant Adams is not alleged to have made any misstatements with respect to the Flagstar Merger.

[7] Similarly, Defendant DiNello is not alleged to have made any of the misstatements in the non-Flagstar Merger categories.

The Complaint includes several specific allegations that some or all of the Officer Defendants were personally aware of the various problems ailing NYCB.

For example, CW-1 stated that she produced a "Board Report" for Adams every month, which he would then use for a monthly presentation to NYCB's Board of Directors. Compl. ¶ 354. This Board Report "contained high-level information about all of the Company's loans," and CW-1 stated that "based on the specific questions that [Adams] asked about the loan portfolio," "he knew, he had to," about the deterioration of NYCB's loans. *Id.* ¶ 354. CW-6 also reported that Adams had an unusually close relationship with Meridian, the now-blacklisted commercial mortgage broker, and "would speak directly with Meridian management whenever NYCB gave any pushback to Meridian brokers." *Id.* ¶ 101. Relatedly, the Complaint alleges that Meridian originated a significant majority of NYCB's loans, *see id.* ¶¶ 97, 99, 356, despite multiple CW reports that Meridian engaged in fraudulent practices and that the CRE department "had no idea whether or not [Meridian's] numbers were accurate," *id.* ¶¶ 100, 102.

CW-3, who was employed in the Enterprise Risk Management Governance department, spent most of their tenure preparing an "Issue Management Report" summarizing the risk management issues at NYCB, including ones that were labeled "past due" and "critical." Compl. ¶ 93. This report was given to Cangemi and "other senior NYCB officials" shortly before CW-3's departure in the fall of 2022. *Id.* CW-1 also added that once NYCB became a Category IV bank, the increased OCC oversight was "the straw that broke the camel's back," and that senior management "freaking

knew" the problems with NYCB's loan portfolio and "just didn't care." *Id.* ¶ 94.

Furthermore, the Complaint refers to a *Bloomberg* report towards the end of the Class Period that stated that NYCB's shocking Q4 2023 metrics were a result of "behind-the-scenes conversations with" the OCC. *Id.* ¶ 7. Plaintiffs thus allege that the Officer Defendants were in talks with their onsite regulators regarding the problems at NYCB, leading to, among other things, the secret removal of the company's Chief Risk Officer and Lead Audit Executive. *Id.* ¶ 367; *see* Opp'n at 48–49.

Standing alone, these direct allegations are insufficient to establish scienter as to the Officer Defendants. The evidence here is strongest with respect to Adams, as the Complaint puts forth numerous CW statements describing his suspicious relationship with brokers at Meridian, which supplements CW-6's allegation that Adams "had to" have known about problems with NYCB's portfolio. Compl. ¶ 354. However, with respect to the other Officer Defendants, it is not enough for Plaintiffs to describe their "high-ranking positions" or the fact that they generally "monitored" the financial conditions at NYCB. *Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) (summary order). Instead, the complaint must allege "particularized facts suggesting that defendants actually possessed information contradicting their public statements." *Id.* "Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support" an inference of scienter. *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 244 (S.D.N.Y. 2010); *see Schiro v.*

*Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305–06 (S.D.N.Y. 2019); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (finding insufficient a confidential witness statement that "merely parrots the conclusory allegations contained in the complaint").

Nevertheless, the allegations here still contribute to (and permit) an ultimate inference of scienter. Where defendants make specific statements about the subjects of the alleged misstatements, as is the case here, courts have found "strong circumstantial evidence that [those individuals] were receiving some form of specific information" on those same subjects. *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012); *see Ambac*, 693 F. Supp. 2d at 268 ("[I]t strains credulity that [the CFO] could remain ignorant of the company's lowered underwriting standards while . . . other senior managers were aware of them[,] . . . . and [he] played an active role in assuring investors of Ambac's continued commitment to conservative underwriting."). Similarly, "common sense dictates that a company's senior executives would have become aware of questions raised by [regulators] about internal controls over financial reporting weeks or even months before those matters were ultimately disclosed to the public." *Diabat v. Credit Suisse Grp. AG*, No. 23-CV-5874 (CM), 2024 WL 4252502, at *145 (S.D.N.Y. Sep. 19, 2024).

2. Core Operations

The Complaint also argues scienter through the "core operations" theory and related doctrines. Under the "core operations" theory, courts may "draw an inference

of scienter where the misrepresentation and omissions allegedly made by defendants were about their 'core operations.'" *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 n.10 (S.D.N.Y. 2015); *accord Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772 (S.D.N.Y. 2021). To be sure, it is yet unclear to what extent this doctrine survived the enactment of the PSLRA. *See City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 18-CV-10330 (JPO), 2020 WL 2834857, at *4 (S.D.N.Y. June 1, 2020) (citing cases expressing skepticism of the doctrine's vitality). However, although the Second Circuit has not resolved the question of whether scienter can be adequately pled "on the basis of the 'core operations' doctrine alone," *Frederick v. Mechel OAO*, 475 F. App'x 353, 356 n.5 (2d Cir. 2012) (summary order), it is evident that it can at least provide supplemental support for the inference of scienter, *see Hain*, 156 F.4th at 148 n.19 (again reserving on the question but affirming at least that "the size of the alleged fraud, coupled with its importance to [the company]'s operations, provides supplemental support for the [p]laintiffs' other sufficiently pled allegations of scienter"); *see also Lipow*, 131 F. Supp. 3d at 163 n.11 (noting that "the majority" of courts within the Second Circuit have found "that the 'core operations' doctrine may provide support for but not an independent basis of scienter").

Furthermore, even without invoking the core operations doctrine, courts have made clear that "the size of the alleged fraud 'can be relevant to the scienter inquiry,' provided it is 'presented in tandem with other circumstantial evidence to suggest scienter.'" *In re Pareteum Sec. Litig.*, No. 19-CV-9767 (AKH), 2021 WL 3540779, at

*17 (S.D.N.Y. Aug. 11, 2021) (quoting *In re Iconix Brand Grp., Inc.*, No. 15-CV-4860 (PGG), 2017 WL 4898228, at *17 (S.D.N.Y. Oct. 25, 2017)); *see Scholastic Corp.*, 252 F.3d at 77 ("[T]he combined total of $24 million in special charges during the third and fourth quarters undermines, at the pleading stage, the argument that defendants were unaware of the sharp increases in Goosebumps returns . . . ."); *Rothman*, 220 F.3d at 92 (agreeing with appellants' claim that "GT's $73.8 million write-off support[ed] its claim of fraudulent intent").

Here, there is little doubt that NYCB's risk management and loan quality were critical to the company's operations, a fact that Defendants do not attempt to dispute. As Plaintiffs note in their opposition, CRE loans constituted 70–90% of NYCB's business, *see* Compl. ¶ 36, and NYCB's failure in risk management ultimately led to a 70% stock price decline in three months, ousted leadership, and "near-total failure, only to be bailed out by an emergency, $1 billion capital infusion," Opp'n at 51; *see* Compl. ¶¶ 163–164, 374. Indeed, these facts are far more favorable for Plaintiffs than those present in Defendants' only case to the contrary on this point, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994), where the Second Circuit found that "a dimming of the company's prospects" showed "that the defendants should have been more alert and more skeptical, but" not that "management was promoting a fraud." *Id.* at 1129.

For example, in *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16 (S.D.N.Y. 2019), plaintiffs alleged that Lexmark engaged in "channel stuffing" a cumulative $50 to $70 million worth of inventory, *id.* at 38, which

led to "Lexmark's stock price plummet[ing] 20% from $47.32 per share . . . to $37.75 per share," *Id.* at 27. The court there found that "the magnitude of the aftershock suggest[ed] more than a careless mistake or trivial miscalculation by Lexmark and its executives." *Id.* at 38. The aftershock here is considerably greater, as NYCB's fraud pertained to nearly its entire loan portfolio, suffered a far steeper decline in stock price, experienced a deposit outflow of $6 billion in just one month in 2024, and only remained afloat due to a $1 billion external capital injection.

Moreover, Defendants repeatedly made specific, substantive statements on these issues, both proactively and in direct response to investor concerns. Returning to just a few examples of what has already been described at length: Defendants stated at various points that NYCB had "a very good risk management plan" with "significant lines available" "in the event if [NYCB] had to pull a liquidity situation," Compl. ¶ 242 (Cangemi); that NYCB had "a significant stress testing group that [they had] put in place a long time ago" in preparation for Category IV classification, *id.* ¶ 252 (Pinto); that NYCB's percentage of NPLs as a percentage of total loans was many times lower than that of peer banks, *e.g.*, *id.* ¶¶ 260, 269, 281; that Defendants "ha[dn't] seen any negative trends" as "originally expected coming out of the pandemic," *id.* ¶ 285 (Pinto); that the increase in NPLs in Q1 2023 was due to the Signature acquisition, *id.* ¶ 316 (Cangemi); and that management was "monitoring the rent-regulated properties closely, but [that] there's not really a lot of cracks in that portfolio that is really raising anything for us," *id.* ¶ 335 (Adams).

Thus, given Defendants' "numerous public comments" on the subjects of risk

management and loan quality, "this Court can reasonably conclude either that Defendants [had] access to information regarding [those issues], or that [D]efendants were recklessly indifferent to the truth or falsity of their [] statements." *In re Avon Sec. Litig.*, No. 19-CV-01420 (CM), 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019); *see also General Electric*, 857 F. Supp. 2d at 395–96 (finding that the defendant "must have educated himself regarding GE Capital's financial health" because he "was able to give detailed accounts regarding the delinquency rates in the consumer portfolio . . . , about the average size of each debt, about the average size of GE Capital's loans, about the location of GE's borrowers, and about the size of GE Capital's loan loss reserves").

Finally, the Court notes the obvious fact that here, NYCB admitted after the fact that it was operating with material weaknesses pertaining to internal controls, risk management, and loan review and assessment. While this admission alone does not establish scienter, "[j]ust as [the Second Circuit's] cases have relied on post-class period data to confirm what a defendant should have known during the class period," *Scholastic Corp.*, 252 F.3d at 72, post-class period admissions can be used to infer a defendant's prior knowledge, as holding otherwise would "reward [defendants] for their successful concealment of their wrongdoing," *Vivendi*, 381 F. Supp. 2d at 181; *see also Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir. 1982) ("The jury could properly infer [scienter] from subsequent admissions of misrepresentations, coupled with the defendants' continuous intimate knowledge of company affairs.").

Thus, in light of Defendants' repeated, targeted statements on NYCB's risk

management, internal controls, and asset quality, and the centrality of those matters to the operations of NYCB, the Court agrees with Plaintiffs that it is "'virtually inconceivable' that [Defendants] were unaware" of the underlying issues at the company. *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 441 (S.D.N.Y. 2025).

3. Other Individual Circumstantial Factors

To resolve any remaining ambiguity, the Court also notes a range of other factors included in the Complaint that provide additional support for an inference of scienter.

First, in the weeks leading up to and following the disclosures, NYCB purged huge swaths of its management (including Defendants Pinto, Adams, and Cangemi): its CEO, CFO, general counsel, eight Board members, and five of the seven members of the Credit Committee, Compl. ¶¶ 168–171, which NYCB's new CEO Otting stated was "part of an effort 'of holding people accountable' 'for material weaknesses and other items associated with the company,'" *id.* ¶ 174. Notably, following the Class Period, NYCB's Compensation Committee slashed Cangemi's, Pinto's, and Adams's compensation by 42%, 50%, and 56%, respectively, citing "the serious risk management issues that emerged in the 4th quarter of 2023." *Id.* ¶ 372.

In response, Defendants simply invoke the well-established principle that "terminations or resignations of corporate executives are insufficient alone to establish an inference of scienter." *In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20-CV-4420 (PAE), 2021 WL 4341500, at *23 (S.D.N.Y. Sep. 22, 2021). But of course,

here, Plaintiffs have offered far more than this personnel exodus to establish scienter. Moreover, the magnitude of departures here was greater than is typical of even a company in significant distress. For example, in *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300 (S.D.N.Y. 2024), the court found that the departures of the company's CEO, CFO, and a senior VP, followed by three other executive resignations, "were too many departures to say that they were coincidental with a straight face." *Id.* at 322. And in *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017), the court found comScore's later disclosure in its Form 8-K that "one of its remedial measures for improving accounting and internal control practice included separating certain personnel" to be persuasive evidence that the resignation of three executives was tied to their knowledge of the alleged fraud. *Id.* at 553. Here, not only is the change in personnel greater in number than in both those cases, but the Complaint includes allegations directly tying the executive exodus to scienter, as Otting expressly stated that the Officer Defendants' departures "were part of an effort 'of holding people accountable' 'for material weaknesses and other items associated with the company.'" Compl. ¶ 174.

Next, the temporal proximity between Defendants' alleged misstatements, as late as October 26, 2023, and NYCB's February 2024 disclosures of material weaknesses, also supports an inference of scienter. Defendants again point out that "proximity alone, without corroborative evidence, is insufficient to give rise to a strong inference of scienter." *Bettis v. Aixtron SE*, No. 16-CV-00025 (CM), 2016 WL

7468194, at *16 (S.D.N.Y. Dec. 20, 2016). Yet once again, "[i]t is [nevertheless] true that the temporal proximity between an allegedly false statement and a later corrective or inconsistent statement can be relevant to the question of scienter." *Id.*; *see Pareteum*, 2021 WL 3540779, at *16 ("The proximity and size of the restatements, just seven months after the Individual Defendants['] firm and rosy representations of revenue, backlog, and realization add further strength to the strong circumstantial evidence of scienter.")

Finally, the Complaint alleges that NYCB violated GAAP in calculating its loan loss reserves. Under Second Circuit law, it is clear that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak*, 216 F.3d at 309. However, where, as here, Plaintiffs allege a variety of other indicia of scienter, that Defendants violated GAAP in calculating their metrics provides additional support for that inference. *See, e.g.*, *In re Winstar Commc'ns*, No. 01-CV-11522, 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006) ("An auditor's reckless disregard of red flags, coupled with allegations of GAAP and GAAS violations, is sufficient to support a strong inference of scienter."); *Peifa Xu v. Gridsum Holding Inc.*, No. 18-CV-3655 (ER), 2020 WL 1508748, at *12 ("Violations of GAAP and other accounting policies, along with allegations of 'corresponding fraudulent intent,' can show scienter." (citation omitted)).

Ultimately, "[u]nlike the atomized approach to scienter [Defendants] urge[] this Court to adopt, no single allegation need conclusively establish scienter." *Pennsylvania Public Sch. Employees' Ret. Sys. v. Bank of America Corp.*, 939 F. Supp.

2d 445 (S.D.N.Y. 2013). In combination, the factors discussed above support the conclusion that the Complaint has sufficiently established scienter as to each Officer Defendant. And because courts "readily attribute[] the scienter of management-level employees to corporate defendants," so it follows that the Complaint has also established scienter as to NYCB. *In re Marsh & Mclennan*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006).

D. Loss Causation

The Court next finds that Plaintiffs have adequately pled loss causation. Under the PSLRA, a plaintiff has "the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C.A. § 78u-4(b)(4). Plaintiffs can meet this burden "either by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–233 (2d Cir. 2014) (citation modified). "To plead loss causation through a corrective disclosure, plaintiffs must establish that the latter disclosure revealed to the market the falsity of the prior disclosure and that the market reacted negatively to the revelation that that prior disclosure had been false." *AppHarvest*, 684 F. Supp. 3d at 273 (citation modified) (quoting *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 267 (S.D.N.Y. 2021)).

Notably, "there is no heightened pleading standard" for loss causation, *Hain*,

156 F.4th at 151, and the "Plaintiffs' burden is not a heavy one," *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). Defendants attempt to dispute the pleading standard, but they rely on authorities that pre-date the Second Circuit's decision in *Hain*. *See, e.g.*, *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 432 n.9 (S.D.N.Y. 2010) (noting that "the Second Circuit has yet to decide whether loss causation must be pled with the specificity required by Rule 9(b)"). It is now clearly established that loss causation is subject only to Rule 8(a) notice, not the standards under Rule 9(b). *See Huey v. Anavex Life Sciences Corp.*, 180 F.4th 56, 72–73 (2d Cir. 2026) ("Our Court has held, however, that loss-causation pleadings are not subject to th[e] heightened requirements [of Rule 9(b)].").

Accordingly, "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters Pension*, 750 F.3d at 233 (emphasis in original). "Generally, plaintiffs sufficiently plead loss causation when they allege that their share's 'price fell significantly after the truth became known' through an express, corrective disclosure." *Abramson*, 965 F.3d at 179 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

Such is the case here. Plaintiffs identify four separate disclosures: NYCB's January 31, 2024 disclosure reporting a quarterly net loss of $193 million and an increased PCL of $552 million, Compl. ¶¶ 125–126; the February 5, 2024, *Bloomberg* article revealing the departure of risk management executives as well as the fact that NYCB's Q4 2023 metrics "reflected a previously unreported deterioration in the

Bank's loan quality," *id.* ¶¶ 137–138; the February 22, 2024, *Better Markets* report revealing FDIC's rejection of the Flagstar Merger and NYCB's subsequent "blatant regulatory arbitrage," *id.* ¶¶ 151–152; and NYCB's ultimate Form 8-K/A on February 29, 2024 disclosing that NYCB had identified material weaknesses and increasing NYCB's previously reported 2023 net loss from $252 million to $2.71 billion, *id.* ¶ 153. All of these disclosures were followed by significant declines in NYCB's stock price. *See id.* ¶¶ 128, 141–142, 159.

In opposition, Defendants primarily rely on cases at different stages of litigation, in which with different burdens of proof apply. *See* Mot. at 50–53; *see, e.g.*, *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) (class certification stage); *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1142 (10th Cir. 2009) (summary judgment stage). Regardless, on the merits, Defendants' sole argument is that the Complaint fails to establish a strong enough "match" between the alleged disclosures and misstatements. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008) ("The relevant inquiry for loss causation purposes is whether the disclosure in question made some part of a previously undisclosed truth known.").

Defendants challenge all four of the alleged disclosures, but the Court need not analyze each one, as it is clear for purposes of assessing loss causation that (1) the February 22, 2024 *Better Markets* report revealing FDIC opposition to the Merger; and (2) NYCB's Form 8-K admission of material weaknesses are sufficiently linked to the alleged misstatements in this case. The *Better Markets* disclosure was the first

time that it was revealed to the public that the FDIC had opposed the Flagstar Merger, the subject of the first category of alleged misstatements by Defendants. Compl. ¶ 151. The Form 8-K admission of material weaknesses directly addresses and ties to the other three categories of misstatements. *Id.* ¶ 153. Plaintiffs' allegations thus easily fulfill the requirement that the "disclosure must somehow reveal to the market some part of the truth regarding the alleged fraud." *Take-Two*, 551 F. Supp. 2d at 285; *see Hain*, 156 F.4th at 151 (finding, in just a single sentence, that plaintiffs sufficiently pled loss causation: "As the Plaintiffs have alleged declines in Hain's stock price following Hain's negative disclosures, the Plaintiffs have met the pleading standard").

Plaintiffs have thus adequately pled a claim for fraud under Section 10(b) of the Exchange Act.

E. Control Person Liability

Plaintiffs also sufficiently plead control-person liability for the Officer Defendants under the Exchange Act. Section 20(a) of the Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To state a claim under this section, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension*, 750 F.3d at 236

(quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)). The Complaint alleges that the four Officer Defendants are liable for the violations of NYCB under this provision. Compl. ¶¶ 407–412.

The Court agrees that Plaintiffs have met their burden here. As already established, NYCB is liable under the Exchange Act as a primary violator for its misstatements. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). "Allegations of control are not averments of fraud and therefore need not be pled with particularity." *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 165 (E.D.N.Y. 2020) (quoting *In re Veon Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2018 WL 4168958, at *21 (S.D.N.Y. 2018)). "[C]orporate officers usually are presumed to possess the ability to control the actions of their employees." *Id.* (quoting *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013)); *cf. F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 (S.D.N.Y. 2014) ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." (quoting *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008))).

Here, there is little doubt that the Officer Defendants exercised considerable control over NYCB's operations. Cangemi, Pinto, and Adams occupied traditional

officer positions at NYCB, and Cangemi and Pinto signed a variety of statements and reports on behalf of NYCB. "Section 20(a) 'provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act.'" *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 59 (2d Cir. 2025) (quoting *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 152 (2d Cir. 2021)). DiNello, while not technically an officer of NYCB, was President and CEO of Flagstar, and regularly spoke on behalf of NYCB at investor calls during the relevant period of his and NYCB's alleged misstatements, leading up to the Merger. *See, e.g.*, Compl. ¶¶ 227, 229, 234. Courts routinely find control-person liability for such individuals with little analysis. *See, e.g.*, *In re Zeta Glob. Holdings Corp. Sec. Litig.*, --- F. Supp. 3d ----, No. 24-CV-8961 (DEH), 2026 WL 1971169, at *13 (S.D.N.Y. July 8, 2026) ("That Gore and Hayes were given authority to be spokespeople on behalf of Zeta on these topics, combined with their respective job descriptions, suggests a sufficient level of control for purposes of this stage of the litigation.").

In opposition, Defendants cite cases in which courts found that merely occupying a director position is not sufficient for control-person liability under Section 20(a). But these cases are readily distinguishable, as they involve individuals who were not actually part of the issuing entity. *See Sloane Overseas Fund, Ltd. v. Sapiens Intern. Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (evaluating control-personal liability for a non-issuer manager of the securities offering); *In re Glob. Crossing Ltd. Sec. Litig.*, No. 02-CV-910 (GEL), 2005 WL 1907005, at *13

(S.D.N.Y. Aug. 8, 2005) (evaluating liability for non-issuer minority shareholder corporations); *see id.* at *13 ("Neither is status as a minority shareholder sufficient 'by itself to infer control.'" (citation omitted)). Indeed, in *Sloane*, the court explicitly recognized that traditional corporate officers possess "status from which control can be directly inferred without more, provid[ing] a sufficient basis to show control liability." 941 F. Supp. at 1378.

Finally, the Complaint establishes the "culpable participation" prong because, as analyzed above, it establishes scienter as to each of the Defendants. "[A]llegations of scienter necessarily satisfy the [culpable participation] requirement." *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004).

The Court thus finds that Plaintiffs have sufficiently established control-person liability for the Officer Defendants.

## II. Securities Act Claims

The Court now turns to the Complaint's claims under the Securities Act. On behalf of all persons or entities who acquired NYCB common stock in exchange for Flagstar securities pursuant to the Flagstar Merger, Plaintiff Indiana Public Retirement System ("IPRS" or hereinafter "Plaintiff") alleges claims of negligence and strict liability under Section 11 and Section 12 of the Securities Act against thirteen directors/corporate officers who contributed to and signed the Offering Documents (the "Signer Defendants") and NYCB (hereinafter "Defendants").[8] The "Offering

[8] The Signer Defendants are so designated because liability under Section 11 statutorily extends to "(1) signatories of the registration statement; (2) directors or partners of the issuer at the time of filing; [and] (3) persons consenting to be named

Documents" refer to a number of forms filed with the SEC in relation to the Flagstar Merger, including a preliminary registration statement, a joint proxy statement and prospectus, a Form 8-K announcing an April 26, 2022 amendment to the merger agreement, and post-effective amendments to the registration statement. *See* Compl. ¶¶ 439–448. The Complaint alleges a violation of Section 11 as to the Signer Defendants, and a violation of Section 12 as to NYCB.

Section 11 of the Securities Act provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue.

15 U.S.C. § 77k(a). Section 12(a)(2) similarly "imposes liability on any person who offers or sell securities by means of a prospectus containing material misstatements." *Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005); *see* 15 U.S.C. § 77*l*(a)(2). "It provides redress similar to what Section 11 provides 'where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 539 (E.D.N.Y. 2025) (quoting *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)).

Pursuant to these two Sections, Plaintiff brings claims of strict liability and

---

as about to become a director or partner." *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 175 (2d Cir. 2011). All of the Signer Defendants meet at least one of these three qualifications. Compl. ¶¶ 421–434.

negligence against NYCB and the Signer Defendants, each of which arise from the statements contained in the Offering Documents. The only element of these claims in significant dispute is whether the Offering Documents "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Morgan Stanley*, 592 F.3d at 358–59 (quoting 15 U.S.C. § 77k(a)). And because there is significant overlap between the alleged misstatements under the Complaint's Exchange Act claims and those under the Securities Act claims, the parties here largely incorporate by reference their arguments under the Exchange Act claims. Accordingly, much of the Court's analysis of Plaintiff's Securities Act claims is controlled by its findings as to the Exchange Act claims.

A. Alleged Misstatements Under the Securities Act

The Court here briefly summarizes the misstatements identified in the Complaint for purposes of the Securities Act claims. Many of these misstatements are ones that were also identified as misstatements for the Exchange Act claims. The Complaint includes certain unique statements included in the Offering Documents, but the parties do not appear to dispute that the substance and context of the statements, as well as the allegations of their materially misleading nature, remain largely the same as are at issue with the Exchange Act claims.

First, the Complaint identifies the statements contained in the Prospectus, Registration Statement, and Form 8-K related to the Flagstar Merger, which denied any knowledge of any problems with gaining regulatory approval from the FDIC or

otherwise. Compl. ¶¶ 452, 453. These were identified as misstatements for the Exchange Act claims.

Defendants also made and/or adopted various statements in Form 10-K's and Form 10-Q's touting management's involvement in risk management, NYCB's strong asset quality, and the company's exercise of effective internal controls. *See, e.g.*, *id.* ¶ 455 ("The Company's and the Bank's Board of Directors are actively engaged in the process of overseeing the efforts made by the Enterprise Risk Management department . . . . Internal controls and ongoing monitoring processes capture and address heightened risks that threaten the Company's ability to achieve [its] goals and objectives."); *id.* ¶ 460 ("[O]ur Board devotes significant attention to the oversight of risks inherent in our banking business . . . ."); *id.* ¶ 462 (touting NYCB's "consistent record of exceptional asset quality"); *id.* ¶ 471 ("Based upon that evaluation, the [CEO] and [CFO] concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this annual report."). Similarly, most of these misstatements were also identified for purposes of the Exchange Act claims.

Finally, Defendants at various points certified that NYCB's SEC filings "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act." *Id.* ¶¶ 470, 473.

The Complaint generally alleges that in these documents, Defendants were required to disclose the material weaknesses that NYCB eventually admitted in February 2024, but failed to do so. *See, e.g.*, *id.* ¶ 468.

B. Standing

As a threshold matter, Defendants argue that IPRS failed to adequately plead standing. Section 11 requires a plaintiff "to plead and prove that [it] purchased shares traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023). "In order to have standing under [Section 12], . . . plaintiffs must have purchased securities directly from the defendants." *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013). Both requirements are satisfied where a plaintiff holds a company's shares, and a merger converts that company's shares into another's. *See Arqit Quantum Inc.*, 774 F. Supp. 3d at 530–31, 538; *In re Hub Cyber Sec. Ltd.*, No. 23-CV-5764 (AS), 2025 WL 872078, at *8, 10 (S.D.N.Y. Mar. 20, 2025).

That is the case here. The Complaint alleges that IPRS "purchased or otherwise acquired over 145,000 shares of NYCB common stock during the Class Period, including 44,435 shares of NYCB traceable to the Offering when Indiana's shares of Flagstar common stock were converted into NYCB shares pursuant to and traceable to the Offering Documents." Compl. ¶ 22.

Defendant's sole argument in opposition is that Plaintiff's attached certification in support of the Complaint indicates that the 44,435 shares of NYCB were acquired through "[p]urchases," rather than an exchange. Compl. Ex. A, ECF No. 69-1. This is a frivolous objection. It is well settled that an exchange of stock pursuant to a merger is equivalent to a "purchase" under securities law. *See Arqit Quantum*, 774 F. Supp. 3d at 538 ("[I]n the Merger, Plaintiff [] exchanged his

Centricus ordinary shares in exchange for Arqit securities, which straightforwardly fits within the definition of a 'sale' under the Securities Act."); *Hub*, 2025 WL 872078, at *10 ("The '[c]oncepts of purchase and sale are to be construed flexibly in order to accomplish the purpose of the securities laws.") (quoting Thomas Lee Hazen, 3 *Treatise on the Law of Securities Regulation* § 12:22 (2024))); *Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) ("A transaction need not involve cash to constitute a purchase or sale under Rule 10b-5."). Plaintiff has thus adequately pled standing.

C. Pleading Standard

The Court now turns to the merits of the Securities Act claims. The parties first dispute whether Rule 9(b)'s heightened pleading standard for fraud applies to Plaintiff's Securities Act claims of negligence and strict liability. The Court holds that it does not.

"Although claims under Section 11 and 12(a) of the Securities Act ordinarily need only to satisfy the basic notice pleading requirements of [Rule 8(a)], 'allegations that sound in fraud are subject to the heightened pleading standard of [Rule 9(b)] even though scienter is not an element of the Securities Act claims.'" *Ohio Public Emps. Ret. Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 495 n.14 (S.D.N.Y. 2024) (quoting *IAM Nat'l Pension Fund v. Farfetch Ltd.*, No. 21-CV-2752, 2023 WL 2879304, at *1 (2d Cir. Apr. 11, 2023) (summary order)). In other words, "claims that . . . rely upon averments of fraud are subject to the test of Rule 9(b)," regardless of how those claims are "styled or denominated," because the wording of Rule 9(b) "is

cast in terms of the conduct alleged." *Rombach*, 355 F.3d at 171.

Here, the substance of the Complaint's Securities Act allegations is indeed similar to that of its allegations as to the Exchange Act claims. Plaintiff argues that the Flagstar Merger documents were misleading in light of Defendants' knowledge of FDIC opposition to the Merger, and that the statements regarding NYCB's risk management, asset quality, and internal controls were misleading in light of the admitted material weaknesses following the Class Period. *See generally* Compl. ¶¶ 452–490. However, the Complaint clearly segregates the allegations of negligence and strict liability under the Securities Act from the Exchange Act claims, and "expressly disclaims any allegations of fraud or intentional misconduct in connection with these non-fraud claims." *Id.* ¶ 414.

In *Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 WL 4588491 (2d Cir. Oct. 28, 2024) (summary order), the Second Circuit found that when a Complaint "expressly disclaims fraud, scienter, and the intent of Defendants to defraud investors and painstakingly segregates the fraud and negligence claims," the Securities Act claims are subject only to the Rule 8 pleading standard. *Id.* at *2; *see also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 448 (S.D.N.Y. 2017) ("Where a plaintiff expressly disclaims allegations of fraud and affirmatively alleges negligence, this is generally sufficient to relieve the plaintiff of Rule 9(b)'s requirements."); *In re Royal Bank of Scotland Grp. plc Sec. Litig.*, No. 09-CV-300 (DAB), 2012 WL 3826261, at * 5 & n.2 (S.D.N.Y. Sep. 4, 2012) (finding an express disclaimer of fraud sufficient to apply the Rule 8(a) standard to plaintiffs' Securities Act claims), *aff'd sub nom.*

*Freeman Grp. v. Royal Bank of Scotland Grp. PLC*, 540 F. App'x 33 (2d Cir. 2013). That applies to Plaintiff's claims here.

Defendants note only that "[c]ourts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient." *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006). But here, Plaintiff does far more than include a "simple disclaimer of fraud." Indeed, Defendants do not point to a single example or allegation in the section of the Complaint alleging the Securities Act claims that suggests that Plaintiff is relying on a theory of fraud, as would be required to apply the Rule 9(b) standard. The language of the allegations here instead reflects what would be expected in claims of negligence and strict liability. *See, e.g.*, Compl. ¶ 454 ("the Securities Act Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding this subject"); *id.* ¶ 468 ("The obligations of Item 303 and 105 required the Offering Documents to disclose . . . .).

Ultimately, even granting that so-called magic words would likely be insufficient to disclaim the Rule 9(b) standard, the Court here finds no evidence that the Complaint has invoked a theory of fraud in alleging its Securities Act claims. *See In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021) (applying the Rule 8(a) standard to plaintiffs' Securities Act claims where "[p]laintiffs d[id] not simply rely on a blanket disclaimer to cordon off their claims into fraud and negligence[ and] pled each allegation separately"). Therefore, the Rule 8(a) pleading standard applies to Plaintiff's Securities Act claims.

D. <u>Merits</u>

The Court finally turns to the merits of Plaintiff's Securities Act claims. Defendants argue that the alleged misstatements identified here were not false or materially misleading by incorporating by reference their defenses of puffery, inactionable opinion, and the PSLRA safe harbor as to the Exchange Act misstatements. For the reasons already set forth in Section I.B *supra*, these arguments fail, especially in light of the Rule 8(a) pleading standard, which does not require the heightened particularity of pleading for fraud. And indeed, even beyond the lower pleading standards for materiality, "unlike securities fraud claims pursuant to [the Exchange Act], plaintiffs bringing claims under section 11 and section 12(a)(2) [of the Securities Act] need not allege scienter, reliance, or loss causation." *Morgan Stanley*, 592 F.3d at 359.

Separately, the Complaint also alleges Securities-Act liability based on omissions of required disclosures under Items 303 and 105 of Regulation S-K, 17 C.F.R. §§ 229.303, 105. Item 303 requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303. Item 105 requires disclosure of "the material factors that make an investment in [the Merger] speculative or risky" and an explanation of "how each risk affects the registrant or the securities being offered." *Id.* § 229.105. Plaintiff alleges that the failure to disclose FDIC opposition to the merger, as well as NYCB's weaknesses in its risk management, loan review, and internal controls, all violated these regulations, separately triggering liability under the Securities Act.

"Omissions of required disclosures under either Items 303 or 503 of Regulation S-K give rise to liability under the Securities Act." *Sharma v. Rent the Runway, Inc.*, 751 F. Supp. 3d 82, 102 (E.D.N.Y. 2024) (citation omitted). Whether an omission is actionable depends on its materiality, and "[t]he definition of materiality is the same for these Securities Act provisions as it is under section 10(b) of the Exchange Act: Whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Morgan Stanley*, 592 F.3d at 360 (citation omitted). As such, the Court's earlier conclusions as to the materiality of the omissions regarding FDIC opposition to the Merger, NYCB's inadequate risk management, poor asset quality, and ineffective internal controls are equally applicable here. Plaintiff has adequately pled claims of negligence and strict liability under the Securities Act.

E. <u>Control-Person Liability</u>

Finally, Plaintiff also alleges control-person liability against the Signer Defendants. Section 15 of the Securities Act, 15 U.S.C. § 77o, extends liability against "[e]very person who, by or through stock ownership, agency or otherwise . . . controls any persons liable under section 11." Defendants do not dispute that all the Signer Defendants were officers or directors of NYCB, and that they signed the Registration Statement alleged to contain false or misleading statements. That is sufficient to establish control-person liability under Section 15. *See, e.g.*, *In re CIT Grp. Inc. Sec. Litig.*, No. 08-CV-6613 (BSJ), 2010 WL 2365846, at *8 (S.D.N.Y. June 10, 2010); *Sharma*, 751 F. Supp. 3d at 121–122 ("[T]he act of signing a registration statement . . . is a manifestation of the signer's responsibility

of the information contained in the document and, therefore, sufficient to establish 'control person' status [under Section 15]." (citation omitted)).

Plaintiff has thus sufficiently pled each of its claims under the Securities Act.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is denied in its entirety.

SO ORDERED.

*/s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated: September 29, 2026
Brooklyn, New York